UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                   Plaintiff,<br><br>     v.<br><br>APPROXIMATELY 127,271 BITCOIN ("BTC") PREVIOUSLY STORED AT THE VIRTUAL CURRENCY ADDRESSES LISTED IN ATTACHMENT A, AND ALL PROCEEDS TRACEABLE THERETO,<br><br>                 Defendant *In Rem*. | Civil Action No. 25-5745 (RPK) |

**NOTICE OF VERIFIED CLAIM AND STATEMENT OF INTEREST
OR RIGHT IN PROPERTY SUBJECT TO FORFEITURE *IN REM***

Claimants are nearly 2,300 victims of state-sponsored terrorism (the "*Fritz* Victims"), who collectively hold more than $23 billion in judgments against the Islamic Republic of Iran ("Iran"), including more than $9.1 billion in compensatory damages, under 28 U.S.C. § 1605A and its predecessor statute, 28 U.S.C. § 1605(a)(7).[1] As detailed in the *Fritz* Victims' pending turnover proceeding, *Fritz v. Iran and China Investment Development Group d/b/a Lubian.com*, No. 25-cv-07093 (E.D.N.Y.) ("*Fritz* Suit"), and summarized herein, the Defendant Cryptocurrency at issue in this forfeiture action is property of the Iran and China Investment Development Group ("Iran-China Group").

The Iran-China Group, doing business on the blockchain as Lubian.com or LuBian, is an agency or instrumentality of Iran that has materially supported that country's efforts to evade Western sanctions by mining cryptocurrency in Iran. Through this scheme, Iran converts

---

[1] A full list of Claimants and the compensatory damages they have been awarded is included as Attachment A to the Verification of the *Fritz* Victims' Claims.

1

sanctioned Iranian oil and gas into electricity, which miners then use to generate cryptocurrency for the Iranian government to use outside the traditional global banking systems.

Under the Terrorism Risk Insurance Act ("TRIA"), the *Fritz* Victims have the right to attach and execute on the property of Iran and its agencies and instrumentalities, including the Iran-China Group, "[n]otwithstanding any other provision of law." Accordingly, the *Fritz* Victims hereby assert their superior interest in all of the Defendant Cryptocurrency, or at least so much as may ultimately be necessary to satisfy the outstanding compensatory damages, plus post-judgment interest, on their judgments, which TRIA makes senior to any interest that the government or other claimants could assert.[2] In support of this Notice, the *Fritz* Victims state as follows:

**I.  The *Fritz* Victims Have Been Awarded Over $23 Billion Against Iran.**

1. The *Fritz* Victims are thousands of individuals who are direct victims or the surviving family members of victims of Iranian-sponsored terrorism. Their lives were forever altered by the 2006 and 2007 kidnapping and murders of U.S. service members on deployment in Iraq (the "Iraq Abductions and Murders"), the 2001 Hamas bombing of a Sbarro restaurant in Jerusalem, Israel (the "Jerusalem Bombing"), the 1998 al Qaeda bombings on the U.S. embassies in Tanzania and Kenya (the "Embassy Bombings"), and the 1983 Hezbollah bombing of the U.S. Marine barracks in Beirut, Lebanon (the "Beirut Bombing").

2. The U.S. District Court for the District of Columbia (the "D.C. District Court") has repeatedly determined that Iran is liable to the *Fritz* Victims for their suffering and has awarded them more than $23 billion in damages, including over $9.1 billion in compensatory damages.

---

[2]  Because the value of Bitcoin can vary widely from day-to-day, the amount of Bitcoin necessary to satisfy the *Fritz* Victims' judgments cannot be fully determined until the Bitcoin is transferred or otherwise liquidated in satisfaction of the judgments.

### A. The Iraq Abductions And Murders.

3. In October 2006 and January 2007, four U.S. soldiers—Ahmed Al-Taie, Jacob Fritz, Johnathan Chism, and Shawn Falter—were abducted and murdered in Iraq by a terrorist organization that relies on training, funding, and support from Iran.[3]

4. In March 2015, the estates and family members of the four kidnapping and murder victims brought suit against Iran for that country's role in those crimes.[4] The D.C. District Court entered a default judgment against Iran and awarded damages in the amount of $248,948,689.[5]

### B. The Jerusalem Bombing.

5. In August 2001, an operative of the militant Islamic group Hamas detonated a bomb at a Sbarro restaurant in Jerusalem, Israel. Iran provided Hamas with support and encouragement to carry out the attack. It killed 15 people, including 15-year-old U.S. citizen Malka Roth.

6. In July 2011, the Roth family brought suit against Iran for that country's role in the bombing.[6] The D.C. District Court entered a default judgment against Iran and awarded damages in the total amount of $131,191,019.[7]

### C. The Embassy Bombings.

7. In 1998, al Qaeda carried out simultaneous suicide bombings on the U.S. embassies in Dar es Salaam, Tanzania, and Nairobi, Kenya—killing more than 224 people and wounding more than 5,000. Iran deliberately provided material support to al Qaeda's planning, recruitment, and training activities and equipped al Qaeda to carry out the Embassy Bombings.

---

[3] *See Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 55, 65-69, 73-75 (D.D.C. 2018).

[4] *See generally Fritz v. Islamic Republic of Iran*, No. 15-cv-456 (D.D.C.) ("*Fritz* Suit").

[5] *Fritz*, 320 F. Supp. 3d at 84-86, 92; *Fritz* Suit, Dkt. 94.

[6] *See generally Roth v. Islamic Republic of Iran*, No. 11-cv-1377 (D.D.C.) ("*Roth* Suit").

[7] *Roth* Suit, Dkt. 43.

8.  Several suits against Iran and the Republic of Sudan (which also provided support to al Qaeda) on behalf of the victims and their estates followed. Four of those suits—*Wamai*, *Amduso*, *Onsongo*, and *Opati*—are relevant here.[8]

9.  In each of those four lawsuits, the D.C. District Court entered default judgment against Iran.[9] It then awarded $1,755,878,431.22 to the *Amduso* plaintiffs; $3,566,104,489.58 to the *Wamai* plaintiffs; $199,106,578.19 to the *Onsongo* plaintiffs; and $3.1 billion to the *Opati* plaintiffs.[10]

### D. The Beirut Bombing.

10. On October 23, 1983, a Hezbollah terrorist detonated a massive truck bomb at the U.S. Marine barracks in Beirut, Lebanon. Iran was determined to have provided "massive material and technical support" to Hezbollah, which directly facilitated the Beirut Bombing.[11] The Beirut Bombing killed 241 U.S. servicemen and wounded many others, including hundreds of *Fritz* Victims and their family members.

11. Iran's material support for the Beirut Bombing occasioned numerous actions in the D.C. District Court holding Iran liable under the FSIA and imposing corresponding damages, discussed in relevant part below.

12. On September 7, 2007, the D.C. District Court awarded default judgments against Iran on behalf of the plaintiffs in the consolidated actions *Peterson v. Islamic Republic of Iran*,

---

[8] *See generally Wamai v. Republic of Sudan*, No. 08-cv-1349 (D.D.C.) ("*Wamai* Suit"); *Amduso v. Republic of Sudan*, No. 08-cv-1361 (D.D.C.) ("Amduso Suit"); *Onsongo v. Republic of Sudan*, No. 08-cv-1380 (D.D.C.) ("*Onsongo* Suit"); *Opati v. Republic of Sudan*, No. 12-cv-1224 (D.D.C.) ("*Opati* Suit").

[9] *Amduso* Suit, Dkt. 40 (Oct. 6, 2009); *Onsongo* Suit, Dkt. 23 (June 2, 2010); *Wamai* Suit, Dkt. 36 (June 4, 2010); *Opati* Suit, Dkt. 42 (June 18, 2014).

[10] *See Amduso* Suit, Dkt. 254; *Wamai* Suit, Dkt. 245; *Onsongo* Suit, Dkt. 231; *Opati* Suit, Dkt. 45.

[11] *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 118 (D.D.C. 2012).

4

No. 01-cv-2094 (D.D.C.), and *Boulos v. Islamic Republic of Iran*, No. 01-cv-2684 (D.D.C.).[12] The district court awarded damages in the amount of $2,656,944,877.00.

13. On September 20, 2010, the D.C. District Court awarded revised default judgments against Iran on behalf of the plaintiffs in the consolidated actions *Spencer v. Islamic Republic of Iran*, No. 06-cv-750 (D.D.C.), *Arnold v. Islamic Republic of Iran*, No. 06-cv-516 (D.D.C.), *Valore v. Islamic Republic of Iran*, No. 3-cv-1959 (D.D.C.), and *Bonk v. Islamic Republic of Iran*, No. 08-cv-1273 (D.D.C.).[13] The district court awarded $290,291,092.00 in compensatory damages and $1,000,000,000.00 in punitive damages, for a total judgment of $1,290,291,092.00.

14. On September 24, 2010, the D.C. District Court awarded a default judgment against Iran on behalf of the plaintiffs in *Murphy v. Islamic Republic of Iran*, No. 06-cv-596 (D.D.C.).[14] The district court awarded $31,865,570.00 in compensatory damages and $61,302,581.60 in punitive damages, for a total judgment of $93,168,141.60.

15. On December 21, 2011, the D.C. District Court awarded a default judgment against Iran on behalf of the plaintiffs in *Bland v. Islamic Republic of Iran*, No. 05-cv-2124 (D.D.C.).[15] The district court awarded $227,805,908.00 in compensatory damages and $955,652,324.00 in punitive damages, for a total judgment of $1,183,458,232.00.

---

[12] Judgment, Dkt. 228, *Peterson v. Islamic Republic of Iran*, No. 01-cv-2094 (D.D.C. Sept. 7, 2007).

[13] Revised Order and Judgment, Dkt. 71, *Valore v. Islamic Republic of Iran*, No. 03-cv-1959 (D.D.C. Sept. 20, 2010).

[14] Order and Judgment, Dkt. 66, *Murphy v. Islamic Republic of Iran*, No. 06-cv-596 (D.D.C. Sept. 24, 2010).

[15] Order and Judgment, Dkt. 70, *Bland v. Islamic Republic of Iran*, No. 05-cv-2124 (D.D.C. Dec. 21, 2011).

16. On March 28, 2012, the D.C. District Court awarded a default judgment against Iran on behalf of the plaintiffs in *O'Brien v. Islamic Republic of Iran*, No. 06-cv-690 (D.D.C.).[16] The district court awarded $10,050,000.00 in compensatory damages and $34,572,000.00 in punitive damages, for a total judgment of $44,622,000.00.

17. On March 30, 2012, the D.C. District Court awarded a default judgment against Iran on behalf of the plaintiffs in *Davis v. Islamic Republic of Iran*, No. 07-cv-1302 (D.D.C.).[17] The district court awarded $486,918,005.00 in compensatory damages and $1,674,997,937.00 in punitive damages, for a total judgment of $2,161,915,942.00.

18. On March 20, 2012, the D.C. District Court awarded a default judgment against Iran on behalf of the plaintiffs in *Anderson v. Islamic Republic of Iran*, No. 08-cv-535 (D.D.C.).[18] The district court awarded $7,500,000 in compensatory damages and $25,800,000 in punitive damages to these plaintiffs, for a total judgment of $33,300,000.

19. On July 3, 2012, the D.C. District Court awarded a default judgment against Iran on behalf of the plaintiffs in *Brown v. Islamic Republic of Iran*, No. 08-cv-531 (D.D.C.).[19] The district court awarded $183,281,294.00 of compensatory damages and $630,487,651 of punitive damages, for a total judgment of $813,768,945.00.

---

[16] Order and Judgment, Dkt. 41, *O'Brien v. Islamic Republic of Iran*, No. 06-cv-690 (D.D.C. Mar. 28, 2012).

[17] Order and Judgment, Dkt. 123, *Davis v. Islamic Republic of Iran*, No. 07-cv-1302 (D.D.C. Mar. 30, 2012).

[18] Order and Judgment, Dkt. 43, *Anderson v. Islamic Republic of Iran*, No. 08-cv-535 (D.D.C. Mar. 20, 2012).

[19] Order and Judgment, Dkt. 57, *Brown v. Islamic Republic of Iran*, No. 8-cv-531 (D.D.C. July 3, 2012).

20. On July 31, 2012, the D.C. District Court awarded a default judgment against Iran on behalf of the plaintiffs in *Fain v. Islamic Republic of Iran*, No. 10-cv-628 (D.D.C.).[20] The district court awarded $15,628,703.00 of compensatory damages and $52,524,338.00 of punitive damages, for a total judgment of $67,793,041.00.

21. On August 2, 2012, the D.C. District Court awarded a default judgment against Iran on behalf of the plaintiffs in *Taylor v. Islamic Republic of Iran*, No. 10-cv-844 (D.D.C.).[21] The district court awarded $148,000,000.00 of compensatory damages and $509,120,000.00 of punitive damages, for a total judgment of $657,120,000.00.

22. On October 14, 2014, the D.C. District Court awarded a default judgment against Iran on behalf of the plaintiffs in *Spencer v. Islamic Republic of Iran*, No. 12-cv-42 (D.D.C.).[22] The district court awarded $17,111,376.00 of compensatory damages and $58,863,133.44 of punitive damages, for a total judgment of $75,974,509.44.

23. On April 18, 2016, the D.C. District Court awarded a default judgment against Iran on behalf of the plaintiffs in *Worley v. Islamic Republic of Iran*, No. 12-cv-2069 (D.D.C.).[23] The district court awarded $58,580,424.00 in compensatory damages and $201,516,659.00 in punitive damages, for a total judgment of $260,097,083.00.

---

[20] Order and Judgment, Dkt. 35, *Fain v. Islamic Republic of Iran*, No. 10-cv-628 (D.D.C. July 31, 2012).

[21] Order and Judgment, Dkt. 26, *Taylor v. Islamic Republic of Iran*, No. 10-cv-844 (D.D.C. Aug. 2, 2012).

[22] Order and Judgment, Dkt. 51, *Spencer v. Islamic Republic of Iran*, No. 12-cv-42 (D.D.C. Oct. 14, 2014).

[23] Order and Judgment, Dkt. 74, *Worley v. Islamic Republic of Iran*, No. 12-cv-2069 (D.D.C. Apr. 18, 2016).

24. On May 31, 2020, the D.C. District Court awarded a default judgment against Iran on behalf of the plaintiffs in *Bova v. Islamic Republic of Iran*, No. 15-cv-1074 (D.D.C.).[24] The district court awarded $348,718,279.00 in compensatory damages and $1,199,590,880.00 in punitive damages, for a total judgment of $1,548,309,159.00.

25. On May 3, 2022, the D.C. District Court awarded a default judgment against Iran on behalf of the plaintiffs in *Ayers v. Islamic Republic of Iran*, No. 18-cv-265 (D.D.C).[25] The district court awarded $73,306,625.00 in compensatory damages and $252,174,790.00 in punitive damages, for a total judgment of $325,481,415.00.

## II. The *Fritz* Victims Are Entitled To Enforce Their Judgments.

26. Claimants are all judgment-holders—either directly or as the estate, heir, or other beneficiary or successor-in-interest of the original judgment holder—in the above actions.

27. In total, the *Fritz* Victims in this action have been awarded damages of $23,206,959,532.03 against Iran, including $9,117,379,610.49 in compensatory damages. These judgments were entered to provide justice and compensation to the direct victims and family members of victims of horrific terrorist attacks enabled by Iran's material support. Iran has refused to voluntarily pay a single cent, and not one of the judgments has been satisfied. They continue to accrue post-judgment interest pursuant to 28 U.S.C. § 1961.

28. The *Fritz* Victims and the compensatory damages they have been awarded are listed in Attachment A to the Verification of their Claims.

---

[24] Order and Judgment, Dkt. 110, *Bova v. Islamic Republic of Iran*, No. 12-cv-1074 (D.D.C. May 31, 2020).

[25] Amended Order and Judgment, Dkt. 69, *Ayers v. Islamic Republic of Iran*, No. 18-cv-265 (D.D.C. May 3, 2022).

### III. The Government Initiates This Forfeiture Action Against The Defendant Cryptocurrency—But Downplays Its Extensive Connections To Iran.

29. On October 14, 2025, the government initiated the instant civil forfeiture action against approximately 127,271 Bitcoin once stored in the virtual-currency addresses identified in Attachment A of its complaint. *See* Dkt. 1 ("Forfeiture Compl.") at 1 & Attachment A.

30. On the same day, this Court issued an arrest warrant *in rem* for the Defendant Cryptocurrency pursuant to 18 U.S.C. § 981(a)(1)(C) and (a)(1)(A). *See* Dkt. 3.

31. The government alleges the Defendant Cryptocurrency is subject to condemnation and forfeiture by the United States (1) under 18 U.S.C. § 981(a)(1)(C), as property that constitutes proceeds or is derived from proceeds of a violation of the wire fraud statute or a conspiracy to violate that statute, 18 U.S.C. §§ 1343, 1349; and (2) under 18 U.S.C. § 981(a)(1)(A), as property that was involved in or is derived from property involved in a money laundering transaction, an attempted money laundering transaction, or a conspiracy to make a money laundering transaction, 18 U.S.C. § 1956. *See* Forfeiture Compl. ¶ 2.

32. Specifically, the government alleges that the Defendant Cryptocurrency was involved in or derived from money-laundering operations conducted by Chen Zhi and Prince Holding Group, an alleged front for Chen's transnational criminal organization, and their co-conspirators. Forfeiture Compl. ¶¶ 20, 38-43. According to the government, one such scheme involved using stolen cryptocurrency to fund a "large-scale cryptocurrency mining operation[ ]" called "Lubian," which was "sixth largest bitcoin mining operation in the world" "[f]or some of the time it was active" and produced "large sums of clean bitcoin dissociated from criminal proceeds." *Id*. ¶ 42.

33. The government describes "Lubian" as "a Chinese bitcoin mining operation" and acknowledges that it had at least one facility in "Iran." Forfeiture Compl. ¶ 16(u).

9

34. That is not the complete story. Instead, as the *Fritz* Victims have detailed in their separate action currently pending before this Court, and as extensive documentary and blockchain evidence—including careful analysis of the hash rates, power capacity, and shipping records—makes plain, LuBian was the cryptocurrency mining pool for the Iran-China Group, an Iranian joint-stock company that partnered with the Iranian government to build a large Bitcoin mine in Rafsanjan, Iran to assist that country's longstanding efforts to evade U.S. sanctions. *See generally Fritz* Suit, Dkt. 1 ("Fritz Compl.").

35. Since the 1979 Iranian Revolution, Iran has faced comprehensive U.S. sanctions aimed at combatting its capacity and willingness to sponsor terrorist operations. *See, e.g.*, Exec. Order No. 13599, 77 Fed. Reg. 6659, 6659 (Feb. 5, 2012) (blocking assets in which Iran or its agencies and instrumentalities have an interest). Over the last decade, Iran has turned to cryptocurrency mining as a central part of its sanctions-evasion strategy. *See generally* Fritz Suit, Dkt. 73, Declaration of Jessica Davis ("Davis Decl."). That is because cryptocurrency transactions are not subject to international banking controls, and cryptocurrency provides a means of laundering Iran's substantial oil and gas reserves, by converting them into electricity, which is then used to generate cryptocurrency. *Id.* ¶¶ 21-22, 25-35, 62-65.

36. In 2020, a key part of Iran's cryptocurrency initiative was the massive crypto mining "farm" located in the Rafsanjan Special Economic Zone in Kerman Province—touted by Iranian media as "the largest digital currency production unit in Iran." *Fritz* Suit, Dkt. 72, Declaration of Avigdor Sason Cohen ¶ 48 ("Cohen Decl."). Once constructed, the Rafsanjan facility operated using over 50,000 high-powered computers built specially for mining cryptocurrency and capable of drawing 175 MW of electrical power—the power equivalent to that consumed by New Orleans. *Id.* ¶¶ 48-49.

37. The site was built and operated by the Iran-China Group in partnership with Iran. Cohen Decl. ¶¶ 26-70. As Iran-China Group Chairman Mohammad Hassan Ranjbar put it, the Group's relationship with Iran was one of "mutual help." Cohen Decl., Ex. 30.

38. Once the Rafsanjan mine was operating, the Iran-China Group conducted its mining operation under the pool label "LuBian," tagging itself as "lubian.com" in transactions on the blockchain.[26] Cohen Decl. ¶¶ 71-119.

39. The government alleges that "Lubian" was associated with several of the cryptocurrency addresses that once contained the Defendant Cryptocurrency. Forfeiture Compl. ¶¶ 44-45. It also alleges—without explanation—that "[t]he Defendant Cryptocurrency was subsequently transferred in its entirety to multiple additional addresses." *Id.* ¶ 58.

40. In reality, the Iran-China Group, through LuBian, owned and controlled *all* of the original addresses that contained the Defendant Cryptocurrency. Cohen Decl. ¶¶ 120-21.

41. A white-hat hacker transferred the Defendant Cryptocurrency from the Iran-China Group's addresses to new addresses on December 28, 2020. *Id.* ¶¶ 132-36.

42. After the hack, each wallet that held the Defendant Cryptocurrency immediately prior to the hack—*i.e.*, each wallet held by the Iran-China Group—sent a series of messages to the hacker on the blockchain begging for the return of its cryptocurrency. Cohen Decl. ¶¶ 137-41. The message from all of these hacked wallets was styled as a "MSG from LB"—*i.e.*, a message from LuBian—"To the whitehat who is saving our asset, you can contact us through 1228btc@gmail.com to discuss the return of asset and your reward." *Id.* ¶ 137.

---

[26] A pool "is the consolidation of computational power amongst a group of cryptocurrency miners" to enable more efficient mining. *Mining Pool*, https://crypto.com/en/glossary/mining-pool.

43. Cryptocurrency wallets can be accessed only through a private key, a long alphanumeric sequence similar to a password. Whoever has the private key holds—and can use—the cryptocurrency associated with the wallet. Knowledge of the private key is thus tantamount to ownership of cryptocurrency—a principle enshrined in the crypto community's adage "not your keys, not your crypto." Cohen Decl. ¶ 140. Because "no one but the person who physically has access to [the] device [where the private key is stored] … can transact on that user's behalf," *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 305 (S.D.N.Y. 2024), "[o]wnership of bitcoin" depends on "a user's possession or knowledge of the private key," *United States v. Harmon*, 474 F. Supp. 3d 76, 82 (D.D.C. 2020).

44. Because the only way to send the messages to the hacker from the hacked wallets was by using the hacked wallets' private keys, the messages confirm LuBian's—and thus the Iran-China Group's—ownership and control over all of the Defendant Cryptocurrency. Cohen Decl. ¶¶ 142-50; *Fritz* Suit, Dkt. 70, Plaintiffs' Memorandum of Law in Support of Motion for Attachment, at 10, 17-19 (Dec. 28, 2025) ("*Fritz* Attachment Motion").

45. On information and belief, based on the government's complaint, the hacker subsequently turned over the keys to the wallets containing the Iran-China Group's hacked cryptocurrency to the U.S. government. *See* Forfeiture Compl. ¶ 58.

46. Because property taken without consent "still belongs to the original owner," the hacker's diversion of the Defendant Cryptocurrency from the Iran-China Group's wallets does not change its ownership. *Bakalar v. Vavra*, 619 F.3d 136, 141 (2d Cir. 2010); *accord Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 317 (1991). And, of course, this forfeiture action does not "transfer ownership of the [Bitcoin]" to the government unless and until "there is a final judgment of forfeiture." *Counihan v. Allstate Ins. Co.*, 25 F.3d 109, 112 (2d Cir. 1994); *accord*

12

*United States v. 500 Delaware St.*, 868 F. Supp. 513, 518 (W.D.N.Y. 1994), *aff'd*, 113 F.3d 310 (2d Cir. 1997). Accordingly, the Defendant Cryptocurrency still belongs to the Iran-China Group.

**IV.     Under TRIA, The *Fritz* Victims Have A Senior Interest In The Defendant Cryptocurrency**

47.     In the context of a forfeiture action, at this stage of the proceedings, the *Fritz* Victims need only assert that they have a "facially colorable interest" in the property at issue. *United States v. Ross*, ___ F.4th ____, 2025 WL 3481603, at *5 (2d Cir. Dec. 4, 2025) (citation omitted). "[W]hether [they] ultimately prove[ ] the existence of that interest is a question for a later stage in the proceedings." *Id*. (citation omitted).

48.     Here, the *Fritz* Victims have far more than a "facially colorable interest" in the Defendant Cryptocurrency. They are judgment creditors of Iran. As explained below, because the Iran-China Group was an agent or instrumentality of Iran, TRIA entitles them to execute on the Defendant Cryptocurrency to satisfy those judgments "[n]otwithstanding any other provision of law." TRIA § 201(a); *see infra* ¶¶ 50-57. And the *Fritz* Victims are currently in the process of doing so in their separate action against the Iran-China Group. *See generally Fritz* Suit.

49.     Thus, in accordance with Federal Rule G, the *Fritz* Victims assert a claim against all the Defendant Cryptocurrency, or such amount of the Defendant Cryptocurrency as may ultimately be necessary to satisfy the outstanding compensatory damages, plus post-judgment interest, owed to the *Fritz* Victims under their judgments against Iran based on the date the Defendant Cryptocurrency is valued for purposes of judgment.

50.     Specifically, TRIA provides that "[n]otwithstanding any other provision of law," those who hold judgments against a "terrorist party" may execute on the "blocked assets" of that terrorist party or its "agency or instrumentality" "to satisfy such judgment to the extent of any

compensatory damages." Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337 (Nov. 26, 2002), codified at 28 U.S.C. § 1610 Note.

51. TRIA's cornerstone is the statute's broad "notwithstanding" clause. The clause aims to "enable" victims "to execute on" terrorists' assets by preventing other provision of law from "bar[ring] victims' efforts to enforce [their] judgments." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 391-92 (2009) (Kennedy, J., concurring). The notwithstanding clause "mak[es] plain that the force of the [statute] extends everywhere" and "'supersede[s] all other laws.'" *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 49 (2d Cir. 2010) (citation omitted). Accordingly, because it expressly overrides "conflict[ing] laws," TRIA's notwithstanding clause necessarily overrides "the civil-forfeiture statute." *Est. of Levin v. Wells Fargo Bank, N.A.*, 156 F.4th 632, 643 n.1 (D.C. Cir. 2025).

52. Because the *Fritz* Victims satisfy the requirements of TRIA, their interest in the Defendant Cryptocurrency necessarily is superior to the claims of the government, as well as all other claimants, in the forfeiture action here. And because their TRIA writ actions "supersede" the forfeiture statute, this forfeiture action should proceed in deference to the *Fritz* Victims' TRIA writ actions. *See, e.g.*, Joint Status Report, *United States v. $2,340,000.00 Associated With Petroleum Tanker Nautic*, No. 20-cv-1139 ("*Nautic* Action") (D.D.C. June 15, 2023), Dkt. 21 (government agreeing to stay forfeiture proceeding in deference to resolution of TRIA attachment actions); Joint Status Report, *Nautic* Action (D.D.C. Dec. 6, 2022), Dkt. 15 (same); Joint Status Report, *Nautic* Action (D.D.C. Apr. 16, 2021), Dkt. 14 (same).

53. First, as explained above and detailed in the *Fritz* Victims' TRIA action, all *Fritz* Victims hold judgments for compensatory damages against Iran based on an act of terrorism under

28 U.S.C. § 1605A or its predecessor statute 28 U.S.C. § 1605(a)(7).  *Fritz* Attachment Motion at 12-13.

54. Second, Iran is a "terrorist party" because it has been designated as a state sponsor of terrorism under the Export Administration Act of 1979.  *See* TRIA § 201(d)(4); Exec. Order No. 13599, 77 Fed. Reg. 6659 (Feb. 5, 2012).

55. Third, as the *Fritz* Victims have shown in their separate action against the Iran-China Group, that entity operated as Iran's agency or instrumentality by materially serving that country in avoiding sanctions, while providing the material function to Iran of laundering its energy resources through cryptocurrency mining, at Iran's direction and behest.  *Fritz* Attachment Motion at 13-17; *see Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107, 135 (2d Cir. 2016).

56. Fourth, under TRIA, "[b]locked assets" include "any asset seized or frozen by the United States" pursuant to the International Emergency Economic Powers Act.  TRIA § 201(d)(2)(A).  The government has used its authority under that statute to "block" all Iranian property in the United States, including the property of agencies or instrumentalities of Iran.  31 C.F.R. §§ 510.211, 594.201(a)(5); *Kirschenbaum*, 830 F.3d at 120.  As a result, because the Iran-China Group is an agency or instrumentality of Iran, all of that organization's property qualifies as a blocked asset under TRIA.  *See Levinson v. Kuwait Finance House (Malaysia) Berhad*, 44 F.4th 91, 98 n.6 (2d Cir. 2022).

57. Because the Defendant Cryptocurrency is property of the Iran-China Group, it is therefore blocked and attachable by the *Fritz* Victims under TRIA.

\*   \*   \*

58. Pursuant to 28 U.S.C. § 983(a) and Rule G, the *Fritz* Victims hereby assert a claim to the Defendant Cryptocurrency—as the property of an agency or instrumentality of Iran—that is

15

senior to the government's claim.  Notwithstanding the government's forfeiture efforts, the *Fritz Victims* reserve all rights and remedies available in law and equity to enforce their interest in the Defendant Cryptocurrency.

Dated:  December 29, 2025  
New York, New York

Respectfully submitted,

/s/ Robert L. Weigel
Robert L. Weigel
Jason W. Myatt
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
Telephone: (212) 351-4000
rweigel@gibsondunn.com
jmyatt@gibsondunn.com

Jessica L. Wagner (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
jwagner@gibsondunn.com

*Attorneys for Claimants*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 29, 2025, I electronically filed the foregoing Notice of Verified Claim and Statement of Interest or Right in Property Subject to Forfeiture *In Rem* and its attachments, including Verification of *Fritz* Victims' Claims, via CM/ECF for the United States District Court for the Eastern District of New York and therefore caused it to be served on all parties registered for CM/ECF, including attorneys for the government, in the above-captioned matter.


Dated: December 29, 2025                    /s/ Robert L. Weigel
                                                                                Robert L. Weigel