UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>    v.<br><br>APPROXIMATELY 127,271 BITCOIN ("BTC") PREVIOUSLY STORED AT THE VIRTUAL CURRENCY ADDRESSES LISTED IN ATTACHMENT A, AND ALL PROCEEDS TRACEABLE THERETO,<br><br>           Defendant *In Rem*. | Civil Action No. 25-5745 (RPK) |

**NOTICE OF VERIFIED CLAIM AND STATEMENT OF INTEREST
OR RIGHT IN PROPERTY SUBJECT TO FORFEITURE *IN REM***

Claimants are victims of state-sponsored terrorism (the "*Baxter* Victims") who hold a judgment against the Islamic Republic of Iran ("Iran") that is worth more than $2 billion, including $470,226,233.75 in compensatory damages, under 28 U.S.C. § 1605A.[1] The Defendant Cryptocurrency at issue in this forfeiture action is property of the Iran and China Investment Development Group ("Iran-China Group").

The Iran-China Group, doing business on the blockchain as Lubian.com or LuBian, is an agency or instrumentality of Iran that has materially supported that country's efforts to evade Western sanctions by mining cryptocurrency in Iran. Through this scheme, sanctioned Iranian oil and gas are converted into electricity, which miners then use to generate cryptocurrency for the Iranian government to use outside the traditional global banking systems.

---

[1] A full list of Claimants and the compensatory damages they have been awarded is included as Attachment A to the Verification of the *Baxter* Victims' Claims.

As the holders of a judgment against Iran, a notoriously recalcitrant debtor, who are presently waiting for the U.S. State Department to complete service of their judgment on that country, the *Baxter* Victims have a substantial interest in ensuring that assets of Iran and of its agencies and instrumentalities are preserved and protected for execution in satisfaction of Iran's debts. This includes blocked property like the Defendant Cryptocurrency, which belongs to the Iran-China Group and accordingly is subject to execution under the Terrorism Risk Insurance Act ("TRIA") to satisfy judgments against state sponsors of terrorism "[n]otwithstanding any other provision of law."

As a protective matter, the *Baxter* Victims hereby assert their superior interest in the Defendant Cryptocurrency, or at least so much as may ultimately be necessary to satisfy their outstanding judgment and post-judgment interest,[2] which TRIA makes senior to any other interest that the government or other non-TRIA claimants could assert. But for the U.S. government shutdown earlier this year, the State Department likely would have completed service of the requisite papers on Iran, and the *Baxter* Victims would be actively enforcing their rights against Iranian assets. It is expected that service will be completed presently, at which point the *Baxter* Victims, subject to the strictures of 28 U.S.C. § 1610(c), will proceed to actively enforce their judgment under TRIA, including their rights in the Defendant Cryptocurrency.

In support of this Notice, the *Baxter* Victims state as follows:

**I.    The *Baxter* Victims Have Been Awarded Over $2 Billion Against Iran.**

1.    The *Baxter* Victims are dozens of individuals who are direct victims or the surviving family members of victims of Iranian-sponsored terrorism. They or their relatives were

---

[2] Because the value of Bitcoin can vary widely from day-to-day, the amount of Bitcoin necessary to satisfy the *Baxter* Victims' judgment cannot be fully determined until the Bitcoin is transferred or otherwise liquidated in satisfaction of the judgments.

killed or injured in terrorist attacks perpetrated by Hamas but enabled by Iran's material support of that group. *See generally Baxter v. Islamic Republic of Iran*, No. 11-cv-02133 (D.D.C.) ("*Baxter* Suit"); *Tratner v. Islamic Republic of Iran*, No. 18-cv-02971 (D.D.C.) ("*Tratner* Suit").

2. On November 30, 2011, many of the *Baxter* Victims filed suit against Iran to hold it accountable for those crimes. *Baxter* Suit, Dkt. 1. After Iran failed to appear, the U.S. District Court for the District of Columbia ("D.C. District Court") entered default judgment and appointed a special master to calculate the *Baxter* Victims' damages. *Baxter* Suit, Dkts. 40-42.

3. On December 17, 2018, the remaining *Baxter* Victims filed suit against Iran. *Tratner* Suit, Dkt. 1. After the country again failed to appear, the D.C. District Court entered default judgment and appointed the same special master to calculate the *Baxter* Victims' damages. *Tratner* Suit, Dkts. 26-28.

4. On March 28, 2022, the D.C. District Court consolidated both lawsuits. *Baxter* Suit, Dkt. 97; *Tratner* Suit, Dkt. 32.

5. On May 13, 2025, the D.C. District Court adopted the special master's report and recommendations and entered a final judgment awarding the *Baxter* Victims over $2 billion, including over $450 million in compensatory damages. *Baxter* Suit, Dkt. 130.

6. On July 10, 2025, the Clerk of the D.C. District Court sent the judgment to the U.S. Department of State to be served on Iran through diplomatic means pursuant to 28 U.S.C. § 1608(a)(4). *Baxter* Suit, Dkt. 141; *see also id.*, Dkts. 136, 140.

7. Ever since, the *Baxter* Victims have been waiting for the U.S. Department of State to complete service upon Iran. The *Baxter* Victims understand that service was delayed due to the lengthy government shutdown between October and November this fall.

## II.   The *Baxter* Victims May Protect Their Interest in the Defendant Cryptocurrency.

8. The *Baxter* Victims are all judgment-holders—either directly or as the estate, heir, or other beneficiary or successor-in-interest of the original judgment holder—in the above actions.

9. In total, the *Baxter* Victims have been awarded $2,087,804,477.85 against Iran, including $470,226,233.75 in compensatory damages. This judgment was entered to provide justice and compensation to the direct victims and the families of victims of terrorist attacks enabled by Iran's material support. It continues to accrue post-judgment interest pursuant to 28 U.S.C. § 1961.

10. While the *Baxter* Victims do not yet have confirmation that Iran has been served with this judgment, that is no fault of the *Baxter* Victims. They have diligently pursued their claims, with many of them waiting nearly 15 years for a judgment. Rather, any delay here is the result of the United States's delayed efforts—as a result of the government shutdown—to effectuate service on Iran through 28 U.S.C. § 1608(a)(4). Iran has thousands of judgment creditors with billions of unpaid judgments and is a known recalcitrant judgment debtor. It would be unreasonable to force the *Baxter* Victims to wait for Iran to receive service and to willingly satisfy their judgment—something that will never occur—before they are able to protect their rights to enforce their judgments and to seek justice for the harms that country has inflicted.

## III.  The Government Initiates This Forfeiture Action Against The Defendant Cryptocurrency—But Downplays Its Extensive Connections To Iran.

11. On October 14, 2025, the government initiated the instant civil forfeiture action against approximately 127,271 Bitcoin once stored in the virtual-currency addresses identified in Attachment A of its complaint. *See* Dkt. 1 ("Forfeiture Compl.") at 1 & Attachment A.

12. On the same day, this Court issued an arrest warrant *in rem* for Defendant Cryptocurrency pursuant to 18 U.S.C. § 981(a)(1)(C) and (a)(1)(A). *See* Dkt. 3.

13. The government alleges the Defendant Cryptocurrency is subject to condemnation and forfeiture by the United States (1) under 18 U.S.C. § 981(a)(1)(C), as property that constitutes proceeds or is derived from proceeds of a violation of the wire fraud statute or a conspiracy to violate that statute, 18 U.S.C. §§ 1343, 1349; and (2) under 18 U.S.C. § 981(a)(1)(A), as property that was involved in or is derived from property involved in a money laundering transaction, an attempted money laundering transaction, or a conspiracy to make a money laundering transaction, 18 U.S.C. § 1956. *See* Forfeiture Compl. ¶ 2.

14. Specifically, the government alleges that the Defendant Cryptocurrency was involved in or derived from money-laundering operations conducted by Chen Zhi and Prince Holding Group, an alleged front for Chen's transnational criminal organization, and their co-conspirators. Forfeiture Compl. ¶¶ 20, 38-43. According to the government, one such scheme involved using stolen cryptocurrency to fund a "large-scale cryptocurrency mining operation[ ]" called "Lubian," which was "sixth largest bitcoin mining operation in the world" "[f]or some of the time it was active" and produced "large sums of clean bitcoin dissociated from criminal proceeds." *Id*. ¶ 42.

15. The government describes "Lubian" as "a Chinese bitcoin mining operation" and acknowledges that it had at least one facility in "Iran." Forfeiture Compl. ¶ 16(u).

16. That is not the complete story. Instead, as detailed in the extensive documentary and blockchain evidence, including careful analysis of hash rates, power capacity, and shipping records, submitted in another action currently pending before this Court, *Fritz v. Iran & China Development Group*, No. 25-cv-07093 (E.D.N.Y) ("*Fritz* Suit"), LuBian was the cryptocurrency mining pool for the Iran-China Group, an Iranian joint-stock company that partnered with the

Iranian government to build a large Bitcoin mine in Rafsanjan, Iran to assist that country's longstanding efforts to evade U.S. sanctions, *see generally Fritz* Suit, Dkt. 1, Complaint.

17. Since the 1979 Iranian Revolution, Iran has faced comprehensive U.S. sanctions aimed at combatting its capacity and willingness to sponsor terrorist operations. *See, e.g.*, Exec. Order No. 13599, 77 Fed. Reg. 6659, 6659 (Feb. 5, 2012) (blocking assets in which Iran or its agencies and instrumentalities have an interest). Over the last decade, Iran has turned to cryptocurrency mining as a central part of its sanctions-evasion strategy. *See generally* Fritz Suit, Dkt. 73, Declaration of Jessica Davis ("Davis Decl."). That is because cryptocurrency transactions are not subject to international banking controls, and cryptocurrency provides a means of laundering Iran's substantial oil and gas reserves, by converting them into electricity, which is then used to generate cryptocurrency. *Id.* ¶¶ 21-22, 25-35, 62-65.

18. In 2020, a key part of Iran's cryptocurrency initiative was the massive crypto mining "farm" located in the Rafsanjan Special Economic Zone in Kerman Province—touted by Iranian media as "the largest digital currency production unit in Iran." *Fritz* Suit, Dkt. 72, Declaration of Avigdor Sason Cohen ¶ 48 ("Cohen Decl."). Once constructed, the Rafsanjan facility operated using over 50,000 high-powered computers built specially for mining cryptocurrency and capable of drawing 175 MW of electrical power—the power equivalent to that consumed by New Orleans. *Id.* ¶¶ 48-49.

19. The site was built and operated by the Iran-China Group in partnership with Iran. Cohen Decl. ¶¶ 26-70. As Iran-China Group Chairman Mohammad Hassan Ranjbar put it, the Group's relationship with Iran was one of "mutual help." Cohen Decl., Ex. 30.

20. Once the Rafsanjan mine was operating, the Iran-China Group conducted its mining operation under the pool label "LuBian," tagging itself as "lubian.com" in transactions on the blockchain.[3] Cohen Decl. ¶¶ 71-119.

21. The government alleges that "Lubian" was associated with several of the cryptocurrency addresses that once contained the Defendant Cryptocurrency. Forfeiture Compl. ¶¶ 44-45. It also alleges—without explanation—that "[t]he Defendant Cryptocurrency was subsequently transferred in its entirety to multiple additional addresses." *Id.* ¶ 58.

22. In reality, the Iran-China Group, through LuBian, owned and controlled *all* of the original addresses that contained the Defendant Cryptocurrency. Cohen Decl. ¶¶ 120-21.

23. A white-hat hacker transferred the Defendant Cryptocurrency from the Iran-China Group's addresses to new addresses on December 28, 2020. Cohen Decl. ¶¶ 132-36.

24. After the hack, each wallet that held the Defendant Cryptocurrency immediately prior to the hack—*i.e.*, each wallet held by the Iran-China Group—sent a series of messages to the hacker on the blockchain begging for the return of its cryptocurrency. Cohen Decl. ¶¶ 137-41. The message from all of these hacked wallets was styled as a "MSG from LB"—*i.e.*, a message from LuBian—"To the whitehat who is saving our asset, you can contact us through 1228btc@gmail.com to discuss the return of asset and your reward." *Id.* ¶ 137.

25. Cryptocurrency wallets can be accessed only through a private key, a long alphanumeric sequence similar to a password. Whoever has the private key holds—and can use— the cryptocurrency associated with the wallet. Knowledge of the private key is thus tantamount to ownership of cryptocurrency—a principle enshrined in the crypto community's adage "not your

---

[3] A pool "is the consolidation of computational power amongst a group of cryptocurrency miners" to enable more efficient mining. *Mining Pool*, https://crypto.com/en/glossary/mining-pool.

keys, not your crypto." Cohen Decl. ¶ 140. Because "no one but the person who physically has access to [the] device [where the private key is stored] … can transact on that user's behalf," *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 305 (S.D.N.Y. 2024), "[o]wnership of bitcoin" depends on "a user's possession or knowledge of the private key," *United States v. Harmon*, 474 F. Supp. 3d 76, 82 (D.D.C. 2020).

26. Because the only way to send the messages to the hacker from the hacked wallets was by using the hacked wallets' private keys, the messages confirm LuBian's—and thus the Iran-China Group's—ownership and control over all of the Defendant Cryptocurrency. Cohen Decl. ¶¶ 142-50; *Fritz* Suit, Dkt. 70, Plaintiffs' Memorandum of Law in Support of Motion for Attachment, at 10, 17-19 (Dec. 28, 2025) ("*Fritz* Attachment Motion"). On information and belief, based on the government's complaint, the hacker subsequently turned over the keys to the wallets containing the Iran-China Group's hacked cryptocurrency to the U.S. government. *See* Forfeiture Compl. ¶ 58.

27. Because property taken without consent "still belongs to the original owner," the hacker's diversion of the Defendant Cryptocurrency from the Iran-China Group's wallets did not change its ownership. *Bakalar v. Vavra*, 619 F.3d 136, 141 (2d Cir. 2010); *accord Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 317 (Ct. App. 1991). And, of course, this forfeiture action does not "transfer ownership of the [Bitcoin]" to the government unless and until "there is a final judgment of forfeiture." *Counihan v. Allstate Ins. Co.*, 25 F.3d 109, 112 (2d Cir. 1994); *accord United States v. 500 Delaware St.*, 868 F. Supp. 513, 518 (W.D.N.Y. 1994), *aff'd*, 113 F.3d 310 (2d Cir. 1997). Thus, the Defendant Cryptocurrency still belongs to the Iran-China Group.

## IV. The *Baxter* Victims Contingent Interest In The Defendant Cryptocurrency Is Set To Become A Senior Interest Under TRIA.

28. In the context of a forfeiture action, at this stage of the proceedings, the *Baxter* Victims need only assert that they have a "facially colorable interest" in the property at issue. *United States v. Ross*, ___ F.4th ____, 2025 WL 3481603, at *5 (2d Cir. Dec. 4, 2025) (citation omitted). "[W]hether [they] ultimately prove[] the existence of that interest is a question for a later stage in the proceedings." *Id*. (citation omitted).

29. Here, the *Baxter* Victims have far more than a "facially colorable interest" in the Defendant Cryptocurrency. They are judgment creditors of Iran. Despite being served with the *Baxter* Victims' complaints, Iran refused to appear, and a judgment was entered and will soon be enforceable. As explained below, because the Iran-China Group was an agent or instrumentality of Iran, TRIA will entitle them to execute on the Defendant Cryptocurrency to satisfy that judgment "[n]otwithstanding any other provision of law." TRIA § 201(a); *see infra* ¶¶ 31-38.

30. Thus, in accordance with Federal Rule G, the *Baxter* Victims assert a protective, prophylactic claim against such amount of the Defendant Cryptocurrency as may ultimately be necessary to satisfy the outstanding compensatory damages owed to the *Baxter* Victims under their judgments against Iran, plus post-judgment interest, based on the date the Defendant Cryptocurrency is valued for purposes of judgment.

31. Specifically, TRIA provides that "[n]otwithstanding any other provision of law," those who hold judgments against a "terrorist party" may execute on the "blocked assets" of that terrorist party or its "agency or instrumentality" "to satisfy such judgment to the extent of any compensatory damages." Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337 (2002), codified at 28 U.S.C. § 1610 Note.

32. TRIA's cornerstone is the statute's broad "notwithstanding" clause. The clause aims to "enable" victims "to execute on" terrorists' assets by preventing other provision of law from "bar[ring] victims' efforts to enforce [their] judgments." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 391-92 (2009) (Kennedy, J., concurring). The notwithstanding clause "mak[es] plain that the force of the [statute] extends everywhere" and "'supersede[s] all other laws.'" *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 49 (2d Cir. 2010) (citation omitted). Accordingly, because it expressly overrides "conflict[ing] laws," TRIA's notwithstanding clause necessarily overrides "the civil-forfeiture statute." *Est. of Levin v. Wells Fargo Bank, N.A.*, 156 F.4th 632, 643 n.1 (D.C. Cir. 2025).

33. Because the *Baxter* Victims will be able to satisfy the requirements of TRIA once their judgment is served upon Iran, their interest in the Defendant Cryptocurrency necessarily will be superior to the claims of the government, as well as all other non-TRIA claimants, in the forfeiture action here. Thus, subject to the procedural matters outside their control, the *Baxter* Victims have an interest in the Defendant Cryptocurrency.

34. First, as explained above, the *Baxter* Victims hold judgments for compensatory damages against Iran based on an act of terrorism under 28 U.S.C. § 1605A. Shortly after the State Department confirms it has completed service as required under the Foreign Sovereign Immunities Act, the *Baxter* Victims will be eligible to pursue attachment of Iranian assets—including the assets of its agencies and instrumentalities. *See* 28 U.S.C. § 1610(c).

35. Second, Iran is a "terrorist party" because it has been designated as a state sponsor of terrorism under the Export Administration Act of 1979. *See* TRIA § 201(d)(4); Exec. Order No. 13599, 77 Fed. Reg. 6659 (Feb. 5, 2012).

36. Third, the Iran-China Group operated as Iran's agency or instrumentality by materially serving that country in avoiding sanctions, while providing the material function to Iran of laundering its energy resources through cryptocurrency mining, at Iran's direction and behest. *Supra* ¶¶ 16-20; *Fritz* Attachment Motion at 13-17; *Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107, 135 (2d Cir. 2016).

37. Fourth, under TRIA, "[b]locked assets" include "any asset seized or frozen by the United States" pursuant to the International Emergency Economic Powers Act. TRIA § 201(d)(2)(A). The government has used its authority under that statute to "block" all Iranian property in the United States, including the property of agencies or instrumentalities of Iran. 31 C.F.R. §§ 510.211, 594.201(a)(5); *Kirschenbaum*, 830 F.3d at 120. As a result, because the Iran-China Group is an agency or instrumentality of Iran, all property of the Iran-China Group qualifies as a blocked asset under TRIA. *See Levinson v. Kuwait Finance House (Malaysia) Berhad*, 44 F.4th 91, 98 n.6 (2d Cir. 2022).

38. Because the Defendant Cryptocurrency is property of the Iran-China Group, it is therefore blocked and subject to execution by the *Baxter* Victims under TRIA.

\*     \*     \*

39. Pursuant to 28 U.S.C. § 983(a) and Rule G, the *Baxter* Victims hereby assert a protective, prophylactic claim to the Defendant Cryptocurrency—as the property of an agency or instrumentality of Iran—that is senior to the government's claim. Notwithstanding the government's forfeiture efforts, the *Baxter* Victims reserve all rights and remedies available in law and equity to enforce their interest in the Defendant Cryptocurrency.

| | |
|---|---|
| Dated:  December 29, 2025<br>New York, New York | Respectfully submitted,<br><br>/s/ Robert L. Weigel<br>Robert L. Weigel<br>Jason W. Myatt<br>GIBSON, DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, NY  10166<br>Telephone: (212) 351-4000<br>rweigel@gibsondunn.com<br>jmyatt@gibsondunn.com<br><br>Jessica L. Wagner (*pro hac vice* forthcoming)<br>GIBSON, DUNN & CRUTCHER LLP<br>1700 M Street, N.W.<br>Washington, D.C.  20036<br>Telephone: (202) 955-8500<br>jwagner@gibsondunn.com<br><br>*Attorneys for Claimants* |

**CERTIFICATE OF SERVICE**

I hereby certify that on December 29, 2025, I electronically filed the foregoing Notice of Verified Claim and Statement of Interest or Right in Property Subject to Forfeiture *In Rem* and its attachments, including Verification of *Baxter* Victims' Claims, via CM/ECF for the United States District Court for the Eastern District of New York and therefore caused it to be served on all parties registered for CM/ECF, including attorneys for the government, in the above-captioned matter.


Dated: December 29, 2025                              /s/ Robert L. Weigel
                                                     Robert L. Weigel