UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>APPROXIMATELY 127,271 BITCOIN ("BTC") PREVIOUSLY STORED AT THE VIRTUAL CURRENCY ADDRESSES LISTED IN ATTACHMENT A, AND ALL PROCEEDS TRACEABLE THERETO,<br><br>    Defendant *In Rem*. | Civil Action No. 25-5745 (RPK) |

**NOTICE OF VERIFIED CLAIM AND STATEMENT OF INTEREST OR RIGHT IN PROPERTY SUBJECT TO FORFEITURE *IN REM***

Claimants are 1,436 victims of state-sponsored terrorism (the "Iranian Terrorism Victims"), who collectively hold more than $5.9 billion in judgments against the Islamic Republic of Iran ("Iran"), including more than $4.9 billion in compensatory damages, under 28 U.S.C. § 1605A and its predecessor statute, 28 U.S.C. § 1605(a)(7).[1] As the Iranian Terrorism Victims just recently learned from the allegations in a separate proceeding, *Fritz v. Iran and China Investment Development Group d/b/a Lubian.com*, No. 25-cv-07093 (E.D.N.Y.) ("*Fritz* Suit"), the Defendant Cryptocurrency at issue in this forfeiture action is property of the Iran and China Investment Development Group ("Iran-China Group"). Upon learning this information, the Iranian Terrorism Victims promptly filed this Notice.

---

[1] A full list of Claimants and the compensatory damages they have been awarded is included as Attachment A to the Verification of the Iranian Terrorism Victims' Claims.

1

As alleged in the *Fritz* Suit, the Iran-China Group, doing business on the blockchain as Lubian.com or LuBian, is an agency or instrumentality of Iran that has materially supported that country's efforts to evade Western sanctions by mining cryptocurrency in Iran. Through this scheme, sanctioned Iranian oil and gas are converted into electricity, which miners then use to generate cryptocurrency for the Iranian government to use outside the traditional global banking systems.

Based on the information newly revealed by the allegations in the *Fritz* suit, under the Terrorism Risk Insurance Act ("TRIA"), the Iranian Terrorism Victims have the right to attach and execute on the property of Iran and its agencies and instrumentalities, including the Iran-China Group, "[n]otwithstanding any other provision of law." Accordingly, the Iranian Terrorism Victims hereby assert their superior interest in all of the Defendant Cryptocurrency, or at least so much as may ultimately be necessary to satisfy the outstanding compensatory damages, plus post-judgment interest, on their judgments, which TRIA makes senior to any interest that the government or other claimants could assert.[2] In support of this Notice, the Iranian Terrorism Victims state as follows:

## I. The Iranian Terrorism Victims Have Been Awarded Over $5.9 Billion Against Iran.

1. The Iranian Terrorism Victims are 1,436 individuals who are direct victims or the surviving family members of victims of Iranian-sponsored terrorism. As detailed further herein, the Iranian Terrorism Victims lives were forever changed by Iran-sponsored acts of terrorism,

---

[2] Because the value of Bitcoin can vary widely from day-to-day, the amount of Bitcoin necessary to satisfy the Iranian Terrorism Victims' judgments cannot be fully determined until the Bitcoin is transferred or otherwise liquidated in satisfaction of the judgments.

including assassinations, murders, and kidnappings in Beirut, Lebanon, and embassy bombings in Lebanon, Kenya, and Tanzania.

2. Courts in the U.S. District Court for the District of Columbia (the "D.C. District Courts") repeatedly have determined that Iran is liable to victims, including the Iranian Terrorism Victims, for their suffering as a result of Iran's sponsorship of terrorism, and have awarded the Iranian Terrorism Victims more than $5.9 billion in damages, including over $4.9 billion in compensatory damages.

### A. 1982 Beirut, Lebanon Kidnapping

3. On July 19, 1982, David S. Dodge, then the acting President of the American University of Beirut, was kidnapped in Beirut, Lebanon and held for one year in captivity in Lebanon and Iran, before his release on July 19, 1983.[3] David S. Dodge's captors were members of terrorist organizations that were provided material resources and support by Iran.[4]

4. In February 2003, David S. Dodge and his family members brought suit in federal district court in the District of Columbia against Iran for Iran's role in his abduction. On August 25, 2004, the D.C. district court entered a default judgment against Iran and awarded the Dodge family members, collectively, $5,670,000 in compensatory damages and $3,000,000 in punitive damages.[5]

### B. 1983 and 1984 U.S. Embassy and Embassy Annex Bombings in Beirut, Lebanon

5. In 1983 and 1984, Iran-sponsored terrorists targeted American servicemembers and embassy employees stationed in Beirut, Lebanon in two terrorist attacks on the U.S. Embassy and

---

[3] *See Dodge v. Islamic Republic of Iran*, 2004 WL 535873, at *1 (D.D.C. Aug. 25, 2004).
[4] *Id.* at *4.
[5] *Id.* at *5-6.

U.S. Embassy Annex, respectively (the "Beirut Embassy Attacks").[6] Iran provided material support and resources to the terrorists to carry out those attacks.[7]

6. Iran's support for the Beirut Embassy Attacks gave rise to numerous suits by victims and their estates to hold Iran liable under the FSIA. Five of those suits – *Dammarell v. Islamic Republic of Iran*, No. 1:01-cv-2224 (D.D.C.); *Doe v. Islamic Republic of Iran,* 1:08-cv-00540 (D.D.C.); *Barry et al v. Islamic Republic of Iran*, No. 1:16-cv-01625 (D.D.C.); *Jones v. Islamic Republic of Iran*, No. 1:16-cv-01625 (D.D.C.); and *Maxwell v. Islamic Republic of Iran*, No. 1:22-cv-00173 (D.D.C.) – are relevant here.

7. On December 14, 2005, the D.C. district court awarded a default judgment against Iran in favor of the plaintiffs in *Dammarell*, and awarded twenty-nine of the Iranian Terrorism Victims who were relatives and estates of individuals murdered in the attacks $126,061,657 in compensatory damages.[8] On September 7, 2007, the district court awarded the remaining Iranian Terrorism Victims in that case $190,858,000 in compensatory damages, for a total final judgment award of $316,919,657 in compensatory damages.[9]

8. On May 9, 2013, the D.C. district court awarded a default judgment against Iran in favor of the plaintiffs in *Doe*, and awarded the Iranian Terrorism Victims in that case $1,126,539,000 in compensatory damages and $299,999,998.08 in punitive damages, for a total judgment amount of $1,426,538,998.08.[10]

9. On November 15, 2017, another group of Iranian Terrorism Victims from the Beirut Embassy Attacks (the "Smith Plaintiffs") moved to intervene in *Barry et al v. Islamic*

---

[6] *See Maxwell v. Islamic Republic of Iran*, 2024 WL 1342775, at *1 (D.D.C. Mar. 29, 2024).
[7] *Id.* at *6.
[8] *See Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 271 (D.D.C. 2005).
[9] Final Judgment Order at 2, 5, *Dammarell v. Islamic Republic of Iran*, No. 1:01-2224 (D.D.C.), Dkt. 72.
[10] Order at 19, *Doe v. Islamic Republic of Iran*, 1:08-cv-00540 (D.D.C. May 9, 2013), Dkt. 107.

*Republic of Iran*, No. 1:16-cv-01625 (D.D.C.).[11] On February 4, 2020, the district court awarded the Smith Plaintiffs $1,525,753,447.00 in compensatory damages.[12]

10. On June 13, 2022, the D.C. district court awarded a default judgment against Iran in favor of the plaintiffs in *Jones*, and awarded the Iranian Terrorism Victims in that case over $412,174,467 in compensatory damages and $15,246,333.91 in punitive damages.[13] On October 26, 2022, the district court award $12,729,910 in compensatory damages and $470,879.37 in punitive damages to four additional Iranian Terrorism Victims as to whom the district court had previously reserved judgment.[14]

11. On March 29, 2024, the D.C. district court awarded a default judgment against Iran in favor of the plaintiffs in *Maxwell*. The district court awarded the Iranian Terrorism Victims in that case $1,189,694,232.00 in compensatory damages and $44,006,789.64 in punitive damages, for a total damages amount of $1,233,701,012.65 On June 23, 2024, the district court awarded $10,000,000 in compensatory damages to the estates of two plaintiffs, bringing the total judgment amount to $1,243,701,012.65.[15]

### C. 1984 Beirut, Lebanon Assassination

12. On January 18, 1984, Iran-sponsored terrorists assassinated Malcolm Kerr, the President of the American University of Beirut, just outside Mr. Kerr's office.[16] U.S. intelligence agencies determined that the attackers acted at the instigation, and with the logistical and financial support of Iran.[17]

---

[11] *See generally* Complaint of John Smith in Intervention, *Barry et al v. Islamic Republic of Iran*, No. 1:16-cv-01625 (D.D.C.), Dkt. 17.
[12] *See Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 63 (D.D.C. 2020).
[13] Mem. Opinion at 54 *Jones v. Islamic Republic of Iran*, No. 1:16-cv-01625 (D.D.C. June 13, 2022), Dkt. 43.
[14] Order at 5 *Jones v. Islamic Republic of Iran*, No. 1:16-cv-01625 (D.D.C. October 26, 2022), Dkt. 53.
[15] *Maxwell v. Islamic Republic of Iran*, 2024 WL 6111323, at *2 (D.D.C. June 23, 2024).
[16] *Kerr v. Islamic Republic of Iran*, 245 F. Supp. 2d 59, 61 (D.D.C. 2003).
[17] *Id.* at 62.

13. On September 20, 2001, the estate of Malcom Kerr and his family members brought suit against Iran for Iran's role in his murder. The D.C. district court entered a default judgment against Iran and in favor of the Kerrs and on February 11, 2003, awarded them, collectively, compensatory damages in the amount of $33,025,296.[18]

### D. 1984 Beirut, Lebanon Kidnappings

14. On February 10, 1984, Iran-sponsored terrorists abducted Frank Regier, a member of the faculty of the American University of Beirut, off a Beirut street and subsequently held him captive for sixty-five days.[19]

15. On June 12, 2001, Frank Regier and his family brought suit against Iran for its role in his abduction. The D.C. district court entered a default judgment against Iran and on September 8, 2003, awarded $5,321,520 in compensatory damages.[20]

16. On May 8, 1984, Iran-sponsored terrorists abducted Benjamin Weir, a pastor of a Presbyterian Church, when Mr. Weir was leaving his apartment in Beirut and subsequently held him captive for the next 495 days in solitary confinement.[21] Mr. Weir's captors were materially supported by Iran.[22]

17. On June 12, 2001, Benjamin Weir and his family brought suit against Iran for Iran's role in his abduction. The D.C. district court entered a default judgment against Iran and on April 29, 2003, awarded $11,450,000 in compensatory damages and $300,000,000 in punitive damages, for a total judgment amount of $311,450,000.[23]

---

[18] *Id.* at 64.
[19] *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 88 (D.D.C. 2003).
[20] *Id.* at 100-101.
[21] Decision and Order at 2-3, *Weir et al v. Islamic Republic of Iran, et al*, No. 01:01cv-01303 (D.D.C. Apr. 29, 2003), Dkt. 12.
[22] *Id.* at 5.
[23] *Id.* at 8-9.

18. On or about November 30, 1984, Iran-sponsored terrorists abducted Peter Kilburn, a librarian at the American University of Beirut, from his Beirut apartment.[24] During Mr. Kilburn's captivity, his captors sold him to another terrorist cell between April 14 and 17, 1986.[25] On April 17, 1986, sixteen months after his abduction, Peter Kilburn was executed and his body left on the side of the road outside Beirut.[26]

19. On June 12, 2001, Peter Kilburn's family and his estate brought suit against Iran for Iran's role in his abduction and murder. The D.C. district court entered a default judgment against Iran and in favor of the Kilburns and on March 30, 2010, awarded them, collectively, $11,030,000 in compensatory damages.[27]

### E.  1987 Beirut, Lebanon Kidnapping

20. On January 24, 1987, Iran-sponsored terrorists abducted Jesse Jonathan Turner, a professor at Beirut University College, along with three other professors, and subsequently held them all captive for 1,731 days.[28]

21. On September 18, 2001, Jesse Jonathan Turner and his wife brought suit against Iran for Iran's role in his abduction. The D.C. district court entered a default judgment against Iran and in favor of the Turners, and on October 2, 2002, awarded the Turners, collectively, $27,310,000 in compensatory damages and $300,000,000 in punitive damages.[29]

---

[24] *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 139 (D.D.C. 2010).
[25] *Id.* at 144.
[26] *Id.*
[27] *Id.* at 157-158
[28] Decision and Order, at 3-5, *Turner, et al v. The Islamic Republic of Iran, et al*, No. 1:01-cv-01981 (D.D.C. Oct. 2, 2002), Dkt. 17.
[29] *Id.* at 7.

### F. 1998 East Africa Embassy Bombings

22. On August 7, 1998, Iran-sponsored terrorists simultaneously bombed the U.S. embassies in Dar es Salaam, Tanzania, and Nairobi, Kenya, killing hundreds and injuring thousands ("East Africa Embassy Bombings").[30] Iran deliberately provided material support to the terrorists' planning, recruitment, and training activities and equipped them to carry out the East Africa Embassy Bombings.[31]

23. Several suits against both Iran and the Republic of Sudan (which also provided support to the terrorists) on behalf of the victims and their estates (including the Iranian Terrorism Victims) followed.

24. On May 9, 2012, one group of Iranian Terrorism Victims (the "Aliganga Plaintiffs") intervened in the case styled *Owens et al v. Republic of Sudan, et al*, No. 1:01-cv-02244 (D.D.C.) and brought claims against Iran, along with other defendants, for Iran's role in supporting the East Africa Embassy Bombings.[32]

25. Having previously issued a default judgment against Iran, on October 24, 2014, the district court awarded the Aliganga Plaintiffs, collectively, $283,809,867 in compensatory damages.[33]

## II. The Iranian Terrorism Victims Are Entitled To Enforce Their Judgments.

26. Claimants are all judgment-holders—either directly or as the estate, heir, or other beneficiary or successor-in-interest of the original judgment holder—in the above actions.

---

[30] *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 132 (D.D.C. 2011).
[31] *Id.* at 135-139.
[32] *See* Complaint in Intervention, *Owens et al v. Republic of Sudan, et al*, No. 1:01-cv-02244 (D.D.C. May 9, 2012). Dkt. 226.
[33] Amended Order, *Owens et al v. Republic of Sudan, et al*, No. 1:01-cv-02244 (D.D.C. October 24, 2014). Dkt. 349.

27. In total, the Iranian Terrorism Victims in this action have been awarded damages of $5,934,151,396.63 against Iran, including $4,971,427,396 in compensatory damages. These judgments were entered to provide justice and compensation to the direct victims and family members of victims of Iran's sponsorship of, and responsibility for, devastating acts of terrorism. To date, Iran has refused to engage with any of the lawsuits against it and has not paid any of the judgments, which continue to accrue post-judgment interest pursuant to 28 U.S.C. § 1961.

28. The Iranian Terrorism Victims and the damages they have been awarded are listed in Attachment A to the Verification of their Claims.

### III. The Government Commenced This Forfeiture Action Against The Defendant Cryptocurrency—But Without Disclosing Its Extensive Connections To Iran.

29. On October 14, 2025, the government initiated the instant civil forfeiture action against approximately 127,271 Bitcoin once stored in the virtual-currency addresses identified in Attachment A of its complaint. *See* Dkt. 1 ("Forfeiture Compl.") at 1 & Attachment A.

30. On the same day, this Court issued an arrest warrant *in rem* for Defendant Cryptocurrency pursuant to 18 U.S.C. § 981(a)(1)(C) and (a)(1)(A). *See* Dkt. 3.

31. The government alleges the Defendant Cryptocurrency is subject to condemnation and forfeiture by the United States (1) under 18 U.S.C. § 981(a)(1)(C), as property that constitutes proceeds or is derived from proceeds of a violation of the wire fraud statute or a conspiracy to violate that statute, 18 U.S.C. §§ 1343, 1349; and (2) under 18 U.S.C. § 981(a)(1)(A), as property that was involved in or is derived from property involved in a money laundering transaction, an attempted money laundering transaction, or a conspiracy to make a money laundering transaction, 18 U.S.C. § 1956. *See* Forfeiture Compl. ¶ 2.

32. Specifically, the government alleges that the Defendant Cryptocurrency was involved in or derived from money-laundering operations conducted by Chen Zhi and Prince

Holding Group, an alleged front for Chen's transnational criminal organization. Forfeiture Compl. ¶¶ 20, 38-43. According to the government, one such scheme involved using stolen cryptocurrency to fund a "large-scale cryptocurrency mining operation[ ]" called "Lubian," which was "sixth largest bitcoin mining operation in the world" "[f]or some of the time it was active" and produced "large sums of clean bitcoin dissociated from criminal proceeds." *Id*. ¶ 42.

33. The government describes "Lubian" as "a Chinese bitcoin mining operation" and acknowledges that it had at least one facility in "Iran." Forfeiture Compl. ¶ 16(u). The government did not include information that put the Iranian Terrorism Victims on notice that the operation involved conduct attributable to the Iranian Government, or otherwise that the Iranian Terrorism Victims had a basis to claim any of the relevant funds.

## IV. The Iranian Terrorism Victims Recently Learned of the Relationship Between the Defendant Cryptocurrency and the Government of Iran

34. Based on information the Iranian Terrorism Victims only recently learned, it appears that the Defendant Cryptocurrency is directly tied to Iran, which was not clear from the forfeiture pleadings. On December 26, 2025, other victims of Iran's state-sponsored terrorism filed a separate action alleging that LuBian was the cryptocurrency mining pool for the Iran-China Group, an Iranian joint-stock company that partnered with the Iranian government to build a large Bitcoin mine in Rafsanjan, Iran to assist that country's longstanding efforts to evade U.S. sanctions. *See generally Fritz v. Iran and China Investment Development Group d/b/a Lubian.com*, No. 25-cv-07093 (E.D.N.Y.), Dkt. 1 ("Fritz Compl.").

35. Plaintiffs in the *Fritz* suit along with another group of victims of Iran's state-sponsored terrorism (the "*Baxter* Victims") filed Notices of Verified Claims in this instant proceeding on December 29, 2025. *See* Dkts. 29, 30.

36. Based on the information just revealed in the allegations in the *Fritz* suit, and summarized by the Notices of Verified Claims filed by the other victim-claimants, the Iranian Terrorism Victims now submit their own Notice of Verified Claim. *See generally* Dkts. 29, 30.

37. The Iranian Terrorism Victims have learned that the Court previously ordered that any third-party claims be filed by December 29, 2025. However, the Iranian Terrorism Victims did not receive notice of this order, and were not aware of their interest in the Defendant Cryptocurrency prior to the *Fritz* suit.

38. Any delay by the Iranian Terrorism Victims in filing their claims is not the result of inexcusable neglect because the Iranian Terrorism Victims had no reason to know of their interest in the instant action prior to the allegations in the *Fritz* suit and the Iranian Terrorism Victims acted swiftly upon becoming aware of that potential interest. *See, e.g. U.S. v. $417,143.48*, 2015 WL 5178121, at *9 (E.D.N.Y. Sept. 2, 2015) ("In the case of an untimely claim "courts generally permit a party to file a belated claim if the party demonstrates excusable neglect for failure to timely file, in line with the standards set forth in Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure.") (collecting cases).

*39.* Given the procedural status of these proceedings, allowing the Iranian Terrorism Victims to file this claim at this time will not prejudice any other party, including because the deadline for other parties to file claims opposing the forfeiture has not yet lapsed. *See, e.g.* December 18, 2025 Order (extending deadline to January 19, 2026 for claimants Yang and LuBian to file claims opposing forfeiture). Further, the Iranian Terrorism Victims' claims are similar to the claims already asserted by the victims in *Fritz*, and therefore the government already is on notice of the type of claim asserted here.

## V. Under TRIA, The Iranian Terrorism Victims Have A Senior Interest In The Defendant Cryptocurrency

40. In the context of a forfeiture action, at this stage of the proceedings, the Iranian Terrorism Victims need only assert that they have a "facially colorable interest" in the property at issue. *United States v. Ross*, 161 F.4th 100, 109 (2d Cir. 2025) (citation omitted). "[W]hether [they] ultimately prove[ ] the existence of that interest is a question for a later stage in the proceedings." *Id*. (citation omitted).

41. Here, based on the information alleged in the *Fritz* suit, the Iranian Terrorism Victims have far more than a "facially colorable interest" in the Defendant Cryptocurrency. They are judgment creditors of Iran as a result of Iran's acts of state sponsored terrorism. As has now been alleged, because the Iran-China Group was an agent or instrumentality of Iran, TRIA entitles the Iranian Terrorism Victims to execute on the Defendant Cryptocurrency to satisfy those judgments "[n]otwithstanding any other provision of law." TRIA § 201(a). Accordingly, the Iranian Terrorism Victims have a possessory interest in the Defendant Cryptocurrency, which permits them to bring the claims asserted here.

42. Thus, in accordance with Federal Rule G, the Iranian Terrorism Victims assert a protective, prophylactic claim against such amount of the Defendant Cryptocurrency as may ultimately be necessary to satisfy the outstanding compensatory damages owed to the Iranian Terrorism Victims under their judgments against Iran, plus post-judgment interest, based on the date the Defendant Cryptocurrency is valued for purposes of judgment.

43. Specifically, TRIA provides that "[n]otwithstanding any other provision of law," those who hold judgments against a "terrorist party" may execute on the "blocked assets" of that terrorist party or its "agency or instrumentality" "to satisfy such judgment to the extent of any

compensatory damages." Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337 (2002), codified at 28 U.S.C. § 1610 Note.

44. TRIA's cornerstone is the statute's broad "notwithstanding" clause. The clause aims to "enable" victims "to execute on" terrorists' assets by preventing other provisions of law from "bar[ring] victims' efforts to enforce [their] judgments." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 391-92 (2009) (Kennedy, J., concurring). The notwithstanding clause "mak[es] plain that the force of the [statute] extends everywhere" and "'supersede[s] all other laws.'" *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 49 (2d Cir. 2010) (citation omitted). Accordingly, because it expressly overrides "conflict[ing] laws," TRIA's notwithstanding clause necessarily overrides "the civil-forfeiture statute." *Est. of Levin v. Wells Fargo Bank, N.A.*, 156 F.4th 632, 643 n.1 (D.C. Cir. 2025).

45. Because the Iranian Terrorism Victims satisfy the requirements of TRIA, their interest in the Defendant Cryptocurrency necessarily is superior to the claims of the government, as well as all other non-TRIA claimants, in the forfeiture action here.

46. First, as explained above and like the other victim-claimants, the Iranian Terrorism Victims hold judgments for compensatory damages against Iran based on an act of terrorism under 28 U.S.C. § 1605A or its predecessor statute 28 U.S.C. § 1605(a)(7).

47. Second, Iran is a "terrorist party" because it has been designated as a state sponsor of terrorism under the Export Administration Act of 1979. *See* TRIA § 201(d)(4); Exec. Order No. 13599, 77 Fed. Reg. 6659 (Feb. 5, 2012).

48. Third, as now alleged in the *Fritz* suit, the Iran-China Group operated as Iran's agency or instrumentality by materially serving that country in avoiding sanctions, while providing the material function to Iran of laundering its energy resources through cryptocurrency mining, at

13

Iran's direction and behest. *Fritz* Suit, Dkt. 70, Plaintiffs' Memorandum of Law in Support of Motion for Attachment, at 13-17 (Dec. 28, 2025) ("*Fritz* Attachment Motion"); *see Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107, 135 (2d Cir. 2016).

49. Fourth, under TRIA, "[b]locked assets" include "any asset seized or frozen by the United States" pursuant to the International Emergency Economic Powers Act. TRIA § 201(d)(2)(A). The government has used its authority under that statute to "block" all Iranian property in the United States, including the property of agencies or instrumentalities of Iran. 31 C.F.R. §§ 510.211, 594.201(a)(5); *Kirschenbaum*, 830 F.3d at 120. As a result, if the Iran-China Group is an agency or instrumentality of Iran, all property of the Iran-China Group qualifies as a blocked asset under TRIA. *See Levinson v. Kuwait Finance House (Malaysia) Berhad*, 44 F.4th 91, 98 n.6 (2d Cir. 2022).

50. Because the Defendant Cryptocurrency is property of the Iran-China Group, it is therefore blocked and subject to execution by the Iranian Terrorism Victims under TRIA.

\*   \*   \*

51. Pursuant to 28 U.S.C. § 983(a) and Rule G, the Iranian Terrorism Victims hereby assert a protective, prophylactic claim to the Defendant Cryptocurrency—as the property of an agency or instrumentality of Iran—that is senior to the government's claim. Notwithstanding the government's forfeiture efforts, the Iranian Terrorism Victims reserve all rights and remedies available in law and equity to enforce their interest in the Defendant Cryptocurrency.

Dated: January 14, 2026 　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　/s/ *Kelly T. Currie*
　　　　　　　　　　　　　　　　　　　　Kelly T. Currie

　　　　　　　　　　　　　　　　　　　　CROWELL & MORING LLP
　　　　　　　　　　　　　　　　　　　　Two Manhattan West
　　　　　　　　　　　　　　　　　　　　375 9th Ave
　　　　　　　　　　　　　　　　　　　　New York, NY 10001
　　　　　　　　　　　　　　　　　　　　(212) 895-4257
　　　　　　　　　　　　　　　　　　　　KCurrie@crowell.com


　　　　　　　　　　　　　　　　　　　　Alexander J. Kramer (*pro hac vice* forthcoming)
　　　　　　　　　　　　　　　　　　　　Michael J. Williams (*pro hac vice* forthcoming)
　　　　　　　　　　　　　　　　　　　　CROWELL & MORING LLP
　　　　　　　　　　　　　　　　　　　　1001 Pennsylvania Avenue NW
　　　　　　　　　　　　　　　　　　　　Washington, DC 20004
　　　　　　　　　　　　　　　　　　　　(202) 624-2500
　　　　　　　　　　　　　　　　　　　　Akramer@crowell.com
　　　　　　　　　　　　　　　　　　　　Mwilliams@crowell.com


　　　　　　　　　　　　　　　　　　　　*Attorneys for Claimants*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 14, 2026, I electronically filed the foregoing Notice of Verified Claim and Statement of Interest or Right in Property Subject to Forfeiture *In Rem* and its attachments, including Verification of Victims' Claims, via CM/ECF for the United States District Court for the Eastern District of New York and therefore caused it to be served on all parties registered for CM/ECF, including attorneys for the government, in the above-captioned matter.

Dated: January 14, 2026                                  /s/ *Kelly T. Currie*
                                                                            Kelly T. Currie