

McANDREW VUOTTO LLC
ATTORNEYS AT LAW

Jonathan P. Vuotto, Esq.
jpv@mcandrewvuotto.com
Direct: (973) 532-6242

January 30, 2026

*Via ECF*

The Honorable Rachel P. Kovner
United States District Judge
U.S. District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

> Re: **United States v. Approximately 127,271 Bitcoin**
> Case No. 1:25-cv-05745 (RPK)

Dear Judge Kovner:

This firm represents Kristen Breitweiser, individually and as Personal Representative of the Estate of Ronald Breitweiser, Caroline Breitweiser, Patricia Ryan, individually and as Personal Representative of the Estate of John J. Ryan, Laura Ryan, Colin Ryan, Kristen Ryan and Jacqueline Eaton-Garland, individually and as Personal Representative of the Estate of Robert D. Eaton (collectively, the "Breitweiser Claimants"). Please accept this letter in lieu of a more formal reply in further support of the Breitweiser Claimants' letter motion for leave to file an untimely Claim, extending the deadline *nunc pro tunc* to date of their filing – January 23, 2026 [ECF Docs. 106-107], and specifically in response to the letter filed by the U.S. Department of Justice (the "U.S.") opposing the Breitweiser Claimants' application.

We received the Court's Text Order dated January 29, 2026, establishing a reply deadline of February 6, 2026, for other claimants who filed motions for leave to file or for extensions of time to file their claims, but the Order did not expressly reference the Breitweiser Claimants. The United States, however, included opposition to the Breitweiser Claimants' application in its January 27, 2026 letter. [ECF Doc. 126.] Accordingly, in an abundance of caution, the Breitweiser Claimants submit this reply within three days of the government's filing.

### I. Applicable Standard

The U.S. argues that the Court should evaluate the Breitweiser Claimants' application under the 'excusable neglect' standard. The U.S. is being overly strict in its view of the standard applicable to considering untimely claims.

The Second Circuit has specifically held that trial courts are compelled "to consider untimely claims with particular indulgence" and therefore claimants who seek "to file an untimely claim against seized assets after default has been entered but before default judgment has been

granted, district courts should apply the 'good cause' standard" – not the excusable neglect standard. *United States v. Starling*, 76 F.4th 92, 102 (2d Cir. 2023). In fact, this Court has already ruled, in this case, that the 'good cause' standard is applicable to extending the deadline for late-filed claims. *United States v. Approximately 127,271 Bitcoin "BTC" Previously Stored at the Virtual Currency Addresses Listed in Attachment A*, 2025 U.S. Dist. LEXIS 265595 at *2 (EDNY Dec. 11, 2025). Although the Court qualified its ruling, stating that "to the extent additional third parties hope to file claims opposing forfeiture in this action, they may do so by 12/29/2025," the Court did not suggest that any additional claimants making extension applications should be subject to the higher "excusable neglect" standard.

Furthermore, as noted in the Breitweiser Claimants' prior submission, they did not know about the U.S.'s proceeding until January 16, 2026. Indeed, even if the proper standard were 'excusable neglect,' the Breitweiser Claimants respectfully submit that they have met that standard. As set forth in the accompanying Declaration, the Breitweiser Claimants were without counsel in *In re Terrorist Attacks on September 11, 2001*, 03-MDL-1570 (GBD)(SN) (the "9/11 Litigation") since at least December 10, 2025 – prior to even the initial deadline of December 14, 2025 (60 days after the U.S.'s Notice). The Breitweiser Claimants were without counsel and still seeking new counsel during the timeframe of both the initial deadline and the extended deadline of December 29, 2025. Courts consistently recognize that disruption in legal representation—including periods in which a claimant is without counsel or reasonably attempting to secure new counsel—constitutes a circumstance beyond the claimant's reasonable control supporting good cause or excusable neglect. *See, e.g., United States v. $96,000 in U.S. Currency*, 2019 WL 3334493, at *4 (S.D.N.Y. July 25, 2019); *United States v. $153,115.00 in U.S. Currency*, 2021 WL 3507894, at *3 (W.D.N.Y. Aug. 10, 2021). Where, as here, Claimants acted promptly upon receiving notice and securing counsel, courts favor adjudication on the merits rather than forfeiture by procedural default.

The Breitweiser Claimants received notice of this forfeiture action on January 16, 2026, contacted and retained their current counsel on January 22, 2026, and filed their application the next day, on January 23, 2026. Thus, being *pro se* since prior to the expiration of the initial deadline and, upon receiving notice of this proceeding, having immediately taken action to retain counsel and protect their rights, the Breitweiser Claimants have demonstrated both excusable neglect and diligence, and should therefore not be closed out from this case.

At this point in the proceeding, before any claims have been adjudicated and there is no judgment, and where multiple other untimely claims have been allowed, it would be unfair to reject the Breitweiser Claimants' extension request. The government's own submission underscores the equities here. The U.S. notes that an extension was granted in a proceeding where counsel missed a deadline due to illness. *United States v. $153,115.00 United States Currency*, No. 21-CV-380 (WMS), 2021 WL 3507894, at *3 (W.D.N.Y. Aug. 10, 2021). That example supports, rather than undermines, the Breitweiser Claimants' request. If a temporary disruption in representation caused by counsel's illness may constitute excusable neglect, then a period in which claimants were entirely without counsel—despite diligent efforts to secure new representation—plainly satisfies the same equitable standard. Unlike the cited example, the Breitweiser Claimants had no counsel available to monitor filings or deadlines at all. Once notice of this proceeding was received, however, they acted immediately to retain counsel and file their claim. Under these circumstances, equitable considerations weigh strongly in favor of permitting the Claim to proceed. Accordingly,

the Breitweiser Claimants respectfully request that the Court reject the U.S.'s argument and accept the Breitweiser Claimants' Claim.

### II.   Standing

The U.S. argues that the Breitweiser Claimants lack standing to make their Claim, because allegedly their Claim "depend[s] on LuBian prevailing on its own claim of ownership over the Defendant Cryptocurrency." [ECF Doc. 126, at 6-7.]

The requirement to demonstrate Article III standing before being heard in a forfeiture proceeding "is hardly onerous: a person need show only a "facially colorable interest" in the property at issue; whether he 'ultimately proves the existence of that interest' is a question for a later stage in the proceedings." *United States v. Ross*, 161 F.4th 100, 2025 U.S. App. LEXIS 31557 at *14 (2d Cir. Dec. 4, 2025) (quoting *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 79 & n.10 (2d Cir. 2002) (internal quotation marks omitted)).  At the standing stage, courts do not weigh competing claims, resolve ownership disputes, or require a claimant to prove priority over others. *See Ross*, 2025 U.S. App. LEXIS 31557, at *14; *United States v.$557,933.89*, 287 F.3d at 79 n.10.

The Breitweiser Claimants respectfully submit that, at this point, they have established a "facially colorable interest" in the Bitcoin such that the Court should at least allow them to prosecute their Claim.  The U.S. admits that LuBian's claim of ownership is "a disputed claim that will be contested by the government as well as by other competing claimants." [ECF Doc. 126, at 7.] Since the Breitweiser Claimants have demonstrated at least a facial interest in the Bitcoin, they should be permitted due process to prove their Claim.

### III.   Merits – TRIA as a Basis for the Claim

The U.S. argues that the Breitweiser Claimants' Claim fails on the merits because "TRIA only applies to the 'blocked assets' of a terrorist party." [*Id.*]  The U.S. further argues that the Breitweiser Claimants should be shut out of this proceeding because allegedly TRIA "does not provide a basis for the Iran Claimants to assert a claim and recover against the Defendant Cryptocurrency in this forfeiture action." [ECF Doc. 126, at 7.]  The Court should not accept the U.S.'s 'merits' arguments at this stage without further briefing, particularly where the government's arguments turn on unresolved factual predicates concerning ownership, agency or instrumentality status, and the application of Executive Order 13599.  *See Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 141–42 (2d Cir. 2016) (remanding TRIA claims because "questions of fact … prevent either of these TRIA questions from being decided"); *Ross*, 2025 U.S. App. LEXIS 31557, at *14.

Nevertheless, contrary to the U.S.'s arguments, TRIA provides a valid basis for the Breitweiser Claimants' Claim.  Congress enacted TRIA § 201(a) to ensure that victims holding terrorism judgments could reach blocked assets of terrorist parties, overriding otherwise applicable legal barriers to execution once the statute's predicates are satisfied: "Notwithstanding any other provision of law … the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution."  28 U.S.C. § 1610 note (TRIA § 201(a)).

Courts have consistently recognized TRIA as a powerful remedial statute designed to ensure compensation of terrorism victims. As the Second Circuit and other courts have made clear, TRIA provides a self-executing execution mechanism once its statutory predicates are met, overriding otherwise applicable legal barriers. *See Bank Markazi v. Peterson*, 578 U.S. 212, 228–31 (2016) (upholding Congress's authority to target specific assets for execution in terrorism cases and confirming judiciary's role in applying statutory predicates); *Weinstein v. Islamic Republic of Iran*, 831 F.3d 470, 483 (D.C. Cir. 2016); *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010) (describing TRIA as "self-executing" in that it authorizes execution without need for additional implementing legislation once predicates are met); *Calderon-Cardona v. JPMorgan Chase*, 770 F.3d 993, 1001–02 (2d Cir. 2014) (defining the scope of "blocked assets" under TRIA). TRIA thus supplies a substantive execution remedy, while leaving courts to determine—based on the factual record—whether the statute's requirements are satisfied in a given case.

Additionally, Executive Blocking Orders under the International Emergency Economic Powers Act ("IEEPA") create "blocked assets" within TRIA's reach. TRIA defines "blocked assets" to include assets "seized or frozen" pursuant to IEEPA. 28 U.S.C. § 1610 note (TRIA § 201(d)(2)(A)). Executive Order 13599 blocks "[a]ll property and interests in property of the Government of Iran, including the Central Bank of Iran, that are in the United States or within the possession or control of any United States person." Exec. Order No. 13,599, 77 Fed. Reg. 6659 (Feb. 5, 2012). Courts have treated IEEPA-based blocking orders as potentially satisfying TRIA's "blocked asset" predicate where the requisite ownership or agency/instrumentality relationship is shown, subject to judicial determinations regarding ownership, agency or instrumentality status, and terrorist nexus. *See Kirschenbaum*, 830 F.3d at 131-33; *Weinstein*, 831 F.3d at 483.

As is being argued in the *Fritz* action, TRIA's execution remedy becomes available once an asset qualifies as a "blocked asset" under IEEPA, and subsequent forfeiture proceedings do not categorically extinguish that remedy. Whether those predicates are satisfied remains a merits-based inquiry.

The U.S. asserts that "numerous courts in this Circuit and elsewhere have held that TRIA does not reach property that is already subject to a forfeiture proceeding." [ECF Doc. 126, at 7.] To the contrary, the fact that this is a forfeiture case does not categorically defeat TRIA standing or participation. TRIA is an execution statute, not a forfeiture statute. Courts have recognized that the government's assertion of forfeiture authority does not, by itself, automatically bar terrorism judgment holders from invoking TRIA. In *United States v. All Funds on Deposit with R.J. O'Brien & Associates*, 783 F.3d 607, 622-24 (7th Cir. 2015), relied on by the U.S. here, the Seventh Circuit held that TRIA execution claims may proceed in contested asset proceedings even where the United States asserts forfeiture interests, and that courts must determine whether the assets qualify as "blocked assets" subject to TRIA. The circuit court emphasized that TRIA's "notwithstanding" clause "cures the standing defect under civil forfeiture law," and that the government's forfeiture claim does not eliminate victims' rights to contest entitlement under TRIA. *Id.* at 622–23. The Circuit Court in *R.J. O'Brien* went on to rely on a stipulation specific to that case to find that the seized assets were not "blocked," but it did <u>not</u> definitively rule that "TRIA does not reach property that is already subject to a forfeiture proceeding," as the U.S. asserts. In any event, government custody of an asset does not, standing alone, resolve TRIA's applicability. Custody establishes

situs for jurisdictional purposes and confirms that the asset is present in the United States, while leaving for later adjudication whether the statutory predicates for TRIA execution are satisfied.

Furthermore, the authorities cited by the U.S. for its narrow, categorical approach are not dispositive. For example, the U.S. relies on *Levin v. United States*, 774 F. App'x 49, 50 (2d Cir. 2019). In *Levin*, the Second Circuit considered only the District Court's "conclusion that the claim was untimely under Rule G(5) of the Supplemental Rules for Admiralty and Maritime," and held that the claim was untimely. The Second Circuit commented, in *dicta*, that it did not understand TRIA's "notwithstanding" clause to extend to property seized by the U.S. – but it did not base its ruling on that understanding, nor did it even analyze the issue.

Similarly, *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107 (2d Cir. 2016) and *United States v. Holy Land Foundation for Relief and Development*, 722 F.3d 677 (5th Cir. 2013), both cited by the U.S., were decided based on facts that are not similar to this case, and therefore are not dispositive. In *Holy Land*, although the subject assets were blocked by Executive Orders 12947 and 13224, the Fifth Circuit noted that there is an exception to the prohibition on transferring blocked property when that transfer is authorized by license. 722 F.3d at 686 (citing 31 C.F.R. §§ 594.201, 594.202, 595.202 and Estate of Heiser v. Islamic Republic of Iran, 807 F. Supp. 2d 9, 18 n.6 (D.D.C. 2011) (recognizing that, in certain situations, an OFAC-issued license authorizing a transaction involving blocked funds has the effect of removing the prohibition on dealing in those funds)); *see also Bank of N.Y. v. Rubin*, 484 F.3d 149, 150 (2d Cir. 2007) (determining that assets blocked pursuant to an Executive Order, but also subject to an OFAC general licensing scheme, were not blocked and therefore were not subject to attachment under the TRIA). The government in *Holy Land* had obtained such a license, which authorized the government to pursue restraining orders, which it did in order to preserve the assets for criminal forfeiture. *Id.* at 687. The government then proceeded with the criminal forfeiture process. *Id.* Moreover, this all occurred <u>before</u> the plaintiffs in *Holy Land* had obtained a judgment against the terrorist entity. *Id.* The Fifth Circuit found that "the government's restraining order became legally effective before the [plaintiffs] received a judgment in their favor giving them the right under the TRIA to execute against [the terrorist's] assets" and that "TRIA could not be applied to those funds since they no longer qualified as blocked under that statute." *Id.* That is clearly not the case here – the facts are fundamentally the opposite: there is no evidence that the U.S. obtained an OFAC-issued license that removed the block imposed by Executive Order 13599, and the Breitweiser Claimants received their Judgments before the U.S.'s seizure of the cryptocurrency.

In *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107 (2d Cir. 2016), the Second Circuit, relying on *Holy Land*, noted that TRIA "does not 'reach those funds which the government has been given authorization to control through another means.'" 830 F.3d at 139 (quoting *Holy Land*, 722 F.3d at 685). The Second Circuit was specifically referring to that general proposition, however, because in *Kirschenbaum* a court-appointed monitor had control over the subject property. The Circuit Court was merely making the point that the monitor had obtained a "possessory interest" in the property, which "is insufficient to render them blocked for purposes of the TRIA." *Id.* at 139-40. The Court nevertheless found that the assets were blocked under Executive Order 13599 "and, therefore, subject to attachment under TRIA § 201" (*id.* at 141) – similar to the Breitweiser Claimants' argument here. The Circuit Court remanded to determine whether the defendants "are a 'political subdivision, agency, or instrumentality thereof, including

. . . any person owned or controlled by, or acting for or on behalf of, the Government of Iran.' *Id.* (citing Executive Order 13599). This Court should make a similar evaluation in this matter.

The U.S. further relies on *United States v. BNP Paribas S.A.*, No. 14-CR-460 (LGS), 2015 WL 1962882, at *6-7 (S.D.N.Y. Apr. 30, 2015). The SDNY in *BNP Paribas*, however, specifically found that there were no "terrorist assets" to confer standing under TRIA. This case has not advanced to the point where the Court can determine whether the Defendant Cryptocurrency are "assets of a terrorist party."

In short, the U.S.'s narrow, categorical approach is incorrect and should not be accepted as a basis to exclude the Breitweiser Claimants from participation before the merits are fully adjudicated. *See Ross*, 2025 U.S. App. LEXIS 31557, at *14; *Kirschenbaum*, 830 F.3d at 141–42. We respectfully request that the Breitweiser Claimants be permitted to participate in the resolution of this matter on its merits.

### IV. Prejudice

Finally, the U.S. argues that it would be prejudiced if the Breitweiser Claimants are allowed to pursue their Claim. This argument is without merit.

The burden of proof is on the U.S. in this case to establish, by a preponderance of the evidence, that "the property is subject to forfeiture." 18 U.S.C. § 983(c)(1). The civil forfeiture procedure "magnifies the importance of deciding such cases on the merits rather than by default." *Starling*, 76 F.4th 92 at 101. "Civil forfeiture can 'enable the government to seize . . . property without any predeprivation judicial process and to obtain forfeiture of the property even when the owner is personally innocent.' *Id.* (quoting *Leonard v. Texas*, 580 U.S. 1178, 1179, 137 S. Ct. 847, 197 L. Ed. 2d 474 (2017) (statement of Thomas, J., respecting denial of certiorari)).

Under the Second Circuit's standard, the U.S. has to prove its right to forfeiture, and the claims sought to be made in this case by the 9/11 claimants, including the Breitweiser Claimants, should be heard on their merits. Allowing the 9/11 claimants to be heard would not "open the floodgates" under the U.S.'s own theory, because according to the U.S., these claims have no merit. If the Court hears the claims on the merits, then all similarly-situated claims will be heard together – it is not as if the U.S. will have to defend against thousands of claimants each with a different basis of claim. Even if the U.S. did have to defend against thousands of claimants, it would not constitute "prejudice." Administrative burden, litigation complexity, or the number of claimants does not constitute legal prejudice. *See United States v. $417,143.48*, 682 F. App'x 17, 20 (2d Cir. 2017); *Williams v. KFC Nat'l Mgmt. Co.*, 391 F.3d 411, 415-16 (2d Cir. 2004). "Prejudice" in this context concerns the ability of a party to fairly prosecute, or defend against, the allegations on their merits. There is nothing about the Breitweiser Claimants' Claim that would prevent the U.S. from prosecuting its allegations on the merits.

      For these reasons, we respectfully request that the Court grant the Breitweiser Claimants' application and extend their filing deadline to the date of their Claim – January 23, 2026. We thank the Court for its consideration of this request.

                                                Respectfully submitted,

                                               */s/Jonathan P. Vuotto*
                                                Jonathan P. Vuotto

cc:     Counsel/Parties of Record