

**PRYOR CASHMAN LLP**                    New York | Los Angeles | Miami

7 Times Square, New York, NY 10036-6569   Tel: 212-421-4100   Fax: 212-326-0806                    pryorcashman.com

March 9, 2026

<u>**VIA E-MAIL**</u>

Alexander Mindlin (alexander.mindlin@usdoj.gov)
Tanisha R. Payne (tanisha.payne@usdoj.gov)
Benjamin Weintraub (benjamin.weintraub@usdoj.gov)
Andrew Reich (andrew.reich@usdoj.gov)
Rebecca Schuman (rebecca.schuman@usdoj.gov)
U.S. Attorney's Office
271 Cadman Plaza East
Brooklyn, NY 11201

Christopher B. Brown (christopher.brown8@usdoj.gov)
National Security Division
950 Pennsylvania Ave, N.W.
Ste 6744a
Washington, DC 20530

> **Re:**   ***United States of America v. Approximately 127,271 Bitcoin (BTC)***
> ***Previously Stored at the Virtual Currency Addresses Listed in***
> ***Attachment A, and All Proceeds Traceable Thereto, No. 25-cv-05745 (RPK)***

Dear Counsel:

Pursuant to the Order dated February 17, 2026, and the Court's Individual Practice Rules, attached for service please find the following documents in connection with Claimant Warp Data Technology Lao Sole Co. Ltd's ("Warp Data") Motion to Dismiss the government's Complaint (ECF No. 1) pursuant to Rule 12(b) of the Federal Rules of Civil Procedure and Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Motion"):

    a.   Notice of Motion; and



Alexander Mindlin
Tanisha R. Payne
Benjamin Weintraub
Andrew Reich
Rebecca Schuman
Christopher B. Brown
March 9, 2026
Page 2

      b.    Warp Data's Memorandum of Law in Support of its Motion to Dismiss the Government's Verified Complaint *In Rem*.

Very truly yours,

*/s/ Jeffrey Alberts*
Jeffrey Alberts

cc:   Honorable Rachel P. Kovner (via ECF)
      Counsel of Record (via ECF)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,
     Plaintiff,

   - against –

APPROXIMATELY 127,271 BITCOIN ("BTC") PREVIOUSLY STORED AT THE VIRTUAL CURRENCY ADDRESSES LISTED IN ATTACHMENT A, AND ALL PROCEEDS TRACEABLE THERETO,
     Defendants *in rem*.

---

**NOTICE OF MOTION**

No. 25 Civ. 05745 (RPK)

    **PLEASE TAKE NOTICE** that upon the accompanying Memorandum of Law in Support of Claimant Warp Data Technology Lao Sole Co. Ltd's ("Warp Data") Motion to Dismiss, exhibits thereto, and upon all prior pleadings and proceedings herein, Warp Data will move the United States District Court in the Eastern District of New York, at the United States Courthouse located at 225 Cadman Plaza East, Brooklyn, NY 11201, in courtroom 4E-N, on a date and time to be set by the Court in accordance with the Court's Individual Practice Rules, for an order dismissing the complaint in this matter pursuant to Rule 12(b) of the Federal Rules of Civil Procedure and Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and for such other and further relief as the Court deems just and proper.

Dated:  New York, New York
       March 9, 2026

PRYOR CASHMAN LLP

By: */s/ Jeffrey Alberts*
Jeffrey Alberts
Sidhardha Kamaraju
Katherine Reilly
David Abramowicz
7 Times Square
New York, NY 10036
Tel.: 212-326-0800

jalberts@pryorcashman.com
skamaraju@pryorcashman.com
kreilly@pryorcashman.com
dabramowicz@pryorcashman.com

Attorneys for Claimant Warp Data
Technology Lao Sole Co. Ltd

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of Claimant Warp Data Technology Lao Sole Co. Ltd's Motion to Dismiss was served on the United States of America this 9th day of March 2026 via electronic mail.

By: */s/ Jeffrey Alberts*
Jeffrey Alberts

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>     Plaintiff,<br><br>   - against –<br><br>APPROXIMATELY 127,271 BITCOIN ("BTC") PREVIOUSLY STORED AT THE VIRTUAL CURRENCY ADDRESSES LISTED IN ATTACHMENT A, AND ALL PROCEEDS TRACEABLE THERETO,<br>     Defendants *in rem*. | No. 25 Civ. 05745 (RPK) |

## CLAIMANT WARP DATA TECHNOLOGY LAO SOLE CO. LTD'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE GOVERNMENT'S VERIFIED COMPLAINT *IN REM*

Of counsel:

Jeffrey Alberts
Sidhardha Kamaraju
Katherine Reilly
David Abramowicz
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
(212) 421-4100

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................... 1

RELEVANT BACKGROUND ..................................................................................................... 4

    A.  Procedural History .............................................................................................................. 4

    B.  The Complaint ..................................................................................................................... 5

        1.  The Defendant Cryptocurrency ..................................................................................... 5

        2.  Warp Data and the Sources of the Defendant Cryptocurrency ..................................... 5

        3.  The Complaint's Lack of Ties to the United States ...................................................... 7

APPLICABLE LAW ..................................................................................................................... 8

    A.  The Alleged Legal Bases for the Government's Forfeiture .............................................. 8

    B.  The Heightened Pleading Standard for Forfeiture Claims ................................................ 9

    C.  Wire Fraud & Money Laundering .................................................................................... 9

ARGUMENT ............................................................................................................................... 10

I.    THE FIRST CLAIM SHOULD BE DISMISSED BECAUSE THE COMPLAINT
    DOES NOT SUPPORT A REASONABLE BELIEF THAT THE DEFENDANT
    CRYPTOCURRENCY IS TRACEABLE TO THE PROCEEDS OF WIRE FRAUD ......... 10

    A.  The Complaint's Allegations of Specified Unlawful Activity Post-Date the
       Alleged Acquisition of the Defendant Cryptocurrency .................................................. 11

    B.  The Complaint's Pre-December 2020 Allegations Similarly Fail to Support the
       Government's Burden ...................................................................................................... 13

        1.  The Pre-December 2020 Allegations Fail to Connect Any Purported
           Criminal Proceeds to the Defendant Cryptocurrency ................................................ 13

        2.  Even to the Extent the Pre-December 2020 Allegations Purport to
           Describe a Fraudulent Scheme, the Allegations Fail to Describe
           Wire Fraud ................................................................................................................. 16

3. The Remaining Pre-December 2020 Allegations Are Too Conclusory to Sustain the Government's Burden..........................................................18

II. THE SECOND CLAIM SHOULD ALSO BE DISMISSED BECAUSE THE COMPLAINT FAILS TO ALLEGE FACTS DEMONSTRATING THAT THE DEFENDANT CRYPTOCURRENCY WAS INVOLVED IN CONCEALMENT MONEY LAUNDERING..........................................................................20

III. THE GOVERNMENT OBSCURES WHAT HAPPENED TO THE DEFENDANT CRYPTOCURRENCY BETWEEN DECEMBER 2020 AND ITS SEIZURE BY THE GOVERNMENT..........................................................................23

CONCLUSION..........................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE(s)**

*In re 650 Fifth Ave. & Related Props.*,
   777 F. Supp. 2d 529 (S.D.N.Y. 2011)................................................................20

*Buscuñán v. Elsaca*,
   927 F.3d 108 (2d Cir. 2019)...........................................................................16

*Eur. Cmty. v. RJR Nabisco, Inc.*,
   764 F.3d 129 (2d Cir. 2014), *rev'd on other grounds*, 579 U.S. 325 (2016)...........16

*One 1958 Plymouth Sedan v. Commonwealth of Pa.*,
   380 U.S. 693 (1965).......................................................................................24

*RJR Nabisco, Inc. v. Eur. Cmty.*,
   579 U.S. 325 (2016).......................................................................................16

*United States v. 250 Documents Containing the Forged Handwriting of President
   John F. Kennedy and Others*, No. 03 Civ. 8004, 2008 WL 4129814 (S.D.N.Y.
   Sept. 5, 2008) ...............................................................................................20

*United States v. $272,000.00*,
   No. 16-CV-6564 (AMD), 2018 WL 948752 (E.D.N.Y. Feb. 16, 2018) ...............9, 14, 18, 22

*United States v. $8,850 in U.S. Currency*,
   461 U.S. 555 (1983).......................................................................................24

*United States v. $1,399,313.74 in U.S. Currency*,
   591 F. Supp. 2d 365 (S.D.N.Y. 2008).............................................................5, 19

*United States v. $38,148.00 U.S. Currency*,
   No. 13 Civ. 1162A(F), 2018 WL 2091415 (W.D.N.Y. Apr. 12, 2018), *report
   and recommendation adopted sub nom. United States v. $18,200.00 U.S.
   Currency*, No. 13-CV-1162A, 2018 WL 2087586 (W.D.N.Y. May 4, 2018)..................12, 19

*United States v. Approximately $541,953.00 Seized from JP Morgan Chase N.A.
   Acct. No. XXXXXXXX Held in Name of Jiawig Trade Inc.*,
   No. 23-CV-9585 (MKB) (PK), 2025 WL 923412 (E.D.N.Y. Mar. 27, 2025) .............8, 14, 15

*United States v. Assets Held in Raymond James & Assocs., Inc. Account Number
   XXXXXXXX in Name of Deltora Enters. Grp. Co. LTD.*,
   No. 19 Civ. 377 (WFK) (CHK), 2025 WL 3683271 (E.D.N.Y. Dec. 18, 2025)...................17

*United States v. Aybar-Peguero*,
   72 F.4th 478 (2d Cir. 2023) ..........................................................................10, 22

*United States v. Capoccia*,
  503 F.3d 103 (2d Cir. 2007)......................................................................12, 15, 23

*United States v. Contents of Acct. No. 2033301 in Name of Luis Freixas, Located
  at Citibank Int'l, Mia., Fla.*, 831 F. Supp. 337 (S.D.N.Y. 1993)..............................17

*United States v. Daccarett*,
  6 F.3d 37 (2d Cir. 1993).........................................................................................9

*United States v. Dimassa*,
  117 F.4th 477 (2d Cir. 2024) ..................................................................................9

*United States v. Elias*,
  154 F.4th 56 (2d Cir. 2025) ............................................................................15, 23

*United States v. Napout*,
  963 F.3d 163 (2d Cir. 2020)...................................................................................16

*United States v. One 1978 Cadillac Sedan de Ville, N.Y. License Plate No. 533
  JPY*, 490 F. Supp. 725 (S.D.N.Y. 1980) ................................................................24

*United States v. Pierce*,
  224 F.3d 158 (2d Cir. 2000)..............................................................................9, 21

*United States v. Ray*,
  No. 20 Cr. 110 (LJL), 2022 WL 17175799 (S.D.N.Y. Nov. 23, 2022), *aff'd
  sub nom. United States v. Pollok*, 139 F.4th 126 (2d Cir. 2025) ...........................10

*United States v. Silver*,
  203 F. Supp. 3d 370 (S.D.N.Y. 2016)....................................................................21

*United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank
  Acct. L7N01967*, 731 F.3d 189 (2d Cir. 2013)..................................12, 15, 19, 23

*United States v. Szur*,
  289 F.3d 200 (2d Cir. 2002)....................................................................................8

*United States v. U.S. Currency in Amount of $146,800*,
  No. 96-CV-4882, 1997 WL 269583 (E.D.N.Y. Apr. 28, 1997) ..............................24

*Vengalattore v. Cornell Univ.*,
  36 F.4th 87 (2d Cir. 2022) ....................................................................................22

*WesternGeco LLC v. ION Geophysical Corp.*,
  585 U.S. 407 (2018)..............................................................................................16

## STATUTES AND RULES

18 U.S.C. §§ 981(a)(1)(A) .............................................................................................8

18 U.S.C. §§ 981(a)(1)(C) ...........................................................................................8, 15

18 U.S.C. § 983 ....................................................................................................................5

18 U.S.C. § 1343 ...........................................................................................................9, 16

18 U.S.C. § 1956 .................................................................................................................8

18 U.S.C. §§ 1956(a)(1)(B)(i), (a)(2)(B)(i), and (h) ........................................................8

18 U.S.C. § 1956(c)(7) .......................................................................................................8

28 U.S.C. 1355(b)(1)(A) ..................................................................................................17

Fed. R. Civ. P. 8(a) ............................................................................................................9

Fed. R. Civ. P. 12(e) ........................................................................................................24

Fed. R. Civ. P. 12(b) ..........................................................................................................5

Supp. R. G(2)(b) .........................................................................................................17, 18

Supp. R. G(2)(f) ........................................................................................................ *passim*

Supp. R. G(5)(a) .................................................................................................................5

## OTHER AUTHORITIES

Crypto Palace, "*Crypto's Greatest Heist: The $3.8 Billion Ghost Wallet Now Worth Over $15 Billion*," Binance (Aug. 11, 2025), available at https://tinyurl.com/3dct4zcp ................................................................................7, 23

Francisco Rodrigues, "*China Accuses U.S. of Stealing 127K BTC in High-Profile Crypto Hack*," CoinDesk (Nov., 11, 2025), available at https://tinyurl.com/2hshr8et ...........................................................................................24

Siamak Masnavi, "*Arkham Says $3.5B LuBian Bitcoin Theft Went Undetected for Nearly Five Years*," CoinDesk (Aug. 2, 2025), available at https://tinyurl.com/4kre3jw7 ..............................................................................................7

## PRELIMINARY STATEMENT

More than five years ago, in or about December 2020, an unidentified hacker stole billions of dollars' worth of cryptocurrency that belonged to, among others, Warp Data Technology Lao Sole Co. Ltd ("Warp Data").  For years, the whereabouts of the stolen cryptocurrency were a mystery.  A mystery, that is, until October 14, 2025, when the government filed a civil forfeiture complaint (ECF No. 1 (the "Complaint" or "Compl.")) alleging that the stolen cryptocurrency was now in the possession of the government and was subject to forfeiture.  The Complaint offers no explanation for how the government obtained the stolen cryptocurrency but summarily claims that the stolen cryptocurrency in its possession was linked to a purported wire fraud and money laundering scheme operated by Chen Zhi, Warp Data, and others.

The government's forfeiture action is now, after the illegal hack, the second unlawful attempt to deprive Warp Data of its rightful property.  Warp Data categorically denies that it participated in any criminal scheme, but even if every allegation in the Complaint were true, the government has not met its most basic burden of demonstrating a link of any kind—let alone a link sufficient to support forfeiture of Warp Data's property—between any criminal conduct and the cryptocurrency it now seeks to forfeit.  The government does not deny that Warp Data produced a significant portion of the stolen cryptocurrency through its own mining efforts—indeed, the government alleges as much in its Complaint.  Rather, the government argues that those mining efforts were funded through the proceeds of a wire fraud scheme and that co-conspirators used the stolen cryptocurrency to enable money laundering.  Based on these arguments, the government alleges that the cryptocurrency is forfeitable as proceeds of wire fraud (the "First Claim") and as property involved in money laundering (the "Second Claim").

The trouble for the government under either theory, however, is that the government's narrative defies logic, and particularly, time.  Specifically, while the government spends pages upon pages detailing a fraud scheme based in Cambodia, it fails, over all those pages, to allege any fraudulent conduct generating proceeds before the cryptocurrency was stolen.  To be sure, the Complaint contains specific allegations purporting to show a wire fraud scheme—but those specific allegations concern supposed criminal conduct that began in 2021, after the stolen cryptocurrency was generated.  That core failure dooms both of the government's claims.

*First*, with respect to the government's fraud theory contained in the First Claim, it is axiomatic that before there can be property traceable to criminal proceeds, there must first be criminal proceeds.  It similarly follows that before there can be criminal proceeds, there must be crime—and in this case, a specific crime, wire fraud.  The Court can scour all 68 pages of the Complaint and the attached Indictment, however, and it will not find any specific allegations describing any fraud that occurred before the cryptocurrency was acquired and, indeed, before it was stolen.  Logically, property that was produced before the commission of a crime cannot be the product of that same crime.

Moreover, to the extent the Complaint contains any allegations concerning conduct occurring before the mining of the stolen cryptocurrency, those allegations also fail to sustain the government's heavy burden in a civil forfeiture case.  First, the sparse allegations concerning conduct before the creation of the stolen cryptocurrency do not establish the existence of any criminal proceeds that could have been used to produce these coins, let alone trace any such proceeds to these coins.  Second, even to the extent that the allegations purport to describe some criminal conduct that could have generated proceeds, those allegations fail to make out wire fraud because they (a) involve an impermissible extraterritorial application of the wire fraud statute; and

2

(b) fail to establish venue at the relevant time.  Third, the government's remaining pre-acquisition allegations are too conclusory as a matter of law.  Accordingly, even accepting the Complaint's allegations as true, they fail to meet the government's pleading burden with respect to the First Claim, and thus, that claim should be dismissed.

*Second*, the Complaint's Second Claim fails for similar reasons.  Again, the vast majority of the purported laundering transactions described in the Complaint post-date December 2020, which is the last point at which the stolen cryptocurrency was mined or used in any transaction directed by the so-called co-conspirators.  As a result, these allegations are entirely irrelevant.  But even the pre-December 2020 conduct that the Complaint alleges fails to establish that the stolen cryptocurrency was involved in any money laundering transaction.  To be sure, the Complaint describes deposits and withdrawals into and out of bank accounts and cryptocurrency transactions in 2019 and 2020 and tries to cast those transactions as suspicious.  But regardless of the government's gloss on those transactions, they cannot support the government's money laundering theory because the Complaint fails to allege any facts showing that these funds or cryptocurrency involved criminal proceeds derived from the statutorily specified unlawful activity, *i.e.*, wire fraud. In fact, the Complaint contains allegations that squarely *undercut* that assertion.  Absent any showing that this property constitutes criminal proceeds, the government cannot satisfy a core element of the money laundering statute—namely, that the aforementioned transactions were for the purpose of concealing information concerning criminal proceeds of specified unlawful activity. And if the government cannot show a money laundering transaction as a matter of law, then it necessarily cannot show that the stolen cryptocurrency was "involved" in a money laundering transaction.  As a result, the Complaint's Second Claim should also be dismissed.

*Third*, the government's secrecy concerning how it came to possess the stolen cryptocurrency has significant ramifications for the government's case.  As an initial matter, the paucity of detail about this subject means that adequate tracing between criminal conduct and the property to be forfeited is not possible, which warrants dismissal.  But even if not, the government should be required to explain how and when it acquired this property because that information bears on whether the government either illegally obtained the stolen cryptocurrency, in violation of the Fourth Amendment, or waited too long to seek to forfeit it, in violation of the Fifth Amendment's due process protections.  If either constitutional violation occurred, the government's attempt to forfeit the stolen cryptocurrency should be rejected.

On October 8, 2025, the government indicted Chen Zhi for the purported wire fraud schemes.  In the Complaint, the government acts as if it enjoys the same lenient pleading standard applicable to a criminal indictment.  That, however, is not the law—the government cannot simply rely on sparse allegations that track a statute's language.  In a civil forfeiture proceeding, to obtain what the Second Circuit has described as a "drastic" remedy, the government must do much more to substantiate its claims.  In this case, the government has failed to meet that burden.  Accordingly, the Complaint should be dismissed.

## RELEVANT BACKGROUND

### A.    Procedural History

On October 14, 2025, the government commenced this action by filing the Complaint, which seeks forfeiture *in rem* against 127,271 Bitcoin ("BTC") that in December 2020 had been stored at 25 specified blockchain addresses, and all proceeds traceable thereto (collectively, the "Defendant Cryptocurrency").  (Compl. ¶¶ 5-6 & Attachment A).  The government filed a notice of forfeiture action the same day.  (ECF No. 4).

4

On January 19, 2026, Warp Data filed its claim under 18 U.S.C. § 983 and Rule G(5)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules") as the putative owner of the portion of the Defendant Cryptocurrency that Warp Data mined or otherwise acquired.  (ECF No. 64).

Warp Data now moves to dismiss the Complaint under Rule 12(b) of the Federal Rules of Civil Procedure and Rule G of the Supplemental Rules.

### B.    The Complaint

The Complaint alleges the following facts relevant to Warp Data's motion, which must be accepted as true on a motion to dismiss under Federal Rule of Civil Procedure 12(b) and Supplemental Rule G.  *See, e.g.*, *United States v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d 365 (S.D.N.Y. 2008).

### 1.    The Defendant Cryptocurrency

The Complaint identifies the Defendant Cryptocurrency as the Bitcoin held in 25 cryptocurrency wallets purportedly "controlled and personally tracked" by Chen Zhi.  (Compl. ¶ 44).  The Complaint claims that the Defendant Cryptocurrency constitutes proceeds traceable to fraudulent schemes allegedly orchestrated by Chen and others.  The cryptocurrency wallets listed in Exhibit A to the Complaint (the "Identified Wallets") held all of the Defendant Cryptocurrency "as of December 2020."  (Compl. ¶ 44 & n.7).  The Complaint provides minimal information about where the Defendant Cryptocurrency came from before arriving in the Identified Wallets, and even less information about where it went from there.

### 2.    Warp Data and the Sources of the Defendant Cryptocurrency

The Complaint alleges that the Defendant Cryptocurrency came from "two categories of sources": (1) cryptocurrency mining operations, including those run by Lubian and Warp Data,

and (2) "indirect transfers from wallets at centralized cryptocurrency exchanges," such as the exchanges identified in the Complaint as Exchange-1 and Exchange-2, as well as wallets at other exchanges controlled by Future Technology Investment ("FTI"), Amber Hill Ventures Limited ("Amber Hill"), and Lateral Bridge Global Limited ("LBG").  (Compl. ¶¶ 45, 47(a)-(m)).

Despite the FBI's "extensive blockchain tracing" analysis (Compl. ¶ 45), the Complaint's allegations about the portion of the Defendant Cryptocurrency mined by Warp Data are limited in scope and specificity.  The Complaint alleges in a conclusory fashion that Chen and others "laundered illicit proceeds" by funding crypto mining, including through Warp Data and its Texas subsidiary.  (Compl. ¶ 42).  While the Complaint sets forth a single example of a so-called shell company that sent funds to Warp Data (*see id.*), it is entirely devoid of any detail explaining the purported illicit activity that produced proceeds routed to Warp Data, when or where that illicit activity might have taken place, or how those proceeds were routed to Warp Data.

While the Complaint's pre-December 2020 tracing analysis is sparse and conclusory, the Complaint sets forth essentially no analysis of what happened to the Defendant Cryptocurrency *after* it was all held in the Identified Wallets that month.  The Complaint offers two cursory allegations about this subject, stating first that the Defendant Cryptocurrency "was subsequently transferred in its entirety to multiple additional addresses" and second that the Defendant Cryptocurrency "is currently in the custody of the United States."  (Compl. ¶ 58).  The government's notice of forfeiture says nothing about when or where the United States seized the Defendant Cryptocurrency.[1]

---

[1] The website forfeiture.gov previously included an entry for this matter that listed a "Seized Date(s)" of July 23, 2024, but that webpage has since been taken down.

The government's silence about what happened to the Defendant Cryptocurrency between December 2020 and the filing of the Complaint nearly five years later omits what has been widely reported publicly: that a hacker stole the Defendant Cryptocurrency from the Identified Wallets in December 2020.  *See*, *e.g.*, Crypto Palace, "*Crypto's Greatest Heist: The $3.8 Billion Ghost Wallet Now Worth Over $15 Billion*," Binance (Aug. 11, 2025), *available at* https://tinyurl.com/3dct4zcp; Siamak Masnavi, "*Arkham Says $3.5B LuBian Bitcoin Theft Went Undetected for Nearly Five Years*," CoinDesk (Aug. 2, 2025), *available at* https://tinyurl.com/4kre3jw7.  Warp Data does not know the hacker's identity.

### 3.    The Complaint's Lack of Ties to the United States

Although the Complaint does purport to describe a wide-reaching criminal conspiracy, those allegations focus on conduct occurring abroad.  Allegations of criminal conduct in the United States, however, are sparse.  The only specific allegations concerning any domestic conduct in furtherance of the purported conspiracy are limited to the assertion that a so-called "Brooklyn Network" laundered money that came "from over 250 victims in the Eastern District of New York and throughout the United States" from May 2021 to August 2022 (Compl. ¶ 36), and that a virtual currency address received fraudulent proceeds from a "scam victim residing in California" between June 2021 and August 2021 (Compl. ¶ 37 & n.2).  The Complaint also alleges—very generally and without reference to any particular time period—that the fraudulent schemes at issue "resulted in billions of dollars in losses incurred by victims in the United States and around the world." (Compl. ¶ 15).  Notably, none of these allegations set forth conduct that is claimed to have occurred in or before December 2020, by which point the Defendant Cryptocurrency was already in the Identified Wallets.

## APPLICABLE LAW

### A.    The Alleged Legal Bases for the Government's Forfeiture

The Complaint alleges that the Defendant Cryptocurrency is subject to forfeiture under 18 U.S.C. §§ 981(a)(1)(C) (First Claim) and 981(a)(1)(A) (Second Claim).  (Compl. ¶¶ 2, 13-14, 62, 65).  Both claims require proof of proceeds from a "specified unlawful activity."

Under Section 981(a)(1)(C), property is subject to forfeiture if it "constitutes or is derived from proceeds traceable to" a prior "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7).  The First Claim alleges that the Defendant Cryptocurrency constitutes or is derived from proceeds traceable to a wire fraud or wire fraud conspiracy.  (Compl. ¶ 61).

Under Section 981(a)(1)(A), property is subject to forfeiture if it is involved in—or traceable to property involved in—a transaction violating one of several money laundering statutes, including 18 U.S.C. § 1956.  The Second Claim alleges that the Defendant Cryptocurrency was involved in or is traceable to a domestic or international transaction knowingly designed to conceal or disguise proceeds generated by a prior specified unlawful activity, *i.e.*, the same wire fraud or wire fraud conspiracy that is the basis for the First Claim.  (Compl. ¶ 64 (citing 18 U.S.C. §§ 1956(a)(1)(B)(i), (a)(2)(B)(i), and (h))); *see United States v. Szur*, 289 F.3d 200, 213 (2d Cir. 2002) (holding that money laundering statute "requires that proceeds of unlawful activity exist before money laundering can occur"); *see generally United States v. Approximately $541,953.00 Seized from JP Morgan Chase N.A. Acct. No. XXXXXXXX Held in Name of Jiawig Trade Inc.*, No. 23-CV-9585 (MKB) (PK), 2025 WL 923412, at *4-6 (E.D.N.Y. Mar. 27, 2025) (explaining that money laundering cannot occur without a specified unlawful activity).[2]

---

[2]  Unless otherwise indicated, this brief's case law citations omit internal quotation marks, citations, footnotes, and alterations.

### B.    The Heightened Pleading Standard for Forfeiture Claims

Civil forfeiture complaints are subject to heightened pleading requirements that greatly exceed the standards of Federal Rule of Civil Procedure 8(a).  A civil forfeiture complaint must, among other things, "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."  Supp. R. G(2)(f).  Accordingly, the "complaint must assert *specific facts* supporting an inference that the property is subject to forfeiture."  *United States v. $272,000.00*, No. 16-CV-6564 (AMD), 2018 WL 948752, at *2 (E.D.N.Y. Feb. 16, 2018) (emphasis added).  These pleading standards "are more stringent than the general pleading requirements set forth in the Federal Rules of Civil Procedure, an implicit accommodation to the drastic nature of the civil forfeiture remedy."  *United States v. Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993).

### C.    Wire Fraud & Money Laundering

To sustain its ultimate burden with regard to either of the First or Second Claims, the government must demonstrate facts showing a "specified unlawful activity," in this case, wire fraud and conspiracy to commit wire fraud.  "The elements of wire fraud under 18 U.S.C. § 1343 are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate wires."  *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000).  In order to establish a wire fraud conspiracy, the government must prove that an individual "agreed with another to commit wire fraud and knowingly engaged in the conspiracy with the intent to commit that offense." *United States v. Dimassa*, 117 F.4th 477, 487 (2d Cir. 2024).

With respect to the Second Claim, the Complaint contends that the Defendant Cryptocurrency is forfeitable as property involved in so-called "concealment" money laundering. To demonstrate concealment money laundering, the government must allege facts demonstrating

four elements: "(1) that the defendant conducted a 'financial transaction,' which must in some way or degree have affected interstate or foreign commerce; (2) the financial transaction at issue involved the proceeds of an unlawful activity; (3) the defendant knew that the property in the financial transaction involved the proceeds of some form of unlawful activity; and (4) the defendant knew that the transaction was designed in whole or in part either to conceal or disguise the nature, location, source, ownership or control of the proceeds of the unlawful activity." *United States v. Ray*, No. 20 Cr. 110 (LJL), 2022 WL 17175799, at \*7 (S.D.N.Y. Nov. 23, 2022), *aff'd sub nom. United States v. Pollok*, 139 F.4th 126 (2d Cir. 2025). The "concealment element of [the] statute requires that the purpose, not merely the effect, of the endeavor must be to conceal or disguise the proceeds of illicit activity." *United States v. Aybar-Peguero*, 72 F.4th 478, 484 (2d Cir. 2023).

## ARGUMENT

I.    **THE FIRST CLAIM SHOULD BE DISMISSED BECAUSE THE COMPLAINT DOES NOT SUPPORT A REASONABLE BELIEF THAT THE DEFENDANT CRYPTOCURRENCY IS TRACEABLE TO THE PROCEEDS OF WIRE FRAUD**

In its Complaint, the government treats its pleading obligations as if they were the same as those that apply to a criminal indictment. Unfortunately for the government, however, that is not the law. When the government sets forth allegations in an indictment, it may rely on conclusory allegations that merely aver misconduct or track the language of relevant statutes. Those types of allegations are simply insufficient to sustain a claim for civil forfeiture. Rather, to do what the government seeks to do—namely, deprive Warp Data and others of billions of dollars of cryptocurrency—the government must allege "sufficiently detailed facts" showing that (a) there was specified unlawful activity, *i.e.*, wire fraud, that generated proceeds; (b) those proceeds were generated prior to the acquisition of the Defendant Cryptocurrency; and (c) those proceeds

constitute or were used to obtain the Defendant Cryptocurrency. *See* Supp. R. G(2)(f). The Complaint, however, lacks any specific allegations setting forth these facts.

The consequences of the Complaint's pleading deficiencies are manifold. *First*, the only specific allegations of purported wire fraud that could generate criminal proceeds pertain to conduct after December 2020, *i.e.*, after the Defendant Cryptocurrency was acquired. Plainly, the Defendant Cryptocurrency could not have been procured using the proceeds of fraud that occurred only after the acquisition of the Defendant Cryptocurrency. *Second*, the minimal conduct that the Complaint alleges that does pre-date December 2020 cannot support the government's theory because (a) that conduct is not alleged to have produced any criminal proceeds before December 2020; (b) the conduct is not tied to the Defendant Cryptocurrency; and (c) even to the extent these allegations hint at criminal proceeds, they do not make out wire fraud as a matter of law because they involve an exterritorial application of the wire fraud statute and fail to properly allege venue. *Third*, to the extent the government makes undated allegations of "illicit" or "laundered" funds, such general allegations are insufficient, even at this early stage of the forfeiture proceeding.

Accordingly, the Complaint does not "state sufficiently detailed facts" regarding criminal activity "to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f).

### A. The Complaint's Allegations of Specified Unlawful Activity Post-Date the Alleged Acquisition of the Defendant Cryptocurrency

The Complaint spills considerable ink describing what the government claims to be a widespread scheme through which the purported co-conspirators obtained cryptocurrency and cash through fraud. Warp Data categorically denies that it participated in any such scheme. But even accepting these allegations as true for purposes of this motion, as the Court must, they fail to satisfy

11

the government's pleading burden because the only conduct the government alleges with any specificity post-dates the acquisition of the Defendant Cryptocurrency.

The Complaint describes alleged fraud transactions involving the so-called "Brooklyn Network" in 2021 and 2022 (Compl. ¶ 36) and a single California victim in 2021 (Compl. ¶ 37 & n.2). By definition, however, these allegations are irrelevant because, according to the government's own narrative, by December 2020, the Defendant Cryptocurrency was already in the Identified Wallets from which it was then stolen before ultimately ending up in the custody of the United States. (*See* Compl. ¶ 44 & n.7). In other words, even according to the government, the purported co-conspirators had already procured the Defendant Cryptocurrency *before* the fraudulent transactions alleged in the Complaint. Logically, coins cannot be proceeds of, derived from, involved in, or traceable to crimes that have yet to happen at the time the coins were obtained. *See United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Acct. L7N01967*, 731 F.3d 189, 197-98 (2d Cir. 2013) (vacating forfeiture of a $100,000 deposit because it was made before the alleged criminal conduct that formed the basis for the forfeiture action); *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007) (vacating the forfeiture of funds transferred into an account because "the government has not established (nor logically could it) that the funds involved in [those] transfers were 'obtained … as the result' of the later, particular transfers of which [defendant] was convicted"); *United States v. $38,148.00 U.S. Currency*, No. 13 Civ. 1162A(F), 2018 WL 2091415, at *9 (W.D.N.Y. Apr. 12, 2018) (finding no "substantial connection" between funds seized from bank account and unlawful activity where timing of deposits "cast[] doubt on whether the Defendant Currency is traceable to the" criminal conduct), *report and recommendation adopted sub nom. United States v. $18,200.00 U.S. Currency*, No. 13-CV-1162A, 2018 WL 2087586 (W.D.N.Y. May 4, 2018).

12

In the end, the Complaint's purported basis for forfeiting the Defendant Cryptocurrency is an illusion.  While the Complaint claims to describe a massive wire fraud scheme that generated the Defendant Cryptocurrency, the reality is that the purported scheme cannot be the source of the Defendant Cryptocurrency as a matter of simple logic.  The Government's claim that that scheme generated proceeds used to fund cryptocurrency mining operations by Warp Data—for example, through a transfer from Hing Seng (Compl. ¶ 42)—is even more attenuated and illogical; proceeds not earned until after the Defendant Cryptocurrency was mined cannot have been used to purchase the equipment used to mine that cryptocurrency.  Given that the Complaint's only "sufficiently detailed facts" concern wholly irrelevant post-December 2020 purported conduct, the Complaint does not contain sufficient allegations "to support a reasonable belief that the government will be able to meet its burden of proof at trial."  Supp. R. G(2)(f).  Accordingly, the Complaint should be dismissed, even accepting its allegations as true.

**B.    The Complaint's Pre-December 2020 Allegations Similarly Fail to Support the Government's Burden**

With the Complaint's core defect laid bare, the government undoubtedly will seek to highlight any pre-December 2020 allegations in the Complaint as the basis for forfeiture. Regardless of how the government may cast about, however, its meager allegations concerning the pre-December 2020 time period cannot save the Complaint, for multiple reasons.

**1.    The Pre-December 2020 Allegations Fail to Connect Any Purported Criminal Proceeds to the Defendant Cryptocurrency**

The Complaint contains a smattering of allegations that purport to describe the conduct of Chen Zhi's alleged co-conspirators prior to December 2020.  These allegations fail to establish the existence of any criminal proceeds that could have been used to procure the Defendant Cryptocurrency.

The Complaint alleges that a purported co-conspirator of Chen's bought a foreign government official a yacht in 2019 and that the government official helped Chen get a foreign diplomatic passport in 2020. (Compl. ¶ 29). Even accepting that these acts occurred and had some relevance to the scheme described in the Complaint, the government fails to explain what, if any, proceeds could flow from these acts—obtaining a yacht or a passport does not earn money at all. Moreover, even if the government could somehow concoct a theory as to how these acts generated "proceeds," the Complaint is devoid of any allegation of how those would be proceeds of wire fraud, as required by Supplemental Rule G(2)(f). *$272,000.00*, 2018 WL 948752, at *2. Finally, even if the government could somehow link the act of purchasing a yacht or obtaining a passport to wire fraud, the Complaint still fails to connect those purported proceeds to any of the Defendant Cryptocurrency, dooming its claim. *See $541,953.00,* 2025 WL 923412, at *5-6 (concluding that portion of seized funds the government's complaint failed to trace to known victims of investment-fraud scheme was not forfeitable as proceeds of that fraud).

The same deficiencies plague the pre-December 2020 allegations that arguably show some preparation for the later alleged criminal conduct. For example, the Complaint alleges that Chen Zhi's purported co-conspirators obtained phone numbers and account passwords from an "illicit" online site in 2018 (Compl. ¶ 25), and "helped oversee construction" in 2019 of a "compound" that at some unspecified time was used to perpetrate "investment scams and other fraudulent schemes" (Compl. ¶¶ 23, 25), though the Complaint does not link those acts to any plan or intent in place at that time to use that information or that compound in furtherance of any scheme. In other words, the fact that the co-conspirators, for example, constructed a building in 2019 and that later in time, that building was used for an investment scheme does not establish that the building's initial construction was for purposes of perpetrating the fraud or that the building was used as part

14

of the fraud before December 2020.  Put simply, even accepting these allegations as true, the fact that co-conspirators were purportedly taking steps to engage in a scheme at some later point does not establish (a) that a substantive wire fraud actually occurred before December 2020; (b) even if wire fraud occurred, that it successfully generated any criminal proceeds; or (c) that those proceeds were used to obtain any part of the Defendant Cryptocurrency.  Absent some additional specificity or connectivity, these allegations fail to satisfy the government's stringent pleading burden.

Finally, the government undoubtedly will point to its allegation that an unidentified co-conspirator, about whom no details as to their role or their knowledge are pled, allegedly boasted in 2022 that Prince Group had earned $30 million daily in 2018 "from fraudulent *sha zhu pan* schemes and related illicit activities."  (Compl. ¶ 26).  As an initial matter, the allegation lacks any specificity, in that it does not show that the schemes purportedly boasted about are the schemes described in the Complaint.  But even if they were, all the allegation establishes is that a fraud scheme generated criminal proceeds (which, as described below, is alone insufficient to establish wire fraud).  It still fails, however, to establish that these proceeds were used to acquire the Defendant Cryptocurrency either through, for example, using the funds to purchase the coins or to fund the crypto-mining operations that generated them.  The absence of this connection is fatal to the government's claim.  *See United States v. Elias*, 154 F.4th 56, 71 (2d Cir. 2025) ("[F]orfeiture under § 981(a)(1)(C) is limited to tainted property."); *Sum of $185,336.07*, 731 F.3d at 197 ("This error affected Pellegrino's substantial rights because the evidence of record falls well short of demonstrating, by a preponderance of the evidence, under CAFRA, that *all* of the seized money constituted proceeds from federal drug crimes."); *Capoccia*, 503 F.3d at 115 (2d Cir. 2007) (vacating forfeiture order insofar as it applied to funds moved in transactions that occurred before criminal conduct for which defendant was charged and convicted); *$541,953.00*, 2025 WL 923412,

at *5-6 (concluding that portion of seized funds the government's complaint failed to trace to known victims of investment-fraud scheme is not forfeitable as proceeds of that fraud).

### 2.    Even to the Extent the Pre-December 2020 Allegations Purport to Describe a Fraudulent Scheme, the Allegations Fail to Describe Wire Fraud

Even if the Court were to conclude that the Complaint's pre-December 2020 allegations made out some fraud scheme that generated criminal proceeds that resulted in the Defendant Cryptocurrency, the government's fraud theory would still fail because those allegations do not allege any conduct occurring in the United States during that time period.  That failure torpedoes the government's claim in two ways.  *First*, the absence of allegations of pre-December 2020 U.S. conduct means that whatever fraud the government purports to describe, it cannot be wire fraud under U.S. law, because the wire fraud statute does not apply extraterritorially.  *Second*, it means that the Complaint fails to establish venue in this District, as required.

Extraterritoriality issues are analyzed under a "two-step framework" that asks (1) "whether the presumption against extraterritoriality has been rebutted" by the statute in question, and, if not, (2) "whether the case involves a domestic application of the statute."  *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337 (2016).  Step one is straightforward: the Second Circuit has held that the wire fraud statute, 18 U.S.C. § 1343, does not apply extraterritorially.  *See United States v. Napout*, 963 F.3d 163, 178 (2d Cir. 2020); *Buscuñán v. Elsaca*, 927 F.3d 108, 121 (2d Cir. 2019); *Eur. Cmty. v. RJR Nabisco, Inc.,* 764 F.3d 129, 141 (2d Cir. 2014), *rev'd on other grounds*, 579 U.S. 325 (2016).  Step two requires "identifying the statute's focus and asking whether the conduct relevant to that focus occurred in United States territory."  *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413 (2018).

The wire fraud statute's focus is "the use of the … wires in furtherance of a scheme to defraud."  *Buscuñán*, 927 F.3d at 122 (emphasis omitted).  The Complaint here does not allege any

16

domestic use of the wires in furtherance of a fraud scheme before the Defendant Cryptocurrency was stolen from the Identified Wallets in December 2020. Indeed, as discussed above, the Complaint's pre-2021 allegations do not describe any victim located in the United States, any false or misleading representation made in the United States, or any wire in furtherance of a fraud scheme that touched the United States. *See supra* pp. 7, 11-15. The pre-December 2020 conduct is purely extraterritorial and thus, even if the Complaint did make out some kind of fraud, it would not be wire fraud under U.S. law.

Similarly, to sustain a civil forfeiture action, the government must demonstrate that venue is appropriate in this District. *See United States v. Assets Held in Raymond James & Assocs., Inc. Account Number XXXXXXX in Name of Deltora Enters. Grp. Co. LTD.*, No. 19 Civ. 377 (WFK) (CHK), 2025 WL 3683271, at *11 (E.D.N.Y. Dec. 18, 2025) ("On a motion to dismiss for improper venue, the plaintiff bears the burden of making a *prima facie* showing of appropriate venue."). To establish venue in the "district in which any of the acts or omissions giving rise to the forfeiture occurred," the government must show that some part of the criminal conduct occurred in this District. 28 U.S.C. § 1355(b)(1)(A); *see United States v. Contents of Acct. No. 2033301 in Name of Luis Freixas, Located at Citibank Int'l, Mia., Fla.*, 831 F. Supp. 337, 340 (S.D.N.Y. 1993) (explaining that Section 1355(b)(1)(A) permits civil forfeiture actions to "be brought in the district where the underlying criminal activity occurred"). As discussed, however, before December 2020, none of the alleged criminal conduct (if it can even be called that) occurred in the United States, let alone in the Eastern District of New York. Accordingly, the Complaint fails to "state the grounds for … venue," Supp. R. G(2)(b), and should be dismissed on this ground as well.

The government will no doubt seek to rely on its allegations regarding the purported "Brooklyn Network" to contend that it is seeking to apply the wire fraud statute domestically and

has properly established venue in the Eastern District of New York. (*See* Compl. ¶ 4 (alleging that venue lies in this District "in that acts and omissions giving rise to the forfeiture accrued in the Eastern District of New York.")). Those allegations, however, concern conduct from 2021 and later. (Compl. ¶ 36). Nothing in the Complaint even attempts to tie those events to the Defendant Cryptocurrency. Indeed, the Complaint says virtually nothing about where the Defendant Cryptocurrency was from December 2020, when it was in the Identified Wallets (Compl. ¶ 44 & n.7), to October 2025, when the government initiated this forfeiture action. The purported operation of a U.S. network at a later point in time, after the Defendant Cryptocurrency was already mined or acquired and located in the Identified Wallets, cannot retroactively convert assets into "proceeds" of domestic wire fraud or of money laundering designed to conceal proceeds of a domestic fraud, let alone into offenses some part of which occurred in the Eastern District of New York. This action therefore represents an improper extraterritorial application of federal law, and the Complaint fails to "state the grounds for … venue." Supp. R. G(2)(b). Either ground requires dismissal.

### 3. The Remaining Pre-December 2020 Allegations Are Too Conclusory to Sustain the Government's Burden

Finally, the government may seek refuge in some of its allegations that generally allege criminality or the existence of fraud proceeds. But again, the government must adhere to the legal requirements not of a criminal indictment, but of a civil forfeiture complaint. And in this posture, the government cannot rely on conclusory allegations but rather must allege "specific facts supporting an inference that the property is subject to forfeiture." *$272,000.00*, 2018 WL 948752, at *2. The Complaint's conclusory allegations fail to do that.

Thus, for example, the Complaint blithely alleges that "Chen had amassed a vast sum of fraud proceeds packaged as heavily laundered cryptocurrency, including the Defendant

18

Cryptocurrency," "[b]y approximately 2020." (Compl. ¶ 44). That allegation lacks any specificity that might allow the Court or Warp Data to discern the purported connection between the "vast sum" and the Defendant Cryptocurrency. Indeed, the allegation does not identify what fraud generated these purported proceeds, whether it involved wires at all, whether it involved any conduct in the United States, or how these proceeds were "packaged" as the Defendant Cryptocurrency. *See, e.g.*, *Sum of $185,336.07*, 731 F.3d at 197-98; *$38,148.00*, 2018 WL 2091415, at *9 (finding no "substantial connection" between funds seized from bank account and unlawful activity where timing of deposits "cast[] doubt on whether the Defendant Currency is traceable to" criminal conduct). These allegations, thus, do not save the government's case.

Similarly, the Complaint states that FTI, Amber Hill, Warp Data, LBG, and wallets at Exchange-1 and Exchange-2 were used to launder "illicit" or "fraudulent" proceeds. (Compl. ¶¶ 40, 43). Conclusory statements that proceeds are "illicit" or "fraudulent" do not amount to "sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f). Here, the Complaint does not supplement the conclusory assertions with corroborating details, such as, critically, how these purported "illicit" or "fraudulent" proceeds were generated. The government has thus failed to plead facts sufficient to support a reasonable belief that the government has the ability to prove at trial that the relevant funds are "illicit." *See $1,399,313.74*, 591 F. Supp. 2d at 376 (dismissing civil forfeiture complaint and stating that the government "cannot premise forfeiture based simply on conclusory allegations").

II.    **THE SECOND CLAIM SHOULD ALSO BE DISMISSED BECAUSE THE COMPLAINT FAILS TO ALLEGE FACTS DEMONSTRATING THAT THE DEFENDANT CRYPTOCURRENCY WAS INVOLVED IN CONCEALMENT MONEY LAUNDERING**

Like the First Claim, the Complaint's Second Claim is deficient as a matter of law.  In the Second Claim, the government asserts that the Defendant Cryptocurrency is forfeitable because it was "involved" in a money laundering offense—specifically, concealment of the proceeds of the wire fraud purportedly described in the Complaint.  The trouble with the government's theory, however, is that it requires that there be proceeds of wire fraud to conceal at the time of the laundering transaction and that the purpose, and not just effect, of the laundering transaction be to conceal the nature, source, or ownership of those proceeds.  The Complaint's allegations do not make either showing.

As an initial matter, as discussed above, any purported laundering transactions described in the Complaint that post-date December 2020 could not have "involved" the Defendant Cryptocurrency.  For property to be "involved" in a laundering transaction, the property must either have been laundered itself or be used to facilitate money laundering.  *See In re 650 Fifth Ave. & Related Props.*, 777 F. Supp. 2d 529, 563 (S.D.N.Y. 2011) ("[C]ourts in this district have held that '[t]he term "involved in" refers to property that is itself being laundered, as well as property used to facilitate a money laundering offense.'"  (quoting *United States v. 250 Documents Containing the Forged Handwriting of President John F. Kennedy and Others*, No. 03 Civ. 8004, 2008 WL 4129814, at *3 (S.D.N.Y. Sept. 5, 2008))).  Neither basis applies to the post-December 2020 transactions.  As set forth above, the government makes no allegations to suggest that Chen Zhi, or any of his co-conspirators, controlled the Defendant Cryptocurrency after December 2020; indeed, though the government does not acknowledge this fact, the Defendant Cryptocurrency was stolen in a hack at that time.  The government's cursory claim that at some point "subsequent[]"

to December 2020 the Defendant Cryptocurrency was transferred "to multiple additional addresses" does not even begin to allege that Chen Zhi or anyone affiliated with him was in a position to exert control over the property. (Compl. ¶ 58). In other words, after December 2020, Chen Zhi and his purported co-conspirators did not possess the Defendant Cryptocurrency, such that they could launder it or use it to facilitate a laundering transaction.

Nor do the government's few allegations of pre-December 2020 transactions support the Second Claim. In particular, the government alleges that there were deposits and withdrawals into bank accounts held by purported shell companies FTI and Amber Hill in 2019. (Compl. ¶ 55). The Complaint further alleges that in the spring of 2020, cryptocurrency mined by Warp Data, including some of the Defendant Cryptocurrency, was co-mingled through a series of "funneling" transactions with cryptocurrency held at an account at Exchange-2, a cryptocurrency exchange platform based in the Seychelles. (Compl. ¶¶ 16, 53). The government argues from these allegations that the co-conspirators engaged in money laundering involving the Defendant Cryptocurrency.

The government's argument, however, falters at the first step—its failure to allege the proceeds of a specified unlawful activity. As described above, none of the Complaint's allegations concerning the pre-December 2020 period make out wire fraud. *See supra* Point I.B. That alone dooms the government's money laundering theory. *See Pierce*, 224 F.3d at 160 ("Because the government thus failed to establish a fact necessary to prove wire fraud, the [defendants' money laundering] convictions cannot stand."); *United States v. Silver*, 203 F. Supp. 3d 370, 376 n.6 (S.D.N.Y. 2016) ("Silver correctly points out that a reversal or order for a new trial on the extortion and honest services fraud counts would also require a reversal or order for a new trial on the money laundering count because the specified unlawful activity that supported the money laundering

21

conviction was the extortion and honest services fraud.").  But even if the government could show allegations that establish that a wire fraud scheme occurred before December 2020, it has failed to allege any facts showing that the funds in the bank accounts held by the purported shell companies or the cryptocurrency held at Exchange-2 were the proceeds of this purported wire fraud scheme. Absent such evidence of a connection, the government cannot allege, as it must to show concealment money laundering, that the purpose of these deposits, withdrawals, or transfers of cryptocurrency was to obscure anything about wire fraud proceeds.  *Aybar-Peguero*, 72 F.4th at 484 ("[The] concealment element of [the] statute requires that the purpose, not merely the effect, of the endeavor must be to conceal or disguise the proceeds of illicit activity.").

Ironically, the Complaint contains allegations that undermine the government's position that the funds and cryptocurrency involved in these transactions were the proceeds of wire fraud or that the purpose of these transactions was to conceal wire fraud proceeds.  In particular, the Complaint alleges that Chen and the Prince Group operated a "sprawling" online gambling business prior to 2020.  (Compl. ¶¶ 38, 41).  The Complaint goes on to allege that in or about 2020, Cambodia outlawed online gambling—precisely around the time of the purported laundering transactions.  (Compl. ¶ 41).  In other words, the Complaint not only fails to lay out any facts showing that the Defendant Cryptocurrency stemmed from wire fraud, as set forth above, but in fact offers allegations supporting an alternate, non-"specified unlawful activity" source for these funds and cryptocurrency, as well as a reason why Chen and his alleged co-conspirators would have engaged in the transactions that the government now tries to cast as suspicious.  *See e.g., Vengalattore v. Cornell Univ.*, 36 F.4th 87, 112 (2d Cir. 2022) (courts assume well-pleaded factual allegations as true unless they are "contradicted by more specific allegations or documentary

22

evidence").  For all of these reasons, the government has not sustained its burden to allege "specific facts" under the Second Claim either.  *$272,000.00*, 2018 WL 948752, at *2.

## III. THE GOVERNMENT OBSCURES WHAT HAPPENED TO THE DEFENDANT CRYPTOCURRENCY BETWEEN DECEMBER 2020 AND ITS SEIZURE BY THE GOVERNMENT

The Complaint "identifies the addresses at which the Defendant Cryptocurrency was stored as of December 2020" (Compl. ¶ 44 & n.7), but does not explain what happened to the Defendant Cryptocurrency between then and the date the government seized it—a date that is itself a mystery. Notably, the Complaint omits that in December 2020, an unknown hacker stole the Defendant Cryptocurrency from the Identified Wallets.  *See*, *e.g.*, Crypto Palace, "*Crypto's Greatest Heist*," Binance (Aug. 11, 2025), *available at* https://tinyurl.com/3dct4zcp.  That gaping hole requires dismissal because the government cannot sustain its burden of establishing the provenance of the Defendant Cryptocurrency.

The government's failure to even attempt to address what happened to the Defendant Cryptocurrency after December 2020—aside from a single conclusory paragraph alleging an unspecific number of subsequent transfers at unspecified times and to unspecified addresses (Compl. ¶ 58)—makes it impossible to reasonably conclude that the government will "be able to meet its burden of proof at trial" based on the allegations in the Complaint. Supp. R. G(2)(f).  The absence of any allegations as to what happened to the Defendant Cryptocurrency after December 2020 makes it impossible to trace the seized property to specified unlawful activity, or even to establish that the Defendant Cryptocurrency deposited in the Identified Wallets in December 2020 is the same BTC that the government seized at an unknown time from an unidentified account. These defects are fatal to the Complaint.  *See Elias*, 154 F.4th at 71; *Sum of $185,336.07*, 731 F.3d at 197; *Capoccia*, 503 F.3d at 115 (vacating forfeiture insofar as it applied to funds moved in transactions that occurred before criminal conduct for which defendant was charged and convicted).

The government's silence as to where the Defendant Cryptocurrency was held after December 2020—and in whose control it rested—raises two additional concerns that contribute to the deficiencies in the Complaint and require, at a minimum, that the government provide a more definite statement pursuant to Federal Rule of Civil Procedure 12(e).

*First*, the government's failure to address the events of the almost three and a half years that preceded its seizure of the Defendant Cryptocurrency hampers Warp Data's ability to litigate this matter and file appropriate motions. There have been allegations, including by a Chinese government agency, that the United States may have initiated the December 2020 hack. *See, e.g.*, Francisco Rodrigues, "*China Accuses U.S. of Stealing 127K BTC in High-Profile Crypto Hack*," CoinDesk (Nov., 11, 2025), *available at* https://tinyurl.com/2hshr8et. Warp Data needs information about how the U.S. came to be in possession of property stolen in a hack in 2020 to assess whether to bring a motion to suppress due to a Fourth Amendment violation. *See One 1958 Plymouth Sedan v. Commonwealth of Pa.*, 380 U.S. 693, 696 (1965) (holding that "the constitutional exclusionary rule does apply" in civil forfeiture matters).

*Second*, the missing information about who had the Defendant Cryptocurrency after December 2020 raises due-process concerns. Nearly five years—a substantial delay by any measure—elapsed between the December 2020 theft of the Defendant Cryptocurrency and the filing of the Complaint. The date the government first came into possession of the Defendant Cryptocurrency would be highly relevant to assessing whether the government deprived Warp Data of its property for an unreasonable period without due process. *See United States v. $8,850 in U.S. Currency*, 461 U.S. 555, 562-65 (1983) (describing four-part test for determining when "a post seizure delay may become so prolonged that the dispossessed property owner has been deprived of a meaningful hearing at a meaningful time"); *United States v. U.S. Currency in Amount of*

*$146,800*, No. 96-CV-4882, 1997 WL 269583, at *3 (E.D.N.Y. Apr. 28, 1997) ("Failure to institute forfeiture proceedings 'promptly' may require a post-seizure probable cause hearing."); *United States v. One 1978 Cadillac Sedan de Ville, N.Y. License Plate No. 533 JPY*, 490 F. Supp. 725, 732 (S.D.N.Y. 1980) ("Unreasonable delay between seizure and institution of a forfeiture proceeding may bar the Government from obtaining forfeiture of the claimant's property . . . .").

## **CONCLUSION**

The Court should dismiss the Verified Complaint *In Rem* and grant Warp Data such other and further relief as the Court deems just and proper.

Dated: New York, New York  
March 9, 2026

PRYOR CASHMAN LLP

By: */s/ Jeffrey Alberts*  
Jeffrey Alberts  
Sidhardha Kamaraju  
Katherine Reilly  
David Abramowicz  
7 Times Square  
New York, NY 10036  
Tel.: 212-326-0800  
jalberts@pryorcashman.com  
skamaraju@pryorcashman.com  
kreilly@pryorcashman.com  
dabramowicz@pryorcashman.com

Attorneys for Claimant Warp Data  
Technology Lao Sole Co. Ltd