**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

                Plaintiff,

    -against-

APPROXIMATELY 127,271 BITCOIN ("BTC")
PREVIOUSLY STORED AT THE VIRTUAL
CURRENCY ADDRESSES LISTED IN
ATTACHMENT A, AND ALL PROCEEDS
TRACEABLE THERETO,

           Defendants *In Rem*.

No. 25 Civ. 5745 (RPK)

**Oral Argument Requested**

**Served on March 9, 2026**

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**CLAIMANT CHEN ZHI'S MOTION TO DISMISS**

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Counsel for Claimant Chen Zhi*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................1

THE COMPLAINT .............................................................................................3

    A.   Claimant Chen Zhi and the Prince Group ....................................3

    B.   The Alleged Fraud .....................................................................4

    C.   The Alleged Connections to This District ....................................5

    D.   The Defendant Cryptocurrency ...................................................5

ARGUMENT ....................................................................................................6

  I.   The Fraud Claim Should Be Dismissed Because the Government Fails to Plead Facts Establishing that the Defendant Cryptocurrency Is the Proceeds of Fraud ......................6

    A.   The Government Does Not Link the Defendant Cryptocurrency to Any Fraud ..........6

    B.   The Complaint Fails to Plead Fraud with Sufficient Particularity ..............7

    C.   The Wire Fraud Statutes Do Not Apply Extraterritorially ..........................10

  II.  The Complaint Fails to Sufficiently Plead Money Laundering ......................12

    A.   The Money Laundering Claim Fails Because the Wire Fraud Claim Fails................12

    B.   The Government Does Not Allege Domestic Transactions Affecting Interstate Commerce ...........13

    C.   The Complaint Does Not Allege Transfers "to" or "from" the United States............15

    D.   The Complaint Does Not Allege Facts Supporting a Reasonable Inference that Transactions Were Designed to Conceal...........18

  III.  The Complaint Does Not Allege Where and How the Defendant Cryptocurrency was Seized. ...............20

  IV.  This Court Lacks Venue..........................................22

CONCLUSION..................................................................................24

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Cuellar v. United States*,
   553 U.S. 550 (2008) .................................................................................................... 18, 19

*Laydon v. Mizuho Bank, Ltd.*,
   No. 12 CIV. 3419 GBD, 2015 WL 1515487 (S.D.N.Y. Mar. 31, 2015) .................................... 11

*Lesavoy v. Gattullo-Wilson*,
   170 F. App'x 721 (2d Cir. 2006) ........................................................................................ 8

*Microsoft Corp. v. AT & T Corp.*,
   550 U.S. 437 (2007) ........................................................................................................ 12

*Minnette v. Time Warner*,
   997 F.2d 1023 (2d Cir. 1993) .......................................................................................... 23

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010) ........................................................................................................ 10

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
   631 F.3d 29 (2d Cir. 2010) .............................................................................................. 11

*RJR Nabisco v. Eur. Cmty.*,
   579 U.S. 325 (2016) .............................................................................................. 10, 11, 12

*SEC v. Payward, Inc.*,
   2024 WL 4511499 (N.D. Cal. Aug. 23, 2024) .................................................................. 22

*United States v. $1,399,313.74 in U.S. Currency*,
   591 F. Supp. 2d ...................................................................................... 8, 9, 13, 21

*United States v. $51, 231.00 United States Currency*,
   734 F.Supp.3d 254 (W.D.N.Y. 2024) .................................................................................. 21

*United States v. 674,739.480211 USDT*
   25-cv-01040 (BKS/PJE), 2026 WL 592743 (N.D.N.Y. March 3, 2026) ........................ 7, 8, 12

*United States v. All Funds Distributed To, or o/b/o Weiss*,
   345 F.3d 49 (2d Cir. 2003) .............................................................................................. 24

*United States v. Daccarett*,
   6 F.3d 37 (2d Cir. 1993) ........................................................................................ 3, 8, 21

*United States v. Dinero Express Inc.*,
  313 F.3d 803 (2d Cir. 2002) ............................................................................ 16

*United States v. Egan,*
  No. 10 Cr. 191 (JFK), 2011 WL 2022824 (S.D.N.Y. 2011) ..................................... 20

*United States v. Garcia,*
  587 F.3d 509 (2d Cir. 2009) ........................................................................ 18, 19

*United States v. Gotti,*
  459 F.3d 296 (2d Cir. 2006) ............................................................................ 13

*United States v. Grant*, No.,
  S4 05 Cr 1192 (NRB), 2008 WL 4376365 (S.D.N.Y. Sept. 25, 2008) ........................ 6

*United States v. Kenner,*
  443 F. Supp. 3d 354 (E.D.N.Y. 2020) ................................................................... 6

*United States v. Ness*,
  565 F.3d 73 (2d Cir. 2009) ............................................................................... 18

*United States v. Piervinanzi*,
  23 F.3d 670 (2d Cir. 1994) .............................................................................. 16

*United States v. Santos*,
  553 U.S. 507 (2008) ....................................................................................... 17

*United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Acct. L7N01967,*
  731 F.3d 189 (2d Cir. 2013) .............................................................................. 7

*United States v. U.S. Funds in Amount of $3,035,648.50,*
  No. CIV-91-217E, 1991 WL 236843 (W.D.N.Y. Nov. 4, 1991) ................................ 20

## **Statutes**

18 U.S.C. § 981(a)(1)(A) ...................................................................................... 12

18 U.S.C. § 1956 ................................................................................................. 12

18 U.S.C. § 1956(a)(1) ................................................................................. 13, 14, 15

18 U.S.C. § 1956(a)(2) ..................................................................................... 16, 17

18 U.S.C. § 1956(c)(4) ........................................................................................ 13

18 U.S.C. §§ 1956(a)(1)(B)(i) ........................................................................................ 12

28 U.S.C. § 1355 .......................................................................................................... 22

28 U.S.C. 1355(b)(1)(A) .............................................................................................. 24

28 U.S.C. § 1355(b)(2) ................................................................................................. 23

28 U.S.C. § 1395 .......................................................................................................... 22

28 U.S.C. § 1395(b) ..................................................................................................... 23

28 U.S.C. § 1395(c) ..................................................................................................... 23

28 U.S.C. § 1406(a) ..................................................................................................... 23

**Rules**

Fed. R. Civ. P. 9(b) ......................................................................................................... 8

Fed. R. Civ. P. E(4)(c) .................................................................................................. 21

Fed. R. Civ. P. G ...................................................................................................... 9, 10

Fed. R. Civ. P. G(1) ........................................................................................................ 8

Fed. R. Civ. P. G(2)(c)-(d) ........................................................................................... 20

Fed. R. Civ. P. G(2)(d) ..................................................................................... 3, 20, 22

Fed. R. Civ. P. G(2((f)) ....................................................................................... 7, 8, 21

Fed. R. Civ. P. G(3) ...................................................................................................... 20

Fed. R. Civ. P. G(3)(b)(i) .............................................................................................. 22

Fed. R. Civ. P. G(4)(a)(ii)(A) ...................................................................................... 20

## PRELIMINARY STATEMENT

There are many things wrong with the government's Complaint, but there is one undeniable fact. Based on the government's own allegations, all of the Defendant Cryptocurrency was "amassed" by Chen Zhi and the Prince Group by no later than December 2020. *All* of the allegations regarding the Defendant Cryptocurrency itself relate to the period between 2018-2020. Yet except for the most conclusory statements about the purported "scam industry across southeast Asia," Compl. ¶ 18, *all* of the Complaint's material allegations of criminality relate to conduct that occurred in 2021 or later. Further, the *only* allegations in the Complaint that have any connection with the United States, let alone this District, also occurred in 2021 or later. Simply put, the Defendant Cryptocurrency could not possibly have been the proceeds of any fraud or money laundering transactions plausibly described in the Complaint.

What really happened here is clear, albeit outside the scope of this motion. On December 28, 2020, unknown hackers committed the largest theft of digital assets in history when they transferred at least 127,426 Bitcoin held in the wallets of LuBian.com to wallets they controlled.[1] LuBian.com was a cryptocurrency mining pool that held assets belonging to Mr. Chen, the Prince Group, and others.

It is not clear how the hack occurred. Security researchers in August 2025 claimed that hackers were exploiting a weakness in popular software used to generate private keys.[2] China claims the United States government conducted a "state-level hacker operation" to steal the

---

[1]     *Arkham Uncovers $3.5B Heist – the Largest Ever*, ARKHAM INTELLIGENCE (Aug. 2, 2025), https://info.arkm.com/announcements/arkham-uncovers.

[2]     Christian Reitter, *Update #14 – More Information on Suspected Lubian.com Hack*, MILK SAD (Aug. 4, 2025), https://milksad.info/posts/research-update-14/.

Bitcoin.[3]  But however it was done, *someone* took Bitcoin from Mr. Chen and the Prince Group in December 2020.  The stolen Bitcoin then sat, in plain sight on the blockchain, in wallets the hackers controlled until on or around July 23, 2024, which the government admits is the latest date that it came into possession of the Defendant Cryptocurrency.[4]

Nearly five years after the theft, and almost a year and a half after the government by its own admission took control of the Bitcoin, the government initiated this case to forfeit the Bitcoin stolen from LuBian, alleging for the first time that it was the proceeds of a global fraud.  No wonder, then, that the Complaint does not mention the 2020 hack at all, or the details of how and from whom it came into possession of the Defendant Cryptocurrency—to do so would be to acknowledge expressly what is crystal clear from the implication flowing from the fact that the Complaint stops tracing the Defendant Cryptocurrency after December 2020.

And why were these details omitted?  Presumably the answers are not good for the government.  At a minimum, the government seized billions in the Defendant Cryptocurrency by July 2024, without any notice or due process, and then searched for a justification to keep it.  What emerged, fifteen months later, was this forfeiture action and a related Indictment unsealed against Mr. Chen, which was incorporated into the Complaint.

We may never know why the government has not disclosed when or how it obtained the Defendant Cryptocurrency, because the Complaint should be dismissed at the outset.  The government does not link the Defendant Cryptocurrency to any alleged fraud.  It does not plead fraud with any particularity, much less the specificity necessary to satisfy the heightened pleading

---

[3]     Francisco Rodrigues, *China Accuses U.S. of Stealing 127K BTC in High-Profile Crypto Hack*, CoinDesk, https://www.coindesk.com/policy/2025/11/09/china-accuses-u-s-of-stealing-127k-btc-in-high-profile-crypto-hack (Nikhilesh De ed., Nov. 11, 2025, 6:06 AM).

[4]     *Public Notice Search (CV-25-5745)*, Forfeiture.gov (Nov. 10, 2025, 9:15 AM), available at https://tinyurl.com/2s3mxp7u (identifying "Seized Date(s)" for the Defendant Cryptocurrency as "July 23, 2024").

standards applicable here. It does not establish the requisite domestic financial transactions or transactions going to or from the United States necessary to plead money laundering. It does not identify where or how the Defendant Cryptocurrency was seized, as required by Supplemental Rule G(2)(d). And it does not establish venue in this Court.

Another Court may eventually unwind the mystery of how the government came to possess billions of dollars of Mr. Chen's cryptocurrency, but this is not the proper forum for that examination. "The particularity-of-pleading requirements in forfeiture cases provide a way of ensuring that the government does not seize and hold, for a substantial period of time, property to which, in reality, it has no legitimate claim." *United States v. Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993). The government has not met those standards here. It has already illegitimately held billions of cryptocurrency belonging to Mr. Chen and others for a "substantial period of time"—and in just the handful of months since this case was filed, the Defendant Cryptocurrency has depreciated by more than $6 billion—and it should be permitted to do so no longer.

## THE COMPLAINT

### A.    Claimant Chen Zhi and the Prince Group

As alleged in the Complaint,[5] Mr. Chen is the founder and operator of the Prince Group, a Cambodian corporate conglomerate comprising dozens of business entities that operate in over thirty countries. Compl. ¶ 15. The Prince Group is "focused on real estate development, financial services and consumer services," *id*. ¶¶ 15–16, and also has substantial and lucrative hospitality and gaming businesses, both online and in casinos.[6] *Id.* at ¶¶ 38, 40, 41–42. As of January 2024,

---

[5]    Unless otherwise noted, the facts in this brief are taken from the Complaint and are accepted as true solely for the purpose of this motion. Mr. Chen disputes the government's allegations, and will prove them wrong if need be.

[6]    The Complaint alleges Prince Group's gaming businesses "operated in multiple countries even following Cambodia's ban on online gambling in approximately 2020" and "ran its gambling operations through mirror websites, which replicated websites across different domains and servers," Compl. ¶ 41, but does not allege that these offshore

the Prince Group's "total annual revenue from legitimate business operations" was estimated to be "several hundred million dollars" per year. *Id.* at ¶ 57. That is, by the government's own admission, not all of the Prince Group's assets or income is alleged to be criminally derived; it has very material "legitimate" income.

### B.    The Alleged Fraud

The government's core claim is that online frauds were run at locations owned by the Prince Group, allegedly at Mr. Chen's direction. *Id.* at ¶¶ 17(a), 20–22, 24. But the Complaint makes only two remotely specific factual allegations in support. First, the Complaint alleges that Mr. Chen "maintained records associated with each [compound], including records tracking profits from the scams that explicitly referenced '*sha zhu*,' or pig-butchering" which allegedly included references to "European and American *jingliao*." *Id.* at ¶ 24. Second, it alleges that Mr. Chen "maintained documents describing and depicting 'phone farms'—automated call centers used to facilitate cryptocurrency investment fraud and other cybercrimes." *Id.* at ¶ 25. But these documents do not describe any frauds actually committed by Mr. Chen and his purported conspirators. And while these allegations must be taken as true for the purposes of this motion, many are provably and obviously false—as the government would know if it had undertaken a genuine investigation. For example, the Indictment, which is incorporated in the Complaint, relies on images of documents allegedly maintained by Mr. Chen "depicting 'phone farms.'" Compl. Attachment B, ¶ 33. But as detailed in Mr. Chen's concurrently-filed motion for a more definite statement, the image referenced in the Indictment comes from a public news report and is totally unconnected to Mr. Chen or any property owned by the Prince Group.

---

gaming operations were illegal (because they were not), and in any event, the Complaint does not allege any violations of foreign law as an alleged basis for forfeiture. *See generally id.* at ¶¶ 38–43.

### C.    The Alleged Connections to This District

The only alleged conduct connecting Mr. Chen and the Prince Group to this District is its alleged association with the "Brooklyn Network," which purportedly operated "on behalf of" the Prince Group, though the government offers scant detail as to how.  *See* Compl. ¶¶ 32–37. According to the Complaint, the Brooklyn Network worked with the Prince Group for roughly one year, beginning in mid-2021.  *Id.* at ¶ 36.  The Complaint alleges no direct contact between the Brooklyn Network and Mr. Chen or any other Prince Group employee.  Nor does it allege that the Brooklyn Network played any role in the accumulation of the Defendant Cryptocurrency—indeed, all of the alleged Brooklyn Network conduct occurred well *after* the Defendant Cryptocurrency had been accumulated.  *Compare id.* (Brooklyn Network operated in 2021), *with id.* at ¶ 44, *et seq.* (all of the Defendant Cryptocurrency had been amassed prior to mid-2020).

### D.    The Defendant Cryptocurrency

The Defendant Cryptocurrency is approximately 127,271 Bitcoin seized from 25 cryptocurrency addresses in unhosted wallets allegedly "controlled and personally tracked by" Mr. Chen.  *Id.* at ¶ 44.  The Complaint includes extensive allegations purporting to trace the Defendant Cryptocurrency, but that tracing stops in December 2020, *id.* at ¶ 44, n.7, with the last transaction on December 28, 2020.  *Id.* at ¶ 50; *see also id.* at ¶ 44 (admitting that the Defendant Cryptocurrency had been "amassed" by 2020).  None of it was acquired after December 2020.  *Id.* at ¶ 58.[7]

Nonetheless, in October 2025, the government filed its Complaint in this District, alleging that the Defendant Cryptocurrency is all the proceeds of Mr. Chen and the Prince Group's fraud (Claim One) or was property involved in their money laundering (Claim Two).

---

[7]    As explained in Mr. Chen's motion for a more definite statement, the Defendant Cryptocurrency has not been in Mr. Chen or Prince Group's possession since late 2020, when it was stolen.

## ARGUMENT

**I.    The Fraud Claim Should Be Dismissed Because the Government Fails to Plead Facts Establishing that the Defendant Cryptocurrency Is the Proceeds of Fraud**

After December 2020, when the government's tracing ends, the Defendant Cryptocurrency was moved to addresses Mr. Chen did not control.  The government may well argue this key detail cannot be considered because it is outside the Complaint.  But no matter.  The government does not link the Defendant Cryptocurrency to any of the fraudulent conduct alleged in the Complaint, let alone trace the Defendant Cryptocurrency as specific proceeds of that fraud.  The only conduct that is alleged with any kind of specificity post-dates December 2020, by which time the government admits Mr. Chen had already "amassed" the Defendant Cryptocurrency—and therefore it could not be the proceeds of the later fraud.  *Id.* at ¶ 44.  Because the Complaint does not—and, logically, cannot—allege that the Defendant Cryptocurrency is the "proceeds" of fraudulent conduct that occurred *after* the Defendant Cryptocurrency came into Mr. Chen's possession, the forfeiture claim arising out of the purported fraudulent conduct must be dismissed.

### A.  The Government Does Not Link the Defendant Cryptocurrency to Any Fraud

The Second Circuit applies a "but for" test to determine whether seized property constitutes "proceeds" subject to forfeiture, whereby "[p]roceeds are property that a person would not have but for the criminal offense."  *United States v. Kenner*, 443 F. Supp. 3d 354, 363 (E.D.N.Y. 2020) (quoting *United States v. Grant*, No. S4 05 Cr 1192 (NRB), 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008)).  The government does not come close to meeting that test here.

The Complaint spends fifteen pages tracing the Defendant Cryptocurrency to wallets Mr. Chen purportedly controlled, Compl. ¶¶ 44–58, but the government does not allege that those transactions were linked to any specific victim or act of fraud.  The most the government says is that the so-called "Chen Wallets" were "primarily funded by . . . cryptocurrency mining . . . and

indirect transfers from wallets at centralized cryptocurrency exchanges." *Id.* ¶ 45.  Of course, neither mining cryptocurrency nor trading it on an exchange is fraudulent.  And the government's blanket assertion that the Defendant Cryptocurrency was part of a "vast sum of fraud proceeds" that Mr. Chen had purportedly accumulated by December 2020 falls far short of establishing a but for link between the Defendant Cryptocurrency and the alleged wire fraud.  *Id.* ¶ 44.

This case is thus similar to *United States v. 674,739.480211 USDT of Tether cryptocurrency*, a recent case where the Northern District of New York denied a motion for default judgment in a cryptocurrency forfeiture case, reasoning that it was "not clear from the verified complaint that Defendant Cryptocurrency 'constitutes or is derived from proceeds *traceable to*' the alleged wire fraud within the meaning of section 981(a)(1)(C), because the verified complaint does not adequately explain the sequence of transfers connecting the Victim to the Target Wallet where the Defendant Cryptocurrency was seized."   No. 25-cv-01040 (BKS/PJE), 2026 WL 592743, at *7 (N.D.N.Y. March 3, 2026) ("*674,739.480211 USDT*").  Similarly, here there are no tracing allegations connecting any victims to any of the so-called Chen Wallets.  Because the government has failed to explain how any portion of the seized assets connects to a single fraudulent act, it has failed to "support a reasonable belief" that it "will be able to meet its burden of proof at trial," as required under Supplemental Rule G(2)(f).  *See United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Acct. L7N01967*, 731 F.3d 189, 197 (2d Cir. 2013) (vacating forfeiture where "the evidence of record falls well short of demonstrating" that "*all* of the seized money constituted proceeds from" illegal acts).

### B.    The Complaint Fails to Plead Fraud with Sufficient Particularity

Even if the government had linked the Defendant Cryptocurrency to fraudulent conduct, which it has not, the Complaint's fraud allegations are not alleged with sufficient particularity to survive a motion to dismiss.

Pursuant to Rule G(2)(f), a civil forfeiture complaint must "state *sufficiently detailed facts to support a reasonable belief* that the Government will be able to meet its burden of proof at trial." *$674, 739.480211 USDT*, 2026 WL 592743 at *4. These heightened pleading standards for civil forfeiture actions are "more stringent than the general pleading requirements" of typical civil lawsuits. *Daccarett*, 6 F.3d at 47; *see also United States v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d at 374, 376 ("complaint devoid of any facts to support its bare allegations and consisting solely of speculative assertions and innuendo cannot stand"). Further, a heightened pleading standard applies in alleging fraud under Rule 9(b) of the Federal Rules of Civil Procedure, which provides that "the circumstances constituting fraud or mistake shall be stated with particularity." *Lesavoy v. Gattullo-Wilson*, 170 F. App'x 721, 722–23 (2d Cir. 2006) (citing Fed. R. Civ. P. 9(b)); *see also* Supp. R. G(1) (the Federal Rules of Civil Procedure apply to forfeiture actions "to the extent this rule [Supp. R. G] does not address an issue").

The Complaint alleges that the Defendant Cryptocurrency was included in "a vast sum of fraud proceeds" that Mr. Chen had "amassed" by "approximately December 2020." Compl. ¶ 44. The government's tracing allegations further make clear that *all* of the Defendant Cryptocurrency was in the "Chen wallets" by December 2020 because each of the transactions cited in the Complaint's tracing section occurred between April 7, 2018 and December 28, 2020. *Id.* at ¶¶ 50, 56. And as already explained, the government does not trace any transfers of cryptocurrency into the wallets after December 2020. *Id.* ¶¶ 44–58. The question then is whether the government has alleged *any* fraudulent conduct with sufficient particularity before December 2020. It has not.

The Complaint contains two fraud sections. The first concerns the "Prince Group," which under Mr. Chen's direction purportedly operated "scam compounds" throughout Cambodia. *Id.* at ¶¶ 22–31. But the allegations concerning the purported "scam compounds" are far too general to

satisfy Rule G's heightened pleading standards.  To the contrary, the "scam compound" allegations are nothing more than nonspecific, unattributed statements, *id.* at ¶ 26, and unrelated narratives regarding the affairs of Cambodia generally, *id.* at ¶¶ 18–21, that are the very type of conclusory allegations that courts in this Circuit find inadequate.  *See, e.g., $1,399,313.74 in United States Currency*, 591 F. Supp. 2d at 376 (the government "cannot premise forfeiture based simply on conclusory allegations").

Courts routinely dismiss forfeiture complaints that, like the government's allegations here, rely on generalized narratives untethered to specific factual allegations about the defendant property.  In *$1,399,313.74 in United States Currency* for instance, a district court dismissed a forfeiture complaint that recited "general facts about the BMPE [Black Market Peso Exchange]," without then alleging concrete connections between the seized funds and the criminal activity.  591 F. Supp. 2d at 374.  The court reasoned that the government "may not seize and continue to hold property upon conclusory allegations," because generalized assertions about how illicit schemes operate, without particularized facts tying the defendant property or claimants to such schemes, fail to satisfy civil forfeiture's heighted pleading requirements.  *Id.* at 376.  As in that case, the allegations here concerning purported "scam compounds" consist of nonspecific statements and background commentary about conditions in Cambodia rather than well-pleaded facts establishing a connection between any frauds and the Defendant Cryptocurrency, and therefore are insufficient as a matter of law.  *See id.*

The second set of fraud allegations concerns the "Brooklyn Network."  Whether the Brooklyn Network allegations are sufficiently detailed is beside the point, because they all post-date December 2020.  For example, the government alleges the Brooklyn Network facilitated the "fraudulent transfer" of funds "on behalf of Prince Group" "[b]etween approximately May 2021

to August 2022." Compl. ¶ 36. And it claims a wallet that Mr. Chen purportedly "monitored" "in or about June 2021" received funds traceable to a U.S.-based scam "that same summer." *Id.* at ¶ 37. What the government does *not* claim is that the Brooklyn Network was operating prior to December 2020, by which time all of the Defendant Cryptocurrency had been accumulated—let alone that the Brooklyn Network's conduct generated any of those assets. Whether the government's allegations concerning the Brooklyn Network are sufficient to satisfy Rule G's pleading standards are therefore beside the point, and the fraud claim should be dismissed for the separate reason that the government has not pled fraud with sufficient particularity.[8]

### C.    The Wire Fraud Statutes Do Not Apply Extraterritorially

The proceeds-of-wire-fraud claim also fails for the separate reason that the wire fraud statute does not apply extraterritorially to capture the conduct described in the Complaint.

It is well-established that, "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 326 (2016) (citing *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)). Courts apply the two-step "*Nabisco* test" to determine whether a statue applies outside of the United States. The Court must determine, first, "whether the statute gives a clear, affirmative indication that it applies extraterritorially," and second, whether the conduct relevant to the statute's "focus" occurred abroad. *Id.* If the statute does not apply extraterritorially and the pleading demonstrates the conduct in question occurred in a foreign country, "then the case involves an impermissible extraterritorial application regardless of whether other conduct occurred in U.S. territory." *Id.*

---

[8]    For similar reasons, as discussed below, venue in this District is not proper.

The wire fraud statute facially lacks extraterritorial application, and so it fails the first step of the *Nabisco* test. *Laydon v. Mizuho Bank, Ltd.*, No. 12 CIV. 3419 GBD, 2015 WL 1515487, at *8 (S.D.N.Y. Mar. 31, 2015) ("Wire fraud does not apply extraterritorially"). The Complaint likewise fails to plead any conduct to support the wire fraud statute's extraterritorial application under step two of the *Nabisco* test. Instead, the Complaint's only allegations relating to any domestic conduct relate to the Brooklyn Network, which (1) are entirely irrelevant to the government's theory of forfeiture, since the activities of the Brooklyn Network as alleged all post-date Mr. Chen and the Prince Group acquiring the Defendant Cryptocurrency; and (2) are outside of the "focus" of the wire fraud state. As alleged, the conduct involving the Brooklyn Network involved scammers located in Cambodia at the "Jinbei Compound," *see* Compl. ¶ 32, and victims at unidentified locations.[9] The only connection between the United States at the Brooklyn Network, as alleged, is that the Cambodian scammers instructed victims to send funds to bank accounts "in the names of Brooklyn- and Queens-based shell companies." *Id.* at ¶ 33. The allegation that fraud proceeds at some point traversed U.S.-based accounts is insufficient to convert an alleged $15 billion foreign scheme into a claim for domestic wire fraud. *See Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 31–33 (2d Cir. 2010) (holding even allegations of "numerous acts in the United States" were "insufficient to support extraterritorial application of the RICO statute" relying on wire fraud predicate).

If permitted to move forward, the government's forfeiture theory would impermissibly convert United States law into a global anti-fraud and anti-money laundering regime, and it is "a basic premise of our legal system that, in general, 'United States law governs domestically but

---

[9]    The Complaint alleges with specificity a single domestic victim, located in California, who allegedly transferred $400,000 in cryptocurrency in 2021. That "Victim-1" is not alleged to have been connected with the work of the Brooklyn Network, and of course based on the dates, no part of the Defendant Cryptocurrency could be the proceeds of any fraud on that victim. *See* Compl. at ¶ 37 & n.2.

does not rule the world.'"  *Nabisco*, 579 U.S. at 335 (quoting *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 454 (2007)).  The fraud claim fails as a matter of law as a result.

## II.    The Complaint Fails to Sufficiently Plead Money Laundering

The government bases the second claim, which seeks the forfeiture of property involved in money laundering, on violations of both the domestic transactional provision and the international transportation provisions of Section 1956.  Compl. ¶ 64 (citing 18 U.S.C. §§ 1956(a)(1)(B)(i) (domestic provision) and 1956(a)(2)(B)(i) (international provision)).  But it does not plead facts sufficient to support either theory.  The government's tracing allegations, while lengthy and complex, reveal the Complaint does nothing more than string together generalized allegations of cryptocurrency movements among unidentified wallets without tying any transaction to interstate commerce, without meeting the statutory requirements for an international transfer, and without alleging facts supporting the required unlawful purpose.

### A.    The Money Laundering Claim Fails Because the Wire Fraud Claim Fails

As a threshold matter, the money laundering claim fails because the government does not link the Defendant Cryptocurrency to a wire fraud or any other alleged predicate offense.  To prove a money laundering transaction under the provisions of section 1956 cited in the Complaint, the government must show a transfer involving the proceeds of specified unlawful activity—here, wire fraud.  But as explained above, the wire fraud claim fails because the government fails to connect the Defendant Cryptocurrency to any fraudulent act.  The money laundering claim thus fails for the same reason the wire fraud claim fails.  *See 674,739.480211 USDT*, 2026 WL 592743 at *8 ("the facts as alleged in the verified complaint do not support a reasonable belief that the Government will be able to meet its burden of proof at trial in establishing that Defendant Cryptocurrency is property 'involved in a transaction or attempted transaction in violation of" section 1956, *see* 18 U.S.C. § 981(a)(1)(A), because—as explained above—the Government

has not adequately alleged the connection between Defendant Cryptocurrency and the wire fraud").

## B. The Government Does Not Allege Domestic Transactions Affecting Interstate Commerce

Section 1956(a)(1) applies to "financial transaction[s]" involving criminal proceeds. 18 U.S.C. § 1956(a)(1). A "financial transaction" is one that "in any way or degree affects interstate or foreign commerce," or involves the use of a financial institution engaged in such commerce. *United States v. Gotti*, 459 F.3d 296, 335 (2d Cir. 2006) (citing 18 U.S.C. § 1956(c)(4)). In *Gotti*, the Second Circuit explained that the interstate commerce element—which is jurisdictional— requires the government to show the "individual subject transaction has, at least, a *de minimis* effect on interstate commerce." *Id.* at 335–36. Even under this minimal standard, the government must establish a "financial transaction" that affects interstate commerce and that "in fact involves the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1). It does not do so here. While gesturing at four purported domestic connections, the Complaint does not identify any "transaction" involving the Defendant Cryptocurrency, much less explain how any such transaction affected interstate commerce.

First, the Complaint references a U.S.-based financial institution, Financial Institution-1, where foreign entities, including FTI and Amber Hill, opened accounts. Compl. ¶¶ 16(n), 40. But it does not identify a *single* financial transaction conducted through Financial Institution-1. All it alleges is that deposits and withdrawals exceeded the entities' anticipated activity. *Id.* at ¶ 40. A variance from "anticipated" account activity, however, is not a money laundering transaction. *See e.g. United States v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d 365, 368 (S.D.N.Y. 2008) (government's allegations about "pattern of wire transfers and deposits . . . [as] indicative of black market peso money laundering operations" insufficient to support an inference that the funds are

subject to forfeiture).  And in any event, the Complaint pleads no facts explaining why the government believes the accounts held at Financial Institution-1 involved criminal proceeds, or—more importantly—how any such transaction involved the Defendant Cryptocurrency.

Second, while making conclusory allegations that "illicit proceeds" were "laundered" when Mr. Chen and his conspirators "us[ed] the proceeds to fund large-scale cryptocurrency mining operations, including the Laos-based Warp Data and its Texas-based subsidiary," Compl. ¶ 42, the Complaint does not identify any transaction by which the Defendant Cryptocurrency was created by, moved through, or exited that business.  Rather, what the government seems to be saying is that *all* of the Bitcoin mined by Warp Data is forfeitable because the company's operations were allegedly funded with criminal proceeds.  But even assuming the government could eventually produce evidence supporting this allegation, which we must accept as true for this motion only,[10] it still has a problem: the government must still identify *at least one* financial transaction involving Warp Data affecting interstate commerce to satisfy Section 1956(a)(1), which it does not do.  The Complaint does not trace a single Bitcoin to Warp Data.  As a result, even assuming for purposes of this motion that the government is correct that Warp Data was funded with fraud proceeds, the government has not met the pleading standards for Section 1956(a)(1).

Third, the government alleges that Hing Seng, a Hong Kong-based company, transferred $60 million to Warp Data between November 2022 and March 2023.  *Id*.  But this transfer is irrelevant because the Defendant Cryptocurrency was accumulated by December 2020.  The

---

[10]    The only evidence the government cites to support its claim that Warp Data was funded with fraud proceeds is a single statement attributed to Mr. Chen with no context—that, with respect to the Prince Group's mining businesses, "the profit is considerable because there is no cost."  Compl. ¶ 42.  This cryptic statement, which is not on its face linked in any way to Warp Data or any other mining operation, does not fairly support the inference that the government wishes to draw.

Complaint does not explain how transactions occurring years later could involve the Defendant Cryptocurrency, much less plead any facts tracing the 2022-2023 funds to the Defendant Cryptocurrency.  The Complaint also does not allege that the Hing Seng-to-Warp Data transfer was itself a laundering transaction or otherwise formed part of the charged laundering scheme.  In short, the government does not identify any "financial transaction" involving Warp Data that affected commerce in any way.[11]

Fourth, the Complaint invokes the so-called "Brooklyn Network" to supply a domestic predicate, alleging that, "between May 2021 and August 2022," a purported criminal group operating in this District "facilitated the fraudulent transfer and laundering of more than $18 million" in New York and elsewhere in the United States.  *Id.* at ¶ 36.  Again, these allegations are untethered to the Defendant Cryptocurrency, which was accumulated by December 2020, and the government pleads no facts connecting the seized Defendant Cryptocurrency to any transaction attributed to the Brooklyn Network.

For all of these reasons, the money laundering claim should be dismissed to the extent it rests on Section 1956(a)(1) because none of the U.S.-based conduct alleged in the Complaint satisfies the requirement that the government plead a domestic financial transaction.

### C.    The Complaint Does Not Allege Transfers "to" or "from" the United States

Similarly, the money laundering claim should be dismissed to the extent it rests on Section 1956(a)(2) because the government does not allege any transfers to or from the United States.

Section 1956(a)(2) applies where funds are transported, transmitted, or transferred "from a place in the United States to or through a place outside the United States," or "to a place in the

---

[11]    The Complaint asserts that Hing Seng was used to purchase a Rolex watch and a Picasso painting as part of the scheme, *id.*, ¶¶ 38, 42, but pleads no facts linking the Defendant Cryptocurrency to either purchase, does not allege that either purchase involved contact with the United States, and is silent as to how the relevant funds reached Hing Seng in the first place.  There is no allegation that Hing Seng was involved in any criminal activity at all.

United States from or through a place outside the United States." 18 U.S.C. § 1956(a)(2). The government is permitted to treat multiple steps as part of a single "transfer" where they are "integral part[s] of a single plan" to move funds "from a place in the United States to . . . a place outside the United States." *United States v. Dinero Express Inc.*, 313 F.3d 803, 806 (2d Cir. 2002). While "transfer" may be construed broadly, absent allegations of a transfer "to" or "from" the United States, § 1956(a)(2) is not violated. *United States v. Piervinanzi*, 23 F.3d 670, 680 (2d Cir. 1994) ("§ 1956(a)(2) is designed to illegalize international money laundering transactions, and covers situations in which money is being laundered . . . by transferring it out of the United States") (internal citations omitted).

The Complaint's money laundering section does not describe even a single transaction to or from the United States. Compl. ¶¶ 38–43. Every transaction is described generally, with no detail as to the locations of the transfers. Nor do any of the government's tracing allegations identify the movement of cryptocurrency to or from wallets hosted in the United States to or from wallets hosted outside the United States. *Id*. ¶¶ 44–58. Again, every transaction described in the tracing section is devoid of detail as to the location of the transfers. On their faces, the money laundering and tracing sections therefore fail to satisfy Section 1956(a)(2)'s international transfer requirement.

The fraud section of the Complaint includes a general allegation that "the Brooklyn Network sent the funds through a series of accounts back to Prince Group scammers at the Jinbei Compound and elsewhere[.]" *Id.* at ¶ 35. But as observed many times already, those transactions cannot support the money laundering allegations because they post-date December 2020. Moreover, the government's description of how the Brooklyn Network completed its fraud does not distinguish between the underlying specified unlawful activities (*i.e.*, fraud) and the alleged

16

laundering of the proceeds of the same. *See United States v. Santos*, 553 U.S. 507, 515–16 (2008) (explaining that transactions that are integral to the predicate offense cannot be money laundering transactions without impermissibly "merg[ing]" the predicate crime with the money laundering crime).

Lastly, the Complaint, in a footnote, describes one transaction involving an alleged U.S.-victim—amazingly, the only predicate transaction described with any specificity in the entire Complaint. Compl. ¶ 37, n.2. According to the government, between July and August 2021, a California victim allegedly transferred more than $400,000 in cryptocurrency from an "account at a popular virtual currency exchange" to an address beginning with "0x1e," which was then routed through addresses beginning with "0x83" and "0x34." *Id.* The Complaint further alleges that later that year, the "0x34" address sent more than $350,000 in USDT—another cryptocurrency—to an address beginning with "0x77." *Id.* Mr. Chen was allegedly "monitoring" the latter address. *Id.*

On its face, this transaction does not satisfy Section 1956(a)(2)'s international transfer requirements because, yet again, it does not identify where any of the accounts were located. While saying the alleged victim was "residing in California," the Complaint is silent as to where the alleged victim's account was located or where the downstream accounts were located. Moreover, the transfer post-dates Mr. Chen's acquisition by December 2020 of the Defendant Cryptocurrency and, therefore, could not have involved those funds. And further, none of the addresses identified in the government's 2021 example are included among the wallets where the Defendant Cryptocurrency was held. *See id.*, Attachment A. While the footnote describing the 2021 California victim defines three separate addresses (the "0x1e Address," the "0x83 Address," and the "0x34 Address"), none of those addresses is mentioned anywhere else in the entire

17

Complaint.  The Complaint thus pleads, at most, a separate set of transactions involving different addresses without a link to the Defendant Cryptocurrency.

Accordingly, the money laundering claim should be dismissed because the Complaint does not meet the basic statutory requirement that the government allege transfers "to" or "from" the United States.

### D. The Complaint Does Not Allege Facts Supporting a Reasonable Inference that Transactions Were Designed to Conceal

The money laundering claim also fails for an independent reason: the government never alleges why the transfers were made.

Both Sections 1956(a)(1) and Section 1956(a)(2) require that a transaction was "designed . . . to conceal" or disguise the nature, location, source, ownership, or control of criminal proceeds. *United States v. Garcia*, 587 F.3d 509, 516–17 (2d Cir. 2009).  The Second Circuit has repeatedly emphasized that concealment laundering turns on *why* funds were moved, not merely *how* they were moved.  *Id.* at 516.  In *Garcia*, for instance, the court held that the statute "requires proof that the purpose—not merely effect—of the transportation was to conceal or disguise a listed attribute" of the funds.  *Id.* (citing *Cuellar v. United States*, 553 U.S. 550, 567 (2008)).  The court further explained that "merely hiding funds during transportation is not sufficient," even where "substantial efforts have been expended to conceal the money."  *Id.* (citing *Cuellar*, 553 U.S. at 563).

The government describes patterns of cryptocurrency movement among multiple addresses, Compl. ¶¶ 44–56, presumably in an effort to draw an inference of concealment from the fact that funds moved through multiple wallet addresses.  But the movement of cryptocurrency between wallets is not enough on its own.  "*How* one moves the money is distinct from *why* one moves the money."  *United States v. Ness*, 565 F.3d 73, 77 (2d Cir. 2009) (citing

*Cuellar*, 553 U.S. at 566) (emphasis added).  The Complaint pleads the former, but not the latter, and therefore fails as a matter of law.

The requirement that the government pleads more than the mere movement of funds is particularly important with cryptocurrency transactions.  While the government makes much of the fact that cryptocurrency funds were dispersed across many wallets, transaction flows in Bitcoin routinely appear fragmented, multi-step, or complex for reasons unrelated to concealment.[12] Wallet software commonly generates new addresses by default, splits unspent outputs, and later consolidates them—ordinary mechanics that can produce a surface resemblance to "layering" even where no effort is made to disguise source or ownership.[13]  The Complaint offers no factual allegations distinguishing ordinary address management from transactions designed to conceal.

The Complaint points to a transaction pattern in which funds were divided among multiple addresses, later recombined through a "funneling" address, and then transferred onward. Compl. ¶ 52.  The government then asserts that this structure "functioned to make tracing the funds more difficult."  *Id*.  But even assuming such movement may have had a concealing *effect*, concealment money laundering requires more: the statute demands allegations that concealment *was the purpose* of the transaction, not merely its incidental consequence.  *Garcia*, 587 F.3d at 516.  The Complaint pleads no facts explaining why this splitting was designed to disguise the source, ownership, or control of the Defendant Cryptocurrency.  The Complaint alleges only mechanics, not concealment purpose.

---

[12]    Dilip Kumar Patairya, *What is Bitcoin's UTXO model, and how to manage UTXOs?*, COINTELEGRAPH: LEARN (Aug. 22, 2024), https://cointelegraph.com/learn/articles/bitcoin-utxo-model-how-to-manage-utcx.

[13]    Vineet Nair, *Bitcoin UTXOs Explained: How to Save Thousands in Transaction Fees*, LEDGER ACADEMY: CRYPTO (Jan. 15, 2026), https://www.ledger.com/academy/topics/crypto/bitcoin-utxos-explained.

## III.    The Complaint Does Not Allege Where and How the Defendant Cryptocurrency was Seized.

The Complaint should further be dismissed under Supplemental Rule G(2)(d) because the government does not explain when, where, or how it seized the Defendant Cryptocurrency.

A complaint for seizure of property must "describe the property with reasonable particularity," and if the property is considered tangible, also "state [the property's] location when any seizure occurred and—if different—its location when the action is filed."  Rule G(2)(c)-(d); *see also* Stefan D. Cassella, *Asset Forfeiture Law in the United States* § 7-10 (2d ed. 2013) ("*Cassella*").[14]  The purpose of this requirement is "to provide a factual basis for the allegations regarding *in rem* jurisdiction," *Cassella*, at § 7-10(c), because how and where the government obtains the property will dictate the procedure for establishing *in rem* jurisdiction over it. *See generally* Rule G(3) (dictating procedure for obtaining and executing arrest warrant in rem); *United States v. U.S. Funds in Amount of $3,035,648.50*, No. CIV-91-217E, 1991 WL 236843, at *2 (W.D.N.Y. Nov. 4, 1991) ("the defendant property in a forfeiture action must be within the court's in rem jurisdiction if its orders are to have any effect.").

Here, the Complaint does not acknowledge that the Defendant Cryptocurrency was seized at all—only that it somehow has come into the government's possession.  Compl. ¶¶ 6, 58.  The government's publication website, however, appears to admit that the Defendant Cryptocurrency was seized, but does not disclose where or from whom it was seized.  *See United States v. Egan*, No. 10 Cr. 191 (JFK), 2011 WL 2022824, at *2 (S.D.N.Y. 2011) (holding that notice failed to

---

[14]    Similarly, Rule G(4)(a)(ii)(A) requires that the property to be forfeited be described with "reasonable particularity" in the published notice of the forfeiture action. While outside the scope of the Complaint, as other potential claimants have noted, the government's detailed notice of forfeiture allegedly published on the Forfeiture.gov website appears to be unavailable, nor do any copies appear to have been preserved on internet archive engines. Notably, the government has not followed its own standard practice of filing a confirmation that publication was made. Thus, it is not clear whether Rule G(4)(a)(ii)(A) was complied with.

satisfy reasonable particularity requirement where it contained no reference to the entity that had custody of currency prior to its seizure); *United States v. $51, 231.00 United States Currency*, 734 F.Supp.3d 254, 258–59 (W.D.N.Y. 2024) (finding the notice deficient because it materially misidentified the source and ownership of the property).  And while the government describes its tracing efforts through December 2020 and then states that the cryptocurrency "was subsequently transferred in its entirety to multiple additional addresses" and "is currently in the custody of the United States," Compl. ¶ 58, these vague statements fail to meet even the "notice pleading" standards required under ordinary civil cases, much less the heightened pleading required for civil forfeiture complaints.[15]  The Complaint therefore fails to meet the requirements of Rule G(2)(d), which requires the government to identify where (and when and how) the Defendant Cryptocurrency was seized and where it is now.

The government cannot sidestep this straightforward requirement by claiming that the Defendant Cryptocurrency is intangible.  First, the government never claims the Defendant Cryptocurrency was seized as intangible code from a physical device or from some other unidentified individual or source.  *See id.* at ¶ 17(i) ("Wallets could be maintained or 'hosted' by a third-party service, such as a virtual currency exchange, or held directly by individuals").  Second, at every stage of this action, the government has treated the Defendant Cryptocurrency not as intangible code, but as seized tangible property.  For example, the government has not followed the attachment procedures specified by Supplemental Rule E(4)(C) for intangible assets, under which "the marshal or other person or organization having the warrant shall execute the process

---

[15]     Pursuant to Rule G(2)(f), a civil forfeiture complaint must "state *sufficiently detailed facts* to support a *reasonable belief* that the government will be able to meet its burden of proof at trial."  *See $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d at 374, 376.  These heightened pleading standards for civil forfeiture actions are "more stringent than the general pleading requirements" of typical civil lawsuits.  *Daccarett*, 6 F.3d at 47;  *see also $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d at 374, 376 (dismissing complaint where, though government's conclusions "may in fact be true," a "complaint devoid of any facts to support its bare allegations and consisting solely of speculative assertions and innuendo cannot stand").

by leaving *with the garnishee or other obligor* a copy of the complaint and process requiring *the garnishee or other obligor to answer*."  Instead, the government's letter requesting a warrant (ECF No. 2 at 1, "Warrant Request") and the arrest warrant itself (ECF No. 3 at 2, "Warrant") invoke the procedures for arrest of tangible property under Rule G(3)(b)(i), which refers to property "in the government's possession, custody, or control."  The government has consistently stated that the Defendant Cryptocurrency is in "the possession, custody, or control of the United States."  Warrant at 2;  *see also* Warrant Letter at 1 ("the Defendants *In Rem* . . . are already in the government's possession, custody and control");  Compl. ¶ 6 ("The Defendant Cryptocurrency is currently in the custody of the United States at virtual currency addresses known to the government").  And the government has taken the position that the Defendant Cryptocurrency is a thing to be possessed via the private keys that control it: "The Complaint alleges that the private keys to the Defendant Cryptocurrency were in [Mr. Chen's] personal possession. . ..  Whoever controls the private key to a crypto asset, controls that asset." ECF No. 10 at 4. (citing *SEC v. Payward, Inc.*, 2024 WL 4511499, at \*1 (N.D. Cal. Aug. 23, 2024).  This position is notably inconsistent with the procedures governing intangible assets under the Supplemental Rules.  *See Cassella* § 7-10(c) ("[M]ore complicated descriptions must be used, however, where the defendant property is an intangible asset—such as the debt owed by one party to another").

Because the government has elected to treat the Defendant Cryptocurrency as tangible in applying the Supplemental Rules, it must satisfy the pleading requirements of Rule G(2)(d). Because it has not, the Complaint must be dismissed.

## IV.    This Court Lacks Venue.

The Complaint alleges that "[v]enue lies in the Eastern District of New York pursuant to 28 U.S.C. §§ 1355 and 1395 in that acts and omissions giving rise to the forfeiture accrued in the Eastern District of New York."  Compl. ¶ 4.  This allegation is not only wrong, but flatly

impossible: as alleged, the conduct that occurred in this District began *years after* Mr. Chen and the Prince Group allegedly "amassed" the Defendant Cryptocurrency. *Id.* at ¶ 44.

When venue is improper, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). "Whether [either] dismissal or transfer is appropriate lies within the sound discretion of the district court." *Minnette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir. 1993). Here, the Complaint does not allege any facts that would support transfer to another potential venue in lieu of dismissal.[16]

The Complaint alleges that "acts and omissions giving rise to the forfeiture accrued in the Eastern District of New York." Compl. ¶ 4. But this is inconsistent with the government's own allegations, which make clear that the Defendant Cryptocurrency pre-dates the conduct alleged to have occurred in this District. Put simply, conduct that occurred years later and involved later-arriving coconspirators cannot establish venue in this Court.

The government alleges that Mr. Chen had amassed the Defendant Cryptocurrency "as of December 2020" at the "Chen Wallets," which were virtual addresses allegedly controlled by Mr. Chen. *Id.* at ¶ 44, n.7. The government further claims the Chen Wallets "contained the Defendant Cryptocurrency and no other funds." *Id.* And with no explanation, the government's Complaint simply stops tracing the Defendant Cryptocurrency in December 2020.

Taking these allegations as true, the Defendant Cryptocurrency was thus fully accumulated and held by Mr. Chen in late 2020. Past that point, the Complaint does not allege that the

---

[16]    28 U.S.C. § 1395(b) provides that venue lies in the district where the defendant property is found, but the Complaint does not allege where the Defendant Cryptocurrency is located, and as such subsection (b) cannot be a basis for venue. Similarly, under 28 U.S.C. § 1395(c), an action to forfeit property seized outside the United States can be filed in the district where such property is first brought, but the Complaint is silent as to where, when, and how the Defendant Cryptocurrency was seized. And the District of Columbia is not a proper venue under 28 U.S.C. § 1355(b)(2) because the Complaint does not allege that the Defendant Cryptocurrency "is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign government."

Defendant Cryptocurrency was commingled, laundered, or otherwise involved in any crime. *See id.* at ¶ 58 (stating only that "[t]he Defendant Cryptocurrency was subsequently transferred in its entirety to multiple additional addresses"). Accordingly, any acts "giving rise to the forfeiture" must have occurred *prior* to late 2020 for venue to be proper under 28 U.S.C. 1355(b)(1)(A).

Yet the only conduct connected in any way to this District is the so-called "Brooklyn Network," which acted between May 2021 and August 2022. *Id.* at ¶ 36. Because it was active after the Defendant Cryptocurrency was already in the Chen Wallets, the Brooklyn Network could not have been the source of the Defendant Cryptocurrency. Nor could any alleged ill-gotten gains from the Brooklyn Network have been commingled with the Defendant Cryptocurrency. Because venue cannot rest on activity that did not give rise to the forfeiture, venue is lacking here. *See, e.g.*, *United States v. All Funds Distributed To, or o/b/o Weiss*, 345 F.3d 49, 55 (2d Cir. 2003) ("The suit is brought not against a person or corporation, but against defendant property that allegedly has been involved in criminal activity.").

//

//

## **CONCLUSION**

The Complaint should be dismissed.


Dated:   March 9, 2026                    Respectfully Submitted,
        New York, New York

BOIES SCHILLER FLEXNER LLP

/s/ *Matthew L. Schwartz*
Matthew L. Schwartz
Peter M. Skinner
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
mlschwartz@bsfllp.com
pskinner@bsfllp.com

Dan G. Boyle
2029 Century Park East, Suite 1520
Los Angeles, California 90067
Telephone: (213) 629-9040
dboyle@bsfllp.com

*Attorneys for Claimant Chen Zhi*