**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

               Plaintiff,

    -against-

APPROXIMATELY 127,271 BITCOIN ("BTC")
PREVIOUSLY STORED AT THE VIRTUAL
CURRENCY ADDRESSES LISTED IN
ATTACHMENT A, AND ALL PROCEEDS
TRACEABLE THERETO,

          Defendants *In Rem*.

No. 25 Civ. 5745 (RPK)

**Oral Argument Requested**

**Served on March 9, 2026**

---

### MEMORANDUM OF LAW IN SUPPORT OF CLAIMANT CHEN ZHI'S MOTION FOR A MORE DEFINITE STATEMENT

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350

*Counsel for Claimant Chen Zhi*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ...................................................................................................................2

     I.       The Complaint's Allegations About the Defendant Cryptocurrency .....................2

     II.     The Government's Other Statements About the Defendant Cryptocurrency .........3

     III.    What Else We Know About the Defendant Cryptocurrency .................................5

     IV.    Other Reasons To Be Skeptical Here....................................................................7

LEGAL STANDARD............................................................................................................11

ARGUMENT ........................................................................................................................13

     I.       Mr. Chen Is Unable To Advance Multiple Facially-Relevant and
           Meritorious Defenses Because the Government is Hiding How It Got the
           Defendant Cryptocurrency ...................................................................................13

           A.     Due Process....................................................................................14

           B.     The Statute of Limitations ............................................................17

           C.     Other Requirements of Forfeiture Law....................................18

           D.     Suppression and the Exclusionary Rule....................................19

     II.     The Government Should Respond To This Motion Promptly..............................20

CONCLUSION....................................................................................................................26

# **TABLE OF AUTHORITIES**

## **CASES**

*Baptista v. Hartford Bd. of Educ.*,
    427 F. App'x 39 (2d Cir. 2011) ................................................................................. 19

*Barker v. Wingo*,
    407 U.S. 514 (1972) ...................................................................................................... 14

*Barnhart v. Peabody Coal Co.*,
    537 U.S. 149 (2003) ...................................................................................................... 21

*Bennett v. Schmidt*,
    153 F.3d 516 (7th Cir. 1998) ...................................................................................... 12

*Brown-Carter v. Jovia Fin. Fed. Credit Union*,
    No. 24-CV-03688 (HG), 2024 WL 3659595 (E.D.N.Y. Jun. 12, 2024) .................. 12

*Casanova v. Ulibarri*,
    595 F.3d 1120 (10th Cir. 2010) .................................................................................. 12

*Culley v. Marshall*,
    601 U.S. 377 (2024) ...................................................................................................... 14

*Hawkins v. Synchrony Bank*,
    No. 23 CIV. 6583 (EK) (VMS), 2025 WL 890476 (E.D.N.Y. Mar. 24, 2025) ...... 13

*In re 650 Fifth Ave. & Related Props.*,
    934 F.3d 147 (2d Cir. 2019) ................................................................................ 17, 19

*Middaugh v. InterBank*,
    528 F. Supp. 3d 509 (N.D. Tex. 2021) ...................................................................... 12

*United States v. $1,106,775.00 in United States Currency*,
    131 F.4th 710 (9th Cir.) ............................................................................................... 24

*United States v. $421,090.00 in U.S. Currency*,
    No. 11-CV-00341(JG), 2011 WL 3235632 (E.D.N.Y. Jul. 27, 2011) .................... 23

*United States v. $515,060.42 in U.S. Currency*,
    152 F.3d 491 (6th Cir. 1998) ...................................................................................... 17

*United States v. $557,933.89, More or Less, in U.S. Funds*,
    287 F.3d 66 (2d Cir. 2002) .......................................................................................... 23

*United States v. All Assets Held in Raymond James & Assocs. Acct. No. XXXXXXX in Name of
    Deltora Enters. Grp. Co. Ltd.*,
    No. 19-CV-377 (WFK) (CHK), 2025 WL 3683271 (E.D.N.Y. Dec. 18, 2025) ..... 15

*United States v. Any and All Funds on Deposit In Acct. No. 12671905, Held In The Name of
    Landlocked Shipping Co. At Wells Fargo Brokerage Servs., LLC*,
    No. 09CV3481(HB), 2010 WL 3185688,  (S.D.N.Y. Aug. 10, 2010) ..................... 17

*United States v. Cosme*,
    796 F.3d 226 (2d Cir. 2015) ........................................................................................ 15

*United States v. One Lot of U.S. Currency ($36,634)*,
    103 F.3d 1048 (1st Cir. 1997) .................................................................................... 20

*United States v. One Motor Yacht Named Mercury*,
    527 F.2d 1112 (1st Cir. 1975) .................................................................................... 15

*United States v. One Tyrannosaurus Bataar Skeleton*,
    No. 12-CIV-4760 PKC, 2012 WL 5834899 (S.D.N.Y. Nov. 14, 2012) .................. 11

*United States v. Real Prop. & Premises Known as 90-23 201st St., Hollis, New York,*
    775 F. Supp. 2d 545 (E.D.N.Y. 2011) ................................................................. 19
*United States v. Ross,*
    161 F.4th 100 (2d Cir. 2025) ........................................................................... 14, 22
*United States v. Technodyne LLC,*
    753 F.3d 368 (2d Cir. 2014)..................................................................................... 23
*United States v. Two Hundred Seventy-Two Thousand Dollars & No Cents ($272,000),*
    No. 1:16-CV-06564 (AMD), 2018 WL 948752 (E.D.N.Y. Feb. 16, 2018) ............................ 11
*United States v. Vazquez-Alvarez,*
    760 F.3d 193 (2d Cir. 2014)..................................................................................... 22
*Williams v. City of New Rochelle,*
    No. 13-CV-3315 NSR, 2014 WL 2445768 (S.D.N.Y. May 29, 2014)................................... 12

## STATUTES

18 U.S.C. § 983.................................................................................................... 19
19 U.S.C. § 1621.................................................................................................. 17

## RULES

Fed. R. Civ. P. 12(e) ...................................................................................... 11, 12
Supplemental Rule G(2) ................................................................................. 11, 19
Supplemental Rule G(6) ...................................................................................... 21
Supplemental Rule G(8) ...................................................................................... 19

## TREATISES

Wright & Miller, Federal Practice and Procedure, 5C Fed. Prac. & Proc. Civ. § 1376
    Motion for a More Definite Statement—Scope of Rule 12(e) (3d ed.)......................... 11, 12, 14

## PRELIMINARY STATEMENT

The government's Complaint is entirely silent about what happened between, at the latest, December 2020—by which time it alleges that Chen Zhi and Prince Holding Group "amassed" all of the Defendant Cryptocurrency—and the filing of the Complaint in October 2025. It says nothing about how, when, or from whom the government obtained the Bitcoin, let alone what legal authority it had to do so. The failure of the Complaint to allege these simple facts—which civil forfeiture complaints are required to do under Supplemental Rule G(2)(d)—is of great import. There are numerous defenses that Claimant is unable to presently assert because the circumstances under which the government obtained the Defendant Cryptocurrency remain a mystery.

This failure is all the more confounding because of what *is* known. However the Defendant Cryptocurrency was obtained by the Claimant—whether from legitimate business operations, as Mr. Chen and the Prince Group maintain, or whether through crime, as the government alleges— it was all obtained no later than December 2020. In late December 2020, all of the Defendant Cryptocurrency was stolen by persons unknown: maybe it was criminals, maybe it was the government or people acting on its behalf, maybe it was someone else. But by July 2024 at the latest, the Defendant Cryptocurrency somehow made its way to the government. We don't know whether the government executed lawful process and seized it, whether someone else turned it over to the government voluntarily, or whether the government had it all along. It took another fifteen months, until October 2025, for the government to finally file this action.

These facts suggest numerous defenses, including quite obviously Due Process and statute of limitations concerns. The substantial questions surrounding how the Defendant Cryptocurrency came into the government's possession are also amplified by other deeply problematic aspects of the case. Among other things, as explained in Mr. Chen's motion to dismiss, the Complaint contains absolutely no allegations tracing the Defendant Cryptocurrency to any criminal conduct.

1

To the contrary, the Complaint's material allegations of wrongdoing all have to do with conduct that post-dated the theft of the Defendant Cryptocurrency, suggesting that the government's investigation may not have even begun until afterwards.  And more concerning still, the government's pleadings are riddled with easily-provable inaccuracies, suggesting that its investigation was far less than thorough—perhaps an exercise to justify taking $15 billion worth of assets from Mr. Chen, rather than a bona fide law enforcement effort.  By way of example, the Indictment (incorporated into the Complaint) contains a number of photographs that purport to depict the Prince Group's alleged criminal activities.  In fact, a simple google search would have revealed that two of the photos come from public websites and have nothing to do with Mr. Chen, and the third depicts a traditional Chinese medicinal practice.

There are simply too many questions about this case for the government to be allowed to continue litigating—and attempting to procedurally default each and every claimant who has appeared, rather than litigate on the merits—without being required to answer the most basic ones now.  Accordingly, the Court should require the government to supplement its pleadings or otherwise provide a more definite statement about how it obtained the Defendant Cryptocurrency.

## BACKGROUND

### I.    The Complaint's Allegations About the Defendant Cryptocurrency

The Complaint alleges that the Defendant Cryptocurrency is comprised of approximately 127,271 bitcoin.  According to the Complaint, that bitcoin is the product of a fraud overseen by Mr. Chen and the Prince Group, and was "stored across 25 cryptocurrency addresses in unhosted wallets controlled and personally tracked by Chen," which the Complaint refers to as the "Chen Wallets." Compl. ¶ 44.  The government alleges that Mr. Chen had "amassed" all of the Defendant Cryptocurrency "[b]y approximately 2020," and no later than December 2020.  *Id.* & n.7.

The very latest transaction involving the Defendant Cryptocurrency alleged in the

Complaint occurred on December 28, 2020.  *Id.* ¶ 50.  From that date until today, the only thing that the Complaint says about the Defendant Cryptocurrency is that it "was subsequently transferred in its entirety to multiple additional addresses. It is currently in the custody of the United States."  *Id.* ¶ 58; *see also id.* ¶ 44, n.7 (alleging "the Defendant Cryptocurrency is now stored at addresses controlled by the government").   The Complaint does not say who "subsequently transferred" the Defendant Cryptocurrency, or when it came into "the custody of the United States."  As far as the allegations in the Complaint are concerned, it could have been on December 28, 2020, it could have been on October 14, 2025 (the date the Complaint was filed), or at any point in between.

## II.     The Government's Other Statements About the Defendant Cryptocurrency

While the Complaint says nothing about the circumstances under which the government came to possess the Defendant Cryptocurrency, it has made several other relevant statements.

First, pursuant to Supplemental Rule G(4), the government was required to publish notice of this action for at least 30 consecutive days on an official internet government forfeiture site. *See* Supp. R. G(4)(a)(iv)(C).  The government at least started this publication process and—while there is no published notice currently available, which is itself unusual—the relevant government website (Forfeiture.gov) formerly provided as follows:



*See* Ex. A.[1]   The government has therefore previously stated that it "seized" the Defendant Cryptocurrency on "July 23, 2024."  *Id.*

Second, on January 27, 2026, the government responded by letter to various motions for leave to file late claims by putative claimants who allege to hold judgments against the Islamic Republic of Iran. *See* ECF No. 126. In opposing the motions, the government stated as follows:

> The Defendant Cryptocurrency is not a blocked asset under TRIA, because it was not seized or frozen "under" TWEA or IEEPA. It was seized and brought within this Court's *in rem* jurisdiction in a civil forfeiture proceeding based on criminal violations of the wire fraud and money laundering statutes.

[ECF No. 126, at 7.]  So here, again, the government admitted that it "seized" the Defendant Cryptocurrency—with or without judicial authorization—and then "brought within this Court's *in*

---

[1]    Unless otherwise indicated, all citations to "Ex." refer to the accompanying Declaration of Dan G. Boyle, dated March 9, 2026.

*rem* jurisdiction."

### III.    What Else We Know About the Defendant Cryptocurrency

One of the good things about Bitcoin is that anyone can see its location and movement on the so-called blockchain. Here's what is known about what happened to the Defendant Cryptocurrency on and after December 28, 2020, when the government's tracing abruptly stops.

On that same date, more than 127,000 Bitcoin—including all of the Defendant Cryptocurrency, as well as some other Bitcoin—was stolen from the very same cryptocurrency wallets at LuBian identified in the Complaint as the "Chen Wallets." This massive theft was first publicly reported in August of 2025, when a commercial blockchain intelligence platform broke the story. *See* Ex. B ("Based on analysis of on-chain data, it appears that 127,426 BTC was stolen from LuBian in December 2020, worth $3.5 billion at the time and now worth approximately $14.5 billion."); Ex. C ("A staggering 127,000+ BTC, worth nearly $14 billion today, was silently drained from LuBian, a once-prominent Chinese Bitcoin mining pool, in late December 2020."). While it is not entirely clear precisely how this massive theft was accomplished, public cybersecurity researchers have noted that the Chen Wallets were vulnerable to a then-unknown cryptography vulnerability. The software tool used to create the primary 256-bit private keys to the Chen Wallets (known as "Libbitcoin Explorer") unknowingly relied on 32-bit inputs to the Mersenne Twister pseudorandom number generator algorithm, and thus created cryptographically weak private keys. *See* Ex. D. This vulnerability was not publicly discovered until mid-2023, more than two years after the Defendant Cryptocurrency was stolen. *See generally* Ex. E ("In 2023, we discovered that the Libbitcoin Explorer (bx) cryptocurrency wallet tool has a flawed entropy generation for new wallets. On vulnerable 3.x versions, bx seed used the weak Mersenne Twister pseudorandom number generator (PRNG) to produce cryptographic key material, which is a critical design error.").

Claimant's initial blockchain tracing analysis confirms these reports. On December 28, 2020, 127,426 Bitcoin, including the Defendant Cryptocurrency, was transferred out of the Chen Wallets in a roughly two hour period, in a coordinated and highly sophisticated fashion. Once stolen, the Defendant Cryptocurrency was moved to a series of new wallets (the "Intermediary Wallets"), not alleged to be connected to Claimant and in transfers the government has not alleged to be money laundering transactions. *See* Declaration of John Roszkowski ("Roszkowski Decl.") at ¶ 4(a). The Intermediary Wallets then held the Defendant Cryptocurrency for nearly 43 months without any notable activity: no withdrawals, no transfers, and no exchanges for other cryptocurrencies. Roszkowski Decl. ¶ 4(b). During this time, the price of Bitcoin appreciated more than 250%. Between June and July of 2024—the same time period identified in the now-missing forfeiture.gov publication notice—the Defendant Cryptocurrency was moved from the Intermediary Wallets to a new series of wallets (the "Consolidation Wallets"), where it remains to this day. Roszkowski Decl. ¶ 4(c). Based on the Complaint's allegations that the Defendant Cryptocurrency is now "stored at addresses controlled by the government" (Compl. ¶ 44, n.7), the government presumably controls the Consolidation Wallets.

While this theft only became publicly known this past summer—shortly after the Defendant Cryptocurrency was moved to the Consolidation Wallets—Mr. Chen and the Prince Group, whose billions in Bitcoin were stolen overnight, obviously knew far earlier. They did not sit idly by. As can be seen on the blockchain, between approximately July 2022 and July 2024, approximately 1,496 "OP_RETURN" messages were sent from the Chen Wallets to the Intermediary Wallets. Roszkowski Decl. ¶ 4(d). An "OP_RETURN" message is a function of Bitcoin's technology where a user can send a very small amount of cryptocurrency to another wallet and embed a brief text message in that transfer. *Id.* The messages all requested that the

Defendant Cryptocurrency be returned.  *Id.*  In total, these messages cost approximately 1.38 BTC across 1,496 different transactions, worth roughly $90,000 as of the date of the final messages in July 2024. *Id.* ¶ 4(e).

 In other words, the Chen Wallets sent more than a thousand requests for the return of the Defendant Cryptocurrency, at a cost of tens of thousands of dollars, but nothing was returned.

## IV.    Other Reasons To Be Skeptical Here

While the Complaint says nothing about how the government obtained the Defendant Cryptocurrency, nor does it make any attempt to trace the Bitcoin to conduct predating December 2020 when it was all already in the "Chen Wallets," the Complaint does contain a number of other allegations that are demonstrably wrong and cause for healthy skepticism of the way the government conducted its investigation and brought this case.  Among other things, the Complaint incorporates and attaches the Indictment against Mr. Chen, which in turn contains a series of pictures that allegedly depict Mr. Chen's criminal conduct.  But that's provably wrong.

To take one example, the Complaint alleges that "Chen himself maintained documents describing and depicting 'phone farms'—automated call centers used to facilitate cryptocurrency investment fraud and other cybercrimes" and that those "documents detailed the completion of two particular facilities staffed with 1,250 mobile phones that controlled 76,000 accounts on a popular social media platform." Compl. ¶ 25.  The attached Indictment includes an image of a "phone farm"—"automated call centers used to facilitate cryptocurrency investment fraud and other cybercrimes"—that Mr. Chen allegedly "maintained":



Compl., Attach. B, ¶ 33.

In fact, a reverse-image Internet search reveals that this photograph was first published years later, in March 2023, in a Chinese-language news article discussing the use of cell phones to artificially inflate viewership of e-commerce live-streams:



Ex. F.

The Complaint also cites photographs in support of the allegation that Mr. Chen and alleged co-conspirators "used violence and coercion to achieve business outcomes and further their

criminal schemes." Compl. ¶ 31.  This allegation is mirrored in the Indictment, which includes the following images as purported evidence of alleged violence:

 

Compl., Attachment B, ¶ 40 ("CHEN possessed images illustrating Prince Group's violent methods, including those below").

The photograph on the left, however, has nothing to do with the "Prince Group's violent methods."  It comes from an April 2020 article entitled "A man got his testicles stuck between plastic chairs during the lockdown. The situation got out of his control and he had to call an ambulance," which recounts the stories of several men injured from sitting naked on chairs with slats, and begins "Be careful, men! Never sit naked on a plastic chair!":



9

Ex. G.

The photo on the right above, meanwhile, does not depict any kind of physical injury, but rather the characteristic effects of *gua sha*, a traditional Chinese therapeutic practice that involves "scraping" the skin with a smooth-edged tool that results in marks on the body identical to those depicted in the government's image:





*E.g.,* Exs. H, I.

The government should have known better, and its reckless choices of what it *did* include in the Complaint and Indictment say just as much about what it deliberately chose not to include.

## LEGAL STANDARD

A civil forfeiture complaint must, among other things, "state the grounds for . . . in rem jurisdiction over the defendant property" and "if the property is tangible, state its location when any seizure occurred and—if different—its location when the action is filed." Fed. R. Civ. P. Supp. R. G(2)(b), (d). It must also "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." *Id.* at G(2)(f).

The rules also require "that the government set forth its claims in [a civil forfeiture] complaint with such particularity that the defendant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." *United States v. Two Hundred Seventy-Two Thousand Dollars & No Cents ($272,000)*, No. 1:16-CV-06564 (AMD), 2018 WL 948752, at *2 (E.D.N.Y. Feb. 16, 2018) (quoting Supp. R. E(2)(a)). "These standards are regarded as 'more stringent than the general pleading requirements set forth in the Federal Rules of Civil Procedure, . . . an implicit accommodation to the drastic nature of the civil forfeiture remedy.'" *United States v. One Tyrannosaurus Bataar Skeleton*, No. 12-CIV-4760 PKC, 2012 WL 5834899, at *3 (S.D.N.Y. Nov. 14, 2012) (quoting *United States v. Daccarett*, 6 F.3d 37, 47 (2d Cir.1993)).

Where a complaint is "so vague or ambiguous that the party cannot reasonably prepare a response," it may move for a more definite statement. Fed. R. Civ. P. 12(e). Such a motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired. *Id.* "If details are necessary in order to make a vague complaint intelligible, the fact that the details also are subject to the discovery process should not preclude their production under Rule 12(e)." Wright & Miller, Federal Practice and Procedure, 5C Fed. Prac. & Proc. Civ. § 1376 Motion for a More Definite Statement—Scope of Rule 12(e) (3d ed.). "The Rules of Civil Procedure make a complaint just the starting point. Instead of lavishing attention on the complaint

until the plaintiff gets it just right, a district court should keep the case moving—if the claim is unclear, by requiring a more definite statement under Rule 12(e)[.]" *Bennett v. Schmidt,* 153 F.3d 516, 518 (7th Cir. 1998). And while a motion under Rule 12(e) may consider materials outside of the complaint, *see generally* Fed. R. Civ. P. 12(d), "[a] motion for a more definite statement is not a motion to dismiss and therefore does not require the Court to assess the viability of the claims." *Brown-Carter v. Jovia Fin. Fed. Credit Union*, No. 24-CV-03688 (HG), 2024 WL 3659595, at *1 (E.D.N.Y. Jun. 12, 2024) (internal citation omitted).

Although Rule 12(e) motions are sometimes disfavored, particularly where immaterial pleading gaps can be filled through discovery, where "the movant shows that there actually is a substantial threshold question that may be dispositive," a motion for a more definite statement is warranted. *Williams v. City of New Rochelle,* No. 13-CV-3315 NSR, 2014 WL 2445768, at *2 (S.D.N.Y. May 29, 2014) (internal citation omitted). Rule 12(e) has particular utility in cases such as this that involve threshold defenses and heightened pleading requirements. *See, e.g., Casanova v. Ulibarri*, 595 F.3d 1120, 1125 (10th Cir. 2010) ("[T]he preferable procedure when a specific date could support a dispositive defense motion is to require the plaintiff to provide a more definite statement under Fed. R. Civ. P. 12(e)."); *Middaugh v. InterBank,* 528 F. Supp. 3d 509, 549 (N.D. Tex. 2021) (finding more definite statement under Rule 12(e) appropriate remedy for failure to plead fraud with particularity under Rule 9(b)); Wright & Miller, Federal Practice and Procedure, 5C Fed. Prac. & Proc. Civ. § 1376 Motion for a More Definite Statement—Scope of Rule 12(e) (3d ed.) ("[M]any courts have found it expedient to require claimants to state more fully matters relating to possible threshold defenses, even though the claim as originally pleaded was sufficiently definite to enable the defendant to respond to the complaint, which means that the pleading was not technically open to attack under Rule 12(e). Some courts thus have required

12

claimants to give particulars about the date on which the claim arose, so that the timeliness of the action could be determined."). Ultimately, "[w]hether to grant a motion for a more definite statement is within the discretion of the district court." *Hawkins v. Synchrony Bank,* No. 23 CIV. 6583 (EK) (VMS), 2025 WL 890476, at *5 (E.D.N.Y. Mar. 24, 2025) (internal citation omitted).

## ARGUMENT

Although the Complaint is in some respects detailed, a more definite statement is appropriate because of what it *doesn't* say: gaping holes that are worse than "vague and ambiguous" allegations, because there are no allegations at all. Some of those pleading failures—such as the Complaint's utter lack of any connection between the Defendant Cryptocurrency and any alleged criminal conduct—can be dealt with through a motion to dismiss, which Mr. Chen filed today. But in other places, the government's silence as to key (and in some cases necessary) facts renders the Complaint too vague to allow Mr. Chen to frame a responsive pleading. That is especially true with respect to the circumstances under which the government came to possess the Defendant Cryptocurrency.

## I.    Mr. Chen Is Unable To Advance Multiple Facially-Relevant and Meritorious Defenses Because the Government is Hiding How It Got the Defendant Cryptocurrency

Mr. Chen cannot "commence an investigation of the facts and to frame a responsive pleading" under Rule E(2) because the Complaint's ambiguities make it impossible for him to evaluate and potentially advance a number of threshold defenses. As Wright and Miller explain, requiring a plaintiff to provide information to allow a defendant to advance a "threshold defense" is an appropriate use of Rule 12(e):

> A second possible exception to the generally restrictive attitude toward Rule 12(e) motions involves compelling a more definite statement of matter relating to possible threshold defenses to the claim for relief. Using Rule 12(e) in this fashion can be justified in terms of one of the major purposes of the federal rules— promoting the speedy adjudication of cases. In keeping with that objective, many

13

courts have found it expedient to require claimants to state more fully matters relating to possible threshold defenses, even though the claim as originally pleaded was sufficiently definite to enable the defendant to respond to the complaint, which means that the pleading was not technically open to attack under Rule 12(e). Some courts thus have required claimants to give particulars about the date on which the claim arose, so that the timeliness of the action could be determined, although there is not universal agreement that doing so is appropriate.

Wright & Miller, Federal Practice and Procedure, 5C Fed. Prac. & Proc. Civ. (3d ed.) § 1376 Motion for a More Definite Statement—Scope of Rule 12(e) (footnotes omitted).

In this case, the circumstances under which the government obtained the Defendant Cryptocurrency are central to at least four threshold defenses.

## A.    Due Process

"[D]ue process requires a *timely* post-seizure forfeiture hearing." *Culley v. Marshall*, 601 U.S. 377, 384 (2024) (emphasis in original).  This is because "a delay in resolving a forfeiture action 'may become so prolonged that the dispossessed property owner has been deprived of a meaningful hearing at a meaningful time.'" *United States v. Ross,* 161 F.4th 100, 113 (2d Cir. 2025) (quoting *Culley,* at 386). This timeliness requirement is assessed by "'analog[izing] . . . to a defendant's right to a speedy trial' and considering four factors: the length of the delay, the reason for the delay, whether the property owner asserted his rights, and whether the delay was prejudicial." *Culley,* 601 U.S. at 386 (citing *U.S. v. $8,850*, 461 U.S. 555, 564 (1983) and *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).

Here, the circumstances surrounding how the government came to possess the Defendant Cryptocurrency raise substantial—and perhaps dispositive—Due Process concerns.  Two of the *Barker v. Wingo* factors—whether the property owner asserted his rights and prejudice—plainly support Claimants, but the analysis of the other two turns on how the government got the Bitcoin. Most importantly, while no single factor is dispositive, "the Supreme Court has deemed the length of the delay as the 'overarching factor' in the due process analysis." *United States v. All Assets*

14

*Held in Raymond James & Assocs. Acct. No. XXXXXXXX in Name of Deltora Enters. Grp. Co. Ltd.,* No. 19-CV-377 (WFK) (CHK), 2025 WL 3683271, at *5 (E.D.N.Y. Dec. 18, 2025) (quoting *$8,850*, 461 U.S. at 565).

Here, the government delayed by at least approximately 15 months, and perhaps by as many as five years, before it brought this case. Such delays are squarely within the time frames that courts have found to offend Due Process. In *$8,850*, the Supreme Court held that a delay of eighteen months between the asset seizure and the filing of a forfeiture action was "quite significant." 461 U.S. at 565. And in *Raymond James*, this court held that, even when accounting for various judicially-approved stays, "the length of the delay in this case totals over five years," and "has been significant," and thus favored the claimant. 2025 WL 3683271, at *6. While the delay in *Raymond James* resulted from court-approved stays, there is no reason to believe that the government's delay here received any judicial imprimatur. Indeed, there is no reason to believe that the government ever received judicial authorization of any kind—such as through a seizure warrant—to seize the Defendant Cryptocurrency.

Here, Claimant has no way of knowing exactly how long the length of delay is, because the Complaint does not so much as hint when the government first obtained control of the Defendant Cryptocurrency. While an approximately 15-month delay (running from the date identified in the publication notice) would be significant under *$8,850*, Claimant has no way of knowing whether the government also had control over the Intermediary Wallets at some point— in which case the length of delay might approach five years. *See United States v. Cosme*, 796 F.3d 226, 235 (2d Cir. 2015) ("We are troubled that, in the absence of a warrant, the government has retained custody of Cosme's bank accounts for over two years"); *see also United States v. One Motor Yacht Named Mercury*, 527 F.2d 1112, 1114 (1st Cir. 1975) (affirming dismissal of

forfeiture proceeding on due process grounds and agreeing with trial court that "the twelve and one-half month delay [was] 'inexcusable'").

The second factor—the reason for the delay—is entirely unknown. Although it might be reasonable to infer that the government only filed this action in October 2025 because the LuBian theft was finally publicly reported in August 2025 (which would *not* be a good reason for the delay), the Complaint is silent about the circumstances surrounding how or when the government first obtained the Defendant Cryptocurrency, let alone why it waited so long to file this action.

The third factor—whether the claimant asserted his rights—favors the Claimant. As discussed above, more than a thousand OP_RETURN messages were sent to the Intermediary Wallets seeking the return of the Defendant Cryptocurrency, Roszkowski Decl. ¶ 4(d), but Claimant could not plausibly have known that the Defendant Cryptocurrency had, at some still undefined point, entered the custody of the government. As such, Claimant was certainly diligent in pursuing his rights to the extent he was able.

And on the fourth factor, the five-year delay between the theft from the Chen Wallets and institution of this action is facially and obviously prejudicial. The government sat on the Defendant Cryptocurrency for *at least* 15 months until it was ready to launch its coordinated sanctions, criminal, and forfeiture campaign against Mr. Chen. During that time, numerous entities have been struck off or records lost, memories have faded, and witnesses with critical knowledge have left or are no longer available to the Claimant. As one example of the clear prejudice, the Complaint itself acknowledges that—in July 2024, years after the Defendant Cryptocurrency was stolen from Mr. Chen, and the same month the forfeiture.gov notice says it was seized—a key employee betrayed Mr. Chen and stole "illicit Prince Group profits" before fleeing. *See* Compl. ¶ 30. That employee was subsequently convicted in Taiwan of theft and embezzlement and is

currently a fugitive from justice, but appears to nonetheless have been a key source for the government's allegations.

Even assuming the government only obtained the Defendant Cryptocurrency in mid-2024, and then sat silent while building its case for the next 15 months, Claimant would have a serious argument that his due process rights have been violated. But unless the government is ordered to detail when and how it obtained control over the Defendant Cryptocurrency, Claimant is hamstrung from bringing this defense, and the Court cannot fully address this constitutional issue. A cynic might say that is exactly why the government omitted these key facts from the Complaint.

### B.    The Statute of Limitations

For similar reasons, Mr. Chen is unable to assess and assert what may be a clear statute of limitations defense.

The statute of limitations in civil forfeiture actions is set forth in 19 U.S.C. § 1621, which requires such actions to be brought "within five years after the time when the alleged offense was discovered, or in the case of forfeiture, within 2 years after the time when the involvement of the property in the alleged offense was discovered, whichever was later." *See, e.g.*, *In re 650 Fifth Ave. & Related Props.*, 934 F.3d 147, 156 (2d Cir. 2019); *United States v. Any and All Funds on Deposit In Acct. No. 12671905, Held In The Name of Landlocked Shipping Co. At Wells Fargo Brokerage Servs., LLC,* No. 09CV3481(HB), 2010 WL 3185688, at *8 (S.D.N.Y. Aug. 10, 2010) (dismissing forfeiture proceeding on statute of limitations grounds).  "The statute of limitations does not run from the date of a particular violation, but from the date of '*discovery*' of an offense. . . . The Government cannot disregard its discovery of earlier occurring offenses in preference for later offenses which would produce a more favorable timeline." *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 502–03 (6th Cir. 1998).

As noted above, the statute of limitations is a textbook example of an issue where a more

17

definite statement may serve the purposes of judicial efficiency by ensuring threshold defenses are not artfully pled around. Here, the failure of the Complaint to identify how or when the government came into possession of the Defendant Cryptocurrency is highly relevant to a potential statute of limitations defense. The statute of limitations is the later of five years from when the government discovered the conduct giving rise to the forfeiture, or two years from when it learned the Defendant Cryptocurrency was involved in the conduct. Here, the Defendant Cryptocurrency was taken from Mr. Chen *just* under five years before the Complaint was filed, and the forfeiture.gov notice says the government "seized" the Defendant Cryptocurrency 15 months before. These facts raise serious questions about when the government came to believe that Mr. Chen was involved in criminal conduct, and when it came to believe that the Defendant Cryptocurrency was involved.

### C.    Other Requirements of Forfeiture Law

The Complaint's failure to identify how or when, or under what legal authority, it came into possession of the Defendant Cryptocurrency stymies the Claimant from raising other defenses, as well.

For example, federal law typically requires that the government "send written notice to interested parties . . . as soon as practicable, and in no case more than 60 days after the date of the seizure," unless the government obtains an indictment or files a civil forfeiture action first. 18 U.S.C. § 983(a)(1)(A)(i)-(iii); *see generally Asset Forfeiture Policy Manual* (2025), Ch. 6, § II.B.1, *available at* https://www.justice.gov/criminal/criminal-afmls/file/839521/dl?inline.

Taking as true the government's statement in its forfeiture.gov notice that it seized the Defendant Cryptocurrency no later than July 2024, the government obviously failed to provide timely notice of the seizure to Mr. Chen. By statute, "[i]f the Government does not send notice of a seizure of property in accordance with subparagraph (A) to the person from whom the property was seized, and no extension of time is granted, the Government shall return the property to that

18

person. . . ." 18 U.S.C. § 983(a)(1)(F).  It follows that Mr. Chen either has an iron-clad meritorious defense, or the government is relying on some unknown and unarticulated basis for failing to provide notice (or some unpled legal authority for the seizure)—and the failure to identify that basis or legal authority is depriving Mr. Chen of his ability to frame a defense.

This is one of several reasons why the Supplemental Rules expressly require a forfeiture complaint to identify "the grounds for . . . in rem jurisdiction over the defendant property" and "if the property is tangible, [to] state its location when any seizure occurred and—if different—its location when the action is filed."  Supp. R. G 2(b), (d).  As described in Mr. Chen's motion to dismiss, the Complaint here fails to do either, which is another reason why a more definite statement is needed.  *See Baptista v. Hartford Bd. of Educ.*, 427 F. App'x 39, 43 (2d Cir. 2011) ("A district court may treat a motion to dismiss as a motion for a more definite statement.").

### D.    Suppression and the Exclusionary Rule

Separate from due process and procedural concerns, how and when the government obtained the Defendant Cryptocurrency—and whether the government had *any* judicial authorization to seize it—raise obvious Fourth Amendment questions.

"It is well-established that the Fourth Amendment's exclusionary rule applies in forfeiture cases." *In re 650 Fifth Ave. & Related Props.,* 830 F.3d 66, 98 (2d Cir. 2016), and pursuant to Supplemental Rule G(8)(a), "[i]f the defendant property was seized, a party with standing to contest the lawfulness of the seizure may move to suppress use of the property as evidence." Where the defendant property is itself suppressed in a civil forfeiture case, the property, as well as any fruit of the poisonous tree, cannot be used to carry the government's burden. *See, e.g., United States v. Real Prop. & Premises Known as 90-23 201st St., Hollis, New York*, 775 F. Supp. 2d 545, 561–63 (E.D.N.Y. 2011) (recognizing that an "illegal arrest does 'not bar this civil forfeiture action against the [d]efendant [p]roperties,'" but excluding seized evidence, agents' notes of seizure and

related statements, and deposition testimony regarding illegal seizure); *see also United States v. One Lot of U.S. Currency ($36,634)*, 103 F.3d 1048, 1052 n.3 (1st Cir. 1997) ("While evidence seized or gathered in violation of the Fourth Amendment may not be relied on to sustain a forfeiture, . . . it is not the case that Mele's *money itself* is immune from forfeiture if it was unconstitutionally seized. . . . However, evidence obtained *from* the money—such as the precise amount Mele was carrying or the dog reaction—could be suppressed if the seizure was unconstitutional.").

Based on the allegations in the Complaint, Mr. Chen plainly has Fourth Amendment standing to move to suppress the Defendant Cryptocurrency. The circumstances surrounding how and when the seizure occurred, including whether it was judicially authorized, may be case dispositive. For example, if the government came into possession of the Defendant Cryptocurrency in December 2020, then suppression would effectively break the government's tracing and dramatically undercut the Complaint. But because the Complaint is silent about how and when the government obtained the Defendant Cryptocurrency (while appearing to acknowledge that Claimant did not control the Intermediary Wallets), Claimant cannot reasonably fashion a motion to suppress while Claimant has no way of knowing whether the government (or some agent or cooperator) was involved in the theft from the Chen Wallets in 2020, and the transfers to the Intermediary Wallets and then the Consolidation Wallets.

## II.    The Government Should Respond To This Motion Promptly

Mr. Chen fully expects that the government will take the position that it need not respond to this motion because it has served special interrogatories pursuant to Rule G(6), and thus, this motion must be held in abeyance while the government contemplates moving to strike Claimant's claim on standing grounds. But that would be wrong; nothing in Rule G tolls the government's response to a motion under Rule 12(e).

As an initial matter, the language of Rule G is clear that it tolls the government's response *only* to motions to dismiss. *See* Supp. R. G(6)(c)("The government need not respond to a claimant's motion to dismiss the action under Rule G(8)(b) until 21 days after the claimant has answered these interrogatories."). Neither does the structure of Rule G suggest that Rule G(6)(c) means anything but what it says. For example, Rule G contemplates a range of different motions by claimants, such as motions for leave to file late claims (Rule G(5)(a)(ii)); motions for interlocutory sale (Rule G(7)(b)); motions to suppress (Rule G(8)(a)); motions to dismiss (Rule G(8)(b)); motions to release property (Rule G(8)(d)); and motions under the Eighth Amendment's Excessive Fines clause (Rule G(8)(e)). The rule also generally provides how and when each of these motions may be filed and heard. *See, e.g.,* Rule G(8)(a). And Rule G(1) explicitly states that the remainder of the Federal Rules apply so long as not inconsistent with Rule G. As such, Rule G identifies a range of potential motions that claimants are authorized to bring, but only identifies one such type of motion that is tolled by the service of special interrogatories in Rule G(6), *i.e.*, motion to dismiss. *See generally Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (canon of *expressio unius* applies when "it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it").

Nonetheless, Claimant expects that the government will take the position—expressly rejected by the drafters of Rule G[2]—that it need not respond to any motion by Claimant until after it has litigated its inevitable, though baseless, motion to strike. For example, in prior filings, the

---

[2]    A leading treatise on civil forfeiture recognizes that Rule G(6) was a compromise position and specifically did *not* adopt the government's position that it should not have to litigate any issue until a party established standing. *See* Cassella, § 8-2 ("Prior to the effective date of Rule G, the Government was entitled to serve a potential claimant with a set of interrogatories at the time it sent him a copy of the civil forfeiture complaint. Defense attorneys complained that this had a chilling effect on the willingness of property owners to oppose the forfeiture and led to meritorious cases being decided by default. The Government, on the other hand, argued that it should not have to litigate any issue in a civil forfeiture case with a person who did not have standing to contest the forfeiture. . . . Rule G reflects the compromise that was reached on these issues.").

government has cited *United States v. Vazquez-Alvarez,* 760 F.3d 193, 197-98 (2d Cir. 2014), for the proposition that "[w]ithout standing, the claimant lacks the right to bring any motion, regardless of the basis." [ECF No. 122 at 2]. The government is wrong, and misreads *Vazquez-Alvarez*.[3]

First, the government's reliance on *Vazquez-Alvarez* is foreclosed by recent Circuit precedent clarifying its scope. In *United States v. Starling,* the Second Circuit cited *Vazquez-Alvarez* and clarified that "[w]hat we have described as 'statutory standing' operates as an obstacle only to *dispositive motions* which follow from establishing the initial claim. For example, a party must first establish that he is a claimant to the seized assets before he can move to dismiss the forfeiture action." 76 F.4th 92, 101 n.4 (2d Cir. 2023) (emphasis added). And in *Ross,* the Court observed that "we have construed *Vazquez-Alvarez* to apply only to dispositive motions." 161 F.4th at 110 n.9 (2d Cir. 2025). As such, *Vazquez-Alvarez* means what is says: after a Court has determined that a party lacks standing, then that party has no role in the action – but this holding says nothing about a party whose standing has not yet been adjudicated. So *Vazquez-Alvarez* provides no justification for the government not to respond to the instant motion (which is certainly not dispositive) in the ordinary course, and independent of any special interrogatories.

More importantly, the purpose of Rule G special interrogatories is "to gather information that bears on the claimant's standing" (*see* Rule G(6) Committee Notes), but there is no serious question that Claimant has standing to contest forfeiture here. In fact, the government's entire theory of this case is that the Defendant Cryptocurrency was held by Mr. Chen in the "Chen Wallets" after being mined or obtained through illicit means. *See Ross*, 161 F.4th at 110 (2d Cir.

---

[3]     The government is also inconsistent.  Numerous motions have been filed in this case already, including motions to leave to file late claims, motions to seal, motions to extend, and motions for return of property.

2025) (standing in civil forfeiture cases "is hardly onerous: a person need show only a 'facially colorable interest' in the property at issue; whether he 'ultimately proves the existence of that interest' is a question for a later stage in the proceedings." (quoting *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 79 & n.10 (2d Cir. 2002)); *see also United States v. Cambio Exacto, S.A.,* 166 F.3d 522, 527 (2d Cir. 1999) ("In determining standing to challenge a forfeiture, we look to ownership and possession because they are often reliable indicators of injury that occurs when property is seized. . . . [A]n owner or possessor of property that has been seized necessarily suffers an injury that can be redressed at least in part by the return of the seized property."). Here, the allegations in the Complaint itself establish Mr. Chen's standing. *See generally United States v. Technodyne LLC*, 753 F.3d 368, 380 (2d Cir. 2014) (rejecting standing challenge because "the government's Complaint itself alleges that each of the bank accounts is held in the name or names of [claimants or their affiliates]" and "alleges that the relevant parcels of real property were purchased—with the proceeds of their crimes—by the [claimants]."); *United States v. $421,090.00 in U.S. Currency*, No. 11-CV-00341(JG), 2011 WL 3235632, at *4 (E.D.N.Y. Jul. 27, 2011) (claimant has standing where claimant's "asserted interest in the money is corroborated in part by the government's own allegation that the money was found in his physical custody."); *United States v. Funds in the Amount of $574,840,* 719 F.3d 648, 651 (7th Cir. 2013) ("Generally when a pleading alleges facts that if true confer Article III standing, the court's focus should move immediately to the merits.").

The obvious reality is that the government is not prepared to answer questions about how it came into possession of the Defendant Cryptocurrency, let alone litigate this case on the merits. Because the core theory of the Complaint is that Mr. Chen held and controlled the Defendant Cryptocurrency, he obviously has standing based on the allegations of the Complaint. The

government plainly thought it would never have to litigate against him, and is now trying every conceivably procedural gambit to avoid doing so.  This very strategy was recently examined in detail—and harshly criticized—by Judge Bress in a case before the Ninth Circuit.

In that case, the claimant was stopped by law enforcement while carrying a large amount of currency.  The claimant promptly moved to suppress the stop as pretextual, but the government avoided responding to that suppression motion by serving, and then extensively litigating, broad special interrogatories, ultimately succeeding in striking out the claim without the trial court ever addressing suppression.  *See United States v. $1,106,775.00 in United States Currency*, 131 F.4th 710, 723–24 (9th Cir.), *reh'g en banc granted, opinion vacated,* 157 F.4th 1102 (9th Cir. 2025). Writing in dissent—at the time; the Ninth Circuit has since granted *en banc* review, which is pending—Judge Bress noted his grave concern that, without proper restraints imposed by the courts, Rule G(6) incentives the government to engage in procedural gamesmanship to obtain property with no finding a crime was committed:

> [T]he government succeeds in having the claimant's entire claim thrown out through an up-front case-ending discovery sanction based on the claimant's purported failure to serve more complete responses to interrogatories unique to civil forfeiture cases. The government wins by default based on a supposed discovery violation, before the case can even get going. This is a serious overextension of the so-called Supplemental Rule G(6) interrogatory device for civil forfeiture cases. And it is a blueprint for allowing the government to take money and keep it, however problematic its search tactics.
>
> . . .
>
> The prospect of government abuse here is real. Through its short-circuiting of the proper processes, the majority's ratification of the government's approach contravenes our precedents, improperly shifts the statutory burden of proof, and allows the government to avoid important Fourth Amendment inquiries into its searches and seizures. The rules of civil forfeiture should weed out false claims, protect people with valid ones, and deter unlawful searches and seizures. The majority is instead incentivizing the government to turn every civil forfeiture action into an early one-sided discovery dispute that the government will nearly always win, backed by the results of law enforcement searches that, by design, will escape

review under the Fourth Amendment.

*Id.* at 726–27.  *See also Starling*, 76 F.4th at 101 (2d Cir. 2023) ("[C]ivil forfeiture procedure magnifies the importance of deciding such cases on the merits rather than by default. Civil forfeiture can 'enable the government to seize . . . property without any predeprivation judicial process and to obtain forfeiture of the property even when the owner is personally innocent.'" (*quoting Leonard v. Texas*, 580 U.S. 1178, 1179 (2017) (statement of Thomas, *J.*, respecting denial of certiorari))).

Simply put, neither the rules nor the purposes animating those rules justify any delay in the government's response to this motion—and to its answers to the important questions posed by it. It will benefit all parties to have more information about how the government obtained the Defendant Cryptocurrency: Claimant will be able to properly evaluate what motions must be brought challenging the Complaint, the various judgment creditor claimants would have clarity as to how the Defendant Cryptocurrency was seized—an issue the government itself has raised—and the Court will be able to evaluate any motions on a fuller record.

//

//

## CONCLUSION

The Court should order the government to provide a more definite statement, in the form of an amended complaint or similar verified disclosure, that details at a minimum, how, where, and when the government (or any agency or instrumentality or person acting at the direction of or in concert with the government) first obtained custody or control over the Defendant Cryptocurrency. Specifically, such an amended complaint or statement should include at a minimum:

- The identity of the person or persons responsible for the December 28, 2020 transfers to the Intermediary Wallets, and any affiliation such persons have with any agency or instrumentality of the government;

- The mechanism(s) used for the December 28, 2020 transfers to the Intermediary Wallets, and whether any such mechanisms were approved by a court-ordered warrant or other lawful process;

- The identity of any custodians of the Intermediary Wallets, and any affiliation such persons have with any agency or instrumentality of the government;

- The locations of any custodians of the Intermediary Wallets;

- The identity of any custodians of the Consolidation Wallets, and any affiliation such persons have with any agency or instrumentality of the government; and

- The locations of any custodians of the Consolidation Wallets.

Alternatively, the government should be directed to respond to written discovery requests from Claimant calling for the same information. *See generally Bisson v. Martin Luther King Jr. Health Clinic*, No. 06CV6682SJFWDW, 2007 WL 1395576, at *1 (E.D.N.Y. May 11, 2007).

Dated: March 9, 2026
      New York, New York

Respectfully Submitted,

BOIES SCHILLER FLEXNER LLP

/s/ *Matthew L. Schwartz*
Matthew L. Schwartz
Peter M. Skinner
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
mlschwartz@bsfllp.com
pskinner@bsfllp.com

Dan G. Boyle
2029 Century Park East, Suite 1520
Los Angeles, California 90067
Telephone: (213) 629-9040
dboyle@bsfllp.com

*Attorneys for Claimant Chen Zhi*