# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| ESTATE OF WANDA LORRAINE KELLY JOHNSON, *et al.*, |
| Plaintiffs, |
| v. |
| ISLAMIC REPUBLIC OF IRAN, |
| Defendant. |

Civil Action No. 23-1689

Judge Beryl A. Howell

**MEMORANDUM OPINION**

This action brought by seven plaintiffs arises out of the bombing on June 25, 1996, of the Khobar Towers apartment complex in Dhahran, Saudi Arabia, which housed United States military personnel. Pls.' Complaint ("Compl.") at Intro., ECF No. 1. The explosion killed nineteen American servicemembers and injured many others, including servicemember Wanda Lorraine Kelly Johnson ("W. Johnson"), whose estate is a plaintiff in this case. *Id.* The remaining six plaintiffs are the immediate family members, and the estates of immediate family members, of W Johnson. *Id.* ¶ 9. Plaintiffs allege that defendant, the Islamic Republic of Iran, is liable under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, for its material support of Hezbollah terrorists that bombed the Khobar Towers complex. *Id.* ¶¶ 22–24. After FSIA's requirements for service were satisfied, Iran failed to enter an appearance or otherwise defend against this action, *see* 28 U.S.C. § 1608(a)(4); Return of Service/Affidavit of Summons and Complaint Executed, ECF No. 15; Clerk's Entry of Default, ECF No. 17, and thus plaintiffs now seek default judgment against defendant as to liability and damages, *see* Pls.' Mot. for Entry of Default J. and to Take Judicial Notice of Evidence in Prior

1

Related Cases ("Pls.' Mot.") at 1, ECF No. 18.  For the reasons detailed below, plaintiffs' motion is granted.[1]

## I. BACKGROUND

Thirteen prior decisions issued by this Court have found defendant liable for the Khobar Towers bombing:  *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006) (Lamberth, J.); *Est. of Heiser v. Islamic Republic of Iran* ("*Heiser I*"), 466 F. Supp. 2d 229 (D.D.C. 2006) (Lamberth, J.); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163 (D.D.C. 2010) (Lamberth, J.); *Akins v. Islamic Republic of Iran* ("*Akins I*"), 332 F. Supp. 3d 1 (D.D.C. 2018) (Howell, C.J.); *Schooley v. Islamic Republic of Iran*, No. 17-cv-1376 (BAH), 2019 WL 2717888 (D.D.C. June 27, 2019) (Howell, C.J.); *Aceto v. Islamic Republic of Iran*, No. 19-cv-464 (BAH), 2020 WL 619925 (D.D.C. Feb. 7, 2020) (Howell, C.J.); *Christie*, 2020 WL 3606273; *Akins v. Islamic Republic of Iran* ("*Akins II*"), 549 F. Supp. 3d 104 (D.D.C. July 16, 2021) (Howell, C.J.); *Blank v. Islamic Republic of Iran*, No. 19-cv-3645 (BAH), 2021 WL 3021450 (D.D.C. July 17, 2021) (Howell, C.J.); *Ackley v. Islamic Republic of Iran*, No. 20-cv-621 (BAH), 2022 WL 3354720 (D.D.C. Aug. 12, 2022) (Howell, C.J.); *Mustard v. Islamic Republic of Iran*, No. 21-cv-163 (BAH), 2023 WL 1778193 (D.D.C. Feb. 6, 2023) (Howell, C.J.); *Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955 (D.D.C. Aug. 15, 2023) (Howell, J.); *Thole v. Islamic Republic of Iran*, No. 23-cv-793 (BAH), 2024 WL 2208208 (D.D.C. May 16, 2024) (Howell, J.).

In *Blais* and *Heiser I*, the Court heard evidence and witness testimony.  *See Blais*, 459 F. Supp. 2d at 46 n.4; *Heiser I*, 466 F. Supp. 2d at 250.  In *Heiser I* alone, the offering of evidence took seventeen days, which included examination of witnesses, including seven expert witnesses.

---

[1]      Plaintiffs also have pending their Motion to Expedite, ECF No. 19, which is denied as moot, given the resolution in this Memorandum Opinion of their motion for default judgment.

*See* 466 F. Supp. 2d at 250.[2] *Rimkus*, *Akins*, and *Schooley* concluded that judicial notice of the findings of fact in *Blais* and *Heiser I* was appropriate, *see Rimkus*, 750 F. Supp. 2d at 167; *Akins I*, 332 F. Supp. 3d at 10; *Schooley*, 2019 WL 2717888, at *2, and plaintiffs here argue that "[a]ll plaintiffs' claims arise from that same single terrorist bombing attack" and "ask[] the Court to take judicial notice of prior findings of fact and supporting evidence" of the prior related proceedings. Pls.' Mem. in Supp. of Mot. to Take Judicial Notice of Evidence in Prior Related Cases and for Entry of Default J. as to Liability and Damages ("Pls.' Mem.") at 4, 7, ECF No. 18-1.

Rule 201 of the Federal Rules of Evidence authorizes a court to "judicially notice" adjudicative facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b).[3] Rule 201 is used frequently to notice judicially factual evidence developed in other FSIA proceedings "involving the same conduct by the same defendants," *Akins I*, 332 F. Supp. 3d at 11, "even when those proceedings have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)). This avoids "the formality of having that evidence reproduced." *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C.

---

[2] The expert witnesses in *Heiser I* were: (1) Louis Freeh, the former Director of the Federal Bureau of Investigation ("FBI"); (2) Dr. Patrick Clawson, a scholar of Middle Eastern politics who has frequently provided expert testimony regarding Iran's involvement in sponsoring terrorism; (3) Dr. Bruce Tefft, a founding member of the CIA's Counterterrorism Bureau and regular consultant on issues of terrorism; (4) Dale Watson, the former Deputy Counterterrorism Chief of the FBI, *see Heiser I*, 466 F. Supp. 2d at 260–65; (5) Dr. Thomas Parsons, a medical examiner, *see id.* at 268; (6) Dr. Dana Cable, a licensed psychologist and expert on grief process, *see id.* at 269–70; and (7) Dr. Herman Miller, an economic consultant, *see id.* at 273–74.

[3] "[A]djudicative facts are simply the facts of the particular case." *Nat'l Org. for Women, Wash., D.C. Chapter v. Soc. Sec. Admin.*, 736 F.2d 727, 737 n.95 (D.C. Cir. 1984) (Robinson, C.J., concurring) (quoting FED. R. EVID. 201(a), Advisory Committee Note). The Rule does not govern judicial notice of "legislative fact[s]," FED. R. EVID. 201(a), which are "those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body," *Nat'l Org. for Women*, 736 F.2d 727 at 737 n.95 (quoting FED. R. EVID. 201, Advisory Committee Note).

2011) (citing *Rimkus II*, 750 F. Supp. 2d at 172); *see also Oveissi v. Islamic Republic of Iran* ("*Oveissi II*"), 879 F. Supp. 2d 44, 50 (D.D.C. 2012) (finding courts permitted "in subsequent related cases to rely upon the evidence presented in earlier litigation" (citation omitted)); *Est. of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237 (D.D.C. 2012) (taking "judicial notice of the evidence presented in the earlier cases"). Taking judicial notice of prior findings "does not conclusively establish the facts found in those cases" in the later FSIA case. *Foley*, 249 F. Supp. 3d at 191. Rather, "based on judicial notice of the evidence presented in the earlier cases[,] . . . courts may reach their own independent findings of fact." *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010); *see also Rimkus*, 750 F. Supp. 2d at 172. In fact, "courts in FSIA litigation have adopted a middle-ground approach that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them." *Rimkus*, 750 F. Supp. 2d at 172.[4]

This Court is persuaded that this approach is both "efficient and sufficiently protective of the absent defendant['s] interests," *Akins I*, 332 F. Supp. 3d at 11, and will therefore grant plaintiffs' request to take judicial notice of the evidence presented in *Mustard*, 2023 WL 1778193; *Ackley*, 2022 WL 3354720; *Blank*, 2021 WL 3021450; *Akins II*, 549 F. Supp. 3d 104; *Christie*, 2020 WL 3606273; *Aceto*, 2020 WL 619925; *Schooley*, 2019 WL 2717888; *Akins I*, 332 F. Supp. 3d 1; *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1 (D.D.C. 2010) (Lamberth, J.); *Rimkus*, 575 F. Supp. 2d at 181; *Heiser I,* 466 F. Supp. 2d 229; and *Blais*, 459 F.

---

[4]    The D.C. Circuit has endorsed the use of judicial notice to establish facts in FSIA terrorism cases. In *Han Kim v. Democratic People's Republic of Korea*, the D.C. Circuit held that plaintiffs had "met their burden of producing evidence 'satisfactory to the court'" to establish subject matter jurisdiction under the FSIA, where the only evidence linking North Korea to the victim's disappearance was a South Korean court's conviction of a North Korean agent, of which the district court had taken judicial notice. 774 F.3d 1044, 1049 (D.C. Cir. 2014); *see also id.* 1051.

Supp. 2d 40; *see Akins I*, 332 F. Supp. 3d at 11 (stating that "factual evidence developed in other cases involving the same conduct by the same defendants is admissible and may be relied upon in this case."). The evidence regarding the Khobar Towers bombing is summarized below, followed by an overview of the procedural history of this case.

## A. The Attack on Khobar Towers

The Khobar Towers residential complex in Dhahran, Saudi Arabia "housed the coalition forces," including the U.S. military forces, "charged with monitoring compliance with [United Nations] security council resolutions." *Blais*, 459 F. Supp. 2d at 47. Just before 10:00 p.m. on June 25, 1996, "a large gasoline tanker truck pulled up" and parked "alongside the perimeter wall of the Khobar Towers complex." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 29. Security guards near the top of one of the towers, Building 131, "started to give warnings about the unusual vehicle location," but the truck exploded "within about 15 minutes." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 29. Subsequent "investigation determined that the force of the explosion was the equivalent of 20,000 pounds of TNT. The [U.S. Department of Defense] said that it was the largest non-nuclear explosion ever up to that time." *Heiser I*, 466 F. Supp. 2d at 252.

## B. Defendant Iran's Role

Iran "has been designated a state sponsor of terrorism" by the U.S. Department of State "since January 19, 1984." *Blais*, 459 F. Supp. 2d at 47 (citation omitted); *see, e.g., Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 77 (D.D.C. 2018); U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ (last visited June 28, 2024). Prior proceedings have found that Iran planned and supported the Khobar Towers

5

bombing.[5]  Both Ayatollah Ali Khamenei, the Supreme Leader of Iran at the time, and the

Minister of Intelligence and Security "approved" the attack.  *Heiser I*, 466 F. Supp. 2d at 252.

The truck bomb used was "assembled" at a base in Lebanon's Bekaa Valley "jointly operated by

the [Iranian Revolutionary Guard Corps ('IRGC')] and by the terrorist organization known as

Hezbollah," with the individuals who carried out the bombing calling themselves "Saudi

Hezbollah."  *Id.*

These conclusions are based in part on the testimony of four key expert witnesses in *Blais*

and *Heiser I*.  Louis Freeh, who was director of the FBI at the time of the bombing, and Dale

Watson, then deputy counterterrorism chief of the FBI, testified in *Heiser I* based on their

oversight of the FBI's "massive and thorough investigation of the attack, using over 250 agents."

*Id.*; *see also id.* at 260–62.  "Based on that investigation, an Alexandria, Virginia, grand jury

returned an indictment . . . against 13 identified members of the pro-Iran Saudi Hezbollah

organization."  *Id.* at 252.  During its investigation, the FBI interviewed six members of Saudi

Hezbollah who "admitted to the FBI their complicity in the attack on the Khobar Towers, and

admitted that senior officials in the Iranian government provided them with funding, planning,

training, sponsorship, and travel necessary to carry out the attack on the Khobar Towers."  *Id.* at

253.  Both Freeh and Watson testified to their conclusions, based on information gathered in

their investigations, that "Iran, [the Ministry of Information and Security ('MOIS')], and IRGC

were responsible for the Khobar Towers bombing carried out by Saudi Hezbollah."  *Id.* at 264.

Further, Dr. Patrick Clawson provided expert testimony in *Heiser I* that "the government

of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and that Saudi

Hezbollah carried out the attack under their direction."  *Id.* at 253.  This conclusion was "based

---

[5]      Under the FSIA, Iran is "vicariously liable for the acts of its officials, employees, or agents."  28 U.S.C.
§ 1605A(c).

on his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials, as well as his academic research on the subject." *Id.* Dr. Bruce Tefft, a former member of the CIA's counterterrorism bureau, supported Clawson's "expert opinion," based on "publicly available sources that were not inconsistent with classified information known to him from his time at the CIA" that "the Islamic Republic of Iran and the Iranian Revolutionary Guards Corp were responsible for planning and supporting the attack on the Khobar Towers." *Id.* at 253–54.

## C. The Instant Plaintiffs

Plaintiffs in this action include the estate of Wanda Lorraine Kelly Johnson, a servicemember who suffered psychological and physical injuries as a result of the Khobar Towers bombing, along with her survivors, including her daughter, three siblings, and the estates of her deceased parents. *See* Compl. at Intro, ¶¶ 9–15. These plaintiffs are described below.

### 1. *The Estate of Wanda Lorraine Kelly Johnson*

On June 25, 1996, Wanda Lorraine Kelly Johnson ("W. Johnson") was stationed at the United States Air Force base in Dhahran, Saudi Arabia, and was living in the Khobar Towers complex. Compl. ¶ 4. W. Johnson was inside the residential quarters during the bombing and felt the impact of the explosion. Pls.' Mot., Att. 4, Decl. of Sarah Denise Kelly (Feb. 10, 2024) ("S. Kelly Decl.") ¶ 15, ECF No. 18-4; *id.*, Att. 3, Decl. of Ari Simone Foster (Mar. 4, 2024) ("A. Foster Decl.") ¶ 24, ECF No. 18-3. "[F]earing for her life," W. Johnson "jumped, shoeless, out of a window," causing permanent injuries to her feet that required her to wear "special shoes" for the rest of her life. S. Kelly Decl. ¶¶ 15–16. W. Johnson also injured her shoulders and back, and incurred lacerations from broken glass. *Id.* ¶ 15.

In the days following the attack, W. Johnson had to "keep going and working," despite experiencing shock from the bombing and the loss of her friends. *See* A. Foster Decl. ¶ 24. She

was tasked with preparing an evacuation/assembly area and was assigned to mortuary affairs, where she had to process the victims of the attack and contact the family members of her deceased colleagues. *Id.* ¶ 25; S. Kelly Decl. ¶ 17. This experience was "particularly hard" for W. Johnson, A. Foster Decl. ¶ 7, and she was awarded an "Air Force Achievement Medal." S. Kelly Decl. ¶ 17; *see also* Pls.' Mot., Att. 3, A. Foster Decl., Ex. D (Air Force Achievement Award), ECF No. 18-3.

W. Johnson's life "spiral[ed] out of control" following the attack. S. Kelly Decl. ¶ 19. The bombing caused her "severe emotional injuries" and caused her to develop a host of psychological conditions, including "post-traumatic stress disorder ("PTSD"), bipolar disorder, depression, and anxiety." *Id.* These conditions led to W. Johnson experiencing nightmares and flashbacks, a sensitivity to loud noises and crowds, and paranoia. A. Foster. Decl. ¶¶ 15–17. W. Johnson tried to treat her conditions by taking prescription medications, but her conditions also caused her to abuse alcohol, which interfered with the medication and exacerbated her condition's effects. *See id.* ¶ 29 (noting the effects of W. Johnson's alcohol abuse on her bipolar disorder). W. Johnson also sought help from an online support group and a preacher. *See id.* ¶¶ 26; Pls.' Mot., Att. 5, Decl. of Andra Lamar Kelly (Feb. 11, 2024) ("A. Kelly Decl.") ¶ 19, ECF No. 18-5.

W. Johnson's alcohol abuse grew worse each summer around the anniversary of the bombing as she would relive the attack. A. Foster Decl. ¶ 23. Her alcoholism caused W. Johnson and her family severe problems. She developed a habit of driving drunk and had gotten into several car accidents, one of which caused her to miss her mother's funeral. *Id.* ¶¶ 33–34. She would also threaten her own life and the lives of her family members, putting a great deal of stress on her relationships. *See id.* ¶ 35; Pls.' Mot., Att. 6, Decl. of Demarco Lashawn Kelly

(Feb. 10, 2024) ("D. Kelly Decl.") ¶ 18, ECF No. 18-6.  The alcohol abuse barred her from having a close relationship with her grandchildren, as her daughter felt the need to protect them from her.  *See* A. Foster Decl. ¶¶ 29–31.

W. Johnson's daughter had taken her to various appointments at the Veterans Affairs Hospital and had contacted them often about her alcohol abuse and mental health problems, before she felt she was "left with no choice" but to involuntarily commit her.  *Id.* ¶¶ 32, 36.  The hospital then sent W. Johnson to a behavioral health facility in another city for treatment, which was "very hard" for her, and ultimately unsuccessful.  *See id.* ¶¶ 36, 37.  W. Johnson died in November 2021, at age 59, due to the chronic alcohol abuse that her family attributes to the Khobar Towers bombing.  *See id.* ¶ 37; *see also* Pls.' Mot., Att. 3, A. Foster Decl., Ex. B (W. Johnson's Death Certificate), ECF No. 18-3.

Following W. Johnson's death, the Department of Veterans Affairs confirmed that she had a "combined disability rating of 100%, and that 50% of her disability was attributable to the PTSD and bipolar disorder that she manifested as a result of her experience during and immediately following the bombing."  A. Foster Decl. ¶ 39; Pls.' Mot., Att. 3, A. Foster Decl., Ex. F (VA Benefit Information), ECF No. 18-3.

### 2. *Ari Simone Foster*

Ari Simone Foster ("A. Foster") is the only child of W. Johnson and the personal representative of her estate.  A. Foster Decl. ¶ 5; *see also* Pls.' Mot., Att. 3, A. Foster Decl., Ex. C. (Certificate of Appointment as Personal Representative), ECF No. 18-3.  A. Foster was seven years old at the time of the Khobar Towers bombing and was living with family friends in Alabama.  A. Foster Decl. ¶¶ 8–10.  After the attack, A. Foster's grandfather (Clarence Kelly, Jr.) brought her back to Florida to live with family, including W. Johnson, who had returned from Saudi Arabia.  *Id.* ¶¶ 11–13.

A. Foster noticed a dramatic change in her mother's behavior in the aftermath of the bombing. *Id.* ¶ 13. Due to her emotional injuries, W. Johnson was "emotionally detached and cold" and "unable to empathize" or provide A. Foster with "emotional support." *Id.* This was especially detrimental for A. Foster, as she needed her mother's support after being molested while living in Alabama. *Id.* ¶ 20. A. Foster was also on the receiving end of W. Johnson's emotionally abusive behavior, which included being blamed for the problems in her mother's life. *See, e.g.*, *id.* ¶ 20 (A. Foster recounting that in response to the question "what's wrong?" W. Johnson responded "You were born").

As W. Johnson's emotional injuries worsened, A. Foster became more distressed regarding her mother's alcohol abuse. *See id.* ¶ 21. Still a child, A. Foster would hide her mother's alcohol because she "wanted her to be healthy." *Id.* As she grew up, A. Foster was "overwhelmed" by the mental health problems W. Johnson developed because of the bombing and contacted the VA frequently about her mother's struggles. *See id.* ¶¶ 22, 32.

Due to her mother's condition, A. Foster was also forced to restrict W. Johnson's relationship with her grandchildren. *Id.* ¶ 29. A. Foster felt like she needed to "take precautions to protect [her] children from [her mother]." *Id.* She was especially concerned about W. Johnson's alcohol abuse and unmanaged bipolar disorder and was often forced to deny her children the opportunity to spend time with their grandmother, for example, by not allowing her mother to drive with the children to Charleston because of her habit of drunk driving. *Id.* ¶ 30.

When W. Johnson's alcohol abuse hit a breaking point, A. Foster was "left with no choice" but to commit her mother to the Veterans Affairs Hospital. *Id.* ¶ 36. The hospital then sent W. Johnson to a detox and treatment facility out of town, which was "very hard" for the both of them. *See id.* Despite all A. Foster did to try and save her mother from the impact of the

Khobar Towers attack, W. Johnson died at age 59 due to her alcoholism and emotional injuries. *See id.* ¶ 37.

### 3. The Estate of Clarence Kelly, Jr.

Clarence Kelly, Jr. ("C. Kelly") was the father of W. Johnson. S. Kelly Decl. ¶ 4. W. Johnson's siblings describe C. Kelly as her best friend, and her as his "love child." *Id.* ¶ 22; D. Kelly Decl. ¶ 8. While C. Kelly and W. Johnson maintained a close relationship after her return from Saudi Arabia, their relationship "changed dramatically" after the bombing. S. Kelly Decl. ¶ 23.

While dealing with her emotional injuries, W. Johnson called C. Kelly at "all times of the night, crying uncontrollably." *See id.* C. Kelly experienced a great deal of distress because he could not lessen W. Johnson's pain after the bombing. *Id.* Along with his wife, C. Kelly watched W. Johnson engage in "self-destructive behavior," like alcohol abuse and threatening suicide. *See id.* ¶ 25. Both of W. Johnson's parents "suffered helplessly" after the attack, *see id* and C. Kelly remained "heartbroken" until his death, D. Kelly Decl. ¶ 24.

### 4. The Estate of Ethelean King Kelly

Ethelean King Kelly ("E. Kelly") was the mother of W. Johnson. S. Kelly Decl. ¶ 4. Similar to W. Johnson's father, E. Kelly was also very close with her daughter. *Id.* ¶ 24. In the aftermath of the attack, E. Kelly's relationship with her daughter suffered, as it became difficult for her to communicate with W. Johnson. *See* D. Kelly Decl. ¶ 25. E. Kelly was particularly distressed by W. Johnson's emotionally charged calls to her husband and her failure to take care of her daughter. S. Kelly Decl. ¶¶ 24–25.

When E. Kelly grew old and fell ill, W. Johnson aided her siblings in caring for her, but W. Johnson's alcohol abuse became "a source of tension between them." *See* A. Kelly Decl. ¶¶ 26–30. E. Kelly did not want to be with W. Johnson when she was drunk, which made their

11

relationship difficult given her daughter's condition. *See id.* ¶ 31. On more than one occasion, E. Kelly refused aid from her daughter because she had been drinking. *See id.*

### 5. Sarah Denise Kelly

Sarah Denise Kelly ("S. Kelly") is the only sister of W. Johnson and, as the surviving daughter of W. Johnson's parents, E. Kelly and C. Kelly, she is also the administrator of both of their estates. S. Kelly Decl. ¶¶ 3–6; *see also id.*, Ex. C (Letters of Administration). S. Kelly and W. Johnson had an "extremely close relationship" before the attack, and S. Kelly considered her sister to be her "best friend." S. Kelly Decl. ¶¶ 9–10. S. Kelly and her sister maintained their relationship after the bombing, despite W. Johnson's behavioral and personality changes. *See id.* ¶ 28. Even before W. Johnson's death, S. Kelly felt like "I lost my sister ***and*** my best friend." *See id.* (emphasis in original).

For days following the attack, W. Johnson's family was unable to confirm if she had survived and suffered anxiety and distress from the lack of information. *See id.* ¶13. One week later, S. Kelly finally spoke to her sister, and immediately could tell she had been "severely traumatized." *See id.* ¶¶ 14, 18.

S. Kelly tried to help W. Johnson with her alcoholism but was met with resistance. *Id.* ¶ 20. S. Kelly, her brothers, and parents, also tried to provide W. Johnson with emotional support after the attack, but it was too difficult for her to discuss the experience. *Id.* ¶ 26. When W. Johnson began behaving "erratically and [] self-destructive[ly]," S. Kelly tried to "maintain peace within the family." *Id.* ¶ 27. S. Kelly took on a burden and tried "coaching everyone to get along with [Wanda]," but she could not "hold [the family] together." *See id.* Like her parents, she could not help W. Johnson and "suffered with her." *See id.* ¶ 29.

### 6. Demarco Lashawn Kelly

Demarco Lashawn Kelly ("D. Kelly") is the younger brother of W. Johnson. D. Kelly Decl. ¶ 3. W. Johnson took care of D. Kelly when he was younger and provided him with a great deal of support as he was growing up. *See id.* ¶ 4. In a stark contrast to reports of her behavior and personality following the attack, D. Kelly describes W. Johnson prior to the attack as "the glue that kept [the family] together" and the one who "maintained the peace among the siblings." *See id.* ¶ 6. He also called her the "'Go-To' sister" and the one who "made sure everyone was okay." *Id.* ¶ 10.

Before the attack, W. Johnson maintained "close contact" with each of her family members. *Id.* ¶ 15. Around the holidays, she would "always do something special for the children." *Id.* After the attack, the family would go entire holiday seasons without hearing from W. Johnson. *Id.* Outside of the holidays, W. Johnson's emotional injuries frequently caused her to "disappear" and cease contact with her family, which caused D. Kelly to worry about her wellbeing. *Id.* ¶ 16. Due to "the trauma of the attack chang[ing] her so dramatically," D. Kelly found it hard to speak and connect with his sister after the bombing. *See id.* ¶ 20.

D. Kelly was also a victim of the abusive behavior the bombing caused W. Johnson to exhibit. On more than one occasion, W. Johnson told D. Kelly she was going to kill him. *Id.* ¶ 18. She would also call him in the middle of the night and become "hurt and angry" if he was not able to talk. *Id.* ¶ 19. According to D. Kelly, "[l]osing the person Wanda was before the attack, and living with the person she became as a result of her trauma was like having a wound that just does not heal." *Id.* ¶ 21.

### 7. Andra Lamar Kelly

Andra Lamar Kelly ("A. Kelly") is the older brother of W. Johnson. A. Kelly Decl. ¶ 3. When they were in high school, A. Kelly and W. Johnson were "so close" that they would often

13

attend school "dressed alike." *Id.* ¶ 8. According to A. Kelly, W. Johnson had always made an effort to "get [the siblings] to spend time together." *Id.* ¶ 10.

When A. Kelly learned of the Khobar Towers attack, he was distraught, as he could not get in contact with W. Johnson to confirm if his sister was alive. *Id.* ¶ 12. When W. Johnson returned home, A. Kelly found it hard to relate to and speak to his sister, as the bombing had left her "severely traumatized" and caused her to become "verbally abusive." *See id.* ¶¶ 14–17. Even when W. Johnson apologized for the things she said, A. Kelly found it didn't "undo the pain inflicted by [her] hurtful comments." *See id.* ¶ 21.

When A. Kelly came to terms with the severity of W. Johnson's emotional injuries, he tried to "make peace" and "help her manage." *See id.* ¶ 23. He found it "very painful" to witness the effects of his sister's PTSD and felt "helpless." *See id.* ¶ 25. He had to struggle to maintain his relationship with his sister. *See id.* ¶ 26.

### D. Procedural Background

Plaintiffs filed this lawsuit on June 11, 2023, as a related case to *Thole v. The Islamic Republican of Iran.* *See* Compl., ECF No. 1; Pls.' Notice of Related Case, ECF No. 4. Plaintiffs' subsequent request to file plaintiffs' addresses under seal, *see* Pls.' Mot. for Leave to File Pls.' Addresses Under Seal, ECF No. 2, was granted on July 10, 2023, *see* Minute Order (July 10, 2023), and plaintiffs then filed those addresses under seal on July 11, 2023, *see* Sealed Notice of Pls.' Addresses Filed Under Seal, ECF No. 11.

As discussed, *infra*, in Part III.B, Iran was properly served under the FSIA and, after failing to appear, the Clerk of the Court entered default against Iran on February 27, 2024. *See* Clerk's Entry of Default, ECF No. 17. Plaintiffs subsequently moved for default judgment as to liability and damages and for judicial notice of evidence in prior related cases on March 4, 2024,

14

and filed their declarations and exhibits with that motion. *See* Pls.' Mot. Thereafter, plaintiffs sought expedited consideration. *See* Pls.' Mot. to Expedite. Plaintiffs' motion for default judgment is now ripe for resolution.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 55(b)(2) permits a court to consider entering a default judgment when a party applies for that relief. *See* FED. R. CIV. P. 55(b)(2). Nevertheless, "strong policies favor resolution of disputes on their merits" and, therefore, "'[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'" *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)). Furthermore, "entry of a default judgment is not automatic," *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted), and thus the procedural posture of a default does not relieve a federal court of its typical obligations, including its "affirmative obligation" to determine whether it has subject-matter jurisdiction over the action, *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6.

When default judgment is sought under the FSIA, a claimant must also "establish[] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This requirement "provides foreign sovereigns a special protection akin to that assured the federal government by Fed. R. Civ. P. 55([d])." *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014); *see also* H.R. REP. No. 94-1487, at 26 (1976) (stating that § 1608(e) establishes "the same requirement applicable to default judgments against the U.S. Government under [R]ule 55([d])").

15

While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," courts must be mindful that Congress enacted § 1605A, FSIA's terrorism exception, and § 1608(e) with the "aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins."  *Han Kim v. People's Democratic Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)); *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114 (D.C. Cir. 2019).  With this objective in mind, the D.C. Circuit has instructed that "courts have the authority—indeed, we think, the obligation—to 'adjust evidentiary requirements to . . . differing situations.'"  *Han Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)) (formatting modified).

Generally, courts in FSIA default actions must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence."  *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)).  Courts take uncontroverted factual allegations that are supported by admissible evidence as true.  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing *Rimkus*, 750 F. Supp. 2d at 171)); *accord Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 319 (D.D.C. 2014); FED. R. CIV. P. 56(e)(2) (authorizing court to "consider the fact undisputed for purposes of the motion" when adverse party "fails to properly address another party's assertion of fact").

The D.C. Circuit's "review of findings underlying a default judgment in a FSIA case of this sort is 'lenient.'"  *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)), as "the courts are

16

granted broad discretion to determine what degree and kind of evidence is satisfactory."

*Maalouf*, 923 F.3d at 1114 (citing *Han Kim*, 774 F.3d at 1047; *Owens*, 864 F.3d at 785). In

particular, "[i]n a FSIA default proceeding, a factual finding is not deemed clearly erroneous if

there is an adequate basis in the record for inferring that the district court . . . was satisfied with

the evidence submitted." *Owens*, 864 F.3d at 785 (second alteration in original) (internal

quotation marks omitted).

## III.    DISCUSSION

A default judgment may be entered when (1) the court has subject-matter jurisdiction

over the claims, (2) personal jurisdiction is properly exercised over the defendant, (3) the

plaintiffs have presented satisfactory evidence to establish their claims against the defendant, and

(4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they

seek. These requirements are satisfied here and addressed in order below.

### A.  Subject-Matter Jurisdiction under the FSIA

"The district courts . . . have original jurisdiction" over "any nonjury civil action against a

foreign state" seeking "relief in personam with respect to which the foreign state is not entitled to

immunity either under sections 1605–1607 of this title." 28 U.S.C. § 1330(a). The FSIA defines

a "foreign state" to include "a political subdivision of a foreign state or an agency or

instrumentality" thereof. 28 U.S.C. § 1603(a). Plaintiffs seek *in personam* relief, raising the key

question whether defendant is entitled to immunity under the "state sponsor of terrorism"

exception set forth in §1605A.[6]

---

[6]    This suit falls beyond the ten-year statute of limitations for actions brought under the FSIA's terrorism
exception, *see* 28 U.S.C. § 1605A(b), but the "limitation period in § 1605A(b) is not jurisdictional," and defendant
has "forfeited its affirmative defense . . . by failing to raise it in" this Court, *Owens*, 864 F.3d at 805; *see also*
*Maalouf*, 923 F.3d at 1115 (holding that a district court may not *sua sponte* raise a forfeited statute of limitations
defense under 28 U.S.C. § 1605A(b)).

"[T]he FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts," *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015) (citing 28 U.S.C. § 1604), but "that grant of immunity is subject to a number of exceptions," *id.* at 13–14; *Doe v. Taliban*, No. 22-7134, 2024 WL 1814317, at *2 (D.C. Cir. Apr. 26, 2024). Among those exceptions is the "terrorism exception," enacted "[i]n 1996, [when] Congress withdrew foreign sovereign immunity for lawsuits that seek money damages for personal injury or death from a state sponsor of terrorism that has engaged in an 'act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources * * * for such an act[.]'" *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1058 (D.C. Cir. 2024) (quoting the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221, 110 Stat. 1214, 1241); *see also Mark v. Republic of Sudan*, 77 F.4th 892, 895 (D.C. Cir. 2023). Plaintiffs assert jurisdiction based on the FSIA's terrorism exception. 28 U.S.C. § 1605A.

In addition to creating "a cause of action for U.S. citizens, members of the U.S. armed forces, and U.S. government employees who have been injured by foreign states' acts or sponsorship of terrorism," *Borochov*, 94 F.4th. at 1057 (citing 28 U.S.C. § 1605A(c)), the terrorism exception abrogates a foreign state's immunity when certain preconditions are met. "First, the foreign state was designated a 'state sponsor of terrorism at the time [of] the act * * * or was so designated as a result of such act[.]'" *Id*. (citing 28 U.S.C. § 1605A(a)(2)(A)(i)(I)). As the D.C. Circuit has explained, "[t]his designation provision allows the Executive Branch to regulate if and when a foreign sovereign may be haled into American courts to answer terrorism allegations." *Doe v. Taliban*, 2024 WL 1814317, at *13–14; *see also Owens*, 531 F.3d at 889–93 (situating the FSIA's delegation of authority to designate state sponsors of terrorism in the President's

18

foreign-relations powers). "Second, 'at the time [of] the act,' either a victim of the act or the claimant in the suit was an American national, a member of the U.S. armed forces, or an employee or contractor for the U.S. government acting within the scope of their employment." *Borochov*, 94 F.4th. at 1057 (citing 28 U.S.C. § 1605A(a)(2)(A)(ii)).[7]

Plaintiffs satisfy each of the applicable elements here. As stated above, Iran was designated a state sponsor of terrorism in 1984, twelve years before the 1996 Khobar Towers bombing. All of the plaintiffs and their estates have averred in sworn declarations that they were U.S. citizens at the time of the attack.[8] Finally, plaintiffs seek damages "for personal injury . . . that was caused by an . . . extrajudicial killing" for which defendant provided "material support or resources." 28 U.S.C. § 1605A(a)(1); *see also Owens*, 864 F.3d at 778 ("[T]he plain meaning of § 1605A(a) grants . . . jurisdiction over claims against designated state sponsors of terrorism that materially support extrajudicial killings committed by nonstate actors").

More specifically, the truck bombing that plaintiffs allege caused their injuries was an "extrajudicial killing" resulting in the deaths of nineteen American military personnel. *See, e.g.*, *Rimkus*, 750 F. Supp. 2d at 182 ("The actions of defendant[] constituted both an extrajudicial killing and the provision of material support in satisfaction of the first element of liability."); *Akins I*, 332 F. Supp. 3d at 33 (same); *Aceto*, 2020 WL 619925 at *13 (same). The term "extrajudicial killing" in the FSIA's terrorism exception has the "meaning given" in "the Torture Victim Protection Act of 1991," 28 U.S.C. § 1605A(h)(7), which defines the term as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted

---

[7]     A third precondition for the terrorism exception to apply is that "if 'the act occurred in the foreign state against which the claim has been brought,' the claimant gave the foreign state a 'reasonable opportunity' to arbitrate prior to filing a lawsuit," *Borochov*, 94 F.4th at 1057 (citing 28 U.S.C. § 1605A(a)(2)(A)(iii)), but the attack at issue here took place in Saudi Arabia, not Iran, so this requirement is inapplicable.

[8]     A. Foster Decl. ¶¶ 3-4; S. Kelly Decl. ¶¶ 2, 7; D. Kelly Decl. ¶ 2; A. Kelly Decl. ¶ 2.

court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 note § 3(a)).

Furthermore, this Court takes judicial notice of the evidence presented in *Blais* and *Heiser I*, demonstrating that defendant provided "material support or resources" for this extrajudicial killing. As is clear from the evidence in those cases, described *supra* in Part I.A–B, defendant authorized, "organized and sponsored" the Khobar Towers attack. *Heiser I*, 466 F. Supp. 2d at 262. The evidence shows that defendant helped to recruit, train, fund, supply, and direct Saudi Hezbollah. This establishes that defendant's actions were "a 'substantial factor' in the sequence of events that led to the plaintiff[s'] injur[ies]" and that the injuries were "'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Owens*, 864 F.3d at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)) (explaining that the jurisdictional standard for causation under the FSIA's terrorism exception is proximate cause).

Accordingly, under 28 U.S.C. § 1605A, defendant is not immune from this suit, and subject-matter jurisdiction may be properly exercised. *See* 28 U.S.C. § 1330(a).

## B. Personal Jurisdiction under the FSIA

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of [the FSIA]." 28 U.S.C. § 1330(b). Section 1608 first prescribes two methods by which service shall ordinarily be made, *see* 28 U.S.C. § 1608(a)(1)–(2), but these methods were "not available" to plaintiffs in this action, *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 61 (D.D.C. 2019); *see also Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 49 (D.D.C. 2019), as

20

"defendant[] ha[s] neither made a special arrangement for service with the plaintiffs nor entered into any international convention governing service," *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017).

Plaintiffs attempted service under § 1608(a)(3) by sending two copies of the summons, complaint, notice of suit, and the FSIA, along with a translation of each into Iran's official language by certified or registered mail to Iran's Ministry of Foreign Affairs. *See* Aff. Requesting Foreign Mailing, ECF No. 7. Plaintiffs then transmitted the same documents under the cover of diplomatic notes, following the procedure for service provided by 28 U.S.C. § 1608(a)(4), and Iran was thus served on December 27, 2023. *See* Return of Service/Aff. of Summons and Complaint Executed, ECF No. 15. On February 21, 2024, the U.S. Department of State certified in an Affidavit of Service that the requirements for diplomatic service under 28 U.S.C. § 1608(a)(4) were met by causing delivery of a Summons, Complaint, and Notice of Suit to Iran on December 27, 2023. *See* Aff. of Service at 1.

Accordingly, this Court has personal jurisdiction over Iran because plaintiffs effectively executed service under 28 U.S.C. § 1608(a)(4).

### C. Defendant's Liability

Plaintiffs seek relief under FSIA § 1605A(c), which creates a private right of action for "personal injury or death," and provides that, "[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages," 28 U.S.C. § 1605A(c); *see also* Compl. ¶¶ 42–50 (Count I). Yet Section 1605A(c) does not set out guidance on the substantive bases for liability that determine plaintiffs' entitlement to damages. Consequently, courts "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)."

*Fraenkel*, 892 F.3d at 353; *see Heiser II*, 659 F. Supp. 2d at 24 (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability); *see also Roth*, 78 F. Supp. 3d at 399 (citing *Oveissi II*, 879 F. Supp. 2d at 54); *Worley*, 75 F. Supp. 3d at 335. As such, defendant's liability is discussed in detail below, starting with the estate of Wanda Lorraine Kelly Johnson ("W. Johnson").[9]

### 1. The Estate of Wanda Lorraine Kelly Johnson

The estate of W. Johnson brings its claims under theories of assault, battery, and intentional infliction of emotional distress. As discussed in the damages section, plaintiffs may recover under only one theory, *see, e.g.*, *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) ("[I]t 'goes without saying that the courts can and should preclude double recovery by an individual.'") (quoting *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 333 (1980)), but each theory of liability is nevertheless evaluated.

### a. Assault and Battery

Assault occurs when a defendant "acts intending to cause a harmful or offensive contact with the person of the other . . . or an imminent apprehension of such a contact, and . . . the other is thereby put in such imminent apprehension." RESTATEMENT (SECOND) OF TORTS § 21(1). "[A]cts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm," so where plaintiffs averred "that they did, in fact, fear such harm because of the attack," defendant may be held liable for assault. *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010); *see also Valore*, 700 F. Supp. 2d at 76 (same). Imminence is defined as being "so close to striking distance that [one] can reach the other almost at once." RESTATEMENT (SECOND) OF TORTS § 29 cmt. 2. W. Johnson was inside the Khobar Towers

---

[9] Plaintiffs also allege that defendant participated in a civil conspiracy and aided and abetted Hezbollah, in Counts VI and VII of the Complaint, although these counts do not influence the damages calculations in this case.

complex when the bomb exploded, and told her sister "that during the attack, she thought she was going to die." Compl. ¶ 32. The attack caused her imminent and extreme fear for her life and therefore defendant is liable to her for assault.[10]

Battery requires an act "intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact," and that such a contact in fact "directly or indirectly results." RESTATEMENT (SECOND) OF TORTS § 13. "Harmful contact" causes a "physical impairment of the condition of another's body, or physical pain or illness." *Id.* § 15; *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010) (defining these terms). Iran acted with the intent to cause harmful contact with the residents of the Khobar Towers when it materially supported the truck bombing. *See, e.g., Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 102 (D.D.C. 2017) (defining material support for terrorist attacks as acts intending to cause harm). W. Johnson was in the residential quarters at the time of the attack and suffered from injuries to her feet, shoulders, back, and lacerations from broken glass. *See* S. Kelly Decl. ¶¶ 15–16. W. Johnson experienced harmful physical contact resulting from the explosive force of the blast and therefore defendant is liable to her for battery.

**b. *Intentional Infliction of Emotional Distress (IIED)***

"[O]ne who by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress to" a plaintiff is liable for intentional infliction of emotional distress. RESTATEMENT (SECOND) OF TORTS § 46(1); *see also Heiser II*, 659 F. Supp. 2d at 26. "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009); *see also Valore*, 700 F. Supp. 2d at 77 (same). W. Johnson's family members have

---

[10]     *See* S. Kelly Decl. ¶¶ 15–16 (W. Johnson feared for her life and jumped shoeless out of a window).

23

demonstrated that W. Johnson suffered severe emotional and psychological stress and illness because of the attack through sworn statements and a corroborating submission of W. Johnson's VA disability rating.[11]  Defendant is liable to her for IIED.

### 2. Immediate Family Members and Their Estates

The remaining six plaintiffs—Ari Simone Foster, the estate of Clarence Kelly, Jr., the estate of Ethelean King Kelly, Sarah Denise Kelly, Demarco Lashawn Kelly, and Andra Lamar Kelly—seek to collect damages as the immediate family members and their estates of a servicemember injured by the Khobar Towers bombing.

The family members' theory of liability is IIED.  Compl. ¶¶ 63–68 (Count IV).  The Restatement permits recovery for those who were not a direct target of a defendant's conduct if (1) "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present" and (2) the claimant is a member of a victim's immediate family, *Heiser II*, 659 F. Supp. 2d at 26–27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307, at 834 (2000)), or the functional equivalent of an immediate family member, *see Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003) (extending liability under the FSIA for IIED to "members of the victim's household" who were also "viewed as the functional equivalents of immediate family members"); *see also* RESTATEMENT (SECOND) OF TORTS § 46, cmt. *l* (leaving "open the possibility of situations in which presence . . . may not be required").

All six of these plaintiffs are immediate family members—children, parents, and siblings—of the victim, and thus able to maintain claims for IIED.  *See Fritz*, 324 F. Supp. 3d at

---

[11]    *See* A. Foster Decl. ¶¶ 18-19; S. Kelly Decl. ¶ 14; D. Kelly Decl. ¶¶ 9-11; A. Kelly Decl. ¶¶ 7-10.  *See also* A. Foster Decl. Ex. F (VA Benefit Information).

63 (observing that the "strict meaning" of immediate family is "one's spouse, parents, siblings, and children" (quoting *Heiser II*, 659 F. Supp. 2d at 28)).

The claims of W. Johnson, C. Kelly, and E. Kelly are brought by their estates. Courts in this district have previously awarded damages to the estates of deceased service members and to the estates of deceased relatives of victims of terrorist attacks. *See Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 38 (D.D.C. 2020). "When, such as here, an estate-plaintiff brings an action under [the] FSIA's private cause of action, the plaintiff must first establish the estate's standing, or '[its] power . . . to bring and maintain legal claims.'" *Barry*, 437 F. Supp. 3d at 36 (quoting *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 85 (D.D.C. 2017)). Standing of an estate is governed by the law of the state which governed the creation of the estate. *Id.* (citing *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 333 (D.D.C. 2014)).

W. Johnson's estate is governed by the law of South Carolina. *See* Pls.' Mot., Att. 3, A. Foster Decl., Ex. C (Certificate of Appointment as Personal Representative). The South Carolina Survival Act allows for W. Johnson's estate to pursue her claims. *See* S.C. Code Ann. § 15-5-90. "Any cause of action which could have been brought by the deceased in his lifetime survives to his representative under the Survival Act." *Gregory v. R.J. Reynolds Tobacco Co., Inc.*, No. 720CV04257TLWJDA, 2021 WL 5827290, at *3 (D.S.C. Mar. 26, 2021), report and recommendation adopted, No. 720CV04257TLWJDA, 2021 WL 5480905 (D.S.C. Nov. 23, 2021).

C. Kelly and E. Kelly's estates are governed by Florida law. *See* S. Kelly Decl., Ex. C (Estate Letters of Administration). "By statute in Florida, '[n]o cause of action dies with the person.' Rather, '[a]ll causes of action survive and may be commenced, prosecuted, and defended in the name of the person prescribed by law.'" *Dammarell v. Islamic Republic of Iran*,

25

404 F. Supp. 2d 261, 285 (D.D.C. 2005) (quoting Fla. Stat. Ann. § 46.021 (West 2005)). The

current text of this statute remains unchanged from the version reviewed in 2005. *See* Fla. Stat.

Ann. § 46.021. "Any claim for personal injury, which includes IIED, can be maintained by the

personal representative of the claimant once the claimant dies," so long as the personal injury did

not cause the claimant's death. *Barry*, 437 F. Supp. 3d at 33 (quoting *Dammarell*, 404 F. Supp.

2d at 272). E. Kelly and C. Kelly's estates may therefore also pursue claims against defendant in

this case.

In summary, the servicemember plaintiff and the immediate-family member plaintiffs

have established the defendant's liability under the federal private right of action against state

sponsors of terrorism, 28 U.S.C. § 1605A(c), for the torts of assault, battery, and intentional

infliction of emotional distress.

### D. Damages

Turning to the allowable damages, all plaintiffs seek compensatory damages for pain and

suffering, under 28 U.S.C. § 1605A(c), and the family member plaintiffs seek solatium damages,

under 28 U.S.C. § 1605A(c). Compl. ¶¶ 68, 71. Plaintiffs also request punitive damages, pre-

judgment interest, costs, and fees. *Id.* Prayer for Relief ¶¶ B–D. Thus, the damage award to

which each plaintiff is entitled is described below.

### 1. Legal Standard for Damages Under Section 1605A(c)

In actions brought under the FSIA's terrorism exception, foreign states may be liable for

money damages, including "economic damages, solatium, pain and suffering and punitive

damages." 28 U.S.C. § 1605A(c). To recover, plaintiffs "must prove that the consequences of

the foreign state's conduct were reasonably certain (i.e., more likely than not) to occur, and must

prove the amount of damages by a reasonable estimate." *Roth*, 78 F. Supp. 3d at 402 (internal

quotation marks omitted); *see also Fraenkel*, 892 F.3d at 353 (stating the same). Courts may

26

look to expert testimony and prior awards in determining whether the amount of damages has been proven by a reasonable estimate. *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008). The D.C. Circuit "review[s] the District Court's FSIA damages awards for abuse of discretion." *Fraenkel*, 892 F.3d at 356.

The evidence presented in *Blais* and *Heiser I*, of which this Court has taken judicial notice and reviewed above, has satisfactorily shown that plaintiffs' injuries were reasonably certain and were the intended consequences of defendant's material support of Saudi Hezbollah. *See Schooley*, 2019 WL 2717888, at *74 (concluding the same); *Akins*, 332 F. Supp. 3d at 39 (same). Having concluded this, whether plaintiffs have shown the amount of pain and suffering, solatium, and punitive damages by a reasonable estimate will be considered next.[12]

### 2. Pain and Suffering

As discussed, defendant is liable to the servicemember plaintiff, W. Johnson, for assault, battery, and intentional infliction of emotional distress, but the bar on multiple recoveries allows her to recover only under one theory, for the single underlying harm. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 77 ("The Court notes that these plaintiffs who have claimed assault, battery, and IIED may recover under only one of any such theories, as multiple recovery is prohibited."). Within this single-recovery framework, the "baseline assumption," *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016), applied in previous cases under the FSIA's terrorism exception is that "persons suffering injuries in terrorist attacks are entitled to $5 million in damages." *Id.* (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)). The baseline may be adjusted either upward or downward. An upward departure would be warranted "in the

---

[12]     The FSIA's private right of action permits plaintiffs to seek "economic damages," 28 U.S.C. § 1605A(c), but plaintiffs have not included such a request in their prayer for relief. *See generally*, Compl.

presence of 'severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic . . . or were mistaken for dead.'" *Id.* at 35–36 (quoting *Valore*, 700 F. Supp. 2d at 84).  A downward departure would be warranted "in the face of 'minor shrapnel injuries or minor injury from small-arms fire.'" *Id.* at 36 (quoting *Valore*, 700 F. Supp. 2d at 84).

Pain and suffering damages are by their nature difficult to quantify.  In *Schooley*, this Court relied in part on an "objective metric"—the VA disability rating—to "determin[e] the relative degree of injury suffered by each servicemember plaintiff." *Schooley*, 2019 WL 2717888, at *74.  That rating is the "agency's official determination regarding the extent of disabling injury sustained by service members in connection with military service." *Id.* (internal quotation marks omitted).  As *Schooley* explained, "[t]he VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides" an effective way of comparing injuries to ensure that similar injuries yield similar awards. *Id.*; *cf. Peterson*, 515 F. Supp. 2d at 54 (in calculating damages, "the Court must take pains to ensure that individuals with similar injuries receive similar awards").  *Schooley*'s basic rubric is adopted in this case as W. Johnson's daughter provided a relevant VA disability rating. *See Ackley*, 2022 WL 3354720, at *51 (using *Schooley*'s "basic rubric" of VA disability ratings to calculate damages amounts); *Christie*, 2020 WL 3606273, at *23 (same); *Aceto*, 2020 WL 619925, at *18 (same).  With this rubric, servicemember plaintiffs rated by the VA up to 30% disabled receive a baseline award of $5,000,000; plaintiffs rated 40–60% disabled by the VA will receive an upward departure, for a total award of $6,000,000; and servicemember plaintiffs rated 70–100% disabled by the VA will receive a further upward departure, for a total of $7,000,000.

*See Ackley*, 2022 WL 3354720, at \*51 (using this approach); *Christie*, 2020 WL 3606273, at \*23 (same); *Aceto*, 2020 WL 619925, at \*18 (same).

Servicemember plaintiff, the estate of Wanda Lorraine Kelly Johnson (W. Johnson), is entitled to recover in the 40–60% disabled category, as she received a combined disability rating of 100% from the VA, 50% of which was attributable to the PTSD and bipolar disorder that she suffered from as a result of the Khobar Towers bombing. A. Foster Decl. ¶ 39; *see id.*, Ex. F (VA Benefit Information). She is thus entitled to an upward departure from the baseline award, for a total award of $6,000,000 for her pain and suffering as a survivor of the bombing.

### 3. Solatium

The remaining plaintiffs seek solatium damages to compensate for the emotional distress they experienced as family members of the servicemember victim. *See* Compl. ¶¶ 69–71. "[S]olatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society," *Fraenkel*, 892 F.3d at 356 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998)), but solatium damages have also been awarded to compensate for the emotional distress of the family members of surviving victims, *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 39 (D.D.C. 2012) (explaining that "in the context of distress resulting from injury to loved ones—rather than death—courts have applied a framework where awards are valued at half of the awards to family members of the deceased" (internal quotation marks omitted)); *see also Valore*, 700 F. Supp. 2d at 85 ("Relatives of surviving servicemen received awards valued at half of the awards to family members of the deceased."). "Under the FSIA, a claim for solatium is nearly indistinguishable from a claim for IIED." *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015) (Contreras, J.); *see also Fraenkel*, 892 F.3d at 357. Damages recoverable on immediate-family member plaintiffs' claims of IIED thus will be discussed as a claim for solatium damages.

29

"Mental anguish, bereavement and grief resulting from" an immediate family member's death or injury "constitutes the preponderant element of a claim for solatium." *Fraenkel*, 892 F.3d at 356–57 (alteration adopted) (quoting *Flatow*, 999 F. Supp. at 30). In determining the appropriate amount to compensate victims' family members for emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium." *Acosta*, 574 F. Supp. 2d at 29.

Commonly accepted in this Court is *Heiser I*'s standardized framework for solatium damages. *Heiser I*, 466 F. Supp. 2d at 269; *see Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror" (citing *Valore*, 700 F. Supp. 2d at 85)). Although not mandatory, *see Fraenkel*, 892 F.3d at 361 ("There is no statutory basis for concluding that district courts *must* award solatium damages in the amounts that *Heiser* found commonly granted." (emphasis in original)), the *Heiser* framework is adopted here for consistency, *see also Akins*, 332 F. Supp. 3d at 43 (adopting the *Heiser* framework for awarding solatium damages); *Schooley*, 2019 WL 2717888, at *77 (same).

The *Heiser* framework, as a baseline, awards spouses of deceased victims $8,000,0000, parents and children of deceased victims $5,000,000, and siblings of deceased victims $2,500,000. *Valencia*, 774 F. Supp. 2d at 15. "[F]amilies of victims who have died are typically awarded greater damages than families of victims who remain alive," *Heiser I*, 466 F. Supp. 2d at 269 (quoting *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 75 (D.D.C. 2006)), and so the courts have awarded family members of surviving victims approximately half the baseline awards for family members of the deceased, *see Wultz*, 864 F. Supp. 2d at 39; *Valore*, 700 F. Supp. 2d at 85. Here, under the *Heiser* framework, the applicable baseline solatium awards are $4,000,000 to spouses of surviving victims and $2,500,000 to parents of surviving victims, *see*

30

*Wultz*, 864 F. Supp. 2d at 39; "[c]hildren of a surviving victim receive $1.5 million on average," *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014), and siblings of surviving victims receive $1,250,000, *see Valore*, 700 F. Supp. 2d at 85.

These numbers serve only as an anchor from which the Court should deviate to compensate for specific circumstances. *See Fraenkel*, 892 F.3d at 362 ("While past solatium awards from comparable cases are appropriate sources of guidance for district courts, different plaintiffs (even under [the] FSIA) will prove different facts that may well (and should) result in different damage awards." (internal quotation marks omitted)). "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case." *Oveissi v. Islamic Republic of Iran* ("*Oveissi I*"), 768 F. Supp. 2d 16, 26 (D.D.C. 2011); *see also Fraenkel*, 892 F.3d at 351 ("District Court judges have discretion . . . to grant solatium awards based on the particular facts of each case, subject to abuse-of-discretion review for errors of law, clearly erroneous factual findings, and faulty reasoning.").

Damages for W. Johnson's daughter are addressed first, followed by her parents and siblings.

### a.    *Child*

One of the immediate-family member plaintiffs will receive an award as the child of a servicemember who was stationed at the Khobar Towers at the time of the bombing: Ari Simone Foster. Her harms are consistent with those suffered by many children of victims of terrorism. *See Akins*, 332 F. Supp. 2d at 16, 17–22; Ari Decl. ¶¶ 17–22. Her mother was in the Khobar Towers complex when the blast went off, and was awarded a 100% disability rating from the VA, 50% of which was attributed to the PTSD and bipolar disorder she suffered from as a result

31

of the Khobar Towers attack. *Id.* ¶ 39; *see id.*, Ex. F (VA Benefit Information). The impacts that W. Johnson's psychological injuries had on A. Foster are severe. She describes that her mother was "emotionally detached and cold" towards her, and that her mother was "unable to empathize or provide [her] with emotional support," even in the wake of A. Foster's sexual abuse. *Id.* ¶ 13. Her mother "became manipulative and tried to make me feel guilty. She would often threaten to commit suicide." *Id.* ¶ 18. A. Foster had to protect her children from her mother, and eventually had her mother involuntarily committed. *Id.* ¶¶ 29–30, 36.

Plaintiffs' memorandum describes competing calculations for the damages awarded to children of victims of terrorist attacks. See Pls.' Mem. at 18. While this Court has previously awarded child plaintiffs $1,500,000 in damages, other courts have awarded $2,500,000, recognizing that "children who lose parents are likely to suffer as much as parents who lose children." *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 271 (D.D.C. 2020) (quoting *Mwila v. Islamic Republic of Iran*, 33 F. Supp. 3d 36, 44-45 (D.D.C. 2014), *aff'd in part, question certified sub nom. Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017). Given the significant lifelong impacts that her mother's injury has had on A. Foster and her family, an award similar to that given to the servicemember's parents of $2,500,000 is appropriate here.

### b. *Parents*

Two of the immediate-family member plaintiffs will receive awards as the parents of a servicemember who was stationed at the Khobar Towers at the time of the bombing: the estates of Clarence Kelly, Jr. and Ethelean King Kelly, both of whom lived for 4 and 25 years, respectively, after the servicemember plaintiff survived the attack and helped her for the duration of that time period. S. Kelly Decl. ¶¶ 23–25 (describing that W. Johnson and C. Kelly "remained unusually close following Wanda's return from Saudi Arabia" and "Wanda would call him at all

32

times of the night, crying uncontrollably."). No departure from the *Heiser* baseline is warranted because their harms are consistent with those suffered by many parents of victims of terrorism, *See Valencia*, 774 F. Supp. 2d at 16; S. Kelly Decl. ¶¶ 22–25, and their damages are proportional to the damages awarded to their daughter. The estates of C. Kelly and E. Kelly, whose daughter's estate was awarded $6,000,000, will receive the baseline award of $2,500,000 each in compensatory damages.

### c. *Siblings*

Three of the immediate family member plaintiffs are siblings of the servicemember plaintiff: Sarah Denise Kelly, Demarco Lashawn Kelly, and Andra Lamar Kelly. Each has described distress upon learning about the bombing and has suffered from the ongoing effects of the attack on their respective siblings and families.[13] These harms are consistent with those suffered by many siblings of victims of terrorism. *See Valencia*, 774 F. Supp. 2d at 15. Within the *Heiser* framework, siblings of injured servicemembers awarded between $5,000,000 and $7,000,000 are each entitled to an award of $1,250,000, with no downward departure for proportionality required. *See Akins I*, 332 F. Supp. 3d at 45 (awarding a baseline amount of $1,250,000 to siblings of injured servicemembers). S. Kelly, D. Kelly, and A. Kelly, whose sister's estate was awarded $6,000,000, will receive a baseline award of $1,250,000 each.

### E. Punitive Damages

In addition to compensatory damages, plaintiffs seek punitive damages under 28 U.S.C. § 1605A(c). *See* Compl. ¶¶ 80–83 (Count VII); *id.*, Prayer for Relief ¶ B. The Supreme Court has laid out three "guideposts" for "reviewing punitive damages" awards: "(1) the degree of reprehensibility of the defendants' misconduct; (2) the disparity between the actual or potential

---

[13]     S. Kelly Decl. ¶¶ 26-29; D. Kelly Decl. ¶¶ 17-21; A. Kelly Decl. ¶¶ 23-26.

harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). Weighing this precedent, *Christie* awarded "[p]unitive damages equal to compensatory damages" in light of the "identified flaws in the [other] methods" for determining punitive damages. 2020 WL 3606273, at *27. Specifically, *Christie* determined that this method avoided "a singular focus on deterrence," *id.* at *28, as well as "elevat[ing] superficial similarities over meaningful ones" and "skim[ing] over analysis of the plaintiffs' precise harms," and does not "yield an excessive award," *id.* Awarding punitive damages equal to compensatory damages, *Christie* concluded, was most appropriate because "plaintiffs [were] already receiving substantial compensatory awards," *id.*, "'the compensatory damages for the injury suffered' . . . [were] 'based on a component which' would be 'duplicated in the punitive award,'" *id.* (quoting *State Farm*, 538 U.S. at 426), and "[a]dding hundreds of millions of dollars to [the] amount [of outstanding court judgments already owed by Iran] . . . [was] not likely to have a meaningful deterrent effect," *id.* at *29.

Given that *Christie* reached this conclusion based on the same event at issue in the present case, the *Christie* punitive damages approach analysis, which was likewise applied in several other cases in this district, *see, e.g.*, *Blank*, 2021 WL 3021450, at *10, *Ackley*, 2022 WL 3354720, at *60, will also be applied here. Plaintiffs urge no alternative approach. *See* Pls.' Mem. at 23. Accordingly, a punitive damages award equal to compensatory damages is most appropriate. Plaintiffs are entitled to a total punitive damages award of $17,250,000 to be apportioned among plaintiffs according to their compensatory damages. *See also Valore*, 700 F. Supp. 2d at 90 (apportioning in the same fashion).

34

## F. Prejudgment Interest

Plaintiffs next seek prejudgment interest. Compl., Prayer for Relief ¶ C. "Whether to award such interest is a question that rests within this Court's discretion, subject to equitable considerations." *Oveissi II*, 879 F. Supp. 2d at 58. At the same time, the majority of Judges on this Court confronted with this issue have concluded—as this Court did in *Akins I*—that "pain and suffering and solatium damages are both designed to be fully compensatory" and prejudgment interest is therefore unwarranted. *See Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 60 (D.D.C. 2020) (Contreras, J.) (quoting *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012)); *see Doe A-1 v. Democratic People's Republic of Korea*, No. 18-cv-252 (DLF), 2021 WL 723257, at *9 (D.D.C. Feb. 24, 2021) (Friedrich, J.) (denying prejudgment interest because the award "in *today's dollars* fully compensates the crew members and their estates for their time spent in captivity" (emphasis in original)); *Bathiard v. Islamic Republic of Iran*, Case No. 16-cv-1549 (CRC), 2020 WL 1975672, at *8 (D.D.C. Apr. 24, 2020) (Cooper, J.) (holding "prejudgment interest is not appropriate for nonpecuniary damages already designed to provide complete compensation"); *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214 (JEB), 2019 WL 3037868, at *10 (D.D.C. Jul. 11, 2019) (Boasberg, J.) (denying prejudgment interest because "direct-injury and solatium awards [are] to be fully compensatory" already); *Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 79, 94, 99 (D.D.C. 2019) (Spec. Master Report), *adopted by Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 75 (D.D.C. 2019) (Kollar-Kotelly, J.); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 54–55 (D.D.C. 2016) (Howell, J.). Thus, the overarching tide of persuasive precedent in this District plainly weighs against awarding prejudgment interest, and is even less warranted considering punitive damages are permissible in § 1605A cases, as prejudgment interest "does not apply to punitive

35

damages because 'prejudgment interest is an element of complete compensation' and punitive damages are non-compensatory." *Thuneibat*, 167 F. Supp. 3d at 55 (quoting *Wultz*, 864 F. Supp. 2d at 42).

Consistent with this persuasive precedent, this Court concludes plaintiffs are not entitled to prejudgment interest on their compensatory or punitive damages. When denying prejudgment interest on compensatory damages in *Oveissi I*, Judge Lamberth explained that "[i]n adopting the *Heiser* framework, this Court determined that the values set by that scale represent the appropriate level of compensation, regardless of the timing of the attack." *Oveissi I*, 768 F. Supp. 2d at 30 n.12; *see also Maupin*, 405 F. Supp. 3d at 94; *Thuneibat*, 167 F. Supp. 3d at 54. Indeed, nonpecuniary damages for pain and suffering and solatium "do not typically require prejudgment interest because they are 'designed to be fully compensatory.'" *Id.* (quoting *Wyatt*, 908 F. Supp. 2d at 232). As in *Oveissi I*, where "the Court s[aw] no reason to deviate from its standard practice" of relying on "the values set by th[at] [*Heiser*] scale[, which] represent the appropriate level of compensation" and award prejudgment interest, *Oveissi I*, 768 F. Supp. 2d at 30 n.12, the instant plaintiffs "have not provided any reason why awards under [the *Heiser*] framework are insufficient to provide 'complete compensation,'" *Akins I*, 332 F. Supp. 3d at 46 (quoting *West Virginia v. United States*, 479 U.S. 305, 310 (1987)). Plaintiffs are likewise not entitled to prejudgment interest on their punitive damages. "[P]rejudgment interest does not apply to punitive damages because 'prejudgment interest is an element of complete compensation' and punitive damages are non-compensatory." *Thuneibat*, 167 F. Supp. 3d at 55 (quoting *Wultz*, 864 F. Supp. 2d at 42). Accordingly, plaintiffs are awarded monetary damages in the amounts established above without prejudgment interest.

36

## IV.  CONCLUSION

For the foregoing reasons, plaintiffs' motion for default judgment and damages is granted.  Defendant is liable for the pain and suffering inflicted on the servicemember plaintiff, for the emotional distress inflicted on the six immediate family member plaintiffs and their estates, and for punitive damages equal to compensatory damages.

Plaintiffs are awarded compensatory and punitive monetary damages in the following amounts:

1.  Servicemember plaintiff, the estate of Wanda Lorraine Kelly Johnson, who suffered injuries resulting in a VA disability rating of 50%, is entitled to $6,000,000 in pain and suffering damages and $6,000,000 in punitive damages;

2.  Plaintiff daughter, Ari Simone Foster, is entitled to $2,500,000 in solatium damages and $2,500,000 in punitive damages;

3.  Plaintiff parents, the estates of Clarence Kelly, Jr. and Ethelean King Kelly, are entitled to $2,500,000 in solatium damages and $2,500,000 in punitive damages;

4.  Plaintiff siblings, Sarah Denise Kelly, Demarco Lashawn Kelly, and Andra Lamar Kelly, are each entitled to $1,250,000 in solatium damages and $1,250,000 in punitive damages.

Thus, the total damages award is $34,500,000.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

DATE: June 28, 2024.

**BERYL A. HOWELL**
United States District Judge