# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHRISTOPHER A. MUSTARD *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 21-cv-163 (BAH) |
| | Chief Judge Beryl A. Howell |
| ISLAMIC REPUBLIC OF IRAN, | |
| Defendant. | |

**MEMORANDUM OPINION**

This action arises out of the bombing on June 25, 1996, of the Khobar Towers apartment complex in Dhahran, Saudi Arabia, which housed United States military personnel. Pls.' Complaint ("Compl.") at 1. Nineteen U.S. Air Force personnel were killed, and hundreds more were injured, including servicemember plaintiff Christopher Mustard. *Id.* ¶¶ 40–41. The five remaining plaintiffs are family members of two injured servicemember plaintiffs in *Aceto v. Islamic Republic of Iran*, No. 19-cv-464 (BAH), 2020 WL 619925 (D.D.C. Feb. 7, 2020). *See also* Compl. ¶ 41. These six plaintiffs allege that defendant, the Islamic Republic of Iran, is liable under the terrorism exception to the Foreign Sovereign Immunities Act ("FISA"), 28 U.S.C. § 1605A, for "provid[ing] material support and resources[,] . . . which caused, enabled, and facilitated the terrorist attack at the Khobar Towers," Compl. ¶ 43. Although plaintiffs have complied with the FSIA's requirements for service on defendant, Iran has failed to enter an appearance or otherwise defend against this action. *See* 28 U.S.C. § 1608(a)(4); Return of Service/Aff. of Summons and Compl. Executed, ECF No. 14; Clerk's Entry of Default, ECF No. 16. Plaintiffs now seek default judgment against defendant as to liability and damages. Pls.'

1

Mot. Entry Default J. & Take Judicial Notice of Evid. in Prior Related Cases ("Pl.s' Mot."), ECF No. 18.  For the reasons detailed below, plaintiffs' motion is granted.

## I.     BACKGROUND

Prior decisions of this Court have found defendant liable for the Khobar Towers bombing:  *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006) (Lamberth, J.); *Estate of Heiser v. Islamic Republic of Iran* ("*Heiser I*"), 466 F. Supp. 2d 229 (D.D.C. 2006) (Lamberth, J.); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163 (D.D.C. 2010) (Lamberth, J.); *Akins v. Islamic Republic of Iran* ("*Akins I*"), 332 F. Supp. 3d 1 (D.D.C. 2018) (Howell, C.J.); *Schooley v. Islamic Republic of Iran*, No. 17-cv-1376 (BAH), 2019 WL 2717888 (D.D.C. June 27, 2019) (Howell, C.J.); *Aceto*, 2020 WL 619925 (Howell, C.J.); *Christie v. Islamic Republic of Iran*, No. 19-cv-1289 (BAH), 2020 WL 3606273 (D.D.C. July 2, 2020) (Howell, C.J.); *Akins v. Islamic Republic of Iran* ("*Akins II*"), 549 F. Supp. 3d 104 (D.D.C. 2021) (Howell, C.J.); *Blank v. Islamic Republic of Iran*, No. 19-cv-3645 (BAH), 2021 WL 3021450 (D.D.C. July 17, 2021) (Howell, C.J.); *Ackley v. Islamic Republic of Iran*, No. 20-cv-621 (BAH), 2022 WL 3354720 (D.D.C. Aug. 12, 2022) (Howell, C.J.).

In *Blais* and *Heiser I*, the Court heard evidence and witness testimony.  *See Blais*, 459 F. Supp. 2d at 46 n.4; *Heiser I*, 466 F. Supp. 2d at 250.  In *Heiser I* alone, the offering of evidence took seventeen days, which included examination of witnesses, including seven expert witnesses. *See* 466 F. Supp. 2d at 250.[1]  *Rimkus*, *Akins*, and *Schooley* concluded that judicial notice of the findings of fact in *Blais* and *Heiser I* was appropriate, *see Rimkus*, 750 F. Supp. 2d at 172–73;

---

[1]     The expert witnesses in *Heiser I* were: (1) Louis Freeh, the former Director of the Federal Bureau of Investigation ("FBI"); (2) Dr. Patrick Clawson, a scholar of Middle Eastern politics who has frequently provided expert testimony regarding Iran's involvement in sponsoring terrorism; (3) Dr. Bruce Tefft, a founding member of the CIA's Counterterrorism Bureau and regular consultant on issues of terrorism; (4) Dale Watson, the former Deputy Counterterrorism Chief of the FBI, *see Heiser I*, 466 F. Supp. 2d at 260–65; (5) Dr. Thomas Parsons, a medical examiner, *see id.* at 268; (6) Dr. Dana Cable, a licensed psychologist and expert on grief process, *see id.* at 269–70; and (7) Dr. Herman Miller, an economic consultant, *see id.* at 273–74.

*Akins I*, 332 F. Supp. 3d at 11; *Schooley*, 2019 WL 2717888, at \*2, and plaintiffs here request that this Court "take judicial notice of prior findings of fact and supporting evidence imposing liability under Section 1605A (and its predecessor, Section 1605(a)(7)) on Iran for providing material support and resources to the terrorists who attacked the Khobar Towers complex on June 25, 1996." Pls.' Mem. Supp. Mot. for Entry of Default J. & Take Judicial Notice of Evid. in Prior Related Cases ("Pls.' Mem.") at 7, ECF No. 18-1.

Rule 201 of the Federal Rules of Evidence authorizes a court to "judicially notice" adjudicative facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b).[2] Rule 201 is used frequently to notice judicially factual evidence developed in other FSIA proceedings "involving the same conduct by the same defendants," *Akins I*, 332 F. Supp. 3d at 11, "even when those proceedings have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)). This avoids "the formality of having that evidence reproduced." *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011); *see also Oveissi v. Islamic Republic of Iran* ("*Oveissi II*"), 879 F. Supp. 2d 44, 50 (D.D.C. 2012) (finding courts permitted "in subsequent related cases to rely upon the evidence presented in earlier litigation"); *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237 (D.D.C. 2012) (taking "judicial notice of the evidence presented in the earlier cases"). Taking judicial notice of prior findings "does not conclusively establish the facts found in those cases"

---

[2] "[A]djudicative facts are simply the facts of the particular case." *Nat'l Org. for Women, Wash., D.C. Chapter v. Soc. Sec. Admin. of Dep't of Health & Human Servs.*, 736 F.2d 727, 737 n.95 (D.C. Cir. 1984) (Robinson, J., concurring) (quoting FED. R. EVID. 201, Advisory Committee Note). The Rule does not govern judicial notice of "legislative fact[s]," FED. R. EVID. 201(a), which are "those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body," *Nat'l Org. for Women*, 736 F.2d at 737 n.95 (quoting FED. R. EVID. 201, Advisory Committee Note).

in the later FSIA case. *Foley*, 249 F. Supp. 3d at 191. Rather, "based on judicial notice of the evidence presented in the earlier cases[,] . . . courts may reach their own independent findings of fact." *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010); *see also Rimkus*, 750 F. Supp. 2d at 172. In fact, "courts in FSIA litigation have adopted a middle-ground approach that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them." *Rimkus*, 750 F. Supp. 2d at 172.[3]

This Court is persuaded that this approach is both "efficient and sufficiently protective of the absent defendant['s] interests," *Akins I*, 332 F. Supp. 3d at 11, and will therefore grant plaintiffs' request to take judicial notice of the evidence presented in *Ackley*, 2022 WL 3354720, *Blank*, 2021 WL 3021450, *Akins II*, 549 F. Supp. 3d 104, *Christie*, 2020 WL 3606273, *Aceto*, 2020 WL 619925, *Schooley*, 2019 WL 2717888, *Akins I*, 332 F. Supp. 3d 1, *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1 (D.D.C. 2010) (Lamberth, J.), *Rimkus*, 750 F. Supp. 2d 163, *Heiser I,* 466 F. Supp. 2d 229, and *Blais*, 459 F. Supp. 2d 40. *See Akins I*, 332 F. Supp. 3d at 11 (stating that factual evidence developed in other cases "involving the same conduct by the same defendants is admissible and may be relied upon in this case"). The evidence regarding the Khobar Towers bombing is summarized below, followed by an overview of the procedural history of this case.

### A. The Attack on Khobar Towards

---

[3]     The D.C. Circuit has endorsed the use of judicial notice to establish facts in FSIA terrorism cases. In *Han Kim v. Democratic People's Republic of Korea*, the D.C. Circuit held that plaintiffs had "met their burden of producing evidence 'satisfactory to the court'" to establish subject matter jurisdiction under the FSIA, where the only evidence linking North Korea to the victim's disappearance was a South Korean court's conviction of a North Korean agent, of which the district court had taken judicial notice. 774 F.3d 1044, 1049 (D.C. Cir. 2014).

The Khobar Towers residential complex in Dhahran, Saudi Arabia "housed the coalition forces," including the U.S. military forces, "charged with monitoring compliance with [United Nations] security council resolutions." *Blais*, 459 F. Supp. 2d at 47. About 10 minutes before 10:00 p.m. on June 25, 1996, "a large gasoline tanker truck pulled up" and parked "alongside the perimeter wall of the Khobar Towers complex." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 40. Security guards near the top of one of the towers, Building 131, "started to give warnings about the unusual vehicle location," but the truck exploded "within about 15 minutes." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 40. The blast "sheared off the face of Building 131," *Heiser I*, 466 F. Supp. 2d at 252, and "shattered windows up to a half mile away," Compl. at 1. Subsequent "investigation determined that the force of the explosion was the equivalent of 20,000 pounds of TNT. The [U.S. Department of Defense] said that it was the largest non-nuclear explosion ever up to that time." *Heiser I*, 466 F. Supp. 2d at 252.

### B. Defendant Iran's Role

Iran "has been designated a state sponsor of terrorism" by the U.S. Department of State "since January 19, 1984." *Blais*, 459 F. Supp. 2d at 47; *see, e.g.*, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 77 (D.D.C. 2018); U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm (last visited Feb. 5, 2023). Prior proceedings have found that Iran planned and supported the Khobar Towers bombing.[4] Both the Ayatollah Ali Khamenei, the Supreme Leader of Iran at the time, and the Minister of Intelligence and Security "approved" the attack. *Heiser I*, 466 F. Supp. 2d at 252. The truck bomb used was "assembled" at a base in Lebanon's Bekaa Valley "jointly operated by the [Iranian Revolutionary Guard

---

[4] Under the FSIA, Iran is "vicariously liable for the acts of its officials, employees, or agents." 28 U.S.C. § 1605A(c).

5

Corps ('IRGC')] and by the terrorist organization known as Hezbollah," with the individuals who carried out the bombing calling themselves "Saudi Hezbollah." *Id.*

These conclusions are based in part on the testimony of four key expert witnesses in *Blais* and *Heiser I*. Louis Freeh, who was director of the FBI at the time of the bombing, and Dale Watson, then deputy counterterrorism chief of the FBI, testified in *Heiser I* based on their oversight of the FBI's "massive and thorough investigation of the attack, using over 250 agents." *Id.*; *see also id.* at 260–62. "Based on that investigation, an Alexandria, Virginia, grand jury returned an indictment . . . against 13 identified members of the pro-Iran Saudi Hezbollah organization." *Id.* at 252. During its investigation, the FBI interviewed six members of Saudi Hezbollah who "admitted to the FBI their complicity in the attack on Khobar Towers, and admitted that senior officials in the Iranian government provided them with funding, planning, training, sponsorship, and travel necessary to carry out the attack on Khobar Towers." *Id.* at 253. Both Freeh and Watson testified to their conclusions, based on information gathered in their investigations, that "Iran, [the Ministry of Information and Security ("MOIS")], and IRGC were responsible for the Khobar Towers bombing carried out by Saudi Hezbollah." *Id.* at 264.

Further, Dr. Patrick Clawson provided expert testimony in *Heiser I* that "the government of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the attack under their direction." *Id.* at 253. This conclusion was "based on his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials, as well as his academic research on the subject." *Id.* Dr. Bruce Tefft, a former member of the CIA's counterterrorism bureau, supported Clawson's "expert opinion," based on "publicly available sources that were not inconsistent with classified information known to him from his time at the CIA" that "the Islamic Republic of Iran

6

and the Iranian Revolutionary Guards Corp were responsible for planning and supporting the attack on Khobar Towers." *Id.* at 253–54.

### C. The Instant Plaintiffs

Plaintiffs in this action include one servicemember who suffered from physical and psychological injuries as a result of the Khobar Towers Bombing, *see* Compl. ¶ 3, and immediate family members of servicemembers who were injured in the bombing and recovered as plaintiffs in a previous suit, *see Aceto*, 2020 WL 619925, at *3–4, *7. The servicemember plaintiff and family-member plaintiffs are described below.

### 1. *Christopher Mustard*

On June 25, 1996, Christopher Mustard was an Airman First Class in the U.S. Air Force quartered in Khobar Towers, having enlisted in 1994 and ultimately serving for a total of 24 years and three days before being honorably discharged in 2018. Decl. of Christopher A. Mustard (Apr. 27, 2022) ("Mustard Decl.") ¶¶ 3, 5–6, ECF No. 18-8. Mustard seeks relief as an injured plaintiff. Compl. ¶¶ 3, 47. On the night of the attack, Mustard was in his residential suite sitting on his couch. Mustard Decl. ¶ 6. He suddenly heard "an enormous blast" and the glass door to his suite "shattered in on [him]," covering his body with lacerations. *Id.* ¶¶ 6, 9. His first memory after hearing the blast was going down the stairs, which he later learned he was only able to do with the help of his supervisor who, while severely injured, lifted an unresponsive Mustard off of the couch and helped him down and out of the building, where the two were assisted by medics. *Id.* ¶¶ 7, 9. Up to a year after the attack, Mustard would "occasionally pull another piece of glass" out of his back. *Id.* ¶ 9. Mustard received a Purple Heart in August 1996 for the wounds he received from the Khobar Towers bombing. *Id.*, Attachment ("Att.") 3 (Mustard's Purple Heart Certificate). Still, many years later, he lives with

the trauma caused by the bombing. *Id.* ¶ 19. He suffers from nightmares and flashbacks, *id.* ¶ 14, and his sensitivity to loud noises persists, *id.* ¶ 22. The U.S. Department of Veterans Affairs ("the VA") has given Mustard a 100% disability rating, and documentation submitted by Mustard shows that 90% of his disability rating is attributable to "Service Connected" injuries, though this documentation leaves unclear whether the injuries were incurred from the Khobar Towers bombing or during the next twenty years of his military service. *See id.*, Atts. 4–5 (Mustard's VA benefit information).

### 2. *One Family Member of Denny Prier*

Denny Prier, a Senior Airman in the U.S. Air Force quartered in the Khobar Towers at the time of the bombing, was a plaintiff in *Aceto*, 2020 WL 619925, at *7. He was awarded $6 million in damages as a result of the serious injuries, and concomitant pain and suffering, he sustained from the attack. *Id.* at *23. Prier's sister, Susanne Ceragioli, is a plaintiff in this action. Decl. of Susanne Prier Ceragioli (Apr. 27, 2022) ("Ceragioli Decl.") ¶ 6, ECF No. 18-3.

Susanne Ceragioli learned of the attack from her mother who called while Ceragioli was at work. *Id.* ¶ 17. Ceragioli immediately left to be with her family as they watched the news and awaited any word of Prier's health. *Id.* ¶ 18. Finally, that night, Prier called his wife who told them he was injured in the blast. *Id.* ¶ 22. After the bombing when Prier returned to the United States, Ceragioli stated that he was "distant," "not as cheerful as he had always been," and unable to open up about his experience without breaking down. *Id.* ¶¶ 26–29. Witnessing the changes in her brother "tore [Ceragioli] apart," *id.* ¶ 28, and even though they have communicated more in the years since the attack, Ceragioli and Prier's relationship still suffers due to his post-traumatic stress disorder, *id.* ¶ 29.

### 3. *Four Family Members of Jennifer Scheidel*

Jennifer Scheidel, a Senior Airman in the U.S. Air Force quartered in the Khobar Towers at the time of the bombing, was also a plaintiff in *Aceto*, 2020 WL 619925, at \*4. She was awarded $3 million in damages as a result of her pain and suffering and solatium damages. *Id.* at \*23. Scheidel's parents, Pauline and William Wilder, and her siblings, Kristene and Jeffery Wilder, are plaintiffs in this action. Decl. of Pauline Wilder (Apr. 27, 2022) ("P. Wilder Decl.") ¶¶ 4–5, ECF No. 18-5; Decl. of Kristene Wilder (Apr. 6, 2022) ("K. Wilder Decl.") ¶ 4, ECF No. 18-6; Decl. of Jeffery C. Wilder (Apr. 27, 2022) ("J. Wilder Decl.") ¶ 4, ECF No. 18-7.[5]

Pauline and William Wilder suffered severe "distress" waiting to hear if Scheidel and her then-husband, also housed in the Khobar Towers, survived the attack. P. Wilder Decl. ¶ 11. Pauline Wilder describes that day as a "blur" during which she and her husband were "terribly upset" and worried with each passing hour without news of their daughter's safety. *Id.* ¶ 12–13. Their fears were also well-informed by their experiences dealing with William Wilder's own struggles: William Wilder is a Vietnam veteran who was injured by Agent Orange while deployed and now suffers from post-traumatic stress disorder. *Id.* ¶ 6. From that experience, the couple knew the life-threatening situations their daughter likely faced. *Id.* ¶ 13. They were relieved when they heard that Schediel and her husband were alive, but from William Wilder's experience, they also knew how difficult her road to recovery would be. *Id.* ¶ 15. When Scheidel was permitted to return to the United States from Saudi Arabia two months later, she was not the same, which further distressed her parents. *Id.* ¶¶ 16–17. Her self-destructive tendencies and family struggles worried them, as did her resistance to their efforts to help. *Id.* ¶ 17–19. Particularly difficult for Pauline and William Wilder was seeing their daughter grow distant from them and their relationship become increasingly strained. *Id.* ¶ 20–22.

---

[5] Pauline Wilder submitted her declaration on behalf of herself and her husband, William Wilder, because the latter suffers from Parkinson's Disease and is "not well." P. Wilder Decl. ¶ 7.

Kristene Wilder learned of the attack from her mother while she was at home for the summer from college. K. Wilder Decl. ¶ 6. She recalls feeling "extremely disconnected from reality," "empty," "powerless," and overall extremely worried while waiting to hear if her sister was alive. *Id.* ¶¶ 6–7. When they learned Scheidel was safe, Kristene Wilder was relieved, but continued to worry for her safety and felt "helpless" being so far away from her sister. *Id.* ¶ 9. Upon Scheidel's return to the United States, Kristene Wilder "had no words to comfort her" and still feels "guilt" about not being able to help. *Id.* ¶ 10. Kristene Wilder tried to be there for her sister in the years after her return, but Scheidel's mental health and residual trauma "dissolve[d]" the sisters' once-close relationship, which was "maddening, traumatizing, and exhausting" for Kristene Wilder. *Id.* ¶¶ 12–14, 17. After many unsuccessful attempts over the years to reconcile, Kristene Wilder eventually "cut off contact" with Scheidel and her two daughters for the sake of their families. *Id.* ¶ 19. Although the sisters have restored their relationship, their bond "was forever damaged" and the lost years between them "saddens [Kristene Wilder] greatly." *Id.* ¶ 20.

Jeffrey Wilder learned of the attack from his sister, Kristene. J. Wilder Decl. ¶ 8. After learning that Scheidel survived the attack, Jeffrey Wilder's concern for her "went to the maximum," as she was still abroad. *Id.* ¶ 9. Despite not having seen images of the bombing at the time, Jeffrey Wilder had "a vivid picture" of the attack and had nightmares about it. *Id.* ¶ 11. When Scheidel returned home, Jeffrey Wilder wanted to get her help to cope with her distress and trauma, but to him, "it seemed like she wanted to self-destruct." *Id.* ¶ 13. In the years that followed, Jeffrey Wilder saw his sister with whom he was once close become a "mean and vindictive person." *Id.* ¶ 14. Jeffrey Wilder has also witnessed Scheidel's recovery and hopes

10

"she continually gets better." *Id.* ¶ 15.  While he still thinks about the bombing "from time to time," he "think[s] of [his] sister's well-being *all the time*."  *Id.* ¶ 17 (emphasis in original).

### D.  Procedural Background

Plaintiffs filed this lawsuit on January 19, 2021.  *See* Compl., ECF No. 1.  As detailed, *infra*, in Part III.B, Iran was properly served under the FSIA and, after failing to appear, the Clerk of the Court entered default against Iran on December 23, 2021.  *See* Clerk's Entry of Default, ECF No. 16.  Plaintiffs took no action for approximately four months until the Court directed them to show cause "why this case should not be dismissed for failure to prosecute."  Min. Order (Apr. 18, 2022).  Plaintiffs subsequently moved for judicial notice of prior related cases and for default judgment as to liability and damages.  *See* Pls.' Mot.

Thereafter, on January 12, 2023, plaintiffs were directed to respond to four inquiries relevant to gaps in the Complaint:  (1) whether the Court has jurisdiction to grant relief under the Florida Anti-Terrorism Act's civil remedy provision asserted in Count III; (2) whether District of Columbia choice-of-law rules apply in determining whether to grant relief under the Florida statute; (3) whether a choice-of-law analysis is necessary to apply intentional infliction of emotional distress "under the Laws of Florida," as alleged in the Complaint in Count II; and (4) whether Count I, which only alleges the FSIA's private right of action, may also serve as the basis for relief under tort law when five of the six plaintiffs asserted no separate tort claim through which they may recover damages.  Min. Order (Jan. 12, 2023).  Plaintiffs duly filed their response on January 17, 2023.  *See* Pls.' Supp. Mem., ECF No. 21.  The motion is now ripe for resolution.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 55(b)(2) permits a court to consider entering a default judgment when a party applies for that relief. *See* FED. R. CIV. P. 55(b)(2). Nevertheless, "strong policies favor resolution of disputes on their merits" and, therefore, "'[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'" *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)). Furthermore, "entry of a default judgment is not automatic," *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted), and so the procedural posture of a default does not relieve a federal court of its typical obligations, including its "affirmative obligation" to determine whether it has subject-matter jurisdiction over the action, *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6.

When default judgment is sought under the FSIA, a claimant must also "establish[] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This requirement "provides foreign sovereigns a special protection akin to that assured the federal government by Fed. R. Civ. P. 55(e)." *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014); *see also* H.R. REP. No. 94-1487, at 26 (1976) (stating that § 1608(e) establishes "the same requirement applicable to default judgments against the U.S. Government under [R]ule 55(e)"). While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," courts must be mindful that Congress enacted § 1605A, FSIA's terrorism exception, and § 1608(e) with the "aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability

12

for their sins." *Han Kim v. People's Democratic Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)); *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114 (D.C. Cir. 2019). With this objective in mind, the D.C. Circuit has instructed that "courts have the authority—indeed, we think, the obligation—to 'adjust evidentiary requirements to . . . differing situations.'" *Han Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)) (formatting modified).

Generally, courts in FSIA default actions must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)). Courts take uncontroverted factual allegations that are supported by admissible evidence as true. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing *Rimkus*, 750 F. Supp. 2d at 171)); *accord Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 319 (D.D.C. 2014); FED. R. CIV. P. 56(e)(2) (authorizing court to "consider the fact undisputed for purposes of the motion" when adverse party "fails to properly address another party's assertion of fact").

The D.C. Circuit's "review of findings underlying a default judgment in a FSIA case of this sort is 'lenient.'" *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)), as "the courts are granted broad discretion to determine what degree and kind of evidence is satisfactory." *Maalouf*, 923 F.3d at 1114 (citing *Han Kim*, 774 F.3d at 1047; *Owens*, 864 F.3d at 785). In particular, "[i]n a FSIA default proceeding, a factual finding is not deemed clearly erroneous if there is an adequate basis in the record for inferring that the district court . . . was satisfied with

13

the evidence submitted." *Owens*, 864 F.3d at 785 (second alteration in original) (internal quotation marks omitted).

## III. DISCUSSION

A default judgment may be entered when (1) the court has subject-matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendant, (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendant, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek. These requirements are satisfied here and addressed in order below.

### A. Subject-Matter Jurisdiction under the FSIA

"The district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" seeking "relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title." 28 U.S.C. § 1330(a). Plaintiffs seek *in personam* relief, so the question for the Court is whether defendant is entitled to immunity under the "state sponsor of terrorism" exception set forth in 28 U.S.C. § 1605A.[6]

"[T]he FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts," *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015) (citing 18 U.S.C. § 1604), but "that grant of immunity is subject to a number of exceptions," *id.* at 13–14. Plaintiffs assert jurisdiction based on the FSIA's terrorism exception. 28 U.S.C. § 1605A; *see* Compl. ¶ 43. In relevant part, this exception abrogates a foreign state's immunity in cases where a plaintiff seeks "money damages" for "personal injury or death that

---

[6] This suit falls beyond the ten-year statute of limitations for actions brought under the FSIA's terrorism exception, *see* 28 U.S.C. § 1605A(b), but the "limitation period in § 1605A(b) is not jurisdictional," and defendant has "forfeited [its] affirmative defense . . . by failing to raise it in" this Court, *Owens*, 864 F.3d at 804; *see also Maalouf*, 923 F.3d at 1114–15 (holding that a district court may not *sua sponte* raise a forfeited statute of limitations defense under 28 U.S.C. § 1605A(b)).

14

was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" if "engaged in by an official, employee, or agent of such foreign state." 28 U.S.C. § 1605A(a)(1). The FSIA defines a "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality" thereof. 28 U.S.C. § 1603(a). The exception also requires that "the foreign country was designated a 'state sponsor of terrorism at the time of the act,'" *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(2)(A)(i)(I)), and that, at that time, "the 'claimant or the victim was' a 'national of the United States,'" *id.* (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)(I)), or was a member of the armed forces, 28 U.S.C. § 1605A(a)(2)(A)(ii)(II).[7]

Plaintiffs satisfy each of the applicable elements here. As stated above, Iran was designated a state sponsor of terrorism in 1984, twelve years before the 1996 Khobar Towers bombing. Plaintiffs have averred in sworn declarations that they were U.S. citizens at the time of the attack.[8] Finally, plaintiffs seek damages "for personal injury . . . that was caused by an . . .

---

[7]  Finally, the provision requires proof that, "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim," 28 U.S.C. § 1605A(a)(2)(A)(iii), but the attack took place in Saudi Arabia, not Iran, so this requirement does not apply.

[8]  Mustard Decl. ¶ 2; P. Wilder Decl. ¶ 3 (declaring U.S. citizenship of herself and William Wilder at the time of the bombing); K. Wilder Decl. ¶ 3; J. Wilder Decl. ¶ 3. As to plaintiff Susanne Ceragioli, who was not born in the United States, a person is a U.S. national and citizen if "born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years." 8 U.S.C. § 1401(g). Ceragioli was born in Germany to a German-citizen biological mother, but her biological father was a U.S. citizen serving in the U.S. military stationed in Germany, Ceragioli Decl. ¶¶ 2–4; Decl. of Monika Prier (Apr. 8, 2022) ¶¶ 2–7, ECF No. 18-4 (Ceragioli's biological mother describing her citizenship status and that of Ceragioli's biological father). Thus, Ceragioli is a national and citizen of the United States at birth and at the time of the attack, so she may recover under the FSIA private right of action. To be sure, despite Ceragioli's citizenship status at the time of the attack, she may also recover under the FSIA because, where "the claimant *or the victim*" was "a national of the United States" at the time of the attack, jurisdiction is proper. 28 U.S.C. § 1605A(a)(2)(A)(ii) (emphasis added); *see also La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya*, 533 F.3d 837, 844 (D.C. Cir. 2008) (interpreting the former version of the terrorism exception to mean that "if either the claimant or the victim is a national of the United States, then immunity is waived"). Relevant to Ceragioli, the victim of the bombing was her brother, Denny Prier, who is a U.S. citizen and was at the time of the attack, *see Aceto*, 2020 WL 619925, at *13 n.9, so therefore provides an alternative basis for jurisdiction over Ceragioli's claim.

extrajudicial killing" for which defendant provided "material support or resources."  28 U.S.C. §

1605A(a)(1); *see also Owens*, 864 F.3d at 778 ("[T]he plain meaning of § 1605A(a) grants . . .

jurisdiction over claims against designated state sponsors of terrorism that materially support

extrajudicial killings committed by nonstate actors").

More specifically, the truck bombing that plaintiffs allege caused their injuries was an

"extrajudicial killing" resulting in the deaths of nineteen American military personnel.  *See, e.g.*,

*Rimkus*, 750 F. Supp. 2d at 182 ("The actions of defendant[] constituted both an extrajudicial

killing and the provision of material support in satisfaction of the first element of liability.");

*Akins I*, 332 F. Supp. 3d at 33 (same); *Aceto*, 2020 WL 619925 at *13 (same).  The term

"extrajudicial killing" in the FSIA's terrorism exception has the "meaning given" in "the Torture

Victim Protection Act of 1991," *see* 28 U.S.C. § 1605A(h)(7), which defines the term as "a

deliberated killing not authorized by a previous judgment pronounced by a regularly constituted

court affording all the judicial guarantees which are recognized as indispensable by civilized

peoples," Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 note

§ 3(a)).

Furthermore, this Court takes judicial notice of the evidence presented in *Blais* and

*Heiser I*, which demonstrates that defendant provided "material support or resources" for this

extrajudicial killing.  As is clear from the evidence in those cases, described above, defendant

authorized, "organized and sponsored" the Khobar Towers attack.  *Heiser I*, 466 F. Supp. 2d at

262.  The evidence shows that defendant helped to recruit, train, fund, supply, and direct Saudi

Hezbollah.  This establishes that defendant's actions were "a 'substantial factor' in the sequence

of events that led to the plaintiff[s'] injur[ies]" and that the injuries were "'reasonably

foreseeable or anticipated as a natural consequence of' the defendant's conduct."  *Owens*, 864

16

F.3d at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)) (explaining that the jurisdictional standard for causation under the FSIA's terrorism exception is proximate cause).

Accordingly, under 28 U.S.C. § 1605A, defendant is not immune from this suit, and subject-matter jurisdiction may be properly exercised. *See* 28 U.S.C. § 1330(a).

**B. Personal Jurisdiction under the FSIA**

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of [the FSIA]." 28 U.S.C. § 1330(b). Here, service was ultimately made under § 1608(a)(4). Section 1608 first prescribes two methods by which service shall ordinarily be made, *see* 28 U.S.C. § 1608(a)(1)–(2), but these methods were "not available" to plaintiffs in this action, *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 61 (D.D.C. 2019); *see also Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 49 (D.D.C. 2019), as "defendant[] ha[s] neither made a special arrangement for service with the plaintiffs nor entered into any international convention governing service," *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017).

Plaintiffs initially attempted service under § 1608(a)(3), by sending one copy of the summons, complaint, and notice of suit, along with a translation of each into Iran's official language by certified or registered mail to Iran's Ministry of Foreign Affairs. *See* Aff. Requesting Foreign Mailing, ECF No. 8. That was unsuccessful because "the U.S. Post Office no longer delivers to Iran," Notice by the Clerk of the Court, ECF No. 9, so pursuant to § 1608(a)(4), plaintiffs transmitted the same documents "through diplomatic channels." Iran was

17

thus served on August 2, 2021. *See* Return of Service/Aff. of Summons and Complaint Executed

at 1–2, ECF No. 14.[9] This Court has personal jurisdiction over Iran.

### C. Defendant's Liability

In the Complaint, plaintiffs seek relief under FSIA § 1605A(c), which creates a "[p]rivate

right of action . . . for personal injury or death," and provides that, "[i]n any such action,

damages may include economic damages, solatium, pain and suffering, and punitive damages."

28 U.S.C. § 1605A(c); *see also* Compl. ¶¶ 42–50 (Count I). Yet Section 1605A(c) does not

guide courts on the substantive bases for liability that determine plaintiffs' entitlement to

damages. Consequently, courts "may rely on well-established statements of common law, found

in state reporters, the Restatement of Torts, and other respected treatises, in determining damages

under § 1605A(c)." *Fraenkel*, 892 F.3d at 353; *see Estate of Heiser v. Islamic Republic of Iran*

(*Heiser II*), 659 F. Supp. 2d 20, 24 (D.D.C. 2009) (applying "general principles of tort law," such

as the Restatement (Second) of Torts, to determine liability); *see also Roth v. Islamic Republic of*

*Iran*, 78 F. Supp. 3d 379, 399 (D.D.C. 2015) (citing *Oveissi II*, 879 F. Supp. 2d at 54); *Worley*,

75 F. Supp. 3d at 335.

Although not readily apparent from the Complaint, the facts sufficiently alleged therein

and supported in plaintiffs' declarations assert claims for battery and intentional infliction of

emotional distress ("IIED") by servicemember plaintiff Christopher Mustard, *see* Compl. ¶ 3,

and IIED for the immediate-family member plaintiffs Susanne Ceragioli, Pauline Wilder,

William Wilder, Kristene Wilder, and Jeffrey Wilder, *see id.* ¶¶ 8–11 (Susanne Ceragioli), 13–28

---

[9]      Specifically, on September 14, 2021, the U.S. Department of State certified in an Affidavit of Service that
it met the requirements for diplomatic service under § 1608(a)(4) by causing delivery of a Summons, Complaint,
and Notice of Suit to Iran on August 2, 2021. *See* Aff. of Service at 2.

(Pauline Wilder, William Wilder, Kristene Wilder, and Jeffrey Wilder).[10]  As such, defendant's

liability is discussed in detail below, starting with the servicemember plaintiff.[11]

### 1. *Servicemember Plaintiff Mustard*

Servicemember plaintiff Christopher Mustard brings his claim under the theories of

battery and intentional infliction of emotional distress.  As discussed in the damages section,

Mustard may recover under only one theory, *see, e.g.*, *EEOC v. Waffle House, Inc.*, 534 U.S.

279, 297 (2002) ("[I]t 'goes without saying that the courts can and should preclude double

recovery by an individual.'") (quoting *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 333

(1980)), but each theory of liability is nevertheless evaluated.

### a. *Battery*

Battery requires an act "intending to cause a harmful or offensive contact . . . or an

imminent apprehension of such a contact," and that such a contact in fact "directly or indirectly

results." RESTATEMENT (SECOND) OF TORTS § 13.  "Harmful contact" causes a "physical

impairment of the condition of another's body, or physical pain or illness."  *Id.* § 15; *see also*

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010) (defining these terms).

---

[10]     The Complaint also contains two claims asserted only by plaintiff Susanne Ceragioli for "Intentional Infliction of Emotional Distress under the Laws of Florida and the District of Columbia" and "Civil Remedy for Terrorism or Facilitating or Furthering Terrorism Under Florida Statute § 772.13."  Compl. ¶¶ 51–56 (Count II), 57–62 (Count III).  According to plaintiffs, these claims are only alleged in the alternative if the Court finds that Ceragioli is not a U.S. citizen or national.  *See* Pls.' Supp. Mem. at 8–9 ("If the Court finds that Ms. Ceragioli is, and has been at all relevant times, a U.S. national, and that she is otherwise entitled to relief under Count I, it need not reach the other issues raised . . . relate[d] to Counts II and III, which were included in the Complaint in an abundance of caution to provide alternative grounds for relief for plaintiff Susanne Ceragioli in the event that the Court finds that she was not a United States national entitled to bring her claim under the statutory cause of action of 28 U.S.C. § 1605A(c).").  As explained previously, *see supra* n.8 and accompanying text, Ceragioli is a U.S. national and citizen at birth and at the time of the attack, so she may recover under the FSIA private right of action. Hence, Counts II and III pled in the alternative for liability under D.C. and Florida laws regarding only Ceragioli need not be addressed.

[11]     Regarding plaintiffs' civil conspiracy claim, *see* Pls.' Supp. Mem. at 8 (citing Compl. ¶¶ 30–35, 45), any presumed claim for civil conspiracy need not be addressed separately in view of this Court's determination, discussed *supra* in Part III.A, that defendant provided material support to terrorists that carried out the Khobar Towers attack, which also establishes defendant's liability for the attack.

Iran acted with the intent to cause harmful contact with the residents of the Khobar Towers when it materially supported the truck bombing. *See, e.g., Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 102 (D.D.C. 2017) (defining material support for terrorist attacks as acts intending to cause harm). Mustard, who was in the Khobar Towers complex at the time of the bombing, avers that harmful physical contact resulted from the bomb, *see* Mustard Decl. ¶¶ 6–9, so defendant is liable to Mustard for battery.

### b. *Intentional Infliction of Emotional Distress*

"[O]ne who by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress to" a plaintiff is liable for intentional infliction of emotional distress. RESTATEMENT (SECOND) OF TORTS § 46(1); *see also Heiser II*, 659 F. Supp. 2d at 26. "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009); *see also Valore*, 700 F. Supp. 2d at 77 (same). Further, Mustard has demonstrated, through his sworn declaration and corroborating submissions, that he suffered severe emotional and psychological distress, both acute and chronic, resulting from the attack. *See* Mustard Decl. ¶¶ 10 (Mustard could not sleep for days after the attack), 12 (he was "distress[ed]" while not being able to call his mother after the attack to let her know he was alive), 14 (he suffered "memory loss, nightmares, and flashbacks" after returning to the United States from Saudi Arabia), 19–21 (expressing how he "live[s] with the trauma from the attack every day"). Defendant is thus liable to Mustard for IIED.

### 2. *Servicemember Victims' Family Members*

The remaining plaintiffs seek to collect damages as family members of servicemembers present in Saudi Arabia for the Khobar Towers bombing. All these plaintiffs are related to servicemembers who were injured at the bombing and awarded damages in *Aceto*.

The family members' theory of liability is IIED. Compl. ¶¶ 11 (describing Ceragioli's emotional distress), 15 (same as to Pauline Wilder), 18 (same as to William Wilder), 22–24 (same as to Kristene Wilder), 25 (same as to Jeffrey Wilder). The Restatement permits recovery for those who were not a direct target of a defendant's conduct if (1) "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present" and (2) the claimant is a member of a victim's immediate family, *Heiser II*, 659 F. Supp. 2d at 26–27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307 (2000)), or the functional equivalent of an immediate family member, *see Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003) (extending liability under the FISA for IIED to "members of the victim's household" who were also "viewed as the functional equivalents of immediate family members"); *see also* RESTATEMENT (SECOND) OF TORTS § 46, cmt. l (leaving "open the possibility of situations in which presence . . . may not be required").

Four of the plaintiffs are plainly immediate family members—parents and siblings—of victims. *See Heiser II*, 659 F. Supp. 2d at 28 (observing that the "strict meaning" of immediate family is "one's spouse, parents, siblings, and children").

One plaintiff's relationship is only slightly more complicated, but the outcome is the same. Susanne Ceragioli is Denny Prier's legal full sibling and biological half-sibling. The two share a biological mother and when Ceragioli was two years old, Prier's biological father legally adopted her following his marriage to Ceragioli's biological mother. Ceragioli Decl. ¶ 4. Viewing Ceragioli as Prier's full sibling, she is plainly his immediate family. *See Heiser II*, 659

21

F. Supp. 2d at 28.  Viewing Ceragioli as Prier's half-sibling, courts have held that half-siblings "are presumed to recover" as full siblings would, *Valore*, 700 F. Supp. 2d at 79 (quoting *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007)), and the evidence here supports application of that presumption:  Ceragioli attests to her close relationship with her brother, Denny Prier.  Prier and Ceragioli grew up together, with Prier "always look[ing] up to" Ceragioli who is four years Prier's senior.  Ceragioli Decl. ¶ 8.  She would serve as Prier's caretaker when their parents left the house, yet Prier was often Ceragioli's protector from bullies who teased her dark complexion, which resembled that of her Puerto Rican biological father.  *Id.* ¶ 9.  When Prier left home to join the military at age eighteen, he and Ceragioli "always kept in touch" and Ceragioli would visit her brother wherever he was stationed.  *Id.* ¶ 15.  Ceragioli is indeed a member of Prier's immediate family.

Iran is liable for IIED to these five immediate-family member plaintiffs.  In this case, defendant's conduct in materially supporting Saudi Hezbollah was "sufficiently outrageous and intended to inflict severe emotional harm upon a person wh[o] is not present," such that a victim's immediate family members need not have been at the bombing to recover for their emotional distress.  *Heiser II*, 659 F. Supp. 2d at 27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307, at 834); *see Schooley*, 2019 WL 2717888, at *73 (concluding the same); *Akins*, 332 F. Supp. 3d at 38 (same).  Finally, the five immediate-family member plaintiffs have shown, through their uncontested declarations, that they suffered significant emotional consequences from the bombing, in the days spent waiting for news of their loved ones and in the years after the attack.[12]  They have established defendant's liability under the federal private right of action

---

[12] Ceragioli Decl. ¶¶ 17–22, 27–31; P. Wilder Decl. ¶¶ 12–14, 17; K. Wilder Decl. ¶¶ 7, 10, 20; J. Wilder Decl. ¶¶ 8–10, 17.

against state sponsors of terrorism, 28 U.S.C. § 1605A(c), for the tort of intentional infliction of emotional distress.

### D. Damages

Turning to the allowable damages, plaintiffs seek "[c]ompensatory damages;" "[p]unitive damages;" "[r]easonable costs and expenses;" "[r]easonable attorneys' fees;" and "[s]uch other and further relief as the Court may determine to be just and equitable in the circumstances." Compl. at 13–14 (Prayer for Relief).  Specifically, servicemember plaintiff Mustard requests pain and suffering and immediate-family member plaintiffs request solatium damages.  *See id.* ¶ 41.  Thus, the damage award to which each plaintiff is entitled is described below.

#### 1.  *Legal Standard for Damages Under Section 1605A(c)*

In actions brought under the FSIA's terrorism exception, foreign states may be liable for money damages, including "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).  To recover, plaintiffs "must prove that the consequences of the foreign state's conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate."  *Roth*, 78 F. Supp. 3d at 402 (internal quotation marks omitted); *see also Fraenkel*, 892 F.3d at 353 (stating the same).  Courts may look to expert testimony and prior awards in determining whether the amount of damages has been proven by a reasonable estimate.  *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012) (relying on the report of a forensic economist to determine damages amount); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008) (relying on "prior decisions awarding damages for pain and suffering" and solatium).  The D.C. Circuit "review[s] the District Court's FSIA damages awards for abuse of discretion."  *Fraenkel*, 892 F.3d at 356.

23

The evidence presented in *Blais* and *Heiser I*, of which this Court has taken judicial notice and reviewed above, has satisfactorily shown that plaintiffs' injuries were reasonably certain and were the intended consequences of defendant's material support of Saudi Hezbollah. *See Schooley*, 2019 WL 2717888, at *74 (concluding the same); *Akins I*, 332 F. Supp. 3d at 39 (same). Having concluded this, whether plaintiffs have shown the amount of pain and suffering, solatium, and punitive damages by a reasonable estimate will be considered next.[13]

### 2. *Pain and Suffering*

As discussed, defendant is liable to servicemember plaintiff Mustard for battery and intentional infliction of emotional distress, but the bar on multiple recoveries allows Mustard to recover only under one theory, for the single underlying harm. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 77 ("The Court notes that these plaintiffs who have claimed assault, battery, and IIED may recover under only one of any such theories, as multiple recovery is prohibited."). Within this single-recovery framework, the "baseline assumption" applied in previous cases under the FSIA's terrorism exception is that "'persons suffering injuries in terrorist attacks are entitled to $5 million in damages.'" *Kaplan*, 213 F. Supp. 3d at 35 (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)). The baseline may be adjusted either upward or downward. An upward departure would be warranted "in the presence of 'severe instances of

---

[13] The FSIA's private right of action permits plaintiffs to seek "economic damages." 28 U.S.C. § 1605A(c). Plaintiffs broadly request "[c]ompensatory damages as against [d]efendant in amounts to be determined by the Count," Compl. at 13 (Prayer for Relief), without any documentation of medical bills or payments or any evidence of lost wages or other economic injury. They have thus failed to allege, let alone prove, the amount of economic or medical expenses damages by a reasonable estimate, and so cannot recover for economic damages. *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71 (D.D.C. 2015) (concluding the same where plaintiff had estimated his economic loss without documentation); *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 41 (D.D.C. 2016) (denying economic damages where plaintiffs did not provide documents "lending credence" to their claims of lost income); *Akins I*, 332 F. Supp. 3d at 39–40 (denying economic losses for failure to support claims with sufficient evidence). "Unlike damages for pain and suffering, lost earnings" and any incurred medical expenses "are not hard to quantify, and the Court will not excuse plaintiffs' failure to support the claim for lost earnings" and medical expenses "with competent evidence." *Moradi*, 77 F. Supp. 3d at 71.

24

physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic . . . or were mistaken for dead.'" *Id.* at 35–36 (quoting *Valore*, 700 F. Supp. 2d at 84). A downward departure would be warranted "in the face of 'minor shrapnel injuries or minor injury from small-arms fire.'" *Id.* at 36 (quoting *Valore*, 700 F. Supp. 2d at 84).

Pain and suffering damages are by their nature difficult to quantify. In *Schooley*, this Court relied in part on an "objective metric"—the VA disability rating—to "determin[e] the relative degree of injury suffered by each service member plaintiff." *Schooley*, 2019 WL 2717888, at *74. That rating is the "agency's official determination regarding the extent of disabling injury sustained by service members in connection with military service." *Id.* (internal quotation marks omitted). As *Schooley* explained, "[t]he VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides" an effective way of comparing injuries to ensure that similar injuries yield similar awards. *Id.*; *cf. Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29, 33 (D.D.C. 2014) ("When calculating damages amounts, 'the Court must take pains to ensure that individuals with similar injuries receive similar awards.'") (quoting *Peterson*, 515 F. Supp. 2d at 54). *Schooley*'s basic rubric is adopted in this case, which includes that plaintiffs rated by the VA up to 30% disabled receive a baseline award of $5,000,000; plaintiffs rated 40–60% disabled by the VA will receive an upward departure, for a total award of $6,000,000; and service-member plaintiffs rated 70–100% disabled by the VA will receive a further upward departure, for a total of $7,000,000. *Schooley*, 2019 WL 2717888, at *75.

Servicemember plaintiff Mustard has a VA disability rating of 100%, *see* Mustard Decl., Att. 4 (VA Benefits Letter, dated Apr. 6, 2022), but as he has conceded, it is unclear from the documentation he submitted whether the injuries identified by the VA were caused by the Khobar Towers attack or whether they were the result of some other service-related injury, *see* Pls.' Mem. at 14 ("[Mustard] has a combined disability rating of 100%. The documentation provided does not indicate what percentage of his disability is attributable to his injuries in the Khobar Towers Attack."). Specifically, of Mustard's 100% disability rating, he only accounts for 90% of that rating with the following injuries: 10% attributable to left thumb tenosynovitis, 20% attributable to right upper extremity radiculopathy, 10% attributable to left knee strain with iliotibial band syndrome, 10% attributable to tinnitus, 20% attributable to right shoulder strain, and 20% attributable to left shoulder strain. *Id.*, Att. 5 at 2 (screenshot of a page from Mustard's VA benefits account showing his disabilities and the percentage disability attributable to each). Next to each disability, the VA screenshot indicates "Service Connected" without any mention of a specific date or incident that caused the condition, which may have occurred anytime over his 24 years of military service. Nothing in Mustard's declaration nor in the Complaint fills this gap. Therefore, because Mustard has not averred nor shown that his lasting injuries are the result of the Khobar Towers attack, he is entitled to recover at the baseline level and will receive a total award of $5,000,000.

### 3. *Solatium*

The remaining plaintiffs seek solatium damages to compensate for the emotional distress they experienced as family members of servicemember victims. *See* Compl. ¶¶ 5 ("Susanne Ceragioli has suffered severe mental anguish and extreme emotional pain and suffering."), 12–28 (describing the emotional distress of the Wilder family). "Solatium is traditionally a

26

compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society," *Fraenkel*, 892 F.3d at 356 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998)), but solatium damages have also been awarded to compensate for the emotional distress of the family members of surviving victims, *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 39 (D.D.C. 2012) (explaining that "in the context of distress resulting from injury to loved ones—rather than death—courts have applied a framework where awards are valued at half of the awards to family members of the deceased." (internal quotation marks omitted)); *see also Valore*, 700 F. Supp. 2d at 85 ("Relatives of surviving servicemen received awards valued at half of the awards to family members of the deceased."). "Under the FSIA, a claim for solatium is nearly indistinguishable from a claim for IIED." *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015); *see also Fraenkel*, 892 F.3d at 357. Damages recoverable on immediate-family member plaintiffs' claims of IIED thus will be discussed as a claim for solatium damages.

"Mental anguish, bereavement and grief resulting from" an immediate family member's death or injury "constitutes the preponderant element of a claim for solatium." *Fraenkel*, 892 F.3d at 356–57 (alteration adopted) (quoting *Flatow*, 999 F. Supp. at 30). In determining the appropriate amount to compensate victims' family members for emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium." *Acosta*, 574 F. Supp. 2d at 29.

Commonly accepted in this Court is *Heiser I*'s standardized framework for solatium damages. *Heiser I*, 466 F. Supp. 2d at 269; *see Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror" (citing *Valore*, 700 F. Supp. 2d at 85)). Although the *Heiser* framework is not mandatory, *see Fraenkel*, 892 F.3d at 361 ("There is no

27

statutory basis for concluding that district courts must award solatium damages in the amounts that *Heiser* found commonly granted."), it is adopted here for consistency, *see also Akins I*, 332 F. Supp. 3d at 42–43 (adopting the *Heiser* framework for awarding solatium damages); *Schooley*, 2019 WL 2717888, at *77 (same).

The *Heiser* framework, as a baseline, awards spouses of deceased victims $8,000,0000, parents and children of deceased victims $5,000,000, and siblings of deceased victims $2,500,000. *Valencia*, 774 F. Supp. 2d at 15. "[F]amilies of victims who have died are typically awarded greater damages than families of victims who remain alive," *Heiser I*, 466 F. Supp. 2d at 269 (quoting *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 75 (D.D.C. 2006)), and so the courts have awarded family members of surviving victims approximately half the baseline awards for family members of the deceased, *see Wultz*, 864 F. Supp. 2d at 39; *Valore*, 700 F. Supp. 2d at 85. Here, then, the applicable baseline solatium awards are $4,000,000 to spouses of surviving victims and $2,500,000 to parents of surviving victims, *see Wultz*, 864 F. Supp. 2d at 39; "[c]hildren of a surviving victim receive $1.5 million on average," *Spencer*, 71 F. Supp. 3d at 28, and siblings of surviving victims receive $1,250,000, *see Valore*, 700 F. Supp. 2d at 85.

These numbers serve only as an anchor from which the Court should deviate to compensate for specific circumstances. *See Fraenkel*, 892 F.3d at 362 ("While past solatium awards from comparable cases are appropriate sources of guidance for district courts, different plaintiffs (even under [the] FSIA) will prove different facts that may well (and should) result in different damage awards." (internal quotation marks omitted)). "Decisions to deviate from the starting points provided by [the] *Heiser* framework are committed to the discretion of the particular court in each case." *Oveissi v. Islamic Republic of Iran* (*Oveissi I*), 879 F. Supp. 2d 16, 26 (D.D.C. 2011); *see also Fraenkel*, 892 F.3d at 351 ("District Court judges have

28

discretion . . . to grant solatium awards based on the particular facts of each case, subject to abuse-of-discretion review for errors of law, clearly erroneous factual findings, and faulty reasoning.").

The solatium damages awards for plaintiff-parents are addressed first, followed by siblings.

### a.   *Parents*

Two of the immediate-family member plaintiffs will receive awards as parents of servicemembers who were stationed at the Khobar Towers at the time of the bombing: Pauline Wilder and William Wilder.  This mother and father have attested to their panic upon learning about the attack and to the continued distress of witnessing their child deal with the psychological after-effects of the attack.[14]  These harms are consistent with those suffered by many parents of victims of terrorism.  *See, e.g.*, *Valencia*, 774 F. Supp. 2d at 16.

The parents of injured servicemembers are each entitled to receive a baseline award of $2,500,000.  *See, e.g.*, *Akins*, 332 F. Supp. 3d at 44 (awarding $2,500,000 to the parents of injured service members).  Here, Pauline Wilder and William Wilder will receive an award of $2,500,000 each.

### b.   *Siblings*

The remaining three immediate-family member plaintiffs are siblings of servicemember victims: Susanne Ceragioli, Kristene Wilder, and Jeffrey Wilder.  Each has described distress upon learning about the bombing and has suffered from the ongoing effects of the attack on their respective siblings and families.[15]  These harms are consistent with those suffered by many

---

[14]     P. Wilder Decl. ¶¶ 11–18, 20–22.

[15]     Ceragioli Decl. ¶¶ 17–22, 27–31; K. Wilder Decl. ¶¶ 7, 10, 20; J. Wilder Decl. ¶¶ 8–10, 17.

siblings of victims of terrorism.  *See, e.g.*, *Akins*, 332 F. Supp. 3d at 45.  These plaintiffs'

service-member siblings—Denny Prier and Jennifer Scheidel— were awarded $6,000,000 and

$3,000,000, respectively, *see Aceto*, 2020 WL 619925, at *23, so no downward departure for

proportionality is required.  Within the *Heiser* framework, these siblings of injured

servicemembers are each entitled to an award of $1,250,000.  *See Akins*, 332 F. Supp. 3d at 45

(awarding a baseline amount of $1,250,000 to siblings of injured servicemembers).

### E.  Punitive Damages

In addition to compensatory damages, plaintiffs seek punitive damages under 28 U.S.C. §

1605A(c).  *See* Compl. ¶¶ 49–50, 56; *id.* at 2, 13 (Prayer for Relief).  The Supreme Court has laid

out three "guideposts" for "reviewing punitive damages" awards: "(1) the degree of

reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential

harm suffered by the plaintiff and the punitive damages award; and (3) the difference between

the punitive damages awarded by the jury and the civil penalties authorized or imposed in

comparable cases."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)

(citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).  In addition, in *Philip Morris*

*USA v. Williams*, the Supreme Court announced that "the Constitution's Due Process Clause

forbids . . . use [of] a punitive damages award to punish a defendant for injury that it inflicts

upon nonparties or those whom they directly represent, *i.e.*, injury that it inflicts upon those who

are, essentially, strangers to the litigation."  549 U.S. 346, 353 (2007).

Weighing this precedent, *Christie* awarded "[p]unitive damages equal to compensatory

damages" in light of the "identified flaws in the [other] methods" for determining punitive

damages.  2020 WL 3606273, at *27.  Specifically, *Christie* determined that this method avoided

"a singular focus on deterrence," as well as "elevat[ing] superficial similarities over meaningful

ones" and "skim[ing] over analysis of plaintiffs' precise harms," and does not "yield an excessive award." *Id.* at *28. Awarding punitive damages equal to compensatory damages, *Christie* concluded, was most appropriate because "plaintiffs [were] already receiving substantial compensatory awards," and "'the compensatory damages for the injury suffered' . . . [were] 'based on a component which' would be 'duplicated in the punitive award,'" *id.* (quoting *State Farm*, 538 U.S. at 426), and "[a]dding hundreds of millions of dollars to [the] amount [of outstanding court judgments already owed by Iran] . . . [was] not likely to have a meaningful deterrent effect," *id.* at *29.

Given that *Christie* reached this conclusion based on the same event at issue in the present case, the *Christie* punitive damages approach analysis, which was likewise applied in *Blank*, 2021 WL 3021450, at *10, will also be applied here. Plaintiffs urge no alternative approach. *See* Pls.' Mem. at 21 (citing *Christie*). Accordingly, a punitive damages award equal to compensatory damages is most appropriate. Plaintiffs are entitled to a total punitive damages award of $13,750,000 to be apportioned among plaintiffs according to their compensatory damages. *See, e.g.*, *Onsongo v. Republic of Sudan*, 60 F. Supp. 3d 144, 153 (D.D.C. 2014), *aff'd*, *Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020) (as to punitive damages holding); *see also Valore*, 700 F. Supp. 2d at 90 (apportioning in the same fashion).

### F. Attorneys' Fees, Costs, and Expenses

Plaintiffs also seek "[r]easonable costs and expenses" and "[r]easonable attorneys' fees," Compl. at 13–14 (Prayer for Relief), but because plaintiffs have not provided any information regarding the fees and costs sought, the request is denied without prejudice. Plaintiffs may file post-judgment motions for attorneys' fees in accordance with Federal Rule of Civil Procedure 54(d)(2)(B) and for costs in accordance with Federal Rule of Civil Procedure 54(d)(1).

31

## G. Prejudgment Interest

Finally, plaintiffs request prejudgment interest "from the date of the terrorist attack -- to the date of the judgment rendered." *See* Pls.' Mem. at 22. "Whether to award such interest is a question that rests within this Court's discretion, subject to equitable considerations." *Oveissi II*, 879 F. Supp. 2d at 58. At the same time, the majority of Judges confronted with this issue have concluded—as this Court did in *Akins II*—that "pain and suffering and solatium damages are both designed to be fully compensatory" and prejudgment interest is therefore unwarranted. 549 F. Supp. 3d at 121–22; *see Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 60 (D.D.C. 2020) (Contreras, J.) (quoting *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012)); *see Doe A-1 v. Democratic People's Republic of Korea*, No. 18-cv-252 (DLF), 2021 WL 723257, at *9 (D.D.C. Feb. 24, 2021) (Friedrich, J.) (denying prejudgment interest because the award "in *today's dollars* fully compensates the crew members and their estates for their time spent in captivity") (emphasis in original); *Bathiard v. Islamic Republic of Iran*, Case No. 16-cv-1549 (CRC), 2020 WL 1975672, at *8 (D.D.C. Apr. 24, 2020) (Cooper, J.) (holding "prejudgment interest is not appropriate for nonpecuniary damages already designed to provide complete compensation"); *Cohen v. Islamic Republic of Iran*, No. 17-cv-1214 (JEB), 2019 WL 3037868, at *10 (D.D.C. Jul. 11, 2019) (Boasberg, J.) (denying prejudgment interest because "direct-injury and solatium awards [are] to be fully compensatory" already); *Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 75, 79, 88–99 (D.D.C. 2019) (Spec. Master Report), *adopted by Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 75 (D.D.C. 2019) (Kollar-Kotelly, J.); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 54–55 (D.D.C. 2016) (Howell, J.). Thus, the overarching tide of persuasive precedent in this District plainly weighs against awarding prejudgment interest, and is even less warranted considering punitive damages are

32

permissible in § 1605A cases, as prejudgment interest "does not apply to punitive damages because 'prejudgment interest is an element of complete compensation' and punitive damages are non-compensatory." *Thuneibat*, 167 F. Supp. 3d at 55 (quoting *Wultz*, 864 F. Supp. 2d at 42).

Consistent with this persuasive precedent, this Court concludes plaintiffs are not entitled to prejudgment interest on their compensatory or punitive damages. When denying prejudgment interest on compensatory damages in *Oveissi I*, Judge Lamberth explained that "[i]n adopting the *Heiser* framework, this Court determined that the values set by that scale represent the appropriate level of compensation, regardless of the timing of the attack." *Oveissi I*, 768 F. Supp. 2d at 30 n.12; *see also Maupin*, 405 F. Supp. 3d at 94; *Thuneibat*, 167 F. Supp. 3d at 54. Indeed, nonpecuniary damages for pain and suffering and solatium "do not typically require prejudgment interest because they are 'designed to be fully compensatory.'" *Id.* (quoting *Wyatt*, 908 F. Supp. 2d at 232). As in *Oveissi I*, where "the Court s[aw] no reason to deviate from its standard practice" of relying on "the values set by the [*Heiser*] scale[, which] represent the appropriate level of compensation" and award prejudgment interest, *Oveissi I*, 768 F. Supp. 2d at 30 n.12, the instant plaintiffs have not "provided any reason why awards under [the *Heiser*] framework are insufficient to provide 'complete compensation,'" *Akins II*, 549 F. Supp. 3d at 109 (quoting *West Virginia v. United States*, 479 U.S. 305, 310 (1987)).

Plaintiffs are likewise not entitled to prejudgment interest on their punitive damages. "[P]rejudgment interest does not apply to punitive damages because 'prejudgment interest is an element of complete compensation' and punitive damages are non-compensatory." *Thuneibat*, 167 F. Supp. 3d at 55 (quoting *Wultz*, 864 F. Supp. 2d at 42).

33

Accordingly, plaintiffs are awarded monetary damages in the amounts established above without prejudgment interest.

## IV. CONCLUSION

For the foregoing reasons, plaintiffs' motion is granted. Defendant Iran is liable, and plaintiffs are awarded damages in the following amounts:

1.  Servicemember plaintiff Christopher A. Mustard is entitled to $5,000,000 in pain and suffering damages, and $5,000,000 in punitive damages;

2.  Plaintiff parents, Pauline Wilder and William Wilder, are entitled to $2,500,000 each in pain and suffering damages, and $2,500,000 each in punitive damages; and

3.  Plaintiff siblings, Susanne Ceragioli, Kristene Wilder, and Jeffrey Wilder, are entitled to $1,250,000 each in pain and suffering damages, and $1,250,000 each in punitive damages.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

DATE: February 6, 2023

_____
BERYL A. HOWELL
Chief Judge