**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

  Plaintiffs,

v.

APPROXIMATELY 127,271 BITCOIN
(BTC) PREVIOUSLY STORED AT THE
VIRTUAL CURRENCY ADDRESSES
LISTED IN ATTACHMENT A, AND ALL
PROCEEDS TRACEABLE THERETO,

    Defendants *In Rem*.

Civil Action No. 1:25-cv-05745 (RPK)

## NOTICE OF VERIFIED CLAIM AND STATEMENT OF INTEREST OR RIGHT IN PROPERTY SUBJECT TO FORFEITURE IN REM

The Encinas Claimants were servicemen killed or injured in the 1983 bombing of the United States Marine barracks in Beirut, Lebanon (the "Beirut Bombings"), their estates, and family members. The Encinas Claimants have been awarded a total judgment of $56,709,454.06 in compensatory damages and $195,080,521.97 in punitive damages under 28 U.S.C. §1605A against the Islamic Republic of Iran ("Iran") for its role in sponsoring the Beirut Bombings. The judgment was served on Iran through mail and is in the process of being served through diplomatic means pursuant to 28 U.S.C. § 1608(a)(4).

The Encinas Claimants just recently learned about this forfeiture action and the allegations and evidence set forth in the complaint at Dkt. No. 1 in *Fritz v. Iran and China Investment Development Group d/b/a Lubian.com,* No. 1:25-cv-07093 (E.D.N.Y.) (the "Fritz Action"). Specifically, the Encinas Claimants learned that the Defendant Cryptocurrency at issue in this forfeiture action is property of the Iran and China Investment Development Group ("Iran-

China Group"). *Fritz*, Dkt. No. 1 at 53. The Encinas Claimants promptly sought leave to file this Notice upon learning of this information and this proceeding.

As alleged by the Fritz plaintiffs at Dkt. No. 1, the Iran-China Group, doing business on the blockchain as Lubian.com or LuBian, is an agency or instrumentality of Iran that has materially supported Iran's efforts to evade U.S. sanctions by mining cryptocurrency in Iran. Through this scheme, sanctioned Iranian oil and gas are converted into electricity, which miners then use to generate cryptocurrency for the Iranian government to use outside the traditional global banking systems.

Based on the information newly revealed by the allegations in the *Fritz* Action, under the Terrorism Risk Insurance Act ("TRIA"), Pub. L. 107-297, 116 Stat. 2322 (Nov. 26, 2002), codified at 28 U.S.C. § 1610 Note, 28 U.S.C. § 1610, and New York law, the Encinas Claimants have the right to attach and execute on the property of Iran and its agencies and instrumentalities, including the Iran-China Group, "[n]otwithstanding any other provision of law." Accordingly, the Encinas Claimants hereby assert their superior interest in so much of the Approximately 127,271 bitcoin ("BTC") previously stored at the virtual currency addresses listed in Attachment A, and all proceeds traceable thereto ("Defendant Cryptocurrency") as may ultimately be necessary to satisfy the Encinas Claimants' outstanding compensatory damages judgments against Iran, plus post-judgment interest thereon. TRIA makes the Encinas Claimants' interest in the Defendant Cryptocurrency senior to any interest of the U.S. government. In support of this Notice, the Encinas Claimants state as follows:

I.     **The Encinas Claimants Have Been Awarded A Total Judgment Of $56,709,454.06 In Compensatory Damages And $195,080,521.97 In Punitive Damages Against Iran.**

1.      The Encinas Claimants were servicemen killed or injured in the 1983 Beirut Bombings and their family members.

2.      In 2024, the United States District Court for the District of Columbia determined that Iran was liable under 28 U.S.C. § 1605A for causing the Encinas Claimants' damages and entered judgment awarding them compensatory damages and punitive damages.

3.      The damages awarded to Encinas Claimants total $56,709,454.06 in compensatory damages and $195,080,521.97 in punitive damages. *See* Judgments, *Encinas et al. v. Islamic Republic of Iran et al.*, No. 1:18-cv-02568, Dkt. Nos. 46, 60.

4.      To date, Iran has not paid any portion of any of the Encinas Claimants' judgment. This judgment continues to accrue post-judgment interest pursuant to 28 U.S.C. § 1961.

## II.     The Encinas Claimants Only Recently Learned Of The Relationship Between The Defendant Cryptocurrency And The Government Of Iran.

9.      Based on information the Encinas Claimants only recently learned, it appears that the Defendant Cryptocurrency is directly tied to the Iranian government, which was not clear from the forfeiture pleadings filed by the U.S. government.

10.     On December 26, 2025, other victims of Iran's state-sponsored terrorism filed a separate action alleging that LuBian was the cryptocurrency mining pool for the Iran-China Group, an Iranian joint-stock company that partnered with the Iranian government to build a large Bitcoin mine in Rafsanjan, Iran to assist Iran's continuing efforts to evade U.S. sanctions. *See Fritz v. Iran and China Investment Development Group d/b/a Lubian.com*, Case No. 1:25-cv-07093 (E.D.N.Y.), Complaint for Execution and Turnover, Dkt. No. 1.

11.     Plaintiffs in the *Fritz* Action, along with another group of victims of Iran's state sponsored terrorism (the "Baxter Victims"), filed Notices of Verified Claims in this action on

December 29, 2025. *See* Dkt. Nos. 29 and 30. Additional Notices of Verified Claims have since been filed in this action. *See, e.g.*, Dkt. Nos. 39, 52, 69, 70, 86, 88, 107, 112, 118, 125, 152, 163.

12.     Based on the information revealed in the allegations in the *Fritz* Action and summarized by the Notices of Verified Claims filed by the other terrorism victim claimants in this action, the Encinas Claimants now submit this Notice of Verified Claim.

### III.    Under TRIA, Encinas Claimants Have A Senior Interest In The Defendant Cryptocurrency.

13.     In the context of a forfeiture action, at this stage of the proceedings, the Encinas Claimants need only assert that they have a "facially colorable interest" in the property at issue. *United States v. Ross*, 161 F.4th 100, 109 (2d Cir. 2025) (citation omitted). "[W]hether [they] ultimately prove[ ] the existence of that interest is a question for a later stage in the proceedings." *Id.* at 110 (citation omitted). Here, based on the information alleged in the *Fritz* Action and summarized by the Notices of Verified Claims filed by the other terrorism victim claimants in this action, the Encinas Claimants have far more than a "facially colorable interest" in the Defendant Cryptocurrency.

14.     The Encinas Claimants are judgment creditors of Iran as a result of Iran's acts of state-sponsored terrorism. As has now been alleged, because the Iran-China Group was or is an agent or instrumentality of Iran, TRIA entitles the Encinas Claimants to execute on the Defendant Cryptocurrency to satisfy those judgments "[n]otwithstanding any other provision of law." TRIA § 201(a). Accordingly, the Encinas Claimants have a possessory interest in the Defendant Cryptocurrency, which permits them to bring the claims asserted here.

15.     Specifically, TRIA provides that "[n]otwithstanding any other provision of law," those who hold judgments against a "terrorist party" may execute on the "blocked assets" of that terrorist party or its "agency or instrumentality" "to satisfy such judgment to the extent of any

4

compensatory damages." Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337 (2002), codified at 28 U.S.C. § 1610 Note. TRIA's cornerstone is the statute's broad "notwithstanding" clause, which aims to "enable" victims "to execute on" terrorists' assets by preventing other provisions of law from "bar[ring] victims' efforts to enforce [their] judgments." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 391-92 (2009) (Kennedy, J., concurring). The notwithstanding clause "mak[es] plain that the force of the [statute] extends everywhere" and "supersede[s] all other laws." *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 49 (2d Cir. 2010) (citation omitted). Accordingly, because it expressly overrides conflicting laws, TRIA's notwithstanding clause necessarily overrides "the civil-forfeiture statute." *Estate of Levin v. Wells Fargo Bank, N.A.*, 156 F.4th 632, 643 n.1 (D.C. Cir. 2025).

16.     Because the Encinas Claimants satisfy the requirements of TRIA, their interest in the Defendant Cryptocurrency necessarily is superior to the claims of the U.S. government, as well as all other non-TRIA claimants, in this forfeiture action. To start, as explained above, the Encinas Claimants hold a judgment for compensatory damages against Iran based on an act of terrorism under 28 U.S.C. § 1605A. Next, Iran is a "terrorist party" because it has been designated as a state sponsor of terrorism under the Export Administration Act of 1979. *See* TRIA § 201(d)(4); Executive Order No. 13599, 77 Fed. Reg. 6659 (Feb. 5, 2012). Additionally, as alleged in the *Fritz* Action, the Iran-China Group operated as Iran's agency or instrumentality by materially helping Iran avoiding U.S. sanctions, while providing the material function to Iran of laundering its energy resources through cryptocurrency mining, at Iran's direction and behest. *See Fritz* Action, Dkt. No. 70, Plaintiffs' Memorandum of Law in Support of Motion for Attachment, at 13–17 (Dec. 28, 2025); *see also Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107,

5

135 (2d Cir. 2016). Finally, under TRIA, "[b]locked assets" include "any asset seized or frozen by the United States" pursuant to the International Emergency Economic Powers Act. TRIA § 201(d)(2)(A).

17.     The U.S. government has used its authority under that statute to "block" all Iranian property in the United States, including the property of agencies or instrumentalities of Iran. 31 C.F.R. §§ 560.211, 594.201(a)(5); *Kirschenbaum*, 830 F.3d at 120. As a result, if the Iran-China Group is an agency or instrumentality of Iran, all property of the Iran-China Group qualifies as a blocked asset under TRIA. *See Levinson v. Kuwait Finance House (Malaysia) Berhad*, 44 F.4th 91, 98 n.6 (2d Cir. 2022). Because the Defendant Cryptocurrency is property of the Iran-China Group, it is therefore blocked and subject to execution by the Encinas Claimants under TRIA.

18.     Pursuant to 18 U.S.C. § 983(a) and Rule G, the Encinas Claimants hereby assert a protective, prophylactic claim against such amount of the Defendant Cryptocurrency—as the property of an agency or instrumentality of Iran—as may ultimately be necessary to satisfy the outstanding compensatory damages owed to them under their judgment against Iran, plus post-judgment interest, based on the date the Defendant Cryptocurrency is valued for purposes of judgment. The Encinas Claimants' claim is senior to the U.S. government's claim. Notwithstanding the U.S. government's forfeiture efforts, the Encinas Claimants reserve all rights and remedies available in law and equity to enforce their interest in the Defendant Cryptocurrency.

19.     This claim is verified under penalty of perjury by the attached (or separately filed) §1746 declaration, executed by an authorized signatory on behalf of the Encinas Claimants.

Dated: March 26, 2026

/s/ Robert A. Braun_____
Robert A. Braun (Bar Code 5384748)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW ● Eighth Floor
Washington, DC 20005
(202) 408-4600
RBraun@cohenmilstein.com

*Attorney for Encinas Claimants*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

  Plaintiffs,

v.

APPROXIMATELY 127,271 BITCOIN
(BTC) PREVIOUSLY STORED AT THE
VIRTUAL CURRENCY ADDRESSES
LISTED IN ATTACHMENT A, AND ALL
PROCEEDS TRACEABLE THERETO,

    Defendants *In Rem*.

Civil Action No. 1:25-cv-05745 (RPK)

## VERIFICATION OF ENCINAS CLAIMANTS' CLAIMS

Robert A. Braun, an attorney duly licensed to practice law in New York, declares under penalties of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.    I am a partner in the law firm Cohen Milstein Sellers & Toll PLLC, 1100 New York Ave NW #800, Washington, DC 20005.

2.    The statements regarding the D.D.C. judgments/service and related matters are within my personal knowledge and/or based on review of the official dockets. Statements regarding ownership/instrumentality of the Defendant are based on allegations and filings in *Fritz v. Iran & China Investment Development Group*, No. 1:25-cv-07093 (E.D.N.Y.) ("*Fritz* Action").

3.    Cohen Milstein represents the Encinas Claimants in this action.

4.    The Encinas Claimants have been awarded $56,709,454.06 in compensatory damages and $195,080,521.97 in punitive damages under 28 U.S.C. § 1605A against the Islamic Republic of Iran ("Iran") for its role in the 1983 bombing of the United States Marine barracks in

Beirut, Lebanon (the "Beirut Bombings"). *See* Judgments, *Encinas et al. v. Islamic Republic of Iran*, No. 1:16-cv-02429, Dkt. No. 38, 52, attached hereto as Exhibit 1.

5.     The judgment was served on Iran through mail and is in the process of being served through diplomatic means pursuant to 28 U.S.C. § 1608(a)(4), attached hereto as Exhibit 2.

6.     As detailed in a related action pending in this Court—the *Fritz* Action—the 127,271 Bitcoin that constitute the Defendant Cryptocurrency in the instant action belong to Iran and China Investment Development Group ("Iran-China Group"), doing business as Lubian.com or LuBian. *See Fritz* Action, Dkt. No. 1. The Iran-China Group is an agency or instrumentality of Iran. *Id.* ¶ 20. Accordingly, its assets are blocked by operation of U.S. law. *See* Executive Order No. 13599, 77 Fed. Reg. 6659, 6659 (Feb. 5, 2012).

7.     To preserve the Encinas Claimants' ability to pursue execution and turnover of the 127,271 Bitcoin—which constitute the Defendant Cryptocurrency in this action—on behalf of the Encinas Claimants pursuant to N.Y. CPLR 3020(d), I hereby notice and verify the claims of the Encinas Claimants against the Defendant Cryptocurrency. Because the Terrorism Risk Insurance Act ("TRIA") allows victims of terrorism with judgments against state sponsors of terrorism to pursue execution and turnover against blocked assets of those terrorist states or their agents or instrumentalities—including such assets that have been "seized" by the U.S. government—"notwithstanding any other provision of law," TRIA § 201(a), I hereby notice and verify the Encinas Claimants' superior interest in so much of the Defendant Cryptocurrency as may ultimately be necessary to satisfy the outstanding compensatory damages owed to the Encinas Claimants on their judgments against Iran, plus pre- and post-judgment interest.

2

I declare under penalties of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Dated: March 26, 2026

*/s/ Robert A. Braun*
Robert A. Braun (D.C. Bar 1023352)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW ● Eighth Floor
Washington, DC 20005
(202) 408-4600
RBraun@cohenmilstein.com

*Attorney for Encinas Claimants*

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MARIA ENCINAS, *et al.*,

        *Plaintiffs*,

    v.

THE ISLAMIC REPUBLIC OF IRAN, *et al.*,

        *Defendants*.

Civil Action No. 1:18-cv-02568 (CJN)

---

## PARTIAL FINAL JUDGMENT

This matter is before the Court on Plaintiffs' Motion for Expedited Entry of Final Judgment, ECF No. 44. Upon consideration of the Motion, as well as the Special Master's Report, ECF Nos. 26 to 35, it is hereby,

**ORDERED** that final judgment is entered in favor of all plaintiffs named below and against all defendants; it is,

**FURTHER ORDERED** that plaintiffs below are awarded $53,850,000.00 in compensatory damages and $185,244,000.00 in punitive damages, for a total award of $239,094,000.00 to be distributed as follows:

| Plaintiff | Pain and Suffering | Solatium | Economic | Punitive |
|---|---|---|---|---|
| Maria Encinas | | $2,500,000 | | $8,600,000.00 |
| Gregory Balzer | $1,500,000 | | | $5,160,000.00 |
| Irma Buck | | $2,500,000 | | $8,600,000.00 |
| Estela Cabus | | $2,500,000 | | $8,600,000.00 |
| Estate of Daniel Nava | | $2,500,000 | | $8,600,000.00 |

1

| | | | | |
|---|---|---|---|---|
| Estate of Carlos Nava | | $2,500,000 | | $8,600,000.00 |
| Estate of George Nava | | $5,000,000 | | $17,200,000.00 |
| Estate of Esperanza Nava | | $5,000,000 | | $17,200,000.00 |
| Estate of Judith Latios | | $2,500,000 | | $8,600,000.00 |
| Susana Gomez | | $2,500,000 | | $8,600,000.00 |
| Eddie Nava | | $2,500,000 | | $8,600,000.00 |
| Anthony Rich | | $2,500,000 | | $8,600,000.00 |
| Melvin Rich | | $2,500,000 | | $8,600,000.00 |
| Sharon Rich | | $2,500,000 | | $8,600,000.00 |
| Estate of Stephanie Rich | | $2,500,000 | | $8,600,000.00 |
| Estate of Georgina Ruelas | | $2,500,000 | | $8,600,000.00 |
| Harold Woodside | $1,500,000 | | | $5,160,000.00 |
| Mary Kathleen Zierhut | | $500,000 | | $1,720,000.00 |
| Richard Zierhut, Sr. | | $850,000 | | $2,924,000.00 |
| Pamela Elaine Davis | | $500,000 | | $1,720,000.00 |
| Terri Norene Jones | | $500,000 | | $1,720,000.00 |
| Joseph M. Cook | $1,500,000 | | | $5,160,000.00 |
| Estate of Thomas Quinn | $1,500,000 | | | $5,160,000.00 |
| Brian Bashore | $1,500,000 | | | $5,160,000.00 |
| Dan James, Jr. | $1,500,000 | | | $5,160,000.00 |

It is

2

**FURTHER ORDERED** that defendants shall be liable for the entire $239,094,000.00; it is,

**FURTHER ORDERED** that plaintiffs shall forthwith, at their own expense and consistent with the requirements of 28 U.S.C. § 1608(e), send a copy of this Order and Judgment this date to defendants.

This is a final appealable order.


DATE:  June 10, 2024

_____
CARL J. NICHOLS
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARIA ENCINAS, et al., | |
| *Plaintiffs* | |
| v. | Civil Action No. 1:18-cv-2568 (CJN) |
| THE ISLAMIC REPUBLIC OF IRAN, et al., | |
| *Defendants*. | |

## AMENDED ORDER AND PARTIAL FINAL JUDGMENT

This matter is before the Court on the Motion of two Plaintiffs—the Estate of Luis Nava and the Estate of Lisa Zierhut—for an entry of Final Judgment as to their claims in this case.

## BACKGROUND

Plaintiffs are American servicemembers who were killed or injured in the 1983 bombing of the U.S. Marine Barracks in Beirut, Lebanon, as well as their relatives. ECF 36 at 1. They sued the Islamic Republic of Iran for its role in the bombing pursuant to the state-sponsored terrorism exception in the Foreign Sovereign Immunities Act. 28 U.S.C. § 1605A. After Iran failed to appear, Plaintiffs secured a default judgment with respect to Iran's liability; the Court then appointed a Special Master to recommend what damages, if any, to award each Plaintiff. ECCF 21, 22. The Special Master—whose work the Court greatly appreciates—lodged his recommendations (ECF 26–35), and thereafter certain Plaintiffs who disagreed with those recommendations filed objections to them and submitted additional evidence. ECF 36. The Special Master responded to these objections; that response considered the additional evidence but declined to alter the original recommendations. ECF 42.

Thereafter, the Court entered partial final judgment in favor of all Plaintiffs except for the Estate of Luis Nava and the Estate of Lisa Zierhut, both of which disagreed with the recommendations of the Special Master. ECF 46. Having considered the entire record in this matter, and for the reasons set forth below, the Court now grants partial final judgment for the Estate of Luis Nava in the amount of $2,359,454.06, and for the Estate of Lisa Zierhut in the amount of $500,000.

## ANALYSIS

Economic damages cannot be awarded on the basis of "mere speculation or guesswork." *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003). Instead, "to recover damages a FSIA plaintiff must prove that the projected consequences are "reasonably certain" (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate." *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003).

The Estate of Luis Nava. Luis Nava was a serviceman killed in the Beirut bombing. Before the Special Master, his Estate initially sought $4,620,056.11 in damages for Nava's loss of accretions, relying principally on a forensic economic report from Dr. L. Wayne Plumly. *Id.* at 17. The Plumly Report assumed that Nava, 22.63 years old at the time of his death, had a life expectancy of 80.53 years and would have spent a 44.37 year career in the electronic computer manufacturing industry following his separation from the military; the $4,620,056.11 figure was an estimate of the earnings such a career would net over that time, adjusting for taxes, personal expenditures, and the like. *Id.* at 16–17.

The Special Master did not disagree with these calculations *assuming* Nava would have pursued a career in electronic computer manufacturing, but did disagree that Nava would have pursued such a career. *Id.* at 22. Dr. Plumly had three primary bases for that assumption, all

gleaned from a questionnaire posthumously compiled by Nava's surviving relatives. *Id.* at 23. The first basis was that Mr. Nava had worked, before enlisting, as a "Junior Assembler at AM Jacquard Systems, a manufacturer of office computer systems in the late 1970s and 80s," and at "Burroughs Corporation, another manufacturer of early computer systems. *Id.* The second was a newspaper article appended to the questionnaire, from the *Gardena Valley News and Gardena Tribune* dated November 2, 1983, in which Nava's brother told a reporter that Nava "was starting to think about applying for a job in the electronics division of Rockwell or Hughes." *Id.* And the third was a copy of Nava's DD1966 "Record of Military Processing," also appended to the questionnaire, which stated once again that Nava had worked for "Burroughs" as a Junior Assembler between December 1979 and March 1980, as well as for "A.M. Jacquard Systems" as a Junior Assembler between March 1980 and the date of his enlistment. *Id.*

In the Special Master's view, this evidence is more consistent with a career in computer *maintenance* than a more lucrative career in computer *manufacturing*. *Id.* at 25. The Special Master also pointed to other sources of evidence in support of that view. For instance, the Special Master cited family testimony that Nava had only received a few months of collegiate education—presumably at El Camino Community College, a supposition the Estate never contested in subsequent filings. *Id.* at 24. As a result, the Special Master concluded, "the highest academic level [Nava] could have attained would have garnered him employment as an entry-level computer programmer." ECF 31 at 25. The Special Master also noted testimony from Nava's relative, Maria Encinas, that "[Nava] would have wanted to become… a computer programmer or person who fixes computers," as well as testimony from relative Susana Gomez that Nava "liked everything to do with… ceramics." *Id.* at 25. In the Special Master's view, if the evidence pointed to any future career for Nava in computer technology, it would have been a career in either "computer

programming" or "computer and office machine repair and maintenance." (The Special Master also relied on Nava's interest in "ceramics" to question whether Nava would have gone into computer-related fields in the first place. *Id.* at 26.) In the end, the Special Master requested that Dr. Plumly submit a new forensic analysis more "in keeping with the evidence." *Id.* at 28.

Dr. Plumly did submit a revised analysis, in which he calculated Nava's future earnings for "a career in computer and office machine repair and maintenance"; the resulting number was $2,359,454,06. ECF 36 at 5. The Special Master rejected this analysis on the grounds that infirmities from the original analysis still lingered—such as Dr. Plumly's "fail[ure] to indicate if he ha[d] read the Complaint or the declarations and sworn statements of" Nava's relatives. ECF 42 at 11. A symptom of this omission, the Special Master determined, was that Dr. Plumly did not "reconcile[] conflicting testimony—such as between the Gomez "ceramics" testimony and the Encinas computer testimony—or explain why only one of Nava's relatives (Encinas) opined on his interest in computers. *Id.* at 12. The Special Master further questioned why Dr. Plumly had not provided any details about Nava's college experience, or any explanation as to why Nava completed a Field Radio Operator Course in the military rather than a computer course. *Id.*

For these reasons, the Special Master rejected both of the Estate's proposed damages calculations, but did not recommend a figure he viewed as correct. As a result, the Special Master's *de facto* recommendation was that the Estate receive no accretion damages whatsoever. But it seems obvious to the Court that Nava would have pursued *some* career following his separation from the military.

The Court agrees with the Special Master that the evidence is more suggestive of a career in computer maintenance rather than computer manufacturing. But the Court disagrees with the Special Master that Dr. Plumly's second analysis is inadequate. To the extent that Dr. Plumly failed

to reconcile Maria Encinas' statements about Nava's interest in computers with Susana Gomez's statement about his interest in ceramics, both of these statements seem tertiary when compared to the more objective evidence found in the questionnaire.  In addition, Nava's sister, Estela Cabus, testified that Nava "was starting to think about applying for a job in the electronics division of Rockwell or Hughes." ECF 31 at 25.  And while the Court recognizes that Nava studied as a Field Radio Operator rather than a computer technician during his time in the service, Nava also worked with early consumer-model personal computers in his pre-enlistment days.

The Court also recognizes the Special Master's concern that "the questionnaire was not provided to the Special Master but obtained directly from Dr. Plumly." *Id.* at 23.  But the Special Master did not conclude that the questionnaire was somehow inaccurate or fraudulent—likely for good reason, since the questionnaire included documents prepared decades before this litigation was even on the horizon.  The Court therefore relies here on the questionnaire evidence, and because it (and the entire record) establishes a "reasonable certainty" that Dr. Plumly's second report accurately states Nava's projected career earnings, the Court enters judgment for the Estate of Luis Nava in the amount of $2,359,454,06.

The Estate of Lisa Zierhut.  Richard Zierhut Jr. was a serviceman who was badly injured in the Beirut bombing but did not die.  ECF 35 at 1.  He was awarded $1.5 million in compensatory relief for pain and suffering in an earlier action, captioned as *DiBenedetto v. Islamic Republic of Iran*. 1:16-cv-02429 (TSC).  *Id.*

Three of Richard's immediate family sought solatium damages here, and the Court has already awarded his father, Richard Sr., $850,000 and his younger sister, Mary Kathleen Zierhut, $500,000.  ECF 46 at 2.  These amounts are consistent with *Davis v. Islamic Republic of Iran*, which granted a pain and suffering award as follows: "$1 million for spouses, $850,000 for parents,

$750,000 for children, and $500,000 for siblings." *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 16 (D.D.C. 2012) (*citing* Heiser v. Islamic Republic of *Iran,* 466 F.Supp.2d 229, 269 (2006), which featured a roughly proportional distribution).

That leaves the Estate of Richard's older sister Lisa Zierhut—who passed away in 2019. Applying the figures in *Davis*, this Estate would receive an award of $500,000. *Davis,* 882 F. Supp. 2d at 16. But the Special Master recommended against any solatium award on the grounds that the Estate "ha[d] not demonstrated a colorable claim warranting an award for loss of solatium." ECF 35 at 13. In particular, the Special Master emphasized that, "for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages." But here, the Special Master concluded, the Estate had not adequately established the closeness of Lisa Zierhut's relationship with her brother. ECF 42 at 13. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015).

Ms. Zierhut's relationship with her brother was, to be sure, the least well-documented of any Plaintiff-relative. She was often mentioned only in passing; for instance, Richard Jr. testified that "[p]rior to Beirut, I was very close to and spent a lot of time with my family, including my sister Lisa." ECF 35 at 13–14. Specific statements as to her mental anguish were, likewise, cursory. Richard Jr. testified that his "relationship" with Ms. Zierhut "was never the same" after the bombing, that "Lisa told me that she thought the bombing had fundamentally changed me," and that he was "distant" from his family "including Lisa, both physically and emotionally." *Id.* His longest sustained statement on the matter is that "[his] sister Lisa suffered emotional distress because of the bombing of the Marine barracks in Beirut, Lebanon. She suffered because of the emotional pain, stress, and the loss of solatium inflicted upon her and [her] family as a result of

the attack." *Id.* The Special Master described that last statement as "unconvincing and app[arently] lifted from the FSIA playbook." *Id.* at 14.

But what constitutes sufficient "closeness" to support an award of damages in these circumstances? In *Wilson v. City of Chicago*, 758 F.3d 875, 883 (7th Cir. 2014), the Seventh Circuit required a quotient of "mutual… love, affection, care, attention, companionship, comfort, guidance, and protection." ECF 42 at 13. But many judges on this Court have "recognized that [they] may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish." *Roth*, 78 F. Supp. 3d at 402.

Here, the Court takes Richard at his word that "prior to Beirut, [he] was close with… [his] sister Lisa," and credits Mary Kathleen Zierhut's testimony recounting Richard and Lisa kissing each other at the airport upon his return from a trip—a poignant moment which was captured in a photograph that appeared in local papers. ECF 42 at 15–16. To be sure, the Special Master points to separate testimony from Mary Kathleen stating that her personal relationship with Lisa was "[n]ot so good" due to internal family squabbles, but this speaks to Lisa's relationship with Mary Kathleen, not with Richard. In any event, a bad relationship is not synonymous with a distant relationship; strong discontent often arises out of intimate bonds.

In sum, the Court concludes that the evidence here is sufficient to establish that the Estate of Lisa Zierhut is entitled to solatium damages, and awards it $500,000.

## CONCLUSION

For the foregoing reasons, it is ORDERED that final judgment is entered in favor of the Estate of Luis Nava and the Estate of Lisa Zierhut. The Estate of Luis Nava is awarded $2,359,454.06 in compensatory damages, and the Estate Lisa Zierhut is awarded $500,000 in solatium damages. Each estate is also awarded punitive damages based on the 3.44 multiplier

from *Fain v. Islamic Republic of Iran*, 885 F. Supp. 2d 78, 83 (D.D.C. 2012). Accordingly, the Estate of Luis Nava is awarded $8,116,521.97 in punitive damages and the Estate of Lisa Zierhut is awarded $1,720,000 in punitive damages.

It is FURTHER ORDERED that defendants shall be liable for the entire $12,695,976—and that the Estate of Luis Nava and the Estate of Lisa Zierhut shall forthwith, at their own expense and consistent with the requirements of 28 U.S.C. § 1608(e), send a copy of this Order and Judgment this date to defendants.

This is a final appealable order.

DATE:  May 15, 2025

_____
CARL J. NICHOLS
United States District Judge

# Exhibit 2

CO 939
Rev. 4/2023

# UNITED STATES DISTRICT AND BANKRUPTCY COURTS
## FOR THE DISTRICT OF COLUMBIA

MARIA ENCINAS et al
_____
Plaintiff(s)

vs.                                                 Civil Action No.:  1:18-cv-02568-CJN

ISLAMIC REPUBLIC OF IRAN et al
_____
Defendant(s)

## CERTIFICATE OF CLERK

I hereby certify under penalty of perjury, that on the __6th__ day of _____February_____, 20 _26_ , I dispatched for mailing:

1. ☐ One copy of the summons and complaint by registered mail, return receipt requested , to the individual of the foreign state, pursuant to the provisions of FRCP 4(f)(2)(C)(ii).

2. ☐ One copy of the summons, complaint and notice of suit , together with a translation of each into the official language of the foreign state, by registered mail, return receipt requested , to the head of the ministry of foreign affairs, pursuant to the provisions of 28 U.S.C. § 1608(a)(3).

3. ☒ Two copies of the judgment , together with a translation of each into the official language of the foreign state, by certified mail, return receipt requested , to the U.S. Department of State, CA/OSC/L, SA-17, 10th Floor, Washington, DC 20522-1710, ATTN: Director of Overseas Citizens Services, pursuant to the provisions of 28 U.S.C. § 1608(a)(4).

4. ☐ One copy of the summons and complaint , together with a translation of each into the official language of the foreign state, by registered mail, return receipt requested , to the agency or instrumentality of the foreign state, pursuant to 28 U.S.C. § 1608(b)(3)(B).

ANGELA D. CAESAR, CLERK

By: _____/s/ Michele M. Grady_____
Deputy Clerk



**UNITED STATES POSTAL SERVICE.**

FRANCES PERKINS
200 CONSTITUTION AVE NW
WASHINGTON, DC 20210-0002
www.usps.com

02/06/2026                           02:58 PM
-----------------------------------------
TRACKING NUMBERS
9510 8114 0842 6037 1530 00
9510 8114 0842 6037 1530 24
9510 8114 0842 6037 1530 48
9510 8114 0842 6037 1530 62
-----------------------------------------
TRACK STATUS OF ITEMS WITH THIS CODE
(UP TO 25 ITEMS)



-----------------------------------------
TRACK STATUS BY TEXT MESSAGE
Send tracking number to 28777 (2USPS)
Standard message and data rates may apply
-----------------------------------------
TRACK STATUS ONLINE
Visit https://www.usps.com/tracking
Text and e-mail alerts available
-----------------------------------------
PURCHASE DETAILS
-----------------------------------------
Product            Qty    Unit    Price
                          Price
-----------------------------------------
Priority Mail®      1            $11.05
  Washington, DC 20522
  Weight: 1 lb 2.20 oz
  Expected Delivery Date
     Mon 02/09/2026
  Tracking #:
     9510 8114 0842 6037 1530 00
  Insurance                      $0.00
     Up to $100.00 included
  Signature                      $4.95
  Confirm
Total                           $16.00

Priority Mail®      1            $11.05
  Washington, DC 20522
  Weight: 1 lb 0.20 oz
  Expected Delivery Date
     Mon 02/09/2026
  Tracking #:
     9510 8114 0842 6037 1530 24
  Insurance                      $0.00
     Up to $100.00 included
  Signature                      $4.95
  Confirm
Total                           $16.00

```
Priority Mail®          1                    $11.05
  Washington, DC 20522
  Weight: 1 lb 2.20 oz
  Expected Delivery Date
        Mon 02/09/2026
  Tracking #:
     9510 8114 0842 6037 1530 48
  Insurance
     Up to $100.00 included            $0.00
  Signature
  Confirm                              $4.95
Total
                                      $16.00

Priority Mail®          1                    $11.05
  Washington, DC 20522
  Weight: 1 lb 0.10 oz
  Expected Delivery Date
        Mon 02/09/2026
  Tracking #:
     9510 8114 0842 6037 1530 62
  Insurance
     Up to $100.00 included            $0.00
  Signature
  Confirm                              $4.95
Total
                                      $16.00
----------------------------------------
Grand Total:                          $64.00
----------------------------------------
Credit Card Remit                     $64.00
  Card Name: VISA
  Account #: XXXXXXXXXXXX4705
  Approval #: 195973
  Transaction #: 148
  AID: A0000000980840    Contactless
  AL: US DEBIT
----------------------------------------
```

CO 939
Rev. 4/2023

# UNITED STATES DISTRICT AND BANKRUPTCY COURTS
## FOR THE DISTRICT OF COLUMBIA

ENCINAS et al
_____
                    Plaintiff(s)

vs.                                                    Civil Action No.: __1:18-cv-02568__

ISLAMIC REPUBLIC OF IRAN et al
_____
                    Defendant(s)

## CERTIFICATE OF CLERK

I hereby certify under penalty of perjury, that on the __22__ day of _____May_____, 20 _25_ , I dispatched for mailing:

1. ☐ One copy of the summons and complaint by registered mail, return receipt requested , to the individual of the foreign state, pursuant to the provisions of FRCP 4(f)(2)(C)(ii).

2. ☒ One copy of the default judgment ▼, together with a translation of each into the official language of the foreign state, by registered mail, return receipt requested , to the head of the ministry of foreign affairs, pursuant to the provisions of 28 U.S.C. § 1608(a)(3).

3. ☐ Two copies of the summons, complaint and notice of suit , together with a translation of each into the official language of the foreign state, by certified mail, return receipt requested , to the U.S. Department of State, CA/OSC/L, SA-17, 10th Floor, Washington, DC 20522-1710, ATTN: Director of Overseas Citizens Services, pursuant to the provisions of 28 U.S.C. § 1608(a)(4).

4. ☒ One copy of the default judgment ▼, together with a translation of each into the official language of the foreign state, by registered mail, return receipt requested , to the agency or instrumentality of the foreign state, pursuant to 28 U.S.C. § 1608(b)(3)(B).

ANGELA D. CAESAR, CLERK

By: _____/s/ Dwight Patterson_____
                    Deputy Clerk



**FRANCES PERKINS**
200 CONSTITUTION AVE NW
WASHINGTON, DC 20210-0002
www.usps.com

5/22/2025                                    12:47 PM

TRACKING NUMBERS
RA650571041US
RA650571055US

TRACK STATUS OF ITEMS WITH THIS CODE
(UP TO 25 ITEMS)



TRACK STATUS BY TEXT MESSAGE
Send tracking number to 28777 (2USPS)
Standard message and data rates may apply

TRACK STATUS ONLINE
Visit https://www.usps.com/tracking
Text and e-mail alerts available

PURCHASE DETAILS

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| First-Class Mail Intl™ Large Envelope (Flat) | 1 | | $14.92 |
| Iran (Islamic Republic of) Weight: 0 lb 11.90 oz | | | |
| Registered | | | $21.75 |
| Amount: $0.00 | | | |
| Tracking #: RA650571041US | | | |
| Return Receipt | | | $6.10 |
| Total | | | $42.77 |
| First-Class Mail Intl™ Large Envelope (Flat) | 1 | | $14.92 |
| Iran (Islamic Republic of) Weight: 0 lb 12.00 oz | | | |
| Registered | | | $21.75 |
| Amount: $0.00 | | | |
| Tracking #: RA650571055US | | | |
| Return Receipt | | | $6.10 |
| Total | | | $42.77 |

Grand Total:                                $85.54

Credit Card Remit                           $85.54
    Card Name: AMEX
    Account #: XXXXXXXXXXX4006
    Approval #: 840316
    Transaction #: 768
    AID: A0000000250l0801 Contactless
    AL: AMERICAN EXPRESS
    PIN: Not Required

