

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| AFM:ADR/RMS/AVR | *271 Cadman Plaza East* |
| F. #2024R00105 | *Brooklyn, New York 11201* |

May 1, 2026

By ECF

The Honorable Clay H. Kaminsky
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    United States v. Approximately 127,271 Bitcoin
>        Civil Docket No. 25-5745 (RPK) (CHK)

Dear Judge Kaminsky:

The government respectfully submits this letter in opposition to the motion to quash the government's special interrogatories filed by claimant Warp Data Technology Lao Sole Co. Ltd. ("Warp Data") on April 15, 2026, *see* ECF No. 411 ("Mot."), and further moves to compel Warp Data to properly respond to those interrogatories. As described below, Warp Data has declined to answer even the most basic questions about its claim, and its vague and conclusory responses raise more questions than they answer. Meanwhile, Warp Data seeks to advance in this action, bringing dispositive motions and generating law of the case while avoiding any real scrutiny of its dubious standing. That is not the law. The government has both the right and the responsibility to inquire into Warp Data's standing through special interrogatories, and Warp Data's non-responses provide the government with no usable information with which to make this necessary assessment. The Court should compel Warp Data to respond to the government's interrogatories and deny Warp Data's motion to quash them.

I.    Background

As the Cout is aware, on October 14, 2025, the government filed the verified complaint in this case (the "Complaint"), which seeks the forfeiture of 127,271 bitcoin (the "Defendant Cryptocurrency") previously controlled by claimant Chen Zhi ("Chen") as proceeds of fraud and property involved in money laundering. ECF No. 1 ("Compl."). The Complaint alleges that Chen, who was the chairman of Prince Group, operated forced-labor scam compounds across Cambodia that perpetrated cryptocurrency investment fraud schemes, and that he laundered the proceeds of those schemes through various corporate entities, professional money laundering

networks and cryptocurrency mining operations, including Warp Data and claimant LuBian, among others. *See id*. ¶¶ 38-43.[1]

In January, 2026, Warp Data filed a barebones claim with respect to the Defendant Cryptocurrency in which it asserted ownership over *all* portions of the Defendant Cryptocurrency derived from bitcoin mining, a total amount which it stated it was "still in the process of calculating." ECF No. 64, at ¶ 6. However, in its attempt to identify the cryptocurrency that it supposedly owned, Warp Data cited descriptions in the government's own Complaint of bitcoin mining by *other entities*. *See id* ¶ 5 (string cite laying claim to various sentences in the Complaint that refer to mining). The claim provides no explanation for Warp Data's grandiose assertions of ownership over thousands of bitcoin mined—and ultimately held and controlled—by others.

Thus, on February 20, 2026, the government served on Warp Data special interrogatories pursuant to Rule G(6) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions in order to obtain necessary precision with respect to Warp Data's claim and assess Warp Data's standing in the case. Under the rule, Warp Data was required to provide responses within 21 days. It has yet to properly do so. Instead, in the more than 20-page document it served on the government, Warp Data's actual responses fill less than two pages (the remainder consists of boilerplate objections and the text of the interrogatories themselves). The responses provide scant additional information beyond what Warp Data alleged in its claim, and as described further below, they shed little light on Warp Data's purported interest in the Defendant Cryptocurrency.

On March 20, 2026, the government met and conferred with counsel for Warp Data and explained its concerns with Warp Data's interrogatory responses. On that call, the government agreed to provide a narrower set of clarifying questions, which it promptly provided. In response, on March 31, 2026, Warp Data declined to respond to those, too, and quickly proclaimed that the parties were at an "impasse." Warp Data then filed its pre-motion letter on April 1, 2026, *see* ECF No. 384, and this motion to quash followed on April 15, 2026, *see* Mot.

Warp Data's strategy is transparent. By its vague pleading and interrogatory responses, it hopes to survive the standing phase of this action while maintaining strategic flexibility. But that is not sufficient under the law. The law requires a claimant to describe its *actual* claim, based not on strategy but on reality. The purpose of special interrogatories under Rule G is to accelerate the issue of standing, so that the government and court can distinguish opportunistic claims from real claims of ownership *before* the merits of the forfeiture action are determined and before the parties must engage in costly discovery. To this end, the law demands that Warp Data respond to the government's interrogatories with sufficient information to meet this purpose—not, as Warp Data has done here, with more of the same bare and conclusory assertions of ownership it pleaded in its claim. Warp Data should not be permitted to remain in the litigation and shape it in meaningful ways (it has already moved to dismiss the government's

---

[1] The Defendant Cryptocurrency is defined as approximately 127,271 bitcoin previously stored in the 25 virtual currency addresses identified in the government's Complaint as of December 2020, which were controlled and tracked by Chen. Compl. ¶ 44. As the Complaint describes, Chen personally maintained records of the wallet addresses and seed phrases associated with the private keys for each. *See id.*

2

Complaint altogether, *see* ECF No. 309) while leapfrogging any scrutiny of its own dubious standing in the case. If Warp Data has a claim, it must describe it by providing information within its knowledge responsive to the government's requests.

II.    Applicable Law

A.    Warp Data Must Establish its Standing Before it Can Proceed in this Matter

In order to assert a claim over property that is subject to a civil forfeiture action, a claimant "must have both standing under the statute or statutes governing [its] claims *and* standing under Article III of the Constitution as required for any action brought in federal court." *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 526 (2d Cir. 1999) (emphasis added); *see also, e.g.*, *United States v. Ross*, 161 F.4th 100, 109 (2d Cir. 2025); *United States v. Technodyne*, 753 F.3d 368, 380 (2d Cir. 2014). Standing is "a prerequisite to challenging the forfeiture," and "[w]ithout standing, the claimant lacks the right to bring any motion, regardless of the basis." *United States v. Vazquez-Alvarez*, 760 F.3d 193, 197 (2d Cir. 2014); *accord United States v. $8,440,190.00 in U.S. Currency*, 719 F.3d 49, 57 (1st Cir. 2013) ("Standing is a threshold consideration in all cases, including civil forfeiture cases.") (citation omitted); *In re 650 Fifth Ave. and Related Props.*, No. 08 Civ. 10934 (KBF), 2013 WL 4572527, at *3 (S.D.N.Y. Aug. 27, 2013), *aff'd*, 581 F. App'x 61 (2d Cir. 2014) ("Unless claimant can first establish his standing he has no right to put the government to its proof.").

For these reasons, testing standing early "simply makes sense." *Vazquez-Alvarez*, 769 F.3d at 197. This also "ensure[s] that the government is put to its proof only where someone with a legitimate interest contests the forfeiture." *United States v. $557,993.89, More or Less, in U.S. Funds*, 287 F.3d 66, 79 (2d Cir. 2002). Indeed, as many courts have recognized, the *in rem* nature of civil forfeiture actions creates a substantial danger that claims will be filed by persons with no real interest in the property. *See, e.g.*, *Mercado v. U.S. Customs Service*, 873 F.2d 641, 645 (2d Cir. 1989) (recognizing "a substantial danger of false claims in forfeiture proceedings"); *United States v. $421,090.00 in U.S. Currency*, No. 11-CV-00341 (JG), 2011 WL 3235632, at *4 (E.D.N.Y. July 27, 2011) (noting that "the likelihood of false claims of ownership in civil forfeiture actions—where the government must publish notice of the proceedings—is high"); *accord United States v. $100,348 in U.S. Currency*, 354 F.3d 1110, 1118–19 (9th Cir. 2004) (underscoring that "the danger of false claims in [civil forfeiture] proceedings is substantial") (cleaned up); *United States v. $104,250.00 in U.S. Currency*, 947 F. Supp. 2d 560, 563 (D. Md. 2013) (emphasizing that "[c]ivil forfeiture cases are *in rem* proceedings in which anyone could conceivably file a claim to the defendant property").

The burden of proof to establish standing rests with the claimant and must be proved by a preponderance of the evidence. *Mercado*, 873 F.2d at 644; *United States v. M/Y Amadea*, 770 F. Supp. 3d 558, 606 (S.D.N.Y. 2025). To establish constitutional standing, a claimant must demonstrate "(1) an injury-in-fact; (2) that is fairly traceable to the complained-of conduct; and (3) that can likely be redressed by a favorable decision." *Mantena v. Johnson*, 809 F.3d 721, 731 (2d Cir. 2015); *In re 650 Fifth Ave. and Related Props.*, 2013 WL 4572527, at *3; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). In forfeiture cases, this typically requires the claimant to establish an ownership or possessory interest in the specific property at issue. *See Cambio Exacto*, 166 F.3d at 527; *In re 650 Fifth Ave.*, 2013 WL 4572527,

at *4; *United States v. Agnello*, 344 F. Supp. 2d 360, 372 (E.D.N.Y. 2004) (finding that standing in a civil forfeiture action requires a showing of an ownership or possessory interest in the forfeited property, not merely a right to payment from the property owner).  In this context, "an interest 'in' property must be an interest in *a particular, specific asset*, as opposed to a general interest in an entire forfeited estate or account." *United States v. Ribadeneira*, 105 F.3d 833, 836 (2d Cir. 1997) (emphasis added).  "[A] bare assertion of ownership of the res, without more, is inadequate to prove an ownership interest sufficient to establish standing." *Olivo v. United States*, No. 96 Civ. 2620 (MBM), 1997 WL 23181, at *7 (S.D.N.Y. Jan. 22, 1997) (citation and internal quotation marks omitted).

> B.      Special Interrogatories Permit the Government to Test the Veracity of Warp Data's Claim

To determine a claimant's standing and the validity of his claim, including the precise nature of the interest he is asserting, the government may serve the claimant with special interrogatories at any time after a claim is filed.  R. G(6); *cf. United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 642 (9th Cir. 2012) (explaining that "Rule G(6)(a) . . . gives the government the right to question the claimant regarding the claimant's identity and relationship to the defendant property, and to gather information that bears on the claimant's standing." (citations and internal quotation marks omitted)).  "So important are these interrogatories to the issue of standing that Rule G(8)(c)(1) permits the government to move to strike a claim or answer '(A) for failing to comply with Rule G(5) or (6); or (B) because the claimant lacks standing.'" *United States v. 10,055.00 in U.S. Currency*, No. 17-CV-78, 2018 WL 2933850, at *2 (N.D. Ohio June 12, 2018).

"[T]he drafters of Rule G(6) intended the special interrogatories to provide an efficient means of testing the truthfulness of the [c]laimant's claim to have a real interest in the defendant property." *$104,250.00 in U.S. Currency*, 947 F. Supp. 2d at 563.  For that reason, special interrogatory responses that fail to provide sufficient information "impair[] the truth-seeking function of the judicial process." *United States v. $295,726.42 in Account Funds Seized*, 279 F. Supp. 3d 1050, 1055 (C.D. Cal. 2018) (citing *$133,420.00 in U.S. Currency*, 672 F.3d at 642).

> i.   The Scope of Special Interrogatories is Broad as it Relates to Testing Standing

The interrogatories may broadly inquire into any matter necessary "to test the veracity of the claimant's claim of ownership and interest." *United States v. Two Hundred Seventy-Two Thousand Dollars & No Cents ($272,000)*, No. 16-CV-06564 (AMD), 2017 WL 8780158, at *3 (E.D.N.Y. Oct. 26, 2017) (alteration and internal quotation marks omitted); *accord $133,420.00 in U.S. Currency*, 672 F.3d at 642 ("Rule G(6)(a) . . . broadly allows the government to collect information regarding the claimant's relationship to the defendant property." (internal quotation marks omitted)); *United States v. $307,970.00, in U.S. Currency*, No. 12–CV–136, 2013 WL 4095373, at *3 (E.D.N.C. Aug. 13, 2013) ("[P]ermissible interrogatories as to a claimant's relationship to the defendant property may encompass more than just the type of interest asserted in the property."); *United States v. $2,051,660.00 in U.S. Currency*, No. 07-CV-1338, 2008 WL 8723566, at *1 (D. Kan. Sept. 29, 2008) (explaining that because "Rule G(5) already requires a claimant to give his name, address and to state ownership interest in the seized property, the

4

addition of Supplemental Rule G(6)['s] phrase regarding [the] 'claimant's identity and relationship to the defendant property' must allow more than a mere recitation of the information already required by . . . Rule G(5)"). This includes the claimant's identity, the nature of his interest in the property, and the *circumstances* of his acquiring that interest, such as the time, place, manner, and reason for acquiring the property, and the identity of the person from whom the claimant acquired it. *See, e.g.*, *$133,420.00 in U.S. Currency*, 672 F.3d at 642 (explaining that "information as to the circumstances under which the currency was obtained is information that bears on [a claimant's] standing" (internal quotation marks omitted)); *United States v. $63,575 in U.S. Currency*, No. 18-CV-02131, 2019 WL 2996001, at *2-3 (E.D. Mo. July 9, 2019) (granting government's motion to compel responses to special interrogatories seeking "the date, time, and places in which any portion of the property was acquired," as well as "whether the defendant property was claimed on her local, state or federal income taxes").

Indeed, courts have given particularly broad scope to the special interrogatories in cases involving the forfeiture of seized currency—cases where the claimant's claim of ownership is inextricably intertwined with the evidence regarding the provenance of the money and the claimant's personal circumstances. *See, e.g.*, *$272,000.00 in U.S. Currency*, 2017 WL 8780158, at *3 (granting government's motion to compel response to special interrogatory seeking "each and every source from which she claims the [defendant currency] was derived" (alterations omitted)); *United States v. Funds in the Amount of $174,000.00*, No. 11-CV-6698, 2012 WL 473146, at *1–2 (N.D. Ill. Feb. 6, 2012) (holding that the government could use special interrogatories to inquire into, *inter alia*, the claimant's interest in the currency and any documents substantiating that interest, the source of the currency and the date it was acquired, and the identity of witnesses corroborating claimant's claim of interest); *United States v. Approximately $750,000 in U.S. Currency*, No. 10-CV-6069, 2011 WL 6155687, at *1, *2 (S.D.N.Y. Dec. 8, 2011) (holding that the government could use special interrogatories to ask the basis for the claim of ownership, the source of the defendant currency, the identity of any person or document supporting the claim, and the claimant's income and tax return information, criminal history, and past participation in civil lawsuits); *United States v. $333,806.93 in Proceeds*, No. 05-CV-2556, 2010 WL 3733932, at *2 (C.D. Cal. Aug. 30, 2010) (concluding that special interrogatories seeking "any records or documents relevant to [the claimant's] interest in the defendant assets" and the identities of "all persons having knowledge" of that interest were "highly relevant" and "directly relevant" to standing).

ii.   Responding to Special Interrogatories

A claimant must answer or object to such interrogatories within 21 days. R. G(6)(b). If the claimant fails to respond, or if the claimant's responses to the interrogatories are inadequate, the government may file a motion to compel responses pursuant to Federal Rule of Civil Procedure 37 or move to strike the claim and answer pursuant to Rule G. *See Vazquez-Alvarez*, 760 F.3d at 196; *$133,420.00 in U.S. Currency*, 672 F.3d at 635; *see also, e.g.*, *United States v. $410,000.00 in U.S. Currency*, No. 07-CV-0589, 2007 WL 4557647, at *7 & n.5 (D.N.J. 2007) (granting government's motion to compel responses to special interrogatories as necessary to ensure claimant has standing and to protect against nominee claimants); *United States v. $2,409 in U.S. Currency*, No. 10-CV-0220, 2010 WL 2670982, at *1 (D. Md. June 24, 2010) (striking claim for failing to respond to special interrogatories within 21 days).

5

III.     Warp Data Failed to Provide Sufficient Interrogatory Responses as Required by Rule G(6)

Warp Data's claim states that:

> Warp Data mined or acquired—and thus owns—all 47,680.03 Bitcoin included in the Defendant *in rem* that the government describes as "newly mined," "newly minted," or "from bitcoin mining." *See* Complaint ¶¶ 50 ("approximately 11,115.83 newly mined bitcoin"), 55(a) ("approximately 13,469 newly minted BTC"), 55(c) ("approximately 5,608 BTC from bitcoin mining"), 55(d) ("approximately 2,272.9 BTC from bitcoin mining"), 55(d) [sic] ("approximately 15,214.30 newly mined BTC"); *see also* Complaint at 36 (diagram summarizing certain allegations that bitcoin was mined) and n.9 (Lubian's addresses were 30% funded by newly mined cryptocurrency).

ECF No. 64, ¶ 5.  The claim adds, conclusorily, that "Warp Data also owns any other Bitcoin in the Defendant *in rem* that Warp Data mined or acquired." *Id.* ¶ 6.  It concludes by asserting that "Warp Data is still in the process of calculating that number of additional Bitcoin it owns." *Id.*  To date, Warp Data has not provided any information, in its interrogatory answers or otherwise, as to any such additional bitcoin.

The claim is nonsensical and riddled with contradictions.  To begin with, Warp Data nowhere even attempts to explain how it can purport to own bitcoin possessed and controlled by someone else.  Instead, Warp Data broadly asserts ownership over all bitcoin constituting the Defendant Cryptocurrency that was newly mined.  Then, in a gesture towards precision that instead underscores the half-baked nature of these responses, Warp Data defines that segment of bitcoin as coterminous with the bitcoin described in a handful of illustrative examples in the Complaint. *See, e.g.,* Compl. ¶¶ 49-55 (using phrases such as "For example," "This pattern repeated itself" and "as illustrated in the selected transactions below").  Warp Data's claimed ownership over the exact same portions of bitcoin that the government happened to describe in those examples—no more and no less—is either an astonishing coincidence, or an indication that Warp Data simply read those examples and adopted them as its own with no further information supporting its position.

Consistent with this confused approach, Warp Data appears to have compiled various figures that appear in those paragraphs of the Complaint without understanding entirely what they mean, resulting in a garbled outcome.  Warp Data refers to Paragraph 55 of the Complaint, which describes a total of "approximately 26,115.2 BTC" that constitutes a portion of the Defendant Cryptocurrency.  Compl. ¶¶ 55, 55(g).  But Warp Data's claim overlooks that bottom line and instead appears to add up all of the bitcoin described in the subsections of that paragraph, including bitcoin that did not actually feed into the Defendant Cryptocurrency wallets but that was described in the paragraph only to demonstrate the broader flow of funds.  As a result, Warp Data's claim includes thousands of bitcoin that are not even part of the Defendant Cryptocurrency at issue in this case, well above the 11,115.83 bitcoin described in Paragraph 50 and the 26,115.2 bitcoin discussed in Paragraph 55, the total amounts of Defendant Cryptocurrency assets referenced in those paragraphs (both, in turn, purely by way of example).

6

Nor is it clear what Warp Data means when it asserts that the bitcoin it allegedly owns were "mined or acquired" by Warp Data. Those are mutually exclusive theories of acquisition, and Warp Data provides no information whatsoever as to which bitcoin it purports to have bought instead of mined, the circumstances of that purchase, or how those assets ultimately ended up in the possession of others in December 2020.

In an effort to test Warp Data's standing and better understand its conclusory and contradictory assertions, the government served special interrogatories on Warp Data concerning the nature and circumstances of its claim, including which portions of the defendant assets Warp Data purports to own, how it came to own those assets, and what its relationship is to various entities actually associated with the accounts and digital wallets that the claimed bitcoin passed through and was stored in. But Warp Data's responses shed no light on these critical issues, nor do they contain any information that would suggest that Warp Data actually has standing to participate in this action.

For example, in response to Special Interrogatory No. 4 (which asks Warp Data to, among other things, describe the nature of its interest in the claimed assets; describe whether that interest is held directly or indirectly; provide information about any other individuals who also have an interest in those assets; explain the time and circumstances of the acquisition of the assets; identify the virtual currency addresses or accounts from which any of those assets originated and through which they passed; identify the origin of the assets and the circumstances that led to the deposit of the assets in those source accounts; and provide additional details about the virtual assets that Warp Data is claiming that it mined), Warp Data simply provided the below, largely copied from its claim:

> Claimant claims an ownership interest in at least the 47,680.03 BTC previously held at the 25 virtual currency addresses listed in Attachment A of the Verified Complaint (the "Warp Data Bitcoin") and described in the Complaint as "newly mined," "newly minted," or "from bitcoin mining" (Compl. ¶¶ 50, 55(a), 55(c), 55(d)), by virtue of either (1) mining through operations in Laos and elsewhere from 2018 through 2020; or (2) mining through participation in mining pools (including the LuBian mining pool) during the same time period. This mining was conducted using equipment owned by Warp Data . . . . Warp Data's bitcoin was held by LuBian, which maintained the wallets that contained the Defendant Cryptocurrency, including the Warp Data Bitcoin. Warp Data has been the sole rightful owner of the Warp Data Bitcoin from the date it was mined through the present.

*See* Response to Special Interrogatory No. 4.

Warp Data's response is patently insufficient. Warp Data's claim that the Defendant Cryptocurrency was obtained "by virtue of either (1) mining through operations in Laos and elsewhere from 2018 through 2020; or (2) mining through participation in mining pools," is a conclusory and "blanket assertion" that "does not sufficiently identify [Warp Data's] interest in the property." *United States v. $70,670.00 in U.S. Currency*, No. 15-CV-23616, 2016 WL 233405,

7

at *2 (S.D. Fla. Jan. 20, 2016).  Warp Data does not identify the virtual currency addresses containing the bitcoin it claims to own or how many bitcoin it purportedly owns in each of those addresses—information the owner of that bitcoin would necessarily have and which Warp Data has not provided any explanation for withholding.  Nor does Warp Data identify a single virtual currency address that Warp Data's claimed bitcoin passed through at any time or identify where it originated.  "[A] claimant asserting an interest in seized property 'needs to provide detail as to how he obtained possession of the currency, including, but not limited to, the person(s) from whom he received the currency, the date of receipt, the place of the receipt, and a description of the transaction which generated the currency.'"  *Id.*  (quoting *United States v. $134,750.00 in U.S. Currency*, No. 09-CV-1513, 2010 WL 1741359, at *3 (D. Md. Apr. 28, 2010)); *see also $272,000.00 in U.S. Currency*, 2017 WL 8780158, at *3 (granting government's motion to compel response to special interrogatory seeking "each and every source from which she claims the [defendant currency] was derived" (cleaned up)); *$333,806.93 in Proceeds,* 2010 WL 3733932, at *3 (in response to interrogatory asking claimant to "'list each and every source from which she claims that the defendant proceeds were derived,' as well as to provide information regarding the date the proceeds were obtained, from whom they were obtained, and the reason why [claimant] obtained the proceeds," claimant's response that the proceeds were "surplus of a foreclosure sale" was deficient, as it did "not address each portion of the interrogatory" (cleaned up)).

Warp Data's responses fail to address the questions posed by the government and do not provide any additional information beyond what was already provided in its vague claim.  *See, e.g.*, *United States v. Funds in the Amount of $574,840*, No. 11–CV–07803, 2015 WL 1537577, at *5 (N.D. IL Mar. 31, 2025) (granting government's motion to compel where claimants "offered lengthy objections to all of the Special Interrogatories and only provided conclusory responses regarding their ownership and possessory interests that added nothing new or different to their claims"); *$295,726.42 in Account Funds Seized*, 279 F. Supp. 3d at 1054 (finding interrogatory response "evasive and incomplete" where it added "nothing new or different to what is already set forth in [claimant's] claim" (cleaned up)).

Meanwhile, Warp Data's responses are riddled with contradictions and strategic non-answers.  For example, in response to Special Interrogatory No. 1, which seeks identifying information about Warp Data and its relevant affiliates, Warp Data's response names two individuals as being involved in the creation of Warp Data, but a different individual as being its owner.  Warp Data refuses to explain the discrepancy or reveal who owned and controlled Warp Data from its inception in 2018 through December 2020 (*see* clarifying request 2), the period most relevant to the claim, information that "connect[s] directly to the task of determining [the claimant's] identity." *$272,000.00 in U.S. Currency*, 2017 WL 8780158, at *3 (citing *$333,806.93 in Proceeds*, 2010 WL 3733932, at *3).  Warp Data also carefully asserts that its U.S. operation "Warp Data US" never owned Warp Data, without confirming whether Warp Data owned or controlled Warp Data US (or identifying any other relationship between the two entities).  Similarly, the government asked Warp Data to describe Chen Zhi's and Prince Group's relationship with Warp Data or its owners or directors in response to Special Interrogatory Nos. 8 and 13.  Warp Data provided lawyerly non-answers, stating that neither Chen nor Prince Holding Group ever owned Warp Data or its "mining equipment," but remaining conspicuously silent as to any other relationship between Chen or Prince Group, on the one hand, and Warp Data and its associates, on the other.  Such questions meant to distinguish claimants and spot nominee claims go directly to standing.

Most significantly, Warp Data continues to assert ownership over bitcoin identified in the Complaint that was mined by other entities (including LuBian and various mining pools, as is easily discernable from the public blockchain) and then held by Chen, without explaining how this bitcoin could have belonged to Warp Data. As discussed, when given the opportunity to explain its relationship to Chen, Warp Data declined. When given the opportunity to explain its relationship to LuBian (*see* Special Interrogatory No. 9), Warp Data simply responded, without explanation, that "LuBian maintained the wallets that contained the Defendant Cryptocurrency, including the Warp Data Bitcoin." This is not only unhelpful but also incorrect—only a small portion of the Defendant Cryptocurrency is alleged to have been held at addresses associated with LuBian, and much of the bitcoin over which Warp Data claims purported ownership was not held at those addresses.[2] In any event, Warp Data does not explain how another claimant allegedly "maintained" wallets that held the bitcoin Warp Data claims as its own—especially where, as here, Lubian is also claiming an interest in those assets (ECF No. 79). *See $70,670.00 in U.S. Currency*, 2016 WL 233405, at *2 (compelling responses to special interrogatories where claimants had conflicting claims and "[n]o claimant provides any factual support regarding their ownership of the Defendants *In Rem* nor regarding the circumstances surrounding their acquisition of the seized currency"). And to the extent Warp Data's claim encompasses bitcoin mined by entities other than LuBian, as it apparently does, Warp Data declines to identify which bitcoin and which entities, or, again, how it is that Warp Data owns those assets.

Warp Data may contend in response that these are the sort of issues that must be hashed out in merits discovery, and that a mere conflict between two claimants' narratives should not be cause to challenge the standing of either claimant. But Warp Data has not really put forth any narrative at all. The patently overbroad and incredible nature of Warp Data's claim underscores the extent to which allowing Warp Data to proceed in this manner will prejudice this litigation. Because Warp Data has never defined what it owns or how, it would enjoy a "heads I win, tails you lose" situation if permitted to proceed without further clarification, in which any set of developed facts could be construed as favorable to Warp Data's claim.

Nor do the allegations in the Complaint, contrary to Warp Data's contention, "establish Warp Data's standing" and thereby excuse Warp Data from having to comply with the government's special interrogatories. Mot. at 10-12. Instead, the Complaint contradicts much of what Warp Data claims, making the need for Warp Data to provide sufficient responses even more acute. *See United States v. Real Properties*, No. 18-CV-9293, 2019 WL 4877490, at *3 (D.N.J. Oct. 9, 2019) (rejecting claimants' argument that they need not answer the special interrogatories because the "civil forfeiture complaint establishes that they are the purchasers of record of each of the respective defendant properties"); *$70,670.00 in U.S. Currency*, 2016 WL 233405, at *2 (compelling responses to special interrogatories and explaining that "[a] blanket assertion that a putative claimant is the owner of the property does not sufficiently identify his interest in the

---

[2] Moreover, Warp Data's claim cites Footnote 9 of the Complaint, which observes that, of the 23,738.17 bitcoin composing the Defendant Cryptocurrency located at virtual currency addresses associated with LuBian, only approximately 30% were newly mined bitcoin. This would seem to have a significant impact on Warp Data's asserted claim over only newly mined bitcoin, but Warp Data declines to explain how it influenced Warp Data's calculation, if at all.

property for the purposes of satisfying Rule G(5), even if the putative claimant was in possession of the seized property at the time it was seized." (cleaned up)).[3]

Warp Data's reliance on *Technodyne* is misplaced. In *Technodyne*, the Second Circuit rejected the government's argument that Rule G(8)(c), which places the burden on the claimant to establish standing, also places the burden on a claimant to prove he is not a fugitive barred from making a claim. 753 F.3d at 377. The Second Circuit determined that the government must affirmatively establish fugitive disentitlement, but in any event ruled that the district court was "well within the bounds of its discretion" in finding it applied. *Id.* The panel separately observed that, setting fugitive disentitlement aside, "[t]he record in the present case" suggested that standing was not an issue because the government had not alleged (unlike here) that the claimants had failed to comply with Rule G, and because the government's complaint (unlike here) alleged that the claimants owned the defendant properties and held them in their names. *Id.* at 380.[4]

Nor do Warp Data's responses to the government's interrogatories "establish its relationship" to the Defendant Cryptocurrency. *See* Mot. at 12-16. The cases Warp Data cites in support of this contention are entirely inapposite and do not speak to the sufficiency of its interrogatory responses. *See United States v. $31,000.00 in U.S. Currency*, 872 F.3d 342, 351 (6th Cir. 2017) (district court erred in striking claim *before* government served any special interrogatories); *United States v. $17,900.00 in U.S. Currency*, 859 F.3d 1085, 1090 (D.C. Cir. 2017) (discussing claimant's evidentiary burden on summary judgment motion following claimant's detailed responses to special interrogatories); *United States v. Funds in the Amount of*

---

[3] Warp Data is correct that the Complaint alleges *some* involvement by Warp Data in bitcoin mining that ultimately funded the wallets containing the Defendant Cryptocurrency. But that does not equate to ultimate *ownership* of funds in those wallets, and certainly not to ownership of all newly mined bitcoin. Moreover, Warp Data's assertion that the government "identified Warp Data [] as the original miner of much of the *res*," *see* Mot. at 11, is flatly incorrect; the government identified two primary mechanisms that funded the wallets holding the Defendant Cryptocurrency, just one of which was mining, and identified LuBian's and Warp Data's association with some of the mining activities and blockchain addresses. Warp Data's further assertion that, for any bitcoin it did mine, it is "thus the entity that both owned and possessed that portion of the *res*" is logically and factually incorrect. ECF 384 No. at 2; *see also* Mot. at 11. Indeed, in December 2020, Warp Data did not possess or control any of the Defendant Cryptocurrency.

[4] The other cases Warp Data cites in support of this proposition are similarly inapposite, as each involves circumstances where (unlike here) the government clearly alleged the claimant's interest in the seized property. *See, e.g.*, *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 501 (6th Cir. 1998) (funds seized from the bedroom of claimants and the government never alleged any "straw man" transfers or "any conceivable alternative owners of the currency"); *United States v. $38,570 in U.S. Currency*, 950 F.2d 1108, 1113 (5th Cir. 1992) (government's complaint "clearly specified that [claimant] exercised some form of dominion over the currency" and claimant was also present "at the scene of the seizure"); *United States v. $215,587.22 in U.S. Currency*, 282 F. Supp. 3d 109, 113 (D.D.C. 2017) (government's complaint alleged that the claimant "established, owns, and controls each of the nine accounts" being forfeited).

*$239,400*, 795 F.3d 639, 647 (7th Cir. 2015) (claimant "was in possession of the money when it was seized" and submitted a sworn affidavit asserting ownership).

IV.    The Government's Interrogatories Do Not Exceed the Scope of Rule G

In its motion to quash, Warp Data attempts to excuse its non-compliance by claiming that the government's requests are improper. They are not.

*First*, Warp Data asserts that several of the government's interrogatories are improper because they seek information about assets other than Warp Data's claimed bitcoin. *See* Mot. at 17-18. This is incorrect. The government seeks only to understand Warp Data's claim over assets constituting the Defendant Cryptocurrency, which Warp Data has failed to identify. Warp Data's criticism appears to arise from a misreading of the government's interrogatories. For example, Warp Data complains of the government's request that Warp Data provide information concerning "all virtual currency addresses, or accounts . . . from which any of the virtual assets at each address in Attachment A originated (the 'source accounts') and through which such assets passed (the 'intermediate accounts')." *Id.* at 17 (purporting to quote Special Interrogatory No. 4). This would indeed be a broad request, if the government had, in fact, made it. But the language as quoted does not actually appear in the government's Special Interrogatories and instead appears to have been made up by Warp Data. Instead, Special Interrogatory No. 4 begins with the qualifier: "*for each of the addresses that held assets to which you are asserting a claim*, provide the following information in detail," and the altered language actually reads, "[a]ll virtual currency addresses, or accounts . . . from which any of the virtual assets *at that address* originated (the 'source accounts') and through which such assets passed (the 'intermediate accounts')." Special Interrogatory Nos. 4, 4(e) (emphasis added).

Thus, the government's requests do not seek information about assets not at issue in this action, and only seek to understand the source and origin of the defendant assets that Warp Data is claiming to own. This is entirely proper. *See $272,000.00 in U.S. Currency*, 2017 WL 8780158, at *3 (special interrogatories were proper when they asked, "when, from whom, where, and how" the claimant acquired the interest in the defendant funds; "each and every source from which" the claimant claimed funds were derived, "including the exact amount of money derived from each source"; and the "name, address, and phone number" of any "third party from whom [claimant] contends the funds were derived" is proper); *see also United States v. $209,815 in United States Currency*, No. 14-CV-0780 SC, 2015 WL 1927431, at *1 (N.D. Cal. Apr. 28, 2015) (special interrogatories that "probe, among other things, how and from whom [claimant] acquired the [money], the facts and records supporting his claim of lawful ownership of the money, and the identities and contact information of individuals with knowledge of [claimant's] interest in the money" are "well within the scope of" Rule G(6)).[5] Surely if Warp Data mined the bitcoin it claims to own, it should be able to identify what virtual currency addresses the mined bitcoin flowed through before funding the wallets composing the Defendant Cryptocurrency, all while

---

[5]    Warp Data cites a separate holding in *$272,000.00 in U.S. Currency*, declining to require a claimant to identify "any and all bank accounts . . . in which [claimant] ha[s] any interest or which are held for [claimant's] benefit." 2017 WL 8780158, at *4. That holding is inapposite here, as the government is not requesting anything of that sort.

supposedly remaining in Warp Data's title. *See also United States v. Eight (8) Counterfeit Watches*, No. 17-CV-156, 2017 WL 3706040, at *3 (S.D. Ohio Aug. 28, 2017), *report and recommendation adopted*, No. 17-CV-156, 2017 WL 4236573 (S.D. Ohio Sept. 21, 2017) ("[C]laimant must [] allege facts 'regarding how the claimant came to possess the property, the nature of the claimant's relationship to the property, and/or the story behind the claimant's control of the property.'" (citations omitted)).[6]

*Second*, Warp Data complains that the interrogatories seek information about persons or entities other than Warp Data. *See* Mot. at 18 (citing special interrogatories 5, 6 and 15, and clarifying request 7) and 19-20 (citing interrogatories 8, 9, 10, 11, 12, 13, 14 and 16, and clarifying requests 2, 3, and 7). These requests are not improper. Warp Data claims it owns assets that it alleges were held and/or mined by LuBian, whose private keys were possessed by Chen Zhi, and which passed through accounts and wallets owned by entities including Amber Hill Ventures Limited ("Amber Hill") and Future Technology Investment ("FTI"), among others. But Warp Data has refused to answer the simplest questions about its relationship with these entities that might explain how it purports to own assets they possessed. Contrary to Warp Data's assertions, "[i]interrogatories into third parties' ownership or possession over the *res* are relevant to Claimant's relationship to the *res* to the extent any such ownership or possession affects Claimants' claim of ownership." *United States v. Amadea*, No. 23-CV-9304 (DEH), 2024 U.S. Dist. Lexis 54490, at *1-2 (S.D.N.Y. Mar. 21, 2024). Such is the case here. Understanding Warp Data's relationship to and knowledge of these entities is necessary to testing its standing in this case, especially where those entities are also claiming ownership over the assets. *See $307,970.00 in U.S. Currency*, 2013 WL 4095373 at *3 (explaining that interrogatories which ask why claimant was in possession of portion of someone else's property, the name of that third party, the amount of property owned by that party, and when claimant took possession of such portion are all proper and go towards standing); *see also Approximately $750,000 in U.S. Currency*, 2011 WL 6155687, at *2 (request for "identity of any person or document supporting the Claimant's claim to the Defendant Currency" proper).

*Finally*, in a last-ditch effort to avoid its obligations to substantively respond, Warp Data claims that the interrogatories are not relevant to standing but instead go to the merits of the underlying case. This is again incorrect, as made clear by the very interrogatories to which Warp Data points. *See* Mot. at 21-22 (citing Special Interrogatories 1-6, which ask Warp Data to identify governing documents, affiliates and subsidiaries, and electronic communications relating to the Defendant Cryptocurrency; Special Interrogatories 4-6, which seek to learn the claimed bitcoin at each of the 25 wallet addresses, the source of claimed bitcoin that is not newly minted, and the location of mining equipment allegedly used to mine the claimed bitcoin). The government's interrogatories all are aimed at understanding Warp Data's relationship to the bitcoin it is claiming to own. Indeed, Warp Data does not identify even one interrogatory that seeks information about the alleged cryptocurrency fraud or money laundering schemes in this case, nor about Warp Data's knowledge of or involvement in operating scam compounds in Cambodia. *Cf. $272,000.00 in U.S. Currency*, 2017 WL 8780158, at *4 (requests to explain "why the Defendant funds were

---

[6] To the extent Warp Data reads Special Interrogatory Nos. 5 and 6 also to exceed the scope of its claim, *see* Mot. at 18, it should respond to those requests only as they apply to the claimed bitcoin. It has not done so, nor is it clear from Warp Data's claim which bitcoin that would be.

12

transported in the manner in which they were transported, and why the currency was transported in lieu of using cash and/or wire transfers" were improper because they sought "information regarding the propriety of the claimant's possession of the currency and the reasons for her use of the funds").

V.       Conclusion

At bottom, the government's interrogatories are simple. They are designed to determine which bitcoin Warp Data claims to own and how it can be that it owns bitcoin that was mined and controlled by others. And they are designed to determine how, if at all, the claim varies from, or is overlapping and mutually exclusive with, similar claims filed by LuBian, Chen, Prince Group, and other claimants. This is the bare minimum that the government is entitled to and that the Court should expect from a party seeking to make itself a litigant in this dispute and seeking to shape the dispute in fundamental ways, from establishing law and facts that will bind other claimants to dismissing the entire action altogether, as Warp Data currently seeks to do. A claimant should not—and cannot—be permitted to use strategic ambiguity to avoid being held to a particular claim so it can adjust its position as it goes.

For these reasons, the government respectfully requests that the Court compel Warp Data to respond to the government's special interrogatories pursuant to Rule G(6). If Warp Data fails adequately to comply, the government intends to move to strike its claim on that basis. *See Vazquez-Alvarez,* 760 F.3d at 196; *United States v. $19,764.00 in U.S. Currency*, No. 10-CV-573, 2011 WL 4899958, at *2-3 (W.D.N.Y. Aug. 12, 2011), *report and recommendation adopted*, No.

13

10-CV-573, 2011 WL 4896507 (W.D.N.Y. Oct. 14, 2011) (citing cases granting motions to strike for failure to respond to interrogatories).

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:  /s/
Alexander F. Mindlin
Tanisha R. Payne
Benjamin Weintraub
Andrew D. Reich
Rebecca M. Schuman
Alessandra Rafalson
Assistant U.S. Attorneys
(718) 254-7000

Christopher B. Brown
Supervisory Trial Attorney
National Security Cyber Section
National Security Division
U.S. Department of Justice

cc:    Clerk of Court (CHK)
Counsel of Record

14