

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AFM:ADR                                        *271 Cadman Plaza East*
F. #2024R00105                                 *Brooklyn, New York 11201*


June 26, 2026

By ECF


The Honorable Clay H. Kaminsky
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    United States v. Approximately 127,271 Bitcoin
>        Civil Docket No. 25-5745 (RPK) (CHK)

Dear Judge Kaminsky:

The government respectfully submits this motion to compel claimants Chen Zhi ("Chen") and Prince Holding Group ("Prince Group") to comply with the government's special interrogatories served on them on February 6, 2026. Chen has not responded to the government's interrogatories, much less given signed and sworn responses; instead, counsel has submitted affidavits from mysterious third parties speculating about what Chen might have said by way of response. This is plainly insufficient, as a matter of law and common sense. What is more, both Chen's purported responses and those provided on behalf of Prince Group lack the most basic information needed to assess their standing and to reconcile their conflicting and dubious claims. The Court should compel both claimants to respond so that their standing can be tested.

I.    Background

As the Court is aware, on October 14, 2025, the government filed the verified complaint in this case (the "Complaint"), which seeks the forfeiture of 127,271 bitcoin previously in Chen's control (the "Defendant Cryptocurrency") as proceeds of fraud and property involved in money laundering. *See* ECF No. 1. The Complaint alleges that Chen, who was the chairman of Prince Group, operated forced-labor scam compounds across Cambodia that perpetrated cryptocurrency investment fraud schemes, and that he laundered the proceeds of those schemes through various corporate entities, professional money laundering networks and cryptocurrency mining operations. *See id*. ¶¶ 38-43.

On December 29, 2025, Chen and Prince Group, each of whom is represented by the law firm Boies Schiller Flexner LLP ("Boies Schiller"), filed barebones claims, both signed by Chen, in which each asserted both an "ownership and possessory interest" in the Defendant Cryptocurrency and in which Chen also claimed to be a "bailee," without further explanation. *See* ECF Nos. 27, 28. Chen's claim did not explain the nature of (or the parties to) the alleged bailment, as is required by law. *See* ECF No. 246 at 2-3 (Gov. Pre-Motion Letter re Motion to Strike Claims).

Thus, on February 6, 2026, the government served on Chen and Prince Group special interrogatories pursuant to Rule G(6) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions in order to assess their standing in the case. Pursuant to Rule G(6)(b), Chen and Prince Group were required to serve answers or objections to these interrogatories within 21 days. They did not do so. Instead, counsel at Boies Schiller informed the government on the day the responses were due that they would be seeking a protective order (they did not provide a proposed order). The government drafted a proposed order, which counsel rejected, and which the Court entered on April 14, 2026. *See* ECF No. 405. Counsel thereafter sent the government purported responses to the government's special interrogatories, approximately six weeks past the statutory deadline. *See* Chen Responses (attached hereto as Exhibit A); Prince Group Responses (attached hereto as Exhibit B).[1]

The responses were categorically deficient. To begin with, the Chen responses are not made and sworn by Chen, as required by law. Instead, the responses are made and sworn by two other individuals, identified as ███████ and ██████, who claim with no support to have "[p]ower of [a]ttorney" for Chen, but are not otherwise characterized in any way. These individuals represented that their responses, provided in April 2026, were "true, accurate, and complete to the best of Claimant's [*i.e.,* Chen's] knowledge and belief prior to his unavailability as of January 6, 2026." This is not only improper but absurd. Chen could not possibly have read the special interrogatories a month before they were served on his counsel, much less provided responses. That fantastical claim raises serious questions not only about the sworn verification but also about the responses themselves—both Chen's and Prince Group's (which are in many places copied-and-pasted from Chen's and are clearly derived from the same sources of information). They suggest that Boies Schiller has begun operating in a manner that is unmoored from its ostensible client, and that counsel lacks any intention or capacity to comply with discovery obligations in this case.

The Prince Group responses also raise separate concerns. Boies Schiller initially filed a claim, signed by Chen, on behalf of an entity it identified as "Prince Holding Group." However, the interrogatory responses it provided, signed by another individual, now purport to have been made on behalf of a different entity, "Prince Real Estate (Cambodia) Group Co. Ltd." ("Prince Real Estate Cambodia"), which is not the same claimant and appears nowhere in Prince Group's verified claim.[2]

---

[1]    Pursuant to the Protective Order in this case, *see* ECF No. 405, the government submits those responses and this motion in redacted form reflecting Boies Schiller's assertions of confidentiality. The government will provide its objections to those assertions in a separate letter.

[2]    Meanwhile, in a liquidation proceeding in the British Virgin Islands ("BVI") and related bankruptcy proceeding in the Southern District of New York, Boies Schiller claims to represent a self-proclaimed director of 25 entirely different Prince Group entities. *See In re Prince Global Holdings Limited, et al.,* No. 26-BK-10769 (MG) (S.D.N.Y.), June 18, 2026 Memorandum Opinion, ECF No. 89 at 5 n.1. (Boies Schiller has apparently refused to divulge the provenance of this individual's claimed appointment, to the concern of the remaining parties and the court. *See id.,* June 9, 2026 Hearing Tr. at 10-11, 42-48.)

Unsurprisingly, the responses issued by this shifting set of nominee entities and mysterious attorneys-in-fact are inadequate. Boies Schiller appears to be almost completely ignorant about what funds each claimant has an interest in, and why. Thus, counsel asserts that each claimant owns only a portion of the assets, but cannot say *what* portion, professing an inability to distinguish which assets are owned by Chen and which by Prince Group. The question is deferred to supposedly ongoing efforts by these claimants to trace their funds (despite having obtained an extension of the claim deadline to perform such tracing many months ago), and further blamed on relevant records likely having been destroyed.

Where the claimants actually make assertions, they tend to be illogical, self-contradictory and facially absurd. Thus, Prince Group claims "ownership" of the funds, but states that it neither possessed nor could access the virtual wallets that held them, and fails to explain what accounts or entities they came from. No explanation is offered as to how a multinational conglomerate could lack control or access over billions of dollars of its own purported corporate earnings, or any record of where those earnings came from. Meanwhile, in a charade of compliance, the responses include thousands of pages of irrelevant Prince Group records that have nothing to do with this action.[3]

On April 27, 2026, the government met and conferred with Boies Schiller and indicated that its responses were inadequate. Counsel stated that it would make efforts to provide additional information about the two claims. As of this filing, they have yet to do so beyond a short paragraph describing Chen's whereabouts prior to his arrest.

As discussed further below, the purpose of special interrogatories under Rule G(6) is to receive from claimants sworn statements about the nature of their claims in order to assess their standing in the case. Boies Schiller's responses purportedly on behalf of Chen and Prince Group fail to comply with this obligation at the most fundamental level, and the Court should direct them to comply.

II.    <u>Applicable Law</u>

To determine a claimant's standing and the validity of his claim, including the precise nature of the interest he is asserting, the government may serve the claimant with special interrogatories at any time after a claim is filed. R. G(6); *cf. United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 642 (9th Cir. 2012) (explaining that "Rule G(6)(a) . . . gives the government the right to question the claimant regarding the claimant's identity and relationship to the defendant property, and to gather information that bears on the claimant's standing." (citations and internal quotation marks omitted)). *See generally,* Gov't Mot. to Compel Warp Data, ECF No. 439 at 3-5 (reviewing relevant law). "So important are these interrogatories to the issue of standing that Rule G(8)(c)(1) permits the government to move to strike a claim or answer '(A) for failing to comply with Rule G(5) or (6); or (B) because the claimant lacks standing.'" *United States v. $10,055.00 in U.S. Currency*, No. 17-CV-78, 2018 WL 2933850, at *2 (N.D. Ohio June

---

[3]    The records largely consist of articles of incorporation for dozens of Prince Group entities that are not the entity Boies Schiller has indicated is the claimant in this matter, including entities like "Prince Horticulture Development Co., LTD" and "Artisan Sculptor, Co., LTD."

12, 2018). "[T]he drafters of Rule G(6) intended the special interrogatories to provide an efficient means of testing the truthfulness of the [c]laimant's claim to have a real interest in the defendant property." *United States v. $104,250.00 in U.S. Currency*, 947 F. Supp. 2d 560, 563 (D. Md. 2013). For that reason, special interrogatory responses that fail to provide sufficient information "impair[] the truth-seeking function of the judicial process." *United States v. $295,726.42 in Account Funds Seized*, 279 F. Supp. 3d 1050, 1055 (C.D. Cal. 2018) (citing *$133,420.00 in U.S. Currency*, 672 F.3d at 642).

The interrogatories may broadly inquire into any matter necessary "to test the veracity of the claimant's claim of ownership and interest." *United States v. Two Hundred Seventy-Two Thousand Dollars & No Cents ($272,000)*, No. 16-CV-06564 (AMD), 2017 WL 8780158, at *3 (E.D.N.Y. Oct. 26, 2017) (alteration and internal quotation marks omitted); *accord $133,420.00 in U.S. Currency*, 672 F.3d at 642 ("Rule G(6)(a) . . . broadly allows the government to collect information regarding the claimant's relationship to the defendant property." (internal quotation marks omitted)); *United States v. $307,970.00, in U.S. Currency*, No. 12-CV-136, 2013 WL 4095373, at *3 (E.D.N.C. Aug. 13, 2013) ("[P]ermissible interrogatories as to a claimant's relationship to the defendant property may encompass more than just the type of interest asserted in the property."); *United States v. $2,051,660.00 in U.S. Currency*, No. 07-CV-1338, 2008 WL 8723566, at *1 (D. Kan. Sept. 29, 2008) (explaining that because "Rule G(5) already requires a claimant to give his name, address and to state ownership interest in the seized property, the addition of Supplemental Rule G(6)['s] phrase regarding [the] 'claimant's identity and relationship to the defendant property' must allow more than a mere recitation of the information already required by . . . Rule G(5)"). This includes not just the claimant's identity and the nature of his interest in the property, but also the *circumstances* of his acquiring that interest, such as the time, place, manner, and reason for acquiring the property, and the identity of the person from whom the claimant acquired it. *See, e.g.*, *$133,420.00 in U.S. Currency*, 672 F.3d at 642 (explaining that "information as to the circumstances under which the currency was obtained is information that bears on [a claimant's] standing" (internal quotation marks omitted)); *United States v. $63,575 in U.S. Currency*, No. 18-CV-02131, 2019 WL 2996001, at *2-3 (E.D. Mo. July 9, 2019) (granting government's motion to compel responses to special interrogatories seeking "the date, time, and places in which any portion of the property was acquired," as well as "whether the defendant property was claimed on [the claimant's] local, state or federal income taxes").

Indeed, courts have given particularly broad scope to the special interrogatories in cases involving the forfeiture of seized currency—cases where the claimant's claim of ownership is inextricably intertwined with the evidence regarding the provenance of the money and the claimant's personal circumstances. *See, e.g.*, *$272,000.00 in U.S. Currency*, 2017 WL 8780158, at *3 (granting government's motion to compel response to special interrogatory seeking "each and every source from which [the claimant] claims the [defendant currency] was derived" (alterations omitted)); *United States v. Funds in the Amount of $174,000.00*, No. 11-CV-6698, 2012 WL 473146, at *1-2 (N.D. Ill. Feb. 6, 2012) (holding that the government could use special interrogatories to inquire into, *inter alia*, the claimant's interest in the currency and any documents substantiating that interest, the source of the currency and the date it was acquired, and the identity of witnesses corroborating claimant's claim of interest); *United States v. Approximately $750,000 in U.S. Currency*, No. 10-CV-6069, 2011 WL 6155687, at *1, *2 (S.D.N.Y. Dec. 8, 2011) (holding that the government could use special interrogatories to ask the basis for the claim of ownership, the source of the defendant currency, the identity of any person or document supporting the claim,

4

and the claimant's income and tax return information, criminal history, and past participation in civil lawsuits); *United States v. $333,806.93 in Proceeds*, No. 05-CV-2556, 2010 WL 3733932, at *2 (C.D. Cal. Aug. 30, 2010) (concluding that special interrogatories seeking "any records or documents relevant to [the claimant's] interest in the defendant assets" and the identities of "all persons having knowledge" of that interest were "highly relevant" and "directly relevant" to standing).

A claimant must answer or object to such interrogatories within 21 days of service. R. G(6)(b).   If the claimant fails to respond, or if the claimant's responses to the interrogatories are inadequate, the government may file a motion to compel responses pursuant to Federal Rule of Civil Procedure 37 or move to strike the claim and answer pursuant to Rule G.  *See United States v. Vazquez-Alvarez*, 760 F.3d 193, 196 (2d Cir. 2014); *$133,420.00 in U.S. Currency*, 672 F.3d at 635; *see also, e.g.*, *United States v. $410,000.00 in U.S. Currency*, No. 07-CV-0589, 2007 WL 4557647, at *7 & n.5 (D.N.J. 2007) (granting government's motion to compel responses to special interrogatories as necessary to ensure claimant has standing and to protect against nominee claimants); *United States v. $2,409.00 in U.S. Currency,* No. 10-CV-0220, 2010 WL 2670982, at *1 (D. Md. June 24, 2010) (striking claim for failing to respond to special interrogatories within 21 days).

III.    Chen and Prince Group Failed to Comply with Rule G(6)

A.    Boies Schiller's Submission on Chen's Behalf is Improper

Chen's purported responses fail to meet the most basic black-letter requirements. In short, they are not Chen's responses; he did not make the statements that Boies Schiller has issued in his name, much less sign or swear to them.  The Court should compel him to respond as a threshold requirement to participate in this litigation and verify the presence of a real party in interest who is bound to tell the truth.  Boies Schiller has no standing to pursue this litigation on its own, and should not be permitted to carry the case forward, zombie-like, in the absence of a real client.  Much less is Boies Schiller permitted to make up convenient answers and assign them to a pair of stand-ins willing to swear that Boies Schiller's formulations are things Chen might have said, had he only had the chance.

"[T]he Federal Rules are explicitly clear that interrogatories must be answered by the party to whom they are directed and signed by him under oath." *Chow v. Shorefront Operating LLC*, No. 19-CV-3541 (FB) (SJB), 2021 WL 225933, at *1 n.1 (E.D.N.Y. Jan. 20, 2021) (quoting *Trueman v. N.Y.S. Canal Corp.*, No. 09-CV-49, 2010 WL 681341, at *5 (N.D.N.Y. Feb. 24, 2010)); *see also Stidhum v. 161-10 Hillside Auto Ave, LLC*, No. 21-CV-7163 (HG), 2022 WL 17852023, at *2 (E.D.N.Y. Dec. 22, 2022) ("The interrogatory responses must be verified by each party on whose behalf they are made."); Fed. R. Civ. P. 33(b)(1)(A) ("[I]nterrogatories must be answered [] by the party to whom they are directed[.]"), 33(b)(3) ("Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath."), 33(b)(5) ("The person who makes the answers must sign them, and the attorney who objects must sign any objections.").   Thus, in a civil forfeiture action like this one, the government's special interrogatories pursuant to Rule G(6) must be answered by the claimant, signed by the claimant, and provided under oath. *See United States v. $39,557.00, More or Less, in U.S. Currency*, 683 F.

5

Supp. 2d 335, 340 (D.N.J. 2010) (special interrogatory responses "made by [] counsel in violation of Fed. R. Civ. P. 33(b)(1)(A)" were "deficient").

"This is not a ministerial requirement; interrogatory answers are equivalent to sworn witness testimony, which cannot be supplied by counsel." *Chow*, 2021 WL 225933, at *1 n.1; *287 Franklin Ave. Residents' Ass'n v. Meisels*, No. 11-CV-976 (KAM), 2012 WL 1899222, at *9 (E.D.N.Y. May 24, 2012) ("The oath requirement applicable to interrogatories has legal significance, and courts have routinely refused to consider interrogatories that do not comport with that mandate.") (collecting cases); *Connelly v. Cook Cnty. Assessor's Off.*, No. 19-CV-7894, 2022 WL 17718411, at *4 (N.D. Ill. Dec. 15, 2022) ("Rule 33's requirements that an individual party sign and verify their own interrogatory answers are among the simplest of all the Rules of Procedure and they are mandatory, not optional." (cleaned up)). Thus, in *Connelly*, for example, when a defendant public official delegated to his deputy "the duty to answer, sign, and verify the interrogatories served upon him," he violated Rule 33 and "the responses that [the deputy] signed and verified" were "not [the defendant's] interrogatory answers." 2022 WL 17718411, at *4.

So too, here. The responses provided by ▮▮▮▮▮ and ▮▮▮▮▮, whoever they are, plainly violate Rule 33 and "are not [Chen's] interrogatory answers." *Id*. Nor is it of any import that Chen's responses were signed by individuals purporting (with no support or explanation) to have "power of attorney" on Chen's behalf. An individual cannot proceed in a civil forfeiture action through attorneys and agents. *See, e.g., United States v. All Assets Held at Bank Julius, Baer & Co., Ltd.*, 228 F. Supp. 3d 118, 126-28 (D.D.C. 2017) (verified claim filed on behalf of other parties as "power of attorney" does not satisfy the requirements of Rule G). And while "a corporation or other listed entity may have an officer or agent sign [interrogatory responses] on its behalf, [] that option is not available for a party who is an individual." *Epps v. Dart*, No. 22-CV-2393, 2022 WL 17251279, at *3 (N.D. Ill. Nov. 28, 2022). This is true even where a party is unavailable. *See, e.g., Martinez v. Salazar*, No. 14-CV-00534, 2015 WL 13638319, at *1 (D.N.M. Apr. 28, 2015) ("The fact that a party to whom interrogatories are directed is not available does not mean that counsel may sign on behalf of that party.") (citing *McDougall v. Dunn*, 468 F.2d 468, 472 (4th Cir. 1972)); *Cabales v. United States*, 51 F.R.D. 498, 499 (S.D.N.Y. 1970), *aff'd*, 447 F.2d 1358 (2d Cir. 1971).

All of this is for good reason. "Requiring a party to sign interrogatory responses under oath serves the critical purpose of ensuring that the responding party attests to the truth of the responses." *Inventus Power v. Shenzhen Ace Battery*, 339 F.R.D. 487, 496 (N.D. Ill. 2021) (internal quotation marks and citation omitted); *see also In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 487-88 (2d Cir. 2013) (describing verification requirement and holding that interrogatory responses not "expressly made under penalty of perjury" were properly rejected). As courts have observed, "the only safeguard the courts have against the filing of false claims in civil *in rem* proceeding[s] is the threat that the filing of a false claim will trigger a perjury prosecution." *United States v. $70,670.00 in U.S. Currency*, No. 15-CV-23616, 2016 WL 233405, at *2 (S.D. Fla. Jan. 20, 2016) (quoting *$104,250.00 in U.S. Currency*); *see also United States v. $17,900 in U.S Currency*, No. 15-CV-00368, 2018 WL 2455436 (D.D.C. May 31, 2018) (striking claims for lack of standing when undisputed evidence revealed that claimants committed perjury in response to special interrogatories).

Nor is Chen's standing a settled matter, as he has suggested in prior filings. While the Complaint alleges that Chen controlled the Defendant Cryptocurrency during the relevant timeframe in December 2020, it is well settled that "simple physical possession is insufficient to establish standing under Article III," and that "the claimant must also allege facts 'regarding how the claimant came to possess the property, the nature of the claimant's relationship to the property, and/or the story behind the claimant's control of the property.'" *United States v. Eight (8) Counterfeit Watches*, No. 17-CV-156, 2017 WL 3706040, at *3 (S.D. Ohio Aug. 28, 2017), *report and recommendation adopted*, No. 17-CV-156, 2017 WL 4236573 (S.D. Ohio Sept. 21, 2017) (citations omitted); *see also United States v. Real Properties Known as 50 Riverside Blvd.*, No. 18-CV-9293, 2019 WL 4877490, at *3 (D.N.J. Oct. 2, 2019) (recognition in complaint that claimant is the titled owner of property is not a concession as to his standing that renders the special interrogatories unnecessary); *$70,670.00 in U.S. Currency*, 2016 WL 233405, at *2 (compelling responses to special interrogatories and explaining that "[a] blanket assertion that a putative claimant is the owner of the property does not sufficiently identify his interest in the property for the purposes of satisfying Rule G(5), even if the putative claimant was in possession of the seized property at the time it was seized." (cleaned up)).

What is more, Chen's claim and purported interrogatory responses contest many of the allegations in the Complaint and in fact assert multiple incompatible theories of ownership, as discussed more fully below. Chen's counsel claim an alleged bailment on behalf of Prince Group and also assert the existence of an arrangement by which ███████████ inexplicably had control of the funds. ██████████████████████████ Chen (or his lawyers) cannot point to the Complaint as establishing his standing while advancing theories that conflict with the Complaint and with each other. If ██████ controlled the funds or owned them, then this is a very different litigation than if Chen held them, and again the litigation is different if Chen held them on behalf of Prince Group. The point of the verification requirement is that Chen himself must pick a story and swear that it is true. His counsel cannot proceed on multiple theories and pick the most advantageous theory or theories down the line.

More fundamentally, the government understands from counsel that Chen is no longer even directing the litigation of his claim in this matter. The attorneys at Boies Schiller (who concede that Chen has not communicated with them in nearly half a year) do not have standing on their own to press a claim in this case, nor do the two mysterious individuals who attempted to sign on Chen's behalf.

**B.    Boies Schiller's Submissions for Chen and Prince Group Are Otherwise Deficient**

Perhaps unsurprisingly, Chen's and Prince Group's supposed responses contain few real answers to the government's questions. They reflect an effort to evade the government's interrogatories and camouflage the claimants' unwillingness to give real answers that would shed light on their standing. The Court should force Chen and Prince Group to answer the special interrogatories as required.

As a starting point, Chen and Prince Group cannot even say which slices of the pie they claim to own. Their counsel asserts that Chen owns some of the funds, and Prince Group owns the rest. *See* Chen Response No. 4; Prince Group Response No. 3. But the responses fail to

identify which assets are allegedly owned by Chen and which by Prince Group, or even what fraction each is claiming. *See id.* They provide no information about the 25 virtual currency addresses that contained the Defendant Cryptocurrency (listed in Attachment A of the government's Complaint), nor about the sources that funded those addresses from each of these two claimants. As a result, this litigation is poised to move forward without clear delineations of the parties' competing claims—a recipe for confusion and mischief down the line.[4]

To the degree the responses purport to characterize Chen's interest in the defendant cryptocurrency, they are tellingly vague. The Chen responses state that Chen's ownership interest in the Defendant Cryptocurrency "generally was acquired through the purchase of cryptocurrency with his business income" and then reference two separate responses (Chen Response Nos. 3 and 13) that list his businesses. Chen Response No. 4. But they do not say when he purchased the cryptocurrency, where he purchased it, how much he purchased, or where he held it before it was routed to the 25 Attachment A addresses. Nor do they specify what income was used to purchase it of the dozens of sources of income listed in Chen Response Nos. 3 and 13.

Meanwhile, the Prince Group responses assert vaguely that Prince Group's "interest in the Defendant Cryptocurrency arises from its businesses and associated revenue streams," and in particular its receipt of cryptocurrency as "payment" in its gaming business and "rent" from tenants. *See* Prince Group Response No. 3. But they do not provide a single detail to make sense of these categorical statements, including how and through what accounts or wallets the funds were accepted, how this money flowed into the Attachment A wallets, or which funds in which wallets came from which alleged sources. They do not offer any explanation of the unlikely scenario whereby tenants paid their landlords in cryptocurrency. Nor do they even identify which or what kind of "gaming" business is purportedly a subsidiary of Prince Real Estate Cambodia, nor how, when or in what amounts the profits of this gaming business allegedly flowed to Prince Real Estate Cambodia. Crucially, the responses fail even to confirm under oath whether Prince Real Estate Cambodia is still a licensed corporate entity operating as a going concern, a basic standing requirement in any litigation.[5] *Cf. Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,

---

[4]    Notably, another law firm has asserted, on behalf of a class of debtors in the liquidation proceedings described above, that its clients may be entitled to Prince Group's stake in this litigation, whatever that may be. *See In re Prince Global Holdings Limited, et al.,* No. 26-BK-10769 (MG) (S.D.N.Y.), June 9, 2026 Hearing Tr. at 16. If that argument wins the day, Chen could lose any stake in Prince Group's claim, while retaining his own stake. But no court could use the vague, muddy assertions put forth by Boies Schiller to sever Prince Group's interests from Chen's. That thought experiment makes clear the need for precise *ex ante* statements delineating the boundaries of each claim.

[5]    As has been widely reported, scores of Prince Group entities have been shut down by Cambodian authorities for their involvement in illegal activities, and as referenced above, some thirty Prince Group entities incorporated in the BVI, including the holding entities Prince Global Holdings Limited and Prince Global Group Limited, are currently undergoing a public interest liquidation by the BVI attorney general for the same reasons and are now controlled by BVI-appointed liquidators. Notably, Prince Group's public website has been taken down.

991 F.3d 370, 384 (2d Cir. 2021) ("[A]bsent a plaintiff with legal existence, there can be no Article III case or controversy." (citations omitted)).

The responses also implausibly claim ignorance of basic information that would support these asserted narratives. For example, the Prince Group responses assert that Prince Group is not aware of any traditional financial accounts that funded the Defendant Cryptocurrency, *see* Prince Group Response No. 3, and Chen's purported responses are completely silent on that question. This would suggest that both Chen and Prince Group funded the 25 Attachment A wallets *solely* from other cryptocurrency wallets (and that Chen only ever earned money in the form of cryptocurrency). That is not only highly unlikely but also unsupported in the responses, which do not provide a single virtual currency address alleged to have funded the Defendant Cryptocurrency wallets.[6]

These vague "blanket assertion[s]" "do[] not sufficiently identify [Chen's and Prince Group's] interest in the property." *$70,670.00 in U.S. Currency*, 2016 WL 233405, at *2 (compelling responses to special interrogatories where claimants had conflicting claims and "[n]o [c]laimant provides any factual support regarding their ownership of the Defendants *In Rem* nor regarding the circumstances surrounding their acquisition of the seized currency"). "[A] claimant asserting an interest in seized property 'needs to provide detail as to how he obtained possession of the currency, including, but not limited to, the person(s) from whom he received the currency, the date of receipt, the place of the receipt, and a description of the transaction which generated the currency.'" *Id.* (quoting *United States v. $134,750.00 in U.S. Currency*, No. 09-CV-1513, 2010 WL 1741359, at *3 (D. Md. Apr. 28, 2010)); *see also $272,000.00 in U.S. Currency*, 2017 WL 8780158, at *3 (granting government's motion to compel response to special interrogatories seeking to learn "when, from whom, where, and how" the claimant acquired the interest in the defendant funds; "each and every source from which" the claimant claimed the funds were derived, "including the exact amount of money derived from each source"; and the "name, address, and phone number" of any "third party from whom [claimant] contends the funds were derived" (cleaned up)); *$333,806.93 in Proceeds,* 2010 WL 3733932, at *3 (holding that, in response to interrogatory asking claimant to "'list each and every source from which she claims that the defendant proceeds were derived,' as well as to provide information regarding the date the proceeds were obtained, from whom they were obtained, and the reason why [claimant] obtained the proceeds," claimant's response that the proceeds were "surplus of a foreclosure sale" was deficient, as it did "not address each portion of the interrogatory" (cleaned up)); *see also United States v. $209,815 in U.S. Currency*, No. 14-CV-0780, 2015 WL 1927431, at *1-2 (N.D. Cal. Apr. 28, 2015) (special interrogatories that "probe, among other things, how and from whom [claimant] acquired the [money], the facts and records supporting his claim of lawful ownership of the money, and the identities and contact information of individuals with knowledge of [claimant's] interest in the money" are "well within the scope of" Rule G(6)); *$307,970.00 in U.S. Currency*, 2013 WL

---

[6]   The government's Complaint alleges a complex flow of on-chain and off-chain laundering ultimately resulting in the funds stored at the Attachment A addresses. If, as the Prince Group responses allege, some of those funds instead flowed directly from cryptocurrency payments by Prince Group customers, that would be easily discernable on the public blockchain (and, presumably, from Prince Group's own records). The responses make no attempt to identify this very simple alleged flow of funds.

9

4095373, at *3 (explaining that interrogatories which ask why claimant was in possession of portion of someone else's property, the name of that third party, the amount of property owned by that party, and when claimant took possession of such portion are all proper under Rule G(6) and go towards standing).

The strategy is clear. The responses are an attempt to give vague and strategically ambiguous answers so that Boies Schiller can shift both its purported clients and their claims as needed rather than be held to the truth. They are also a transparent attempt to afford Chen multiple bites at the apple—one in his own name and one (improperly and contrary to the facts) in Prince Group's name.[7] As the responses indicate, Prince Real Estate Cambodia is 100% owned by Chen and had neither possession of the funds nor access to the virtual wallets that held them. *See* Prince Group Response No. 3; Chen Response Appendix A at 2. Such claims by nominees with no control over the defendant property are prohibited in civil forfeiture actions. *See, e.g., United States v. One 1990 Beechcraft*, 619 F.3d 1275, 1278-79 (11th Cir. 2010) (a corporation holding legal title is not an owner if all control is exercised by its majority shareholder in his individual capacity without regard to the corporate form); *$410,000.00 in U.S. Currency*, 2007 WL 4557647, at *7 & n.5 (granting government's motion to compel responses to special interrogatories as necessary to ensure claimant has standing and to protect against nominee claimants). Such a strategy would thus be plainly improper, but without basic information as to which property each entity has actually claimed, it will be impossible to litigate that issue before the Court.

Equally lacking are the responses provided by each claimant concerning its relationship with the Lubian cryptocurrency mining operation and that entity's alleged role with respect to the Defendant Cryptocurrency.

---

[7]    Indeed, at times, the Prince Group responses mistakenly answer as if they were Chen. *See, e.g.*, Prince Group Response No. 7 (asserting that "Plaintiff's Verified Complaint states that Claimant 'personally maintained records of the wallet addresses and seed phrases associated with the private keys for each.'"). Of course, the government's Complaint made those allegations about Chen, not about Prince Group, *see* Complaint ¶ 44 n.6, and nowhere alleges that Prince Group had any ownership, possession or control of the Defendant Cryptocurrency, which Prince Group elsewhere appears to concede.



These strategic nonanswers are a transparent attempt to avoid providing crucial information that "connect[s] directly to the task of determining [the claimant's] identity." *$272,000.00 in U.S. Currency*, 2017 WL 8780158, at *3 (citing *$333,806.93 in Proceeds*, 2010 WL 3733932, at *3).

Indeed, "[i]interrogatories into third parties' ownership or possession over the *res* are relevant to Claimants' relationship to the *res* to the extent any such ownership or possession affects Claimants' claim of ownership," which here it clearly does. *United States v. Amadea*, No. 23-CV-9304, 2024 U.S. Dist. LEXIS 54490, at *1-2 (S.D.N.Y. Mar. 21, 2024).[8]

These issues are all the more central given Chen's and Prince Group's vague and strategic responses about Lubian's business operations as they relate to the Defendant Cryptocurrency.

But they provide no explanation as to how portions of the Defendant Cryptocurrency that were mined by Lubian (as is clear from the public blockchain) belong to Chen, nor how the portions of the Defendant Cryptocurrency not maintained in wallets associated with Lubian (*i.e.*, the majority of the Defendant Cryptocurrency) were derived or how they also belong to Chen. The Prince Group responses similarly fail to explain this. In other words, and more broadly, both the Chen and Prince Group responses appear to allege that 100% percent of the Defendant Cryptocurrency is personal and business income

Meanwhile, as the Complaint sets forth, some portion of the Defendant Cryptocurrency (both at Lubian and non-Lubian addresses) was *newly mined*. This is easily discernable from the public blockchain and cannot be contested. Neither Chen's nor Prince Group's responses even attempt to assert or explain any ownership interest over any newly mined bitcoin, even though such bitcoin definitionally cannot be derived from Chen's and Prince Group's business income, as these claimants loosely allege all of the Defendant Cryptocurrency was. Again, these vague and contradictory responses are entirely deficient and do nothing to satisfy Chen's and Prince Group's basic obligations under Rule G. *See $70,670.00 in U.S.*

---

[8]

*Currency*, 2016 WL 233405, at \*2; *$272,000.00 in U.S. Currency*, 2017 WL 8780158, at \*3; *$209,815 in U.S. Currency*, 2015 WL 1927431, at \*1-2.[9]

Finally, and similarly concerning, both sets of responses appear to concede that the respective claimants destroyed relevant records and cannot provide information about their own funds as a result. *See* Chen Response No. 4 (discussing records "no longer available"); Prince Group Response No. 3 (discussing "loss of records"). But neither claimant explicitly admits, as they are required to do, that they therefore cannot answer the government's special interrogatories. Instead they lodge improper objections, refuse to respond and assert that they do not owe the government any additional information. That is not sufficient. If these claimants are incapable of answering the government's special interrogatories, they must say so. *See, e.g., Connelly*, 2022 WL 17718411, at \*4 ("Even if a party is unable to supply the requested information after engaging in these efforts, 'the party may not simply refuse to answer, but must state under oath that he is unable to provide the information and set forth the efforts he used to obtain the information.'") (citations omitted); *Wang v. Shanghai You Garden, Inc.*, No. 20-CV-4588 (CBA) (CLP), 2023 WL 5670772, at \*7 & n.13 (E.D.N.Y. Mar. 31, 2023) (ordering defendant corporation "to provide a detailed Affidavit from a party representative explaining why defendants are unable to respond to these interrogatories" and warning of sanctions should defendants file additional improper or frivolous objections to the interrogatories).[10]

Fundamentally, the responses offer no explanation for the deeply implausible answers they provide. It is not clear how Prince Group had ownership of funds that it concedes it had no access to, *see* Prince Group Response No. 3, nor how a multinational conglomerate did not possess or have access to billions of dollars of its purported corporate earnings. And it is equally unclear why or how ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ The answers provided are at times so strategically ambiguous as to be entirely unhelpful in assessing standing, and at other times so outlandish (or demonstrably false) as to be almost certainly perjurious. Chen and Prince Group must comply with the rules if they wish to press claims in this action.

---

[9]     Both Chen and Prince Group purport to object "to the definition provided for 'LuBian' as vague, inaccurate, and inconsistent with claims filed by other claimants in this action," Chen Response Nos. 10 and 11, Prince Response Nos. 7, 8 and 9, though it is not clear what this means. Neither offers any explanation as to what "definition" they are referring to or why exactly they believe it is inaccurate. Meanwhile, they provide no alternative and instead leave unaddressed Lubian's role in cryptocurrency mining that gave rise to portions of the Defendant Cryptocurrency.

[10]     In discussing the loss of relevant records, both sets of responses incorrectly assert that the government "delayed filing" the civil forfeiture action. In fact, the government filed the civil forfeiture action well within the period prescribed by statute.

IV.    Conclusion

For these reasons, the government respectfully requests that the Court compel Chen and Prince Group to properly respond to the government's special interrogatories pursuant to Rule G(6).  If they fail to comply, the government intends to move to strike their claims on this basis in addition to those already contemplated in the government's forthcoming motions to strike for failure to establish statutory and constitutional standing.  *See Vazquez-Alvarez,* 760 F.3d at 196; *United States v. $19,764.00 in U.S. Currency*, No. 10-CV-573A, 2011 WL 4899958, at *2-3 (W.D.N.Y. Aug. 12, 2011), *report and recommendation adopted*, No. 10-CV-573, 2011 WL 4896507 (W.D.N.Y. Oct. 14, 2011) (citing cases granting motions to strike for failure to respond to interrogatories).

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/
       Alexander F. Mindlin
       Benjamin Weintraub
       Andrew D. Reich
       Alessandra V. Rafalson
       Tanisha R. Payne
       Assistant U.S. Attorneys
       (718) 254-7000

       Christopher B. Brown
       Supervisory Trial Attorney
       National Security Cyber Section
       National Security Division
       U.S. Department of Justice

cc:    Clerk of Court (CHK)
       Counsel of Record

13