**BSF** | BOIES
SCHILLER
FLEXNER

MATTHEW L. SCHWARTZ
Tel.: (212) 303-3646
E-mail: mlschwartz@bsfllp.com

July 17, 2026

**BY ECF**

The Honorable Clay H. Kaminsky
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    *United States v. Approximately 127,271 Bitcoin,*
              25 Civ. 5745 (RPK) (CHK)

Dear Judge Kaminsky:

We represent Claimants Chen Zhi and Prince Holding Group ("Prince Group" and collectively with Mr. Chen, "Claimants") in the above-referenced action. Claimants respectfully submit this letter in opposition to the government's June 26, 2026 letter motion to compel further responses to its special interrogatories under Supplemental Rule G(6). *See* ECF No. 468 (the "Motion" or "Mot.").

The motion should be denied first and foremost because Mr. Chen's standing is not reasonably in dispute. And even if standing discovery was warranted here, Supplemental Rule G(6) does not compel the production of the additional information the government seeks concerning bitcoin tracing and Lubian, a separate claimant. Lastly, and perhaps most fundamentally as it goes to the government's overall strategic approach, barring Mr. Chen from participating in proceedings concerning billions of dollars' worth of his bitcoin because he is unable to personally sign his responses while being held incommunicado in a Chinese prison is not required by the rules and would make a mockery of an adversary proceeding intended to resolve "the largest forfeiture action in the history of the Department of Justice."[1]

Special interrogatories are permitted to identify a claimant's identity and relationship to the defendant property to establish a claimant's standing to participate in forfeiture proceedings. Here, for Mr. Chen at least, they are completely beside the point. There is no dispute that the government knows who Mr. Chen is. It has explained in exhaustive detail what it knows—or, more accurately, thinks it knows—about Mr. Chen in an Indictment, the Complaint, a DOJ press release, multiple Treasury Department press releases, and many other public filings.[2] And the government well knows

---

[1] "Chairman of Prince Group Indicted for Operating Cambodian Forced Labor Scam Compounds Engaged in Cryptocurrency Fraud Schemes," U.S. Department of Justice Press Release (Oct. 14, 2025), available at https://www.justice.gov/opa/pr/chairman-prince-group-indicted-operating-cambodian-forced-labor-scam-compounds-engaged (referring to this case as the "largest ever forfeiture action"; "the largest forfeiture action in the history of the Department of Justice"; and a "historic forfeiture, the largest in Department history").

[2] We say "thinks it knows" because the government clearly has much of it wrong, including (in its indictment, no less) referring to publicly-available photographs having nothing to do with *anyone's* alleged fraud to Mr. Chen. To cite one example, the Complaint includes photographs in support of



Mr. Chen's connection to the Defendant Cryptocurrency. It makes clear in the Complaint that Mr. Chen possessed and controlled it. And it further makes clear his relationship to the Defendant Cryptocurrency: allegedly, the bitcoin is the proceeds of, traceable to, or was involved in his purported crimes.  Were it not, there would be no basis to seek forfeiture.  In fact, in parallel with this civil case, the criminal case against Mr. Chen seeks specific-asset forfeiture of the Defendant Cryptocurrency, an acknowledgement that Mr. Chen must have some *in personam* "right, title, or interest" in it to be forfeited. That judicial admission alone establishes Mr. Chen's standing.

Despite knowing exactly who Mr. Chen is and relying on his ownership of the Defendant Cryptocurrency as the basis for civil and criminal forfeiture, the government nevertheless served extensive Special Interrogatories under Rule G(6)—32 total special interrogatories on Claimants, with no less than 680 subparts. Claimants responded in detail, serving more than seventy pages of responses, including appendices and more than 5,000 pages of supporting corporate records (collectively, the "Responses"). Out of these dozens of interrogatories and hundreds of subparts, the government's Motion only challenges nine of the Responses. Even that actually overstates the scope of the dispute, as a number of the Responses are only mentioned in passing. The Motion largely boils down to two groups of disputed Responses: (1) Claimants' responses to one interrogatory each demanding that they effectively trace all 127,271 bitcoin at issue in this case; and (2) Claimants' responses to a series of interrogatories demanding extensive detail about Lubian, a separate claimant in this action.

The latter dispute is largely resolved by this Court's recent Order quashing virtually identical interrogatories served on claimant Warp Data about Lubian. *See* ECF No. 472 (the "July 7 Order"). The remaining dispute is similarly without merit: Claimants provided detailed responses based on the information available to them, which were more than sufficient under Rule G.

Separately, the government complains that Mr. Chen's Responses were verified by his power of attorney while he is detained in the People's Republic of China. But courts regularly allow a party's agent to verify interrogatory responses where, as here, that party is unavailable. And even if that were not the case, the obvious remedy would be to direct the parties to seek Mr. Chen's personal verification through international process or once he is provided access to counsel in China—not to kick Mr. Chen out of a case concerning *billions* on a technicality.

That's clearly the government's preferred course. It filed this action, and the accompanying criminal indictment, expecting that Mr. Chen would not appear in the United States so that it could argue fugitive disentitlement—a strategy that the government laid bare early on. *See* ECF No. 60, at 9-10. What it did not expect was that Mr. Chen would not have the opportunity to appear here; he was first confined to Cambodia and unable to travel to the United States, and then renditioned to and detained in China—undisputed facts that deprive the government of a disentitlement argument. Forced to pivot, and desperate not to litigate this case on the merits, the government is searching for any conceivable argument to strike Claimants from this action before it has to explain how it came to

---

the allegation that Mr. Chen used violence as part of his scheme. ECF No. 1, ¶ 40 ("CHEN possessed images illustrating Prince Group's violent methods, including those below"). But one of those photos actually comes from a publicly-available April 2020 article entitled "A man got his testicles stuck between plastic chairs during the lockdown. The situation got out of his control and he had to call an ambulance," which recounts the stories of several men injured from sitting naked on chairs with slats, and begins "Be careful, men! Never sit naked on a plastic chair!" *See* ECF No. 317 at 9.



possess $15 billion in cryptocurrency stolen from Mr. Chen more than five years ago. But while the government's Motion spends page after page accusing Claimants (and their counsel) of various misdeeds, the few actual discovery disputes it musters are limited, narrow, and—in those instances not already resolved by the Court in the Warp Data motion—completely meritless. The Motion should be denied.

## I.    **Relevant Factual Background**

### *Mr. Chen and the Prince Group:*

Mr. Chen is the founder and, until recently, Chairman of Prince Group. As alleged in the Complaint, Prince Group is a "Cambodian-registered corporate holding company that operated more than 100 business entities in over thirty countries," ECF No. 1 ¶ 16(o) ("Compl."), which is "focused on real estate development, financial services and consumer services." *Id.* ¶ 15. As of January 2024, its "total annual revenue from legitimate business operations" were estimated as high as "several hundred million dollars" per year. *Id.* ¶ 57. Prince Group is one of the largest real estate developers and operators in Cambodia. *See, e.g. id.* ¶¶ 15, 16(p)–(s).

As detailed in his interrogatory responses, Mr. Chen and Prince Group had modest beginnings: Mr. Chen ran an internet café business in Fujian, China starting in 2005. ECF No. 468-1 (the "Chen Resp.") at 7–8. This business was lucrative, but when it began to decline in profitability, Mr. Chen sold off his Chinese business interests and followed family members to Cambodia, which had recently begun opening up its property markets to Chinese investment. *Id.* at 8–9. After partnering with local investors and receiving loans from some family, Mr. Chen began buying and brokering property deals in Cambodia. *Id.* at 8. With time, this business grew as Chinese investment flowed into Cambodia's property market. *Id.* at 9–10. Mr. Chen became a Cambodian citizen in December of 2014, and ultimately formed what would eventually be Prince Group, *id.* at 11, which received investment from and partnered with, multinational firms to develop projects in Cambodia. With Prince Group, Mr. Chen was able to move up the real estate food chain, not just buying and selling properties, but buying land and developing it. *Id.* at 9–11. Prince Group developed a number of substantial real estate projects in the ensuing years, yielding substantial profits for Mr. Chen and his partners. *Id.*

As Prince Group's investments in Cambodia grew, Mr. Chen was recruited into informal government service by Hun Sen, the former Prime Minister of Cambodia and father of Cambodia's current Prime Minster, Hun Manat. *Id.* at 13. Mr. Chen acted as an unpaid adviser to Hun Sen, and then Hun Manat, on real estate matters, as well as to the Cambodian Ministry of Interior. *Id.*

When these investments began producing significant profits, Mr. Chen invested these funds into other lines of business, including online gaming. *Id.* at 12, 33. Through a trust structure based in the Isle of Man, Mr. Chen and his spouse invested in a fully-licensed gaming company that held the rights to various popular online games. *Id.* at 33–35. Mr. Chen was also an investor in cryptocurrency, and in particular bitcoin, which is popular in online gaming circles. Mr. Chen acquired and held bitcoin at various points, *id.* at 17–18, and, as relevant here, became acquainted through his businesses with members of the Lubian software group ("Lubian"). *Id.* at 17. ████████████████

████████████████████████████████████████████████

████████████████████████████████████. *Id.* at 17–18.



*The Defendant Cryptocurrency*:

By late 2020, Mr. Chen had acquired a substantial amount of bitcoin with the proceeds of the above-described legitimate businesses, which he was holding in Lubian's Touhou wallets. Chen Resp. at 17. But this was all about to change: on December 28, 2020, 127,426 bitcoin (including all of the Defendant Cryptocurrency) was transferred out of these Lubian wallets in a roughly two-hour period, in a coordinated and highly sophisticated theft. *See* ECF No. 317 at 9–11. Public cybersecurity researchers have since discovered that the wallets were vulnerable to a then-unknown cryptography vulnerability in the software used to create the wallets' private keys. *Id.* at 9. This vulnerability would not be publicly discovered until mid-2023, more than two years after the Defendant Cryptocurrency was stolen. ECF No. 317 at 9. The Chinese government, for its part, has implicated the United States government in the theft. *See* ECF No. 316 at 1-2, n.3.

Once stolen, the Defendant Cryptocurrency was moved to another set of wallets (the "Intermediary Wallets"), which held the Defendant Cryptocurrency for nearly 43 months without any notable activity—no withdrawals, no transfers, and no exchanges for other cryptocurrencies. *Id.* at 10. Between June and July of 2024, the Defendant Cryptocurrency was moved from the Intermediary Wallets to a new series of wallets (the "Consolidation Wallets"), where it remains to this day. *Id.* It is unclear who held the Defendant Cryptocurrency in the Intermediary Wallets for the roughly three years following the theft, but the Consolidation Wallets at least are controlled by the government.

While the Defendant Cryptocurrency came into the government's possession by no later than mid-2024 (and potentially much earlier if the government controlled the Intermediary Wallets), according to disclosures made by the United Kingdom's National Crime Agency, the FBI has been investigating Mr. Chen since *at least* 2022, if not earlier. Nonetheless, Mr. Chen was not notified that the government was holding this stolen bitcoin until the filing of the Complaint, despite repeated efforts to determine who had it. *See generally* ECF No. 317 (Motion for More Definite Statement).

*The Indictment and Its Fallout*

On October 14, 2025, the government unsealed an indictment of Mr. Chen, and filed the Complaint here with notice to Mr. Chen by email. After the charges were unsealed, Cambodia's Interior Ministry publicly stated that Prince Group had operated in accordance with all Cambodian legal requirements and stressed that the Cambodian government was not accusing Mr. Chen or Prince Group of wrongdoing, and went on to question the evidence against Mr. Chen, adding that "we [the government] just hope that there will be arguments and sufficient proof to put against [Mr. Chen]."[3] Privately, however, the Cambodian government informed Mr. Chen that he was not free to leave the country. Chen Resp. at 38.

Mr. Chen and Prince Group ultimately filed timely claims in this action on December 29, 2025, with Mr. Chen verifying both his own and Prince Group's claims (the "Claims"). ECF Nos. 27, 28. Within days, however, Mr. Chen was renditioned from Cambodia to the People's Republic of

---

[3]     Sopheng Cheang, *Cambodia Urges a Fair Process as US and UK Pursue Prince Group's Chen Zhi in a Global Scam Case*, AP (Oct. 15, 2025), https://apnews.com/article/cambodia-us-uk-online-scam-prince-chen-zhi-bbc3fae393003a16cda22efd5a2ada22.



China on January 6, 2026.[4] The Chinese government promptly publicized footage of him being hauled off by private jet, manacled and hooded, by heavily-armed PRC commandos:[5]



Almost as an afterthought, the Cambodian government belatedly announced that Mr. Chen's Cambodian citizenship had secretly been revoked days before.[6] The Chinese Ministry of State Security issued a public statement that Mr. Chen had been "placed under compulsory measures" and announced its intent to hunt down any associates of Mr. Chen, issuing "a stern warning to the criminals, urging them to halt their criminal activities before it's too late, and to surrender immediately and seek lenient treatment."[7] Since his detention, Mr. Chen has been held incommunicado, ████████████████████████████████████████████████████████████████. Chen Resp. at 35. █████████████████████████████ undersigned counsel have attempted to retain counsel for Mr. Chen in China, or have counsel appointed for him to understand his status, but so far have been unsuccessful.

## II.    **Procedural Background**

On February 6, 2026, the government served separate sets of special interrogatories on Mr. Chen and Prince Group. *See* Mot. at 1. Mr. Chen's set comprised 18 interrogatories, many with numerous subparts and requests for highly sensitive information, including residential addresses spanning more than a decade, international travel records, foreign proceedings, corporate affiliations, financial accounts, email accounts, and even passwords and encryption keys. *See* Chen Resp. at 5–6,

---

[4]    Helen Regan, *Alleged Cybercrime Kingpin Arrested and Extradited From Cambodia to China*, CNN (Jan. 8, 2026), https://www.cnn.com/2026/01/07/asia/chen-zhi-arrest-extradition-cambodia-china-intl-hnk.

[5]    *Alleged scam kingpin Chen Zhi arrives in China after extradition from Cambodia*, THE GUARDIAN (Jan. 8, 2026), https://www.theguardian.com/world/2026/jan/08/alleged-scam-kingpin-chen-zhi-extradited-china-cambodia-arrest.

[6]    *Id.*

[7]    *Ringleader of Cross-Border Gambling, Fraud Syndicate Extradited From Cambodia to China*, MINISTRY OF PUBLIC SECURITY OF THE PEOPLE'S REPUBLIC OF CHINA (Jan. 09, 2026), https://www.mps.gov.cn/n2255079/n6865805/n7355748/n7355823/c10359866/content.html.



14, 19, 35, 37. These 18 interrogatories contained hundreds of discrete questions. For instance, Interrogatory No. 4 demanded eight categories of information for each of 25 separate cryptocurrency addresses—amounting to a minimum of 200 distinct subparts. *Id. at* 13–14. *See generally* Fed. R. Civ. P. 33 ("discrete subparts" counted as separate interrogatories). Likewise, Interrogatory No. 13 sought detailed information about seven different entities through multiple layered subparts, constituting at least 98 separate interrogatories. Chen Resp. at 29.

The interrogatories served on Prince Group were similarly expansive. Although they consisted of only 14 numbered interrogatories, they sought extensive information about corporate formations, ownership structures, subsidiaries, directors, officers, business operations, email accounts, purported witnesses, and relationships among Mr. Chen, Lubian, Warp Data and numerous other entities that are not identified in the Complaint. *See* ECF No. 468-2 ("PG Resp.", and collectively with the Chen Resp., the "Responses") at 3–4, 10, 19–20, 23–24, 26–27, 30. And as with Mr. Chen's set, the government included a far greater number of discrete demands within individual numbered requests. *See, e.g.*, *id. at* 3–4, 11–12, 21–24.

Claimants completed their Responses by February 27, 2026. The government now claims Mr. Chen and Prince Group waited until that same day to state their intention to seek a protective order, which they did not provide. Mot. at 2. That is incorrect. Two days prior, on February 25, Claimants had requested the government's availability to confer on this issue. The government was not available until February 27 at 4:30 p.m., when the parties conferred. At that conferral, Claimants requested the government's position on a protective order, which it said it would need time to consider. Claimants' counsel proposed to produce Claimants' Responses that same day if the government would agree to keep the Responses confidential pending negotiation and/or motion practice concerning a protective order under Rule 26(c). The government refused, electing instead to first attempt to negotiate a protective order—but these negotiations were unsuccessful.[8] On April 14, 2026, the Court resolved the parties' disputes and entered a Protective Order, ECF No. 405 (the "Protective Order" or "PO"); *see also* ECF No. 404 (Apr. 14, 2026 Memorandum Opinion & Order). The very next day, Claimants served their Responses. *See* Responses.

Although the government's interrogatories plainly exceeded Rule G(6)'s limited scope, Claimants nonetheless undertook a substantial investigation and provided extensive responses. Out of the 18 Interrogatories served on Mr. Chen and 14 Interrogatories served on Prince Group, Claimants only declined to respond to one of these Interrogatories (*see* PG Resp. at 28-29),and that one is not the subject of the government's Motion. In addition to extensive written answers, Claimants produced detailed appendices of corporate shareholdings and nearly 5,500 pages of supporting documents, including records relating to dozens of entities and their ownership and management.[9]

---

[8]    The government also claims it drafted a protective order, "which counsel rejected." Mot. at 2. Again, that is incorrect. The parties in fact exchanged proposed drafts based on Judge Eshkenazi's form protective order, agreeing on much of the proposed order, but ultimately reaching a narrow impasse as to changes the government proposed to Paragraphs 5 and 7 and changes Claimants proposed to Paragraphs 1 and 13.

[9]    The government claims many of these records "have nothing to do with this action." Mot. at 3. Maybe so, but they are all responsive to the government's requests. It was the government that served exceedingly broad demands for information concerning Mr. Chen and Prince Group's



Mr. Chen's responses addressed, among other things, his asserted ownership and possessory interests in the Defendant Cryptocurrency; his extensive business history in Cambodia, including the founding and sale of multiple businesses; his relationships with Prince Group and related entities; his knowledge of Warp Data, Lubian and other entities identified by the government; his current unavailability due to detention in China; and other information responsive to the government's interrogatories to the extent known. *See* Chen Resp. at 7–13, 16, 21–22, 24–25, 30–35. Following a subsequent meet-and-confer, the government requested additional information, which counsel for Mr. Chen provided by letter on May 18, 2026.

Prince Group's responses were equally thorough, and included thousands of pages of corporate records, including organizational documents, articles of incorporation, shareholder agreements and liquidation documents for dozens of entities. *See* PG Resp. at 5–10. Its Responses explained Prince Group's structure, ownership, relationship to the Defendant Cryptocurrency, relationship with Mr. Chen, and its knowledge of Lubian and other entities. *Id.* at 5–10, 13–28.

When Claimants served their Responses, they designated both the Responses and accompanying productions of business records as confidential pursuant to the Protective Order. *See* PO ¶ 2. After conferring with the government, Claimants voluntarily revised those designations and, on May 28, provided versions of the Responses containing proposed de-designations and targeted redactions. Following further negotiations, Claimants agreed to de-designate additional information concerning Mr. Chen's ownership interests in certain entities, including Prince Real Estate (Cambodia) Group Co., Ltd. Claimants ultimately served updated redacted responses reflecting those narrowed designations on June 19, 2026.

## III.     <u>Relevant Law</u>

Special interrogatories are not a substitute for merits discovery; they are "limited to the claimant's identity and relationship to the defendant property," Supp. R. G(6)(a), and are used to "gather information that bears on the claimant's standing." *Id.* Advisory Committee Note (Subdivision 6). Courts have repeatedly enforced those limitations, holding improper special interrogatories that exceed this limited scope. *See, e.g.*, *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 643 n. 5 (9th Cir. 2012) (special interrogatory requiring the claimant to explain "why anyone would travel anywhere with more than $133,420 in U.S. currency in a rented vehicle" falls beyond the scope of Rule G(6)(a)). Once a claimant has provided information sufficient to establish an interest in the defendant property, such as "showings of actual possession, control, title and financial stake," *$148,840.00 in U.S. Currency*, 521 F.3d at 1275, Rule G(6) no longer authorizes the government to continue probing the merits of its forfeiture theories under the guise of testing standing.

Because special interrogatories are limited to standing, they are not a vehicle to test the legitimacy of a claimant's interest in the property. On this point, *United States v. Two Hundred Seventy-Two Thousand Dollars & No Cents ($272,000)* ("*$272,000*") is instructive. No. 1:16-CV-06564 (AMD), 2017 WL 8780158 (E.D.N.Y. Oct. 26, 2017). There, another judge of this court held that a Rule G(6) interrogatory is permissible only if it seeks information bearing on the claimant's identity or the claimant's relationship to, or interest in, the defendant property. *Id.* at *2. Applying this test, the court rejected interrogatories that sought to probe so-called "why" questions—for

---

relationships with *all* Prince Group subsidiaries or affiliates. Having made such a blunderbuss demand, the government cannot now reasonably complain they got too much information in response.



example, the claimant's purpose in transporting or holding funds in a particular form—or inquired into the claimant's general background, such as by identifying all bank accounts the claimant had an interest in, obtaining employment history, tax returns, or other income sources unrelated to the claimant's asserted ownership interest, or demanding document production, which Rule G(6) does not require. *See id.* at \*4–5. The court held that such interrogatories were overbroad and sought to investigate "the propriety of the claimant's possession of the currency and the reasons for her use of the funds"—not whether the claimant had standing to contest forfeiture. *Id.* at \*4.

Appellate courts interpreting Rule G(6) have likewise consistently recognized that special interrogatories are a narrow mechanism for testing standing, not a vehicle for merits discovery. In the Second Circuit's only decision discussing Rule G(6), it recognized that Rule G(6) serves only the threshold purpose of testing standing, explaining that "[e]stablishing standing in the context of a forfeiture action before considering the merits of a motion to dismiss simply makes sense." *United States v. Vazquez-Alvarez*, 760 F.3d 193, 197 (2d Cir. 2014). And because the Second Circuit has not addressed what *types* of interrogatories fall within Rule G(6)'s limited scope, appellate decisions from other circuits provide the most persuasive guidance.

For example, the Seventh Circuit has emphasized that Rule G(6) is a limited mechanism for testing standing, not a vehicle for requiring claimants to prove the merits of their claims at the outset of the case. In *United States v. Funds in the Amount of $574,840*, the court explained that Rule G(6) interrogatories are designed only to "smoke out fraudulent claims" by persons with no colorable interest in the property. 719 F.3d 648, 650 (7th Cir. 2013). Consistent with that limited purpose, the court stressed that, once a claimant has alleged an injury sufficient to establish Article III standing, "the court's focus should move immediately to the merits." *Id.* at 651. The court further rejected the notion that the government may simply demand that a claimant "prove it's your property," explaining that a verified claim identifying the claimant and the nature of the claimant's interest is itself evidence and shifts at least a burden of production of evidence (that the claim is invalid) to the government. *Id.* at 653; *see also United States v. Funds in the Amount of $239,400*, 795 F.3d 639, 643 (7th Cir. 2015) (holding that "satisfying procedural requirements—not demonstrating 'legitimate' ownership—is all that Rule G asks of claimants aside from showing constitutional standing.").

And the Ninth Circuit held just last month that the government may not "use Rule G(6) to ask questions unrelated to standing, to shift CAFRA's burden of proof to claimants, to seek excessive and unduly burdensome discovery, or to obtain dismissal based on an alleged lack of discovery responses if the responses already given provide adequate fodder for investigation of the claimant's asserted basis for standing." *United States v. $1,106,775.00 in United States Currency*, 177 F.4th 986, 999 (9th Cir. 2026). These decisions reflect an appellate consensus that standing discovery is a limited and distinct vehicle from merits discovery. *See*, *e.g.*, *United States v. $148,840.00 in U.S. Currency*, 521 F.3d 1268, 1275 (10th Cir. 2008) ("Rather, 'courts have held that an allegation of ownership and some evidence of ownership are together sufficient to establish standing to contest a civil forfeiture.'") (quoting *United States v. U.S. Currency, $81,000, etc.,* 189 F.3d 28, 35 (1st Cir. 1999)).

Finally, once a claimant has provided information sufficient to establish an ownership interest in the defendant property, such as "showings of actual possession, control, title and financial stake," *$148,840.00*, 521 F.3d at 1275, then Rule G(6) no longer authorizes the government to continue probing the merits of its forfeiture theories under the guise of testing standing. *See $1,106,775.00*, 177 F.4th at 997 ("Of course, once a claimant's standing is not 'reasonably in dispute,' his claim



cannot be struck for failure to respond to G(6) interrogatories." (*quoting United States v. 17 Coon Creek Rd.*, 787 F.3d 968, 977 (9th Cir. 2015))).

**IV.    Mr. Chen's Standing Is Not Reasonably at Issue, So the Special Interrogatories to Him are Unenforceable[10]**

Rule G(6) authorizes limited discovery concerning a claimant's identity and relationship to the defendant property where standing is genuinely uncertain. *See supra* § III. That is not the case here. The Complaint alleges in detail that Mr. Chen accumulated, controlled, possessed, and exercised dominion over the Defendant Cryptocurrency. Those allegations, taken as true, establish an ownership or possessory interest sufficient for standing, and  thus foreclose Rule G(6) discovery on Mr. Chen. *See United States v. Technodyne LLC*, 753 F.3d 368, 380 (2d Cir. 2014).

In *Technodyne*, the Second Circuit rejected the government's challenge to standing where the government's own complaint alleged that the claimants held the bank accounts and purchased the property subject to forfeiture. *Id.* Having alleged ownership, the government could not simultaneously deny the existence of the interest it had pled. *Id.* This Court recently affirmed that "allegations set forth in a civil forfeiture complaint may establish standing on its face." July 7 Order at 5 (citing *id.*).

That is the case here as to Mr. Chen. The Complaint alleges in extraordinary detail that Mr. Chen "amassed" the Defendant Cryptocurrency, "controlled and personally tracked" the wallets in which it was held, "personally held" the corresponding private keys, "personally tracked" the movement of the assets, "personally maintained records of the wallet addresses and seed phrases associated with the private keys," and exercised dominion and control over them. *See* Compl. ¶¶ 37, 42–45, 44 n. 6; *see also* ¶ 15. Those allegations, on their own, are more than sufficient to establish standing.

The Court's July 7 Order supports Mr. Chen here, where the Complaint's allegations about him are an order of magnitude more voluminous and detailed than about Warp Data. First, the Court recognized that *Technodyne* does indeed hold that "allegations set forth in a civil forfeiture complaint may establish standing on its face." July 7 Order at 5. Second, the Court recognized that "the government alleges that Chen Zhi personally controlled the cryptocurrency wallets containing the Defendant Bitcoin," and that such a possessory interest may establish standing. *Id*. at 5–6. And while the Court found that Warp Data's standing arguments required a "logical leap" the Court could not make, *id.*, there is no such issue here—the government alleges that Mr. Chen possessed the bitcoin, *see, e.g.*, Compl. ¶¶ 43–44 & n. 6, and Mr. Chen agrees. *See* ECF No. 27; Chen Resp. at 17–18. Whatever disputes the government may have with Mr. Chen's asserted ownership interest, his possession of the bitcoin is simply not in dispute.

The government's only response is that "simple physical possession" is not sufficient to confer standing. Mot. at 7. That is incorrect. As this Court recently explained, "[i]n the civil forfeiture

---

[10]    While Prince Group asserted an objection on the same basis, in consideration of the Court's July 7 Order, and given the many other reasons to deny the government's Motion, this opposition focuses on the government's allegations in the Complaint concerning Mr. Chen.  To be clear, neither Prince Group nor Mr. Chen waive any argument—whether for discovery purposes or in the context of the government's inevitable motions to strike—that the Complaint establishes their standing.



context, Article III standing requires 'a possessory or ownership interest in the [*res*], which may be proven by *actual possession*, dominion, control, title, *or* financial stake.'" July 7 Order at 3 (citing *United States v. M/Y Amadea*, 770 F. Supp. 3d 558, 606 (S.D.N.Y. 2025), *aff'd sub nom. United States v. Khudainatov*, 177 F.4th 224 (2d Cir. 2026)) (emphasis added). Actual possession is therefore more than enough to establish standing. Here, of course, the Complaint alleges far more, claiming also that Mr. Chen exercised dominion and control over the Defendant Cryptocurrency. *See, e.g.*, Compl. ¶ 44 (the "Defendant Cryptocurrency" was "stored across" the 25 "Chen Wallets" that were "controlled and personally tracked by Chen"). And as the government itself has already argued in this case, the "Complaint alleges that the private keys to the Defendant Cryptocurrency were in Chen's personal possession," and "whoever controls the private key to a crypto asset, controls that asset." *See* ECF No. 10, at 4 (*quoting SEC v. Payward, Inc.*, 2024 WL 4511499, at \*1 (N.D. Cal. Aug. 23, 2024)). Mr. Chen clearly has standing if these allegations are taken as true; it is difficult to imagine who could possibly have standing if he does not.

Not only has the government made these allegations in its Complaint, it has relied on these allegations to try and defeat other parties in related litigation. For example, in the parallel turnover action brought by certain judgment creditors of Iranian terrorism, the government has repeatedly invoked Mr. Chen's alleged possession and control of the Defendant Cryptocurrency. *See Fritz et al v. Iran and China Investment Development Group,* 1:25-cv-07093-RPK-CHK, ECF No. 96 (government arguing that Defendant Cryptocurrency "originated from virtual currency wallets in the possession of the criminal defendant Chen Zhi," from conduct allegedly carried out "under the umbrella of the Prince Group"). Likewise, in the criminal case against Mr. Chen, the government obtained an indictment containing specific forfeiture allegations seeking to forfeit from Mr. Chen his interest in the Defendant Cryptocurrency—an allegation that makes sense only if Mr. Chen has such an interest. *See* ECF No. 1, at 65-67. Under principles of judicial estoppel, therefore, the government cannot plausibly contest Mr. Chen's standing. *See Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 397 (2d Cir. 2011) (judicial estoppel protects "integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment" (internal citation omitted)). The government nevertheless claims it is entitled to more, including "how the claimant came to possess the property" and "the story behind the claimant's control of the property." Mot. at 7. But as courts have consistently held, the "why" behind a claimant's possession or ownership is a merits question—indeed, it is the primary merits question—and thus is not a valid subject for special interrogatories. *See, e.g., Funds in the Amount of $239,400*, 795 F.3d at 643 (holding that "satisfying procedural requirements—not demonstrating 'legitimate' ownership—is all that Rule G asks of claimants aside from showing constitutional standing."); *$133,420.00 in U.S. Currency*, 672 F.3d at 643 n. 5 (requiring the claimant to explain "why anyone would travel anywhere with more than $133,420 in U.S. currency in a rented vehicle" falls beyond the scope of Rule G(6)). The government's allegations—false as many of them may be[11]—are miles away from the sort of unexplained possession cases that the government relies on.

---

[11]    The government bafflingly suggests that the Court cannot rely on its own allegations because Mr. Chen has disputed certain of them. *See* Mot. at 7. Setting aside that this is simply not how pleadings-stage motion practice works, the key allegations as to standing are not disputed: Mr. Chen and the government both agree that Mr. Chen had possession and control over the relevant digital wallets until the Defendant Cryptocurrency was stolen from them. *See* Compl. at ¶ 44 & n.6, Chen Resp. at 17–18. Whatever else the parties disagree on, that fact is not in dispute, and establishes Mr. Chen's standing to assert at the very least a possessory interest in all of the Defendant Cryptocurrency.



In short, the government claims it can forfeit the Defendant Cryptocurrency because Mr. Chen possessed it and it is traceable to Mr. Chen's purported crimes. If it was not Mr. Chen's cryptocurrency, then it would not be forfeitable. The government cannot have it both ways—building its case on repeated allegations that Mr. Chen controlled and possessed the Defendant Cryptocurrency, but then seeking Rule G(6) discovery to question those same allegations. Because the government's own Complaint establishes at least a colorable interest in the Defendant Cryptocurrency for Mr. Chen, his standing is not reasonably in dispute, and Rule G(6) provides no basis for the expansive discovery the government seeks.

## V.    Claimants Sufficiently Responded to Every Interrogatory at Issue

The Motion says a lot but actually challenges very little. The government addresses barely a quarter of Claimants' Responses—and as detailed below, a number of these mentions are fleeting at best. In substance, the Motion raises two groups of Interrogatory Responses: (1) those seeking extensive information about Claimants' ownership and tracing of the Defendant Cryptocurrency, Mot. at 7–10, and (2) those seeking information about claimant Lubian. *Id.* at 10–12. And to be clear, the government does not—and cannot—allege that Claimants refused to respond to even one of these challenged interrogatories. As explained above, Claimants only declined to respond to a single Interrogatory, which was so overbroad that the government has not even tried to compel a response.

Instead, the government's argument is not that Claimants failed to respond to the challenged interrogatories, but rather, that Claimants did not provide the merits discovery the government wanted. And while the government likens this to cases where claimants simply refused to answer interrogatories, even a passing glance at the Responses demonstrates the opposite. Claimants served detailed and substantive Responses, identified the bases for their claimed interests in the Defendant Cryptocurrency, provided information concerning their identities and relationships to the property, produced extensive supporting documentation, and supplemented those responses through subsequent submissions and meet-and-confer efforts. And where Claimants simply did not have the information that the government sought, Claimants explained *why* they did not have the requested information, and where applicable, identified who it might be sought from. Nonetheless, the government treats these extensive responses as a nullity, and seeks to compel significantly broader discovery. Rule G(6) does not entitle the government to that information.



A.    <u>Interrogatories Regarding Tracing (Mr. Chen Interrogatory No. 4; Prince Group Interrogatory No. 3)</u>

The government's primary complaint concerns Interrogatory No. 4 to Mr. Chen and Interrogatory No. 3 to Prince Group (collectively, the "Tracing Interrogatories"). The Tracing Interrogatories were mirror images of each other, *see* Chen Resp. at 13–14; PG Resp. at 11–12, and requested a *vast* amount of information: each had eight individual subparts, and requested that each subpart be answered for "each of the 25 addresses [listed in Attachment A of the Complaint]"—thus comprising 400 subparts in total. *See id.* The Tracing Interrogatories went far beyond Claimants' "relationship to the defendant property" under Rule G(6), and demanded, among other things, (1) every wallet address that each and every one of the more than 127,000 bitcoin had passed through, (2) the identity of every person who ever had access to such wallets, (3) the origin of all funds that went into any "source accounts"—regardless of whether connected to the defendant *res*—as well as "how, when, and by whom" every mined bitcoin was funded. *See id.* In effect, the Tracing Interrogatories demanded that Claimants trace every one of the subject bitcoin back to its origin, with exceeding detail about every person or account involved at each and every step of the way.

While the Tracing Interrogatories were facially overbroad, Claimants nevertheless responded and provided (1) each type of interest that each of Claimants was asserting, Chen Resp. at 16–17; PG Resp. at 13–14; (2) the identity of any bailor/bailees, Chen Resp. at 17; PG Resp. at 14; (3) the details of their constructive trust interests—while noting that these interests could only be fully pleaded once the government revealed details about the theft of the bitcoin in 2020, Chen Resp. at 17; PG Resp. at 14–15; (4) the laws these interests arose under (generally Cambodian law), Chen Resp. at 17; PG Resp. at 15; (5) ████████████████████████, Chen Resp. at 16–17; PG Resp. at 14–15; (6) other parties claiming an interest in the bitcoin, Chen Resp. at 17; PG Resp. at 16; and (7) the general sources of the bitcoin or associated funds. Chen Resp. at 17; PG Resp. at 16.[12] Claimants also provided extensive detail about Mr. Chen's sources of wealth and business history, and Prince Group's corporate entities, attaching thousands of pages of supporting documents. Chen Resp. at 17–18; PG Resp. at 5–9. These Responses addressed at least subparts (a), (b), (c), and (g) of the Tracing Interrogatories.

Claimants also explained what information they lacked, and why. Because the bitcoin was stolen in 2020, Claimants logically could not answer questions about the *res* during the time period it was lost. And during that nearly five-year period, records were naturally lost to time, and employees with relevant knowledge left. *See, e.g.,* Chen Resp. at 15-16. The government ignores this lengthy delay, other than vaguely asserting that it "filed the civil forfeiture action well within the period prescribed by statute." Mot. at 12, n.10. Maybe. Given the government's refusal to respond to Claimants' motion for a more definite statement, Claimants cannot test this assertion. But regardless, whether the case was filed within the limitations period is irrelevant to Claimants' ability to access information lost due to the five-year delay between the theft (in 2020) and the filing of this action (in

---

[12]    The Motion makes a fleeting reference to Mr. Chen's Responses to Interrogatory Nos. 3 and 13, stating that the Responses do not "specify what income was used to purchase it of the dozens of sources of income listed in Chen Response Nos. 3 and 13." Mot. at 8. While clear from the Responses, for the avoidance of doubt, the sources of funds extensively detailed in Mr. Chen's Responses to Interrogatory Nos. 3 and 13 were, in fact, the sources of funds used to purchase the seized bitcoin he owned. *See* Chen Resp. at 17.



2025). The assets were stolen, and there was no reason for Claimants to have preserved detailed tracing information for nearly half a decade.

Despite the voluminous information produced, and the legitimate hurdles Claimants had to overcome to produce it, the government would have more, seeking to compel further responses to the Tracing Interrogatories. The Court should deny this request. The remaining portions of the Tracing Interrogatories seek information far beyond the standing inquiry contemplated by Rule G(6), and are entirely disproportionate under Rule 26(b)(1), particularly after Claimants provided the information reasonably available to them.

Even if Claimants had not fully and adequately responded to the Tracing Interrogatories (which they have), they still should not be compelled to provide information in response to facially improper demands. As the Court recognized in the July 7 Order, Rule G(6) permits limited discovery to determine whether a claimant has a colorable interest in the defendant property. It does not authorize the government to force claimants to trace every transaction or disprove the government's forfeiture theory before discovery has even begun. *See* July 7 Order at 7–10. Rule G(6) requires only information sufficient to evaluate the claimant's asserted relationship to the defendant property, not a complete forensic reconstruction of every transaction allegedly connected to that property. The Ninth Circuit, in considering similar special interrogatories while recently sitting *en banc* in *$1,106,775.00,* unanimously rejected compelling such exhaustive transaction-by-transaction details concerning a claimant's acquisition of seized property, explaining that such requests went well beyond what Rule G(6) contemplates at the outset of a civil forfeiture proceeding. 177 F.4th at 999. There, the government sought "a detailed description of the circumstances of every transaction by which you acquired or obtained each interest in the property," but the Ninth Circuit found this request plainly overbroad, and held it sufficient that the claimant had stated his general sources of income that he asserted resulted in the seized cash. *See id*.

*$1,106,775.00* is particularly illuminating for multiple reasons. First, as noted above, the Second Circuit has not examined the scope of Rule G(6) interrogatories, so no binding authority exists, leaving only persuasive authority from other circuits. In fact, the government relied heavily on Ninth Circuit precedent in its motion.  Second, and relatedly, in *$1,106,775.00*, the Ninth Circuit distinguished and narrowed its own prior holding in *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629 (9th Cir. 2012), which was repeatedly relied on by the government to support the Tracing Interrogatories, *see* Mot. at 4–5, and thus undermines much of the government's argument on this point. Finally, in *$1,106,775.00,* the Ninth Circuit acknowledged the growing skepticism the Supreme Court has expressed with civil forfeiture procedure and incorporated that guidance in the Circuit's holding. 177 F.4th at 992. In light of each of these factors, Claimants respectfully submit that *$1,106,775.00* is far more authoritative than older precedent cited by the government.

But even if the government were entitled to the level of detail it demands at this threshold stage, under Rule 26, the government cannot compel the production of information it already has. As this Court has already recognized, Rule 26 applies with full force to special interrogatories. *See* July 7 Order at 13 ("Some of the government's other interrogatories seeking information about third parties are also overbroad and disproportionate to the needs of this case."). Thus, the government cannot use special interrogatories to demand information or tracing it already has. *See* Rule 26(b)(1) (considering "the parties' relative access to relevant information"). Here, the Complaint has extensive tracing allegations about the Defendant Cryptocurrency. Compl. ¶¶ 45–58. And unlike cases



involving cash, in which the government might need information to trace seized currency, the Complaint here rests on extensive blockchain tracing analysis.

The government cannot seriously argue that Claimants' standing turns on whether they reproduce information that the government already claims to possess. And if the government somehow could not complete its blockchain tracing despite a three-year head start (at least), it is hardly proportionate to expect Claimants to do so in a matter of months. The allegations of the Complaint drive this point home: at numerous points, the Complaint indicates that the government already has tracing information about Claimants that it simply is not disclosing. For example, the Complaint alleges that the Defendant Cryptocurrency consists of Prince Group's "illicit profits." Compl. ¶ 38 ("Chen and his co-conspirators laundered Prince Group's illicit profits, *including the Defendant Cryptocurrency*, through a variety of complex money laundering networks…") (emphasis added). To make this allegation in a verified complaint, the government presumably has already traced Prince Group's "profits" to the Defendant Cryptocurrency. In other words—the exact evidence that the government is demanding in the Tracing Interrogatories. While the government is not required to plead every fact it knows in its Complaint, it also cannot pretend not to have such information just to test an opposing party.

The government's discovery shell game also touches on a more fundamental principle: the government can only demand what the Claimants actually know, and nothing more. Claimants answered the Tracing Interrogatories with the information that was available to them. Rule 33 requires a "reasonable inquiry," not the unknowable. *See Zanowic v. Reno*, No. 97CIV.5292, 2000 WL 1376251, at *3 n. 1 (S.D.N.Y. Sept. 25, 2000) ("Rule 33 does not require a party to provide information that is unknown and unknowable to that party."). The Defendant Cryptocurrency was stolen in 2020 and Claimants can only "provide the best answer they can based upon current information in their possession." *See Richard v. Dignean*, 332 F.R.D. 450, 459 (W.D.N.Y. 2019); *see also Cullins v. Heckler*, 108 F.R.D. 172, 177 (S.D.N.Y. 1985) ("[A]n answer to interrogatories that denies possession of the requested records is an adequate response if the responding party specifically states that the information is unavailable."). Here, the Responses disclosed the information Claimants had, and explained why they lacked other information, providing the government with "plenty to investigate." *See $1,106,775.00*, 177 F.4th at 998. This was all that Rule G(6) requires.

The government's demands are also disproportionate because Claimants need not establish ownership of every part of the Defendant Cryptocurrency at this stage. The government acknowledges that Claimants have both established ownership of portions of the seized Bitcoin but faults the Claimants for not delineating "which slices of the pie they claim to own." Ltr. Mot. at 7. But this is simply not what is required under Rule G(6) or to establish standing. Rather, a colorable interest in some portions of the Defendant Cryptocurrency is sufficient for standing. *See $148,840.00 in U.S. Currency*, 521 F.3d at 1275 (noting that a claimant "who had asserted at least a partial ownership interest in the defendant res, had Article III standing to challenge the forfeiture") (citing *United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1058 (9th Cir. 1994)). To the extent that the government is now demanding that Claimants quantify the *exact amount* of their interests (*i.e.,* Mr. Chen claims a possessory interest in X amount of bitcoin and an ownership interest in Y amount of bitcoin…), Mot. at 7–8, the government simply never made such a request in the Tracing Interrogatories, so the government cannot compel such an answer now. The Tracing Interrogatories



requested the "nature of your interest" in subpart (a)[13] and the "time and circumstances of your acquisition of *any* interest" in the *res* in subpart (d), Chen Resp. at 14–15 (emphasis added)—which Claimants provided to the best of their ability. What the Tracing Interrogatories *did not* ask was for Claimants to disclose the amount of any such interest. The government clearly knew how to do this—for instance, subpart (c) requested the "nature *and extent*" of any interests for *other* persons or entities who might have an interest in the defendant *res*. But it did not ask for the same information of Claimants. Claimants cannot be faulted for not volunteering details the government did not ask for, and cannot be compelled to respond to an interrogatory that was not made.

Finally, it is worth observing that, here again, the government's present position stands in stark contrast to a previous position it advocated to this Court. At the outset of this case, when Claimants (who were not yet claimants at the time) wanted more time to file their claims so they could conduct a tracing analysis to the extent possible, the government responded without qualification that tracing "is an issue for trial" and "go[es] to the merits of this case." [ECF No. 10 at 4]. It cannot now reasonably argue otherwise, nor is its present position consistent with Rule G(6).

As the Ninth Circuit explained just last month in *$1,106,775.00*, the purpose of special interrogatories are to "gain some understanding of who the claimant is and his alleged relationship to the seized property," which the government can use "to seek further discovery and potentially to strike the claim." 177 F.4th at 994. Put another way, special interrogatories are not a vehicle for the government to one-sidedly litigate its entire case. *See id*. at 998 ("The Rules do not anticipate that all civil forfeiture litigation will be resolved through Rule G(6)."). If the government simply does not believe Claimants' Responses, or thinks it has compelling evidence otherwise, then the Second Circuit laid out exactly how such a dispute should be resolved in *Khudainatov*: the government may move to strike the claims and, if the Court believes that Claimants' standing is not apparent from the pleadings, it may conduct an evidentiary hearing on standing, with all the attendant disclosures and mutual discovery that was ordered in that case. 177 F.4th at 228–230. But what the government should not be allowed to do is retread the path that was soundly rejected in *$1,106,775.00.* 177 F.4th at 998 ("That Porcelli was required to respond to the Rule G(6) interrogatories does not mean that civil forfeiture claims like his—where the property was indisputably taken from him—should always be litigated through the vehicle of case-opening Rule G(6) discovery disputes.").

B.    <u>Interrogatories Regarding Lubian (Mr. Chen Interrogatory Nos. 10–12; Prince Group Interrogatory Nos. 7–9)</u>

The second general group of interrogatories raised in the Motion concern the government's Interrogatory Nos. 10–12 to Mr. Chen and Nos. 7–9 to Prince Group (collectively, the "Lubian Interrogatories"). The Court's July 7 Order largely resolves the government's Motion on this point, as the Court already found virtually identical interrogatories served on Warp Data to be "beyond the legitimate scope of Supplemental Rule G(6)." ECF No. 472, at 13.

Rule G(6) authorizes "special interrogatories limited to the claimant's identity and relationship to the defendant property"—it is not a vehicle for broad merits discovery concerning other claimants, third parties, or the comparative strength of competing claims. Yet the Lubian

---

[13]    Subpart (a) helpfully clarified that it was seeking the *type* of interest claimed, not the *extent* of such an interest: "For example, state whether you claim an interest as an owner of the property, a custodian, a bailee. . ." *See e.g.,* Chen Resp. at 13.



interrogatories seek sweeping discovery about Lubian's ownership structure, operations, corporate history, employees, investors, financial accounts, virtual currency addresses, and alleged relationships with foreign governments. *See, e.g.,* Chen Resp. at 24-26.

Under Rule G(6), a claimant's identity concerns whether the *claimant* is who it purports to be and whether it possesses a stake in the defendant property. *See United States v. M/Y Amadea*, 770 F. Supp. 3d at 604. And the purpose of such discovery is to test the *claimant's* asserted interest in the *res. Id.* But the Lubian interrogatories have nothing to do with either of Claimants' standing, and not a single one of the Lubian Interrogatories even mentions the Defendant Cryptocurrency.

For this reason, this Court rejected virtually the same interrogatories when they were served on Warp Data. *See* July 7 Order, at 13. There, the government sought information concerning Lubian's "identity, corporate structure, business operations, and accounts." *Id.* at 13. The Court held that such requests exceeded Rule G(6), explaining that information regarding another claimant's business operations and corporate affairs was "more appropriately directed to those claimants" and was not relevant to Warp Data's standing. *Id.* The Court further held that the government could not use Rule G(6) to force one claimant to "explain the difference between its interest in the Defendant Bitcoin and that of other claimants" or otherwise litigate the merits of competing claims at the standing stage. *Id.* The same reasoning applies here. *See id.* (citing *United States v. $128,915.00 In United States Currency*, No. 20-CV-00667-JPG, 2021 WL 243585, at *4 (S.D. Ill. Jan. 25, 2021) (rejecting the government's argument that its interrogatories are proper to determine whether "the currency seized from [the claimant] is truly his and his alone")).

This Court already set the bounds of any inquiry to other claimants about Lubian at this stage when it quashed identical interrogatories to Warp Data, directing answers only "to the extent they ask about whether . . . Lubian had access or control over the Defendant Bitcoin." July 7 Order, at 15 n. 2. Claimants' Responses already provided this information: Prince Group identified the interests it asserts in the Defendant Cryptocurrency, described the basis for those interests, and disclosed ██ ████████████████████████████████████████. *See* PG Resp. at 13–16. Mr. Chen went further, ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████. *See* Chen Resp. at 17–18; *id.* at 16–17. This was all either Rule G or the Court's July 7 Order requires because, as the court in *$272,000* held, special interrogatories are not a vehicle to inquire into questions of "why" an asset was held or treated in any particular manner. 2017 WL 8780158, at *4 (quashing special interrogatories that asked "why the Defendant Funds were transported in the manner in which they were transported, and why the currency was transported in lieu of using cash and/or wire transfers."); *see also $133,420.00 in U.S. Currency*, 672 F.3d at 643 n. 5 (special interrogatory requiring the claimant to explain "why anyone would travel anywhere with more than $133,420 in U.S. currency in a rented vehicle" was beyond the scope of Rule G(6)). In sum, Claimants' Responses to the Lubian Interrogatories already far exceeded what the Court's July 7 Order requires, and thus the Motion must be denied as to these Interrogatories.

C.     Interrogatories Regarding Warp Data (Mr. Chen Interrogatory No. 13)

Finally, in a single footnote, the government makes a stray, passing reference to Mr. Chen's response to an Interrogatory regarding claimant Warp Data. *See* Mot. at 11, n. 8 ███████████



███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████. This is especially curious given Chen's extensive and intertwining business relationships with Warp Data's founder."). Assuming *arguendo* that in pointing out this "curiosity," the government is seeking to compel something more, this request fails for the same reason the Lubian Interrogatories fail.

The government's Interrogatory No. 13 to Mr. Chen sought information from Mr. Chen about Warp Data's ownership, lines of business, officers and employees, investors, corporate structure, governing documents, and more. Chen Resp. at 29. These demands plainly have nothing to do with Mr. Chen's interest in the Defendant Cryptocurrency. The Court's decision striking similar interrogatories regarding Lubian, *see supra* § V.B, should apply equally to the government's Interrogatory No. 13 concerning Warp Data. To the extent that Interrogatory No. 13 seeks information about Warp Data's business or assets unrelated to the Defendant *res*, the Court did not even require Warp Data to provide such information about itself, so it should certainly not compel Mr. Chen to do so. *See, e.g., id.* at 9 (noting such "interrogatories are overbroad to the extent they seek information about Warp Data's assets that are *not* part of the *res*, such as unrelated funds held in Warp Data's accounts").

Finally, while the Motion alludes to "Chen's extensive and intertwining business relationships with Warp Data's founder," Mot. at 11, n. 8, it does not cite or attach anything supporting this. Claimants are at a loss as to how to meet this vague assertion, other than to point out that there is nothing particularly odd about one person having "business relationships" with another person that he "does not control." That is largely why contract law exists. In any event, the government's Motion cannot rest on purported evidence that the government chooses not to disclose. To the extent the Motion is construed as seeking to compel some additional information regarding Interrogatory No. 13 from Mr. Chen, it should be denied.

## VI.  Mr. Chen's Verification Was Proper Under the Circumstances

The government complains that Mr. Chen did not do the impossible—that is, personally verify his Responses while being held incommunicado in an undisclosed Chinese prison—and asks the Court to compel him to do so as a "threshold requirement to participate in this litigation." Mot. at 5. The government is well aware that Mr. Chen is detained in China; it served Interrogatories on that point. *See* Chen Resp. at 37–38. And because of the circumstances of his detention, Mr. Chen cannot communicate with counsel, review discovery materials, or personally execute sworn discovery responses. *See id.* at 38. Since his detention in January, he has been legally and practically unavailable, ████████████████████████████████████. To be clear: this is not like a litigant being confined in an American prison, where counsel can get limited access to his or her client, whether in person or by remote means, and the client can review and even sign documents. Since his rendition from Cambodia—which occurred without advance notice or due process—Mr. Chen has been held incommunicado, period. In fact, numerous public sources have observed that Mr.



Chen may have been transferred to China for the purpose of silencing him.[14] Regardless of the motivation, this much is true:  Mr. Chen is not able to sign anything at the moment.

This was explained to the government at the parties' meet-and-confer, yet the government nonetheless asks the Court to penalize Mr. Chen for failing to provide a personal signature that, as a practical matter, he cannot provide. Mot. at 5–7. That is no basis to strike Mr. Chen from this action, which is plainly what the government aims to do.

As an initial matter, the government ignores the threshold issue: Mr. Chen's standing is not reasonably in dispute and his signature was not required for his counsel to object on such grounds. Federal Rule of Civil Procedure 33 requires only that answers—not objections—be verified. *See* Fed. R. Civ. P. 33(b)(5) ("The person who makes the answers must sign them, and the attorney who objects must sign any objections."). Mr. Chen's signature was not required for his counsel to object on the grounds that his standing is not reasonably at issue.  *See* Chen Resp. at 2 ("Claimant objects to the Interrogatories on the grounds that Plaintiff's Verified Complaint alleges facts sufficient to show standing at this stage, and accordingly, Claimant's standing to contest forfeiture is not reasonably in dispute, and the interrogatories are therefore served for an improper purpose."). Whether or not Mr. Chen personally verified the answers is thus irrelevant because that objection was proper—and should be sustained. *See supra* § IV.

But even if the Court were to find that Mr. Chen's standing is not established on the face of the Complaint, his answers were still properly verified by his attorneys-in-fact, which was appropriate under these circumstances. Courts recognize that Rule 33's verification requirement must yield to practical realities where personal verification is impossible or impracticable for reasons beyond a party's control, particularly where no prejudice results. *See Lastick v. Bahama Cruise Line, Inc.*, No. 88 CIV. 3624 (KC), 1990 WL 139023, at *5 (S.D.N.Y. Sept. 18, 1990) (recognizing exceptions to Rule 33's verification requirement "in exigent circumstances" or "where no prejudice was shown" (citing *Fyodorova v. National Enquirer, Inc.*, 89 F.R.D. 68 (S.D.N.Y. 1981))).[15]

That principle applies where, as here, a party cannot reasonably or safely verify interrogatory responses. The closest parallel is *Fyodorova*, where the plaintiff was located in the Soviet Union and faced potential risk if required to verify interrogatory responses personally. 89 F.R.D. at 69. The court

---

[14]    *See, e.g.,* Sui-Lee Wee, *Why Cambodia Handed Over a Man Accused of Stealing Billions in Crypto Scam*, THE NEW YORK TIMES (Jan. 8, 2026), https://www.nytimes.com/2026/01/08/world/asia/cambodia-scam-china-prince-group-chen.html; Toh Han Shih, *Chen Zhi Extradition Removes a Thorn in Beijing's Flesh*, ASIA SENTINEL (Jan. 12, 2026),  https://www.asiasentinel.com/p/chen-zhi-extradition-remove-thorn-beijing-flesh.

[15]    In contrast, the Motion cites *Cabales v. United States*, 51 F.R.D. 498 (S.D.N.Y. 1970) to argue that a litigant may not proceed "through attorneys or agents," even when unavailable. Mot. at 6. But in *Cabales* the court expressly noted that there had been "no showing that the plaintiff was never once available to answer the interrogatories during the year preceding [the motion]." 51 F.R.D. at 499. Here there has been a documented showing explaining why Mr. Chen is unavailable to respond, and became unavailable before the government ever served its special interrogatories. Moreover, *Cabales* supports Mr. Chen's position insofar as the court there afforded multiple extensions of time—more than a year—before imposing a discovery penalty, *see id.*, reflecting courts' willingness to accommodate genuine issues of availability before resorting to sanctions.



rejected a rigid enforcement of the verification requirement, holding that "the arguable risk to plaintiff outweighs all of the facts," and permitted counsel's verification instead so that discovery could proceed fairly. *Id.* The court concluded that her responses "need not be verified by plaintiff unless she is in the United States at the time they are served or filed." *Id.*

Other courts have applied the Rules practically to reach similar results in other cases where personal verification was not realistically obtainable. *See, e.g.*, *Tomlinson v. United Behav. Health*, No. 19-CV-06999-RS (JCS), 2025 WL 3485634, at *1 (N.D. Cal. Dec. 4, 2025) (responses "properly signed by an agent with a power of attorney" were sufficient in light of plaintiff's "fragile mental condition"); *Hometown Folks, LLC v. S & B Wilson, Inc.*, No. 1:06-CV-81, 2007 WL 2227817, at *8 (E.D. Tenn. Jul. 31, 2007), *objections overruled sub nom. Hometown Folks, LLC v. S&B Wilson, Inc.*, No. 1:06-CV-81, 2007 WL 3132609 (E.D. Tenn. Oct. 18, 2007) (permitting interrogatory responses by defendant's wife where defendant's mental condition made personal responses "a fruitless exercise"); *Miller v. Holzmann*, 238 F.R.D. 111, 112 (D.D.C. 2006) (declining to require personal signature from incapacitated defendant where he executed limited power of attorney appointing litigation agents).

This case falls squarely within that line of authority. Mr. Chen is not a capricious litigant who simply forgot to sign his answers or one who willfully thumbed his nose at the Court. He is not traveling abroad and choosing not to cooperate. Nor is he incarcerated domestically, where counsel could use ordinary procedures to transmit papers, confer with their client, and obtain a signature. He is detained by a foreign sovereign under conditions where, as a factual matter, he is actually unavailable to review and execute discovery responses. Accordingly, his attorneys-in-fact verified the responses based on the information available to them. That is exactly the type of reasonable accommodation courts permit when personal verification is not realistically obtainable. *See Fyodorova*, 89 F.R.D. at 69.[16]

Nor is there anything "mysterious" about Mr. Chen's attorneys-in-fact. The government has their names, and their identities were not hidden from the government in any way. If the government has questions about their appointment, it could have asked for additional information. But it did not— perhaps opting to stay in the dark strategically. Whatever the reason, if the government has a valid basis to demand additional information about the attorneys-in-fact, it can serve a demand for such information, and Mr. Chen will respond accordingly.

Finally, even if the Court were to conclude that verification by Mr. Chen's attorneys-in-fact is insufficient (and it should not), the remedy would not be to deem Mr. Chen's detailed Responses deficient and compel the impossible; it would be a practical accommodation tailored to the circumstances. Courts routinely permit additional time or other procedures where a party's circumstances prevent ordinary compliance. *See, e.g.*, *Chimbay v. Dzurenda*, No. 2:21-CV-01297

---

[16]    This case is not remotely close to those where personal signatures have been required despite a party's presence in a foreign country. For instance, in *Choi v. Prattco, Inc.*, No. 12 C 4562, 2014 WL 13111328, at *1 (N.D. Ill. Apr. 1, 2014), defendants argued they could not sign interrogatory responses because they were in Korea. The Court rejected this claim because the defendants had "fail[ed] to explain why these parties could not have signed the interrogatories earlier when they provided discovery information to their counsel" and they "could have provided a signature page by fax or some other electronic means." *Id.* Here Mr. Chen was rendered to China before the government issued its demands and lacks any means of transferring his signature.



(NJC) (ST), 2024 WL 2214173, at *7–8 (E.D.N.Y. May 16, 2024) (denying motion to dismiss where defendants argued that responses were not verified or signed by plaintiff pursuant to Rule 33(b) and granting extension of time to serve complete discovery responses where plaintiff's attorney was unable to locate plaintiff in light of attorney's affirmation stating that he had established contact with plaintiff, who signed a power of attorney form over to his mother, and sat for a video deposition in another case); *Wright v. Elton Corp.*, No. CV 17-286-JFB-CJB, 2021 WL 9385092 (D. Del. Mar. 2, 2021) (staying deadline for plaintiff, who was legally blind and suffering from dementia, to respond to interrogatories to allow her time to provide documentation that her daughter has the legal authority to answer the interrogatories).

Here, the government has received thousands of pages of early discovery and detailed records and Responses about Mr. Chen's identity and sources of wealth—far more than what reasonably is required by Rule G. If the Court nonetheless believes that it is indispensable to obtain Mr. Chen's signature even while his standing cannot reasonably be contested, the proper path is international process—not an order compelling what cannot practically be obtained. *See generally Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct.*, 482 U.S. 522, 546 (1987).

In sum, Mr. Chen's inability to personally verify his responses at this time is not gamesmanship. It is the consequence of his detention by a foreign sovereign. That does not justify treating the detailed responses verified by his authorized attorneys-in-fact as a nullity. Mr. Chen respectfully requests that the Court deny the government's Motion, either by sustaining his objections to the special interrogatories in light of his obvious standing—as established by the Complaint itself— or by holding that the detailed responses verified by his authorized attorneys-in-fact are sufficient under the circumstances. In the alternative, the Court should order the parties to confer on a reasonable accommodation to account for his incarceration in China. What the Court should not do is allow the government to make an end run around its obligation to meet its burden and litigate this case on the merits—and in doing so forfeit billions of dollars in assets without ever having to demonstrate its entitlement to those assets—by capitalizing on Mr. Chen's unavailability. Put differently, an egregious violation of Mr. Chen's due process rights in Cambodia and China should not beget another such violation here.

## VII.    <u>There Is No Dispute as to Prince Group's Identity</u>

The government's final half-hearted complaint is that it cannot properly identify Prince Group, or that it is somehow a "shifting set of nominee entities," Mot. at 2–3. This is not a serious objection. It is an attempt to manufacture confusion over Prince Group's identity where none exists.

The government's own Complaint could not be clearer: it repeatedly refers to "Prince Holding Group," describing it as a "Cambodian-registered corporate holding company." Compl. ¶¶ 15, 16(o). The government further alleges that Mr. Chen served as the "Chairman of Prince Holding Group, a Cambodian corporate conglomerate" and controlled its operations. *Id.* ¶ 15. In short, the government described Prince Group in its pleadings as a real entity through which it alleges Mr. Chen conducted business. The government cannot now contend that this exact same entity is somehow unidentifiable. This was not some error of pleading; on the same day that the Complaint was filed, the government unsealed an indictment in which it had apparently presented evidence to a grand jury about "Prince Holding Group," *and* the Treasury Department also designated and sanctioned "Prince Holding Group," announcing that "Prince Group TCO is composed of Cambodia-based *Prince Holding Group*, its Chairman and CEO, Chen Zhi, his close associates and business partners, and their core



commercial interests. . . " (emphasis added).[17] Treasury's designation also identified Prince Group's physical address, website, and "Organization Established Date Mar 2015."[18]

Nor is there any confusion about Claimants' Responses, which identified the underlying Cambodian legal entity: "Prince Real Estate (Cambodia) Group Co., Ltd" —commonly referred to as Prince Holding Group. PG Resp. at 4 ("Claimant is formally registered with the Kingdom of Cambodia as . . . 'Prince Real Estate (Cambodia) Group Co., Ltd.', and does business under the English-language name 'Prince Holding Group,' as identified in Plaintiff's Verified Complaint."). There is no ambiguity: "Prince Holding Group" and "Prince Real Estate (Cambodia) Group Co., Ltd." are not competing claimants. "Prince Holding Group" is the English-language associational name under which "Prince Real Estate (Cambodia) Group Co., Ltd." publicly conducts business and has long been identified in public facing materials—including the government's own Complaint. The use of a trade name does not create a separate legal entity. *See TicketNetwork, Inc. v. Darbouze*, 133 F. Supp. 3d 442, 450–51 (D. Conn. 2015) ("Use of a so-called 'trade name' does not create a separate legal entity . . . Instead, the trade name user is the same entity as its owner.") (citing *Trustees of the Mason Tenders, Dist. Council Welfare Fund, Pension Fund, Annuity Fund and Training Prog. Fund v. Faulkner*, 484 F. Supp. 2d 254, 257 (S.D.N.Y. 2007) ("Doing business under another name does not create an entity [distinct] from the person operating the business." (citation and quotation marks omitted))).

The government's selective attention to allegations of its own verified Complaint should not be given any countenance here. It has spent months litigating a case premised on allegations about Prince Group, repeatedly identified Prince Group in its filings, sanctioned "Prince Holding Group" under that exact name, presented evidence to a grand jury about "Prince Holding Group," served special interrogatories on Prince Group, and received detailed responses explaining Prince Group's corporate identity. It cannot now claim it is somehow unable to determine what Prince Group is, and that certainly cannot support further Rule G discovery.

//

//

---

[17]     *U.S. and U.K. Take Largest Action Ever Targeting Cybercriminal Networks in Southeast Asia*, U.S. DEP'T OF THE TREASURY (Oct. 14, 2025), https://home.treasury.gov/news/press-releases/sb0278.

[18]     *Transnational Criminal Organizations Designations; Issuance of TCO-related General License*, OFFICE OF FOREIGN ASSETS CONTROL (Oct. 14, 2025), https://ofac.treasury.gov/recent-actions/20251014.



## VIII.    Conclusion

The Court should deny the government's motion to compel.

Thank you for your consideration.

Respectfully,

BOIES SCHILLER FLEXNER LLP

 /s/
Matthew L. Schwartz
Peter M. Skinner
55 Hudson Yards
New York, New York 10001

Dan G. Boyle
2029 Century Park East, Suite 1520
Los Angeles, California 90067

*Counsel for Claimants Chen Zhi
and Prince Holding Group*