**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>APPROXIMATELY 127,271 BITCOIN (BTC) PREVIOUSLY STORED AT THE VIRTUAL CURRENCY ADDRESSES LISTED IN ATTACHMENT A, AND ALL PROCEEDS TRACEABLE THERETO,<br><br>Defendants *In Rem*. | 1:25-cv-05745 (RPK) (CHK) |

<u>**DECLARATION OF HASSAN MIAH IN SUPPORT OF
AMENDED VERIFIED CLAIM AND STATEMENT OF INTEREST OR RIGHT
IN PROPERTY SUBJECT TO FORFEITURE *IN REM***</u>

I, Hassan Miah, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

## I.    INTRODUCTION AND PROFESSIONAL BACKGROUND

1.    I submit this declaration in support of the present pre-motion letter and its enclosures, by and through my counsel Cahill Gordon & Reindel LLP ("Cahill"). I am the sole owner and operator of Tiger Mines New York Inc. ("Tiger Mines"), and I am authorized to make this Declaration on behalf of Tiger Mines and to assert its claim in this action. I have personal knowledge of the matters set forth in this Declaration, except as to those matters expressly stated to be on information and belief. As to those matters, I believe they are true.

2.    I submit this declaration to establish three points relevant to the relief sought. *First*, Tiger Mines is the owner of the cryptocurrency the Government seeks to forfeit in this action (the "*Defendants In Rem*"), having acquired it through an assignment from Chen Zhi on September 18,

1

2024. *Second*, Tiger Mines acquired that interest in good faith and for value—and at a time when I had no knowledge or reason to believe that the property was, or might become, subject to forfeiture; indeed, neither Chen Zhi nor Prince Group was indicted or designated by the U.S. Treasury's Office of Foreign Assets Control ("OFAC") until more than a year later. *Third*, I did not receive direct notice of this action and did not learn of it until late fall of 2025; after which I received inconsistent and confusing legal advice that ultimately led me to file my claim *pro se*. The balance of this declaration sets out the facts supporting each of these points.

3.    I am 70 years old and reside in Glen Head, New York. I hold a Bachelor of Business Administration in Accounting from the University of Michigan (1976) and an MBA from the Stanford Graduate School of Business (1981). I am a former partner at KPMG, where I specialized in corporate finance and mergers and acquisitions. Over the course of my career, I have advised on a wide range of financial, accounting, and digital-asset matters.

4.    I have spent nearly four decades working at the intersection of finance and emerging technology. I began my career at KPMG, where I returned in 1985 and became a partner in 1991; most of my assignments were in community banking, regional investment banking firms, and Hollywood studios. I later served as a Corporate Agent and then as Head of Technology and Digital Media at Creative Artists Agency ("CAA"). At CAA, I was a partner of the consulting team that advised Seagrams on its acquisition of Universal Studios, and I later led the team that created the CAA/Intel Media Lab, the first major collaboration between Hollywood and the technology industry. I have since founded, led, and advised numerous technology companies, including as Chief Executive Officer of Xing Technology Corporation, the creator of the world's first consumer MP3 recorder, which was acquired for approximately $75 million, and as Managing Director of Media Investments at Intel Capital Corporation. In 2020, I co-founded and became

Chief Executive Officer of Paybby, a financial-technology company offering checking and savings accounts. Notably, Paybby implemented a comprehensive, technology-based know-your-customer ("KYC") and anti-money laundering ("AML") system, compliant with the U.S. Bank Secrecy Act, that was reviewed and accepted by the sponsor bank and regulators.

5. My wife and business partner, Miranda Tan, co-founded Paybby with me. Ms. Tan is fluent in Chinese and has at times translated on my behalf, as I do not speak the language.

## II. THE TETHER ENGAGEMENT AND THE TIGER MINES LITIGATION

6. In or about November 2022, I attended Bitmain's World Digital Mining Summit in Cancun, Mexico. At the time, I was working on Cheetah Miner USA Inc. ("Cheetah Miner"), which was a Bitcoin mining company I started. While there, a Bitmain sales representative introduced me to potential investors seeking access to inexpensive power and mining sites in the United States. Among those investors were Xuesong ("Charles") Ren and Haibin ("Harris") Zeng, whom I understood at the time to be associated with Warp Data Technology Lao Sole Co., Ltd. ("Warp Data").

7. At the time, I was unfamiliar with Prince Group. Based on my internet research at the time, I understood Prince Group was a large conglomerate involved in a variety of businesses, including real estate and airlines. After the introduction, Charles introduced me to his "boss," who I now know is Qianjiang Wei ("William Wei"), to discuss a potential investment by Warp Data in Cheetah Miner's mining site in Michigan. Charles mentioned that Prince Group might also be interested in my digital-banking company, Paybby.

8. In or about November 2023, Charles informed me that Warp Data had a wallet holding approximately $60 million in USDT (also known as "Tether") that had been frozen by Tether Holdings Limited ("Tether Holdings") at the request of the Chinese police. After our initial

discussions, I learned that there were in fact two frozen Tether wallets, holding a combined value of approximately $160 million. Charles stated that Warp Data was looking for assistance in getting the wallets unfrozen, as they had been improperly frozen by the Chinese police in an effort to extort Warp Data. Based on my background, Charles was interested in whether I had any ideas for unfreezing the wallets. I agreed to consider how I might assist.

9. In December 2023, I traveled to Cambodia, accompanied by Ms. Tan, to meet in person with William Wei, Charles, and Harris to discuss a proposed strategy for unfreezing the wallets as well as a potential investment in Cheetah Miner and/or Paybby. The proposed strategy contemplated that I would work in close collaboration with U.S.-based counsel to unfreeze the wallets. During this trip, William Wei informed me for the first time that Chen Zhi was the ultimate beneficial owner of Warp Data, Prince Group, and the frozen Tether wallets.

10. Following the meeting, I exchanged several proposed agreements with Chen Zhi's representatives concerning how to structure an engagement around the unfreezing. At some point, it became clear in the course of these exchanges that I (through one of my entities) would need to acquire an ownership stake in the frozen Tether wallets in order to engage Tether Holdings directly and try to negotiate a resolution and/or pursue litigation. As part of these discussions, the parties agreed that, if my efforts succeeded in unfreezing the wallets, I would be paid a success fee for that work.

11. Before agreeing to assist with the Tether wallets, I made clear that I would conduct diligence on the wallets and underlying USDT transactions to (1) confirm that they were not connected to criminal or illicit activity—and thus had been frozen in error—and (2) satisfy myself that I was not unwittingly doing business with bad actors.

12. As part of my diligence efforts, in January 2024, I purchased a subscription to Chainalysis and commissioned an analysis by someone certified in Chainalysis, who prepared a report for me on the Tether wallets (the "Chainalysis Report").

13. The Chainalysis Report concluded that, "[c]ontrary to Tether's action, the analysis did not uncover any involvement with illegal or high-risk operators." The Chainalysis Report also determined that since 100% of the funds in the frozen wallets had been traced to cryptocurrency exchanges adhering to KYC/AML regulations before being deposited into the wallets, the funds in the wallets were not illicit.

14. The Chainalysis Report discussed a Chinese criminal judgment from December 2023, which purported to connect the two frozen Tether wallets to illegal gambling operations. Because I understood that this Chinese criminal judgment might be the basis for Tether's decision to freeze the wallets, I focused on assessing the content of the judgment. Based on a translation of the judgment, I understood the judgment related to third parties (two individuals named Li Hai and Qiu Junxin) who were alleged to have helped launder proceeds from the illegal gambling operations of Zhao Xunli/Xunliang and Zhao Xunzhong by purchasing USDT through Binance's trading platform, moving it to a wallet registered by Zhao Xunzhong, and then transferring it to three wallets said to be controlled by the gambling operation—two of which were the frozen Tether wallets. I understood the judgment did not relate to anyone in Chen Zhi's network with whom I had substantively engaged to date, nor did it explicitly connect any alleged criminal activity to Chen Zhi, Warp Data, or Prince Group.

15. Around this same time, I retained King & Wood, one of the largest and leading law firms in China, to engage with Chinese authorities about the Tether wallets. That engagement gave me no reason to believe the freezing of the wallets was legitimate. I also gathered and

5

reviewed additional diligence materials, including regarding the wallets' source of funds and KYC and source of wealth information on Chen Zhi and Prince Group. Based on the diligence I conducted and commissioned, I became comfortable that the wallets were not connected to criminal activity and therefore had been frozen in error.

16. In January 2024, I returned to Cambodia, accompanied by Ms. Tan, to meet for the first time with Chen Zhi, together with William Wei, Charles, Harris, and Ryan Tang (Charles' assistant). During the meeting, and to confirm my initial diligence findings, I asked Chen Zhi, William Wei, and Harris how the frozen Tether wallets had been funded. Harris represented that the wallets had been funded with the proceeds of Warp Data's cryptocurrency-mining operations. Chen Zhi also represented that he amassed his wealth in part through an enormously profitable real estate company and offered to substantiate that representation by showing me audited financial statements. I did not raise the Chinese criminal judgment with Chen Zhi during this meeting because, based on the diligence I had conducted and commissioned, I believed the judgment was unrelated to him.

17. Based on my understanding that I (through one of my entities) needed to acquire an ownership stake in the frozen Tether wallets in order to engage Tether Holdings directly and try to negotiate a resolution and/or pursue litigation, Chen Zhi executed an April 2024 assignment agreement with Tiger Mines, in which Chen Zhi assigned full rights in the wallets to Tiger Mines for $500,000. Around this same time, I also discussed with Charles and Harris the possibility of pursuing damages against Tether Holdings and the parties agreed that I would keep any recovered damages for myself.

18. Tiger Mines retained counsel (first Keven Kerveng Tung, P.C., and subsequently Quinn Emanuel Urquhart & Sullivan, LLP) to help unfreeze the Tether wallets.

19.    Before initiating litigation against Tether Holdings in August 2024, Tiger Mines sought to negotiate the unfreezing of the wallets with counsel for Tether Holdings. These efforts included sending Tether Holdings' counsel a draft complaint on or about April 18, 2024; meeting in person with Tether Holdings' counsel to discuss a possible settlement on or about May 23, 2024; and providing Tether Holdings' counsel a copy of the Chinese criminal judgment on or about June 17, 2024.

20.    Although Tether Holdings' counsel advised on or about July 15, 2024 that Tether Holdings did not intend to keep the wallets frozen indefinitely based solely on the original Chinese law-enforcement request, on or about July 31, 2024, it informed Tiger Mines that it would give Chinese law enforcement until September 30, 2024 to commence a proceeding in the British Virgin Islands.

21.    Around this time, I took steps to assess the risk that Chinese authorities would prevail in a proceeding against the wallets in the British Virgin Islands, and I understood that risk to be low.

22.    On August 2, 2024, faced with continued delay and no firm commitment to release the wallets, Tiger Mines filed a complaint in *Tiger Mines New York Inc.* v. *Tether Holdings Limited et al.*, No. 24 Civ. 5905 (VEC) (S.D.N.Y.), seeking to compel Tether Holdings to return the wallets and seeking damages for their unlawful seizure.

23.    Shortly after Tiger Mines filed suit, on or about September 6, 2024, Tether Holdings' counsel sent Tiger Mines' counsel a draft settlement agreement. To my surprise, the draft included a provision requiring me to personally indemnify Tether Holdings in the event of future claims relating to the Tether wallets. On or about September 9, 2024, Tiger Mines' counsel

7

responded with proposed revisions that sought to (1) remove the personal indemnification provision and (2) add language providing for damages.

24.     With respect to the personal indemnification provision, Tether Holdings refused to remove the indemnification requirement. When I agreed to assist Chen Zhi, I had not contemplated assuming personal liability that could reach into the millions of dollars, and Tether Holdings' insistence on that provision caused me considerable concern.

25.     With respect to the damages, Tiger Mines' claim had two components: a claim for the lost interest or "staking fees" Tiger Mines would have earned on approximately $160 million of USDT during the period the wallets were frozen, and a related lost-profits claim. Indeed, in the proposed settlement agreement revisions circulated on or about September 9, 2024, Tiger Mines inserted language seeking "compensatory damages calculated by the loss staking fees in the $160 Million for the time the wallet was frozen."

26.     On or about September 14, 2024, I requested a meeting with Chen Zhi to discuss the settlement agreement.

27.     On or about September 16, 2024, Tiger Mines' counsel conveyed to Tether Holdings' counsel that Tiger Mines was pursuing "payment of damages from Tether after the wallets [had been] held for almost three years and Tether is able to earn '[staking] interest' from the wallets. Tether can propose a number of the damage." I estimated the aggregate damages claim Tiger Mines had against Tether Holdings, including the lost staking fees and related lost profits, to be at least $50 million.

## III.    THE SEPTEMBER 18, 2024 ASSIGNMENT OF THE LUBIAN WALLETS

28.     On or about September 18, 2024, at Chen Zhi's invitation and accompanied by Ms. Tan to translate, I met with Chen Zhi at his townhouse in London (the "September 2024 Meeting").

Also present at Chen Zhi's London townhouse were Harris and Yun ("Sandy") Zhou, whom I understood to be a member of Chen Zhi's senior business team. We also later met only with Chen Zhi without others.

29.     During the meetings, I informed Chen Zhi of the proposed settlement agreement. I explained that Tiger Mines could obtain at least an additional approximately $50 million in USDT from Tether Holdings in the form of compensatory damages for lost staking interest/lost profits and that I did not want to settle without receiving these damages. In response, Chen Zhi pushed hard for me to forgo the damages in the Tether litigation. Chen Zhi stated that if I agreed to sign the Tether Holdings settlement on terms acceptable to Tether Holdings—forgoing the damages claim and accepting the personal indemnity provision—he would, in exchange, pay the agreed-upon success fee, indemnify me against my personal exposure under the settlement, and assign to Tiger Mines the assets he previously held in a separate set of cryptocurrency wallets that he described, collectively, as his "Lubian wallets." Based on this and subsequent conversations with Chen Zhi and his representatives, as well as my review of the government's allegations in this action, I understand the "Lubian wallets" label to refer not only to wallets previously associated with the Lubian mining pool, but also to wallets previously holding Chen Zhi's other Bitcoin.

30.     When I asked for specifics on the Lubian wallets at the September 2024 Meeting, Chen Zhi represented that the wallets were his, there were "a lot" of them, and they had contained "billions" of dollars' worth of Bitcoin that belonged to him, but that they had been hacked and were for the time being inaccessible to him. I viewed the Lubian wallets as essentially distressed assets that might prove worthless, but might also be worth billions of dollars if I succeeded in recovering the assets Chen Zhi previously stored in them. In exchange for the potential upside of

recovering the Bitcoin previously stored in these wallets, I accepted Chen Zhi's offer and agreed to forgo the damages claim and otherwise accept Tether Holdings' proposed settlement.

31.     At Chen Zhi's urging, Tiger Mines relinquished its damages claim against Tether Holdings—real and substantial value that I bargained for and gave up—in exchange for the Bitcoin that Chen Zhi previously held in the Lubian wallets. I was under no obligation to sign the Tether Holdings settlement, and I did so only because I understood that, in exchange, I would receive the full consideration I had agreed to with Chen Zhi, which included the assets previously held in the Lubian wallets. As part of that same bargain, Chen Zhi agreed to pay the agreed-upon success fee and to indemnify me against the personal indemnity exposure to Tether Holdings that I was to assume under the settlement.

32.     At the time Chen Zhi assigned the assets previously held in the Lubian wallets to Tiger Mines, I understood Chen Zhi to be using "Lubian wallets" as a shorthand label, not as a reference to a single mining pool or a distinct legal entity. Indeed, my subsequent conversations with Chen Zhi's representatives confirmed my understanding that Chen Zhi used the term "Lubian wallets" in our agreement to describe a broader set of Bitcoin holdings identical to those at issue in this matter. Chen Zhi did not at the meeting identify the wallets by individual cryptographic address. When I asked him for that information, he explained that a member of his team would need to assemble it, and I understood that the precise addresses, as well as access and control information, would be provided to me later. As such, I understand that the assets previously stored in the Lubian wallets Chen Zhi conveyed to Tiger Mines are the same assets that the Government seeks to forfeit as the *Defendants In Rem*, and the description Chen Zhi and his representatives gave me is consistent with how the *Defendants In Rem* are described in this matter. Tiger Mines

has held its ownership interest in the *Defendants In Rem* continuously since Chen Zhi's September 18, 2024 assignment, and it presently claims that interest in this action.

33.    At the time of the assignment, I understood from Chen Zhi's representations that, notwithstanding the "hacked" status, Chen Zhi owned the assets that were hacked from the wallets. I also understood that the technical impediment to access was a temporary condition that could be addressed in due course, and that Chen Zhi or his associates would provide that information.  I accepted the assignment notwithstanding that I did not at that time have cryptographic control.  I understood the assignment to convey Chen Zhi's full legal and beneficial ownership interest in the wallets and the Bitcoin previously held in them, separate and apart from the mechanical question of when the private keys or seed phrases would be transferred to permit operational control. Although Chen Zhi's assignment of the assets held in the Lubian wallets to Tiger Mines was oral, I understood it to be a binding conveyance of his full ownership interest, and Chen Zhi never disclaimed the assignment thereafter.

34.    At the time of the assignment of the assets previously held in the Lubian wallets, I had no knowledge or reason to believe that Chen Zhi, Prince Group, Warp Data, Lubian and his other mining operations, or any associated person or entity was the subject of any United States criminal investigation, indictment, or civil forfeiture action, or that the Lubian wallets or the Bitcoin held in them was or might become subject to forfeiture under United States law.  Based on the diligence I had already conducted and commissioned, I had no reason to believe that the wallets or assets previously held therein were connected to criminal activity or potentially subject to forfeiture.

11

35.     Following the September 2024 Meeting and in reliance on Chen Zhi's assignment, I directed Tiger Mines' counsel to send Tether Holdings a revised settlement agreement removing the request for damages, which counsel did on or about September 18, 2024.

## IV.    THE TETHER SETTLEMENT AND CHEN ZHI'S DRAINING OF THE TETHER WALLETS

36.     Tiger Mines and Tether Holdings ultimately executed a settlement agreement dated on or about November 6, 2024 (the "Settlement Agreement").  In connection with that settlement, and consistent with the written assignment of the Tether wallets from Chen Zhi, Tiger Mines represented that it had "the sole legal and beneficial ownership interest" in the wallets and the USDT held therein, and that "[n]either [Chen Zhi] nor any other third party has any legal rights relating to the USDT held in the Wallets."

37.     On or about November 20, 2024, the Tether wallets were unfrozen.  At that time, and as Tiger Mines had truthfully represented to Tether Holdings in the Settlement Agreement, Tiger Mines was the sole legal and beneficial owner of the wallets and the USDT held in them. Although I had been provided with certain private keys to the wallets, before I was able to use those keys to access the wallets, the USDT in the Tether wallets was transferred to new wallets. When I asked Chen Zhi whether he had moved the funds, he confirmed that he had.  I did not authorize Chen Zhi to do so.  His unilateral action deprived Tiger Mines and me of the very property we had worked for nearly a year to recover.  Although I had previously discussed with Chen Zhi the sale of Tiger Mines to him (and thus the proceeds of the Tether wallets) once the wallets were unfrozen, I understood that this contemplated transaction would occur through a negotiated and orderly process during which I would also receive precise address, access, and control information for the Lubian wallets—not through Chen Zhi's unilateral seizure of assets that, as of that moment, belonged to Tiger Mines.

## V. EFFORTS TO OBTAIN THE LUBIAN WALLET INFORMATION AND THE CONTINUING RELATIONSHIP WITH CHEN ZHI

37.     In or about January 2025, I traveled to London and met with Chen Zhi at his townhouse, accompanied by Ms. Tan to translate (the "January 2025 Meeting").  Chen Zhi's assistant, Sin Huat Yeo ("Alan"), was also present.

38.     During the January 2025 Meeting, I raised with Chen Zhi the status of the Lubian wallets that had been the subject of his September 18, 2024 assignment to Tiger Mines.  I asked Chen Zhi for the information necessary to specifically identify and ultimately access the Lubian wallets and to work to recover the assets hacked from them—for example, the wallet addresses, any private keys or seed phrases in his custody, and any related custodial information—because, although Tiger Mines held the assigned legal interest in the assets, I had no independent means of identifying or controlling them.  Chen Zhi explained that his assistant, Alan, would need to go through Chen Zhi's phone(s) in order to assemble the relevant information, and agreed to provide me with that information once Alan had done so.

39.     During the January 2025 Meeting, I also continued the diligence I had been conducting on Chen Zhi since the outset of our dealings.  I asked Chen Zhi about recent negative press reports by Radio Free Asia ("RFA").  Chen Zhi adamantly disputed the reports, describing them as false and damaging.  Chen Zhi's denials were consistent with the diligence I had conducted and commissioned to that point, and I had no information contradicting them.  Chen Zhi also asked whether I could help address the reports, and I agreed.  In the months that followed, up until Chen Zhi's October 2025 Indictment, through Brookville LLC, a consulting firm of which I am a co-owner, I engaged in outreach to RFA, as well as various third parties in an effort to persuade RFA to retract its articles about Chen Zhi.  While seeking to obtain a retraction of the RFA articles, I informed Chen Zhi that I would follow where the evidence led, and Chen Zhi agreed to proceed

13

on that basis. I understood this public-affairs work to be a legitimate engagement, and I undertook nothing improper in connection with it.

40. By this time, Chen Zhi had already drained the Tether wallets (totaling approximately $160 million), as described above. Because those wallets had been the principal asset securing my dealings with Chen Zhi, his draining of them left me with no practical leverage to compel him to deliver the Lubian wallet information he had promised. Throughout this period, however, Chen Zhi never disclaimed or retracted his assignment of the assets previously held in the Lubian wallets to Tiger Mines, and members of his staff acknowledged the assignment, as discussed below.

## VI.    FIRST AWARENESS OF THE CIVIL FORFEITURE ACTION

41. After the January 2025 Meeting, I had no further substantive communications with Chen Zhi about the Lubian wallets, the assets previously held therein, or their assignment to Tiger Mines. I did not receive from Chen Zhi, Alan, or anyone else the wallet addresses, private keys, seed phrases, or other relevant information Chen Zhi had said Alan would assemble. My professional engagements with Chen Zhi and his associates during the spring and summer of 2025—principally the RFA engagement described above—were unrelated to the Lubian wallets. At no point during this period was I told that any specific cryptocurrency held by Chen Zhi—let alone the assets held in the Lubian wallets—was the subject of a forfeiture investigation or might become subject to United States forfeiture.

42. On October 8, 2025, a grand jury in this District returned an Indictment charging Chen Zhi with wire-fraud conspiracy and money-laundering conspiracy. On October 14, 2025, the Indictment was unsealed, the United States filed the Verified Complaint in this action seeking the *in rem* forfeiture of approximately 127,271 Bitcoin previously stored at the twenty-five virtual

currency addresses listed in Attachment A, and OFAC designated Prince Group, Chen Zhi, and related individuals and entities, including Alan, Sandy, and William Wei, on the Specially Designated Nationals and Blocked Persons List. These events occurred more than a year after Chen Zhi assigned the assets previously held in the Lubian wallets to Tiger Mines.

43.     I did not receive direct notice of this action under Supplemental Rule G(4)(b) when it was filed. I have since learned from the Government's January 27, 2026 status letter (ECF No. 126) that the operative claim-filing framework was: a default deadline of December 15, 2025 (sixty days from the October 16, 2025 first day of publication on www.forfeiture.gov); a court-extended general deadline of December 29, 2025 (Dec. 11, 2025 Order); and an extended deadline of January 19, 2026 for certain identified claimants, including Chen Zhi and Warp Data (same order).

44.     In early November 2025, Ms. Tan traveled to Hong Kong with Jeremy Zucker of Dechert LLP to meet with Harris and Charles regarding their HashUnion and Warp Data U.S. matter. While in Hong Kong, Harris suggested that Ms. Tan and Mr. Zucker travel to Cambodia to meet with Sandy about a potential engagement concerning sanctions. Ms. Tan then traveled to Cambodia. I understand from Ms. Tan that, during that trip, she met separately with William Wei, the Chairman of Warp Data, and with Sandy, and that both acknowledged to her Tiger Mines' ownership of the Bitcoin previously held in the Lubian wallets. Sandy further asked Ms. Tan whether I intended to file a claim in this civil forfeiture action concerning that Bitcoin, and told Ms. Tan that, if she remained in Cambodia, she and Chen Zhi would compile and provide her information about the wallets that was represented to be held "on Chen's phone"—a representation consistent with what Chen Zhi himself had said at the January 2025 Meeting about Alan retrieving wallet information from Chen Zhi's phone(s).

15

45.    My subsequent conversation with Ms. Tan was the first time I learned that the Government had filed a civil forfeiture action against the cryptocurrency Chen Zhi assigned to Tiger Mines on September 18, 2024. The confirmation from both William Wei and Sandy that the Bitcoin was Tiger Mines'—together with Sandy's offer to provide information from Chen Zhi's phone—was consistent with my understanding of the September 2024 assignment and confirmed that Chen Zhi's own associates recognized Tiger Mines' ownership interest in the property. This conversation further confirmed for me that the assets in the Lubian wallets Chen Zhi assigned to me were the same assets as the *Defendants In Rem*.

46.    Around the same time, I consulted a number of attorneys about whether and how to file a claim to assert Tiger Mines' interest in the *Defendants In Rem*, what information a claim would require, and whether I could interact directly with Chen Zhi and his associates given their legal exposure and the fact that they had been sanctioned. Without waiving attorney-client privilege, the advice I received was inconsistent, confusing, and, in at least one instance, came from attorneys who had a pre-existing relationship with other individuals claiming ownership of the Bitcoin at issue in the forfeiture action.[1] As a result, I did not immediately file a claim.

## VII.    THE JANUARY 13, 2026 FBI CONTACT AND THE JANUARY 2026 *PRO SE* FILINGS

47.    On January 13, 2026, FBI agents contacted me without prior notice. To the best of my recollection, the agents identified themselves as FBI personnel and stated that they wished to speak with me in connection with an ongoing investigation. They asked, among other things, whether I had a professional engagement with Chen Zhi. This was the first occasion on which any

---

[1] To the extent any description of legal advice in this Declaration could be construed as a waiver of attorney-client privilege, no such waiver is intended, and any such potential disclosure is limited to what is necessary to establish the *Pioneer* "reason for the delay" factor and the related Rule G(5)(a)(ii) "good cause" showing. I do not, by virtue of this declaration, waive any privilege as to communications with counsel on any other subject.

United States law-enforcement agency contacted me directly in connection with any matter involving Chen Zhi, Prince Group, Warp Data, the Lubian wallets, or any of the individuals or entities referenced in the Verified Complaint.

48. Immediately following the FBI contact, I engaged counsel to handle the communication with the FBI on my behalf. I have since learned from the Government's submission at ECF No. 349 that, on January 15, 2026, my counsel informed the Government that I likely would agree to be interviewed but needed additional time to meet with her first; that on January 22, 2026, my counsel proposed January 29, 2026 as an interview date; and that on January 26, 2026, my counsel communicated to the Government that I was no longer willing to be interviewed.

49. Around the same time as the FBI's January 13, 2026 contact, I learned that the Court had extended the claims-filing deadline from December 29, 2025 to January 19, 2026 for certain identified claimants, including Chen Zhi and Warp Data. Concerned that I had not been receiving sound or disinterested advice, and unwilling to risk further prejudice, I determined to file my claim by January 19, 2026—the extended deadline the Court had granted certain identified claimants—albeit on a rushed, *pro se* basis.

50. I prepared the January 19, 2026 filing personally and without the assistance of counsel, and submitted it through the EDNY *Pro Se* Electronic Delivery Portal. The filing consisted of a Letter Motion for Extension of Time *Nunc Pro Tunc* under Supplemental Rule G(5)(a)(ii) and Federal Rule of Civil Procedure 6(b)(1)(B), a Verified Claim of Hassan Miah, *Pro Se*, and a Proposed Order, and was docketed at ECF No. 84. Two days later, on January 21, 2026, I filed an Answer of Claimant Hassan Miah (ECF No. 103), likewise prepared personally and without the assistance of counsel.

## VIII.   THE GRAND JURY SUBPOENA

51.    On March 9, 2026, FBI agents served a grand jury subpoena on me personally.  The subpoena directed me to appear before the grand jury on March 26, 2026 and indicated that I could comply by producing certain specified documents in lieu of testimony.  The subpoena was accompanied by a cover letter from Assistant U.S. Attorney Benjamin L. Weintraub requesting that I refrain from disclosing the existence or contents of the subpoena while the investigation was ongoing.

52.    On March 10, 2026, I filed three *pro se* motions in this action: a Motion for Protective Order (ECF No. 318), a Motion to Quash Grand Jury Subpoena (ECF No. 319), and a Motion to File the Grand Jury Subpoena Under Seal (ECF No. 321).  On March 17, 2026, the Government filed a response (ECF No. 349).  On March 19, 2026, I filed a sealed *pro se* Reply and supporting Declaration (ECF Nos. 354, 355).  On March 30, 2026, the Government filed a sur-reply (ECF No. 379).

53.    On April 8, 2026, Magistrate Judge Clay H. Kaminsky issued an Order denying my Motion for Protective Order and my Motion to Quash, denying my Motion to Seal the subpoena as moot, and granting my Motion to Seal the Reply.  The Order indicated that I could "make an application for court-appointed counsel pursuant to the Criminal Justice Act (CJA), 18 U.S.C. § 3006A, as well as Section III(A)(9) of this District's CJA Plan."

54.    Shortly thereafter, I retained counsel to represent me and Tiger Mines in pursuing my claim.

55.    From the time I first learned of this action in late fall of 2025, I have sought to protect my interest in the *Defendants In Rem* as promptly as my circumstances allowed.  I did not receive direct notice of this action and learned of it only secondhand; and the advice available to

me before I retained Cahill was inconsistent, confusing, and, in at least one instance, came from attorneys who had a pre-existing relationship with other individuals claiming ownership of the Bitcoin at issue in this action. Notwithstanding those circumstances, I filed my *pro se* Verified Claim and Letter Motion for Extension of Time *Nunc Pro Tunc* on January 19, 2026—the date to which the Court had extended the deadline for certain identified claimants—and my *pro se* Answer on January 21, 2026. Once I retained Cahill in April 2026, I moved promptly to perfect the claim through this pre-motion letter and its enclosures. The facts set forth in this Declaration are also the facts on which the proposed Amended Verified Claim and Amended Answer enclosed with the pre-motion letter are based, and I have reviewed those proposed pleadings and confirm that the factual statements they contain concerning the ownership interest in the *Defendants In Rem* are true and correct to the best of my knowledge. I respectfully submit this Declaration in support of that effort.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on August 7, 2026, in Glen Head, New York.

Hassan Miah