**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

AFM:CBB
F. #2024R00105

September 11, 2026

By ECF

The Honorable Clay H. Kaminsky
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Approximately 127,271 Bitcoin
Civil Docket No. 25-5745 (RPK) (CHK)

Dear Judge Kaminsky:

The government respectfully submits this motion to compel claimant LuBian to comply with the government's special interrogatories served on it on February 20, 2026 (the "Special Interrogatories"). LuBian responded on April 28, 2026 with vague and incomplete answers (LuBian's "Objections and Responses" or "Obj. & Resp.," attached as Ex. A). On May 18, 2026, the parties met and conferred. LuBian's counsel provided some additional detail by way of attorney proffer, but to date LuBian has failed to supplement, let alone fully answer, its interrogatory responses. The government has been left with incomplete responses that lack the most basic information needed to assess LuBian's standing and to reconcile its claim with overlapping claims filed by other, apparently affiliated entities. The Court should compel LuBian to respond so that its standing can be tested.

## I. Background

As the Court is aware, on October 14, 2025, the government filed the verified complaint in this case (the "Complaint"), which seeks the forfeiture of 127,271 bitcoin (the "Defendant Cryptocurrency") previously in the control of Chen Zhi ("Chen") as proceeds of fraud and property involved in money laundering. *See* ECF No. 1. The Complaint alleges that Chen, who was the chairman of the Prince Holding Group ("Prince Group"), operated forced-labor scam compounds across Cambodia that perpetrated cryptocurrency investment fraud schemes, and that he laundered the proceeds of those schemes through various corporate entities, professional money laundering networks and cryptocurrency mining operations. *See id.* ¶¶ 38-43. The Complaint also alleges that Chen and his co-conspirators laundered their illicit proceeds by, among other things, funding large-scale cryptocurrency mining operations, including LuBian, to produce large sums of clean Bitcoin dissociated from criminal proceeds. *Id.* ¶ 42.

On January 20, 2026, LuBian filed a barebones claim, asserting a generalized interest in the Defendant Cryptocurrency "arising from [LuBian's] participation in operations

connected to the mining of a substantial quantity of BTC constituting the Defendant Assets and its hosting of those assets at wallet addresses for which it held the private keys." ECF No. 79, ¶ 4. LuBian's claim did not explain basic facts about the basis of its interest, such as how much of the Defendant Cryptocurrency it was claiming, or provide any details about the origin and nature of its asserted property interest. The claim described LuBian's own identity only in the vaguest of terms, as an "unincorporated collective of software engineers involved in BTC mining group operations and cryptocurrency wallet hosting services, among other ventures . . . ." *Id.* ¶ 2. The claim was verified by an individual claiming to be a "member of the collective of LuBian." *Id.* ¶ 3.

## II. <u>Applicable Law</u>

To determine a claimant's standing and the validity of his claim, including the precise nature of the interest it is asserting, the government may serve the claimant with special interrogatories at any time after a claim is filed. R. G(6); *cf. United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 642 (9th Cir. 2012) (explaining that "Rule G(6)(a) . . . gives the government the right to question the claimant regarding the claimant's identity and relationship to the defendant property, and to gather information that bears on the claimant's standing." (citations and internal quotation marks omitted)). *See generally,* Gov't Mot. to Compel Warp Data, ECF No. 439 at 3-5 (reviewing relevant law). "So important are these interrogatories to the issue of standing that Rule G(8)(c)(1) permits the government to move to strike a claim or answer '(A) for failing to comply with Rule G(5) or (6); or (B) because the claimant lacks standing.'" *United States v. $10,055.00 in U.S. Currency*, No. 17-CV-78, 2018 WL 2933850, at *2 (N.D. Ohio June 12, 2018). "[T]he drafters of Rule G(6) intended the special interrogatories to provide an efficient means of testing the truthfulness of the [c]laimant's claim to have a real interest in the defendant property." *United States v. $104,250.00 in U.S. Currency*, 947 F. Supp. 2d 560, 563 (D. Md. 2013). For that reason, special interrogatory responses that fail to provide sufficient information "impair[] the truth-seeking function of the judicial process." *United States v. $295,726.42 in Account Funds Seized*, 279 F. Supp. 3d 1050, 1055 (C.D. Cal. 2018) (citing *$133,420.00 in U.S. Currency*, 672 F.3d at 642).

The interrogatories may broadly inquire into any matter necessary "to test the veracity of the claimant's claim of ownership and interest." *United States v. Two Hundred Seventy-Two Thousand Dollars & No Cents ($272,000)*, No. 16-CV-06564 (AMD), 2017 WL 8780158, at *3 (E.D.N.Y. Oct. 26, 2017) (alteration and internal quotation marks omitted); *accord $133,420.00 in U.S. Currency*, 672 F.3d at 642 ("Rule G(6)(a) . . . broadly allows the government to collect information regarding the claimant's relationship to the defendant property." (internal quotation marks omitted)); *United States v. $307,970.00, in U.S. Currency*, No. 12-CV-136, 2013 WL 4095373, at *3 (E.D.N.C. Aug. 13, 2013) ("[P]ermissible interrogatories as to a claimant's relationship to the defendant property may encompass more than just the type of interest asserted in the property."); *United States v. $2,051,660.00 in U.S. Currency*, No. 07-CV-1338, 2008 WL 8723566, at *1 (D. Kan. Sept. 29, 2008) (explaining that because "Rule G(5) already requires a claimant to give his name, address and to state ownership interest in the seized property, the addition of Supplemental Rule G(6)['s] phrase regarding [the] 'claimant's identity and relationship to the defendant property' must allow more than a mere recitation of the information already required by . . . Rule G(5)"). This includes not just the claimant's identity and the nature of his interest in the property, but also the *circumstances* of his acquiring that interest, such as the time,

place, manner, and reason for acquiring the property, and the identity of the person from whom the claimant acquired it. *See, e.g.*, *$133,420.00 in U.S. Currency*, 672 F.3d at 642 (explaining that "information as to the circumstances under which the currency was obtained is information that bears on [a claimant's] standing" (internal quotation marks omitted)); *United States v. $63,575 in U.S. Currency*, No. 18-CV-02131, 2019 WL 2996001, at *2-3 (E.D. Mo. July 9, 2019) (granting government's motion to compel responses to special interrogatories seeking "the date, time, and places in which any portion of the property was acquired," as well as "whether the defendant property was claimed on [the claimant's] local, state or federal income taxes").

Indeed, courts have given particularly broad scope to the special interrogatories in cases involving the forfeiture of seized currency—cases where the claimant's claim of ownership is inextricably intertwined with the evidence regarding the provenance of the money and the claimant's personal circumstances. *See, e.g.*, *$272,000.00 in U.S. Currency*, 2017 WL 8780158, at *3 (granting government's motion to compel response to special interrogatory seeking "each and every source from which [the claimant] claims the [defendant currency] was derived" (alterations omitted)); *United States v. Funds in the Amount of $174,000.00*, No. 11-CV-6698, 2012 WL 473146, at *1-2 (N.D. Ill. Feb. 6, 2012) (holding that the government could use special interrogatories to inquire into, *inter alia*, the claimant's interest in the currency and any documents substantiating that interest, the source of the currency and the date it was acquired, and the identity of witnesses corroborating claimant's claim of interest); *United States v. Approximately $750,000 in U.S. Currency*, No. 10-CV-6069, 2011 WL 6155687, at *1, *2 (S.D.N.Y. Dec. 8, 2011) (holding that the government could use special interrogatories to ask the basis for the claim of ownership, the source of the defendant currency, the identity of any person or document supporting the claim, and the claimant's income and tax return information, criminal history, and past participation in civil lawsuits); *United States v. $333,806.93 in Proceeds*, No. 05-CV-2556, 2010 WL 3733932, at *2 (C.D. Cal. Aug. 30, 2010) (concluding that special interrogatories seeking "any records or documents relevant to [the claimant's] interest in the defendant assets" and the identities of "all persons having knowledge" of that interest were "highly relevant" and "directly relevant" to standing).

A claimant must answer or object to such interrogatories within 21 days of service. R. G(6)(b). If the claimant fails to respond, or if the claimant's responses to the interrogatories are inadequate, the government may file a motion to compel responses pursuant to Federal Rule of Civil Procedure 37 or move to strike the claim and answer pursuant to Rule G. *See United States v. Vazquez-Alvarez*, 760 F.3d 193, 196 (2d Cir. 2014); *$133,420.00 in U.S. Currency*, 672 F.3d at 635; *see also, e.g.*, *United States v. $410,000.00 in U.S. Currency*, No. 07-CV-0589, 2007 WL 4557647, at *7 & n.5 (D.N.J. 2007) (granting government's motion to compel responses to special interrogatories as necessary to ensure claimant has standing and to protect against nominee claimants); *United States v. $2,409.00 in U.S. Currency,* No. 10-CV-0220, 2010 WL 2670982, at *1 (D. Md. June 24, 2010) (striking claim for failing to respond to special interrogatories within 21 days).

III. LuBian Failed to Comply with Rule G(6)

A. LuBian Has Failed To Explain the Nature and Source of Its Interest in the Defendant Cryptocurrency (Special Interrogatories 4, 5, 7)

As this Court has recognized, the government is entitled to inquire into the source and circumstances of a claimant's asserted interest in the Defendant Cryptocurrency. This includes "when, from whom, where, and how [the claimant] acquired [its] interest in the Defendant Funds." ECF No. 472, at 8 (quoting *$272,000.00 in U.S. Currency*, 2017 WL 8780158, at *3). LuBian's interrogatory answers, however, provide none of these details. Indeed, LuBian's answers are so vague that they appear to provide multiple theories of ownership—and these theories are presented as nothing more than bare-bones assertions, lacking in factual and legal detail, and seemingly overlapping with one another. LuBian must supplement its answers to allow the government to engage in a meaningful evaluation of LuBian's identity and standing.

At the outset, it is worth highlighting the information that LuBian did *not* provide about its claim of interest in the Defendant Cryptocurrency: the "time and circumstances" of LuBian's acquisition of its interest; the "virtual currency addresses[] or accounts" from which the funds originated (*i.e.*, the "source accounts") or passed through before reaching the 25 addresses comprising the Defendant Cryptocurrency (*i.e.*, the "intermediate accounts"); who owned or controlled those source accounts or intermediate accounts; the "origin of all funds" traceable to the Defendant Cryptocurrency; whether the funds were sourced through cryptocurrency mining, and if so, "how, when, and by whom" were the cryptocurrency mining operations funded;[1] what other persons or entities exercise any control over the Defendant Cryptocurrency including the "dates and manner" and "circumstances" of such control, and each such person or entity's "relationship" to LuBian. *See* Special Interrogatories 4, 5.

Rather than respond to the government's interrogatories in any detail, LuBian offers a four-bullet list in which it sketches out (but does not explain) various theories of interest in the Defendant Cryptocurrency. LuBian begins by asserting a generic "possessory interest" over the "entirety" the Defendant Cryptocurrency based on LuBian's "possession of the private keys" for and "hosting" of the wallets comprising the Defendant Cryptocurrency before December 2020. Obj. & Resp. at 9. But LuBian never explains when or how it came to host the Defendant Cryptocurrency in these custodial wallets. From whom did LuBian receive the Defendant Cryptocurrency? Under what business arrangement were the funds retained by or turned over to LuBian for safekeeping? What kind of activity generated such a large sum of money?

LuBian only deepens the mystery by asserting a "*further* claims an interest" as "a bailee for other parties *including* claimants Chen Zhi and Warp Data." Obj. & Resp. at 9 (emphases added). It is unclear whether this is a new theory or merely a continuation of the

[1] As noted in the government's forfeiture complaint, some of the Defendant Cryptocurrency was newly mined by LuBian. *See* ECF No. 1 (Verified Compl. *In Rem*), ¶ 47 & n.9. LuBian does not explain how this newly-mined Bitcoin was nevertheless being held by LuBian as a bailee for another party, or how these funds differ from other funds over which LuBian is asserting a claim.

"possessory interest" theory. Use of the word "further" implies that it is distinct, but if so, LuBian never explains what distinguishes the bailee theory from the possessory interest theory. In any event, LuBian's bailee theory remains equally unexplained. When, how, and from whom did LuBian receive the Defendant Cryptocurrency as bailee? Which portions did it receive from whom? LuBian states that it acted as bailee for parties "including" Chen Zhi and Warp Data—implying the existence of other bailors but declining to name them. And if there were multiple bailors (Chen Zhi, Warp Data, and perhaps other unnamed bailors), how was the Defendant Cryptocurrency divided up among them? LuBian elsewhere states that, in addition to LuBian itself, only Chen Zhi had complete "access to the private keys" for LuBian's digital wallets. Obj. & Resp. at 14. What accounts for the difference in the terms of bailment between Chen Zhi and Warp Data? LuBian does not explain.[2]

It is well-established that "[a]n 'interest' in the property is determined under the law of the state or foreign nation in which the interest arose . . . and the constitutional effect of that interest is determined under federal law." *United States v. All Assets Held in Acct. No. XXXXXXXX in name of Doraville Props. Corp.*, 299 F. Supp. 3d 121, 128 (D.D.C. 2018). Here, LuBian asserts that its "interests" (plural) arise "under the laws of Cambodia." Obj. & Resp. at 10. But LuBian declines to name any Cambodian statute or legal doctrine as the basis for any of its theories of interest. Given the extent to which legal concepts such as bailment or constructive trust differ across states, let alone foreign jurisdictions, LuBian must identify the specific legal basis for each of its theories.

B. <u>LuBian Has Not Explained Its Identity or the Nature of Its Relationship to the Individual Who Is Claiming To Be LuBian's Representative in the Forfeiture Proceeding (Special Interrogatories 1, 2, 3)</u>

LuBian has also failed to explain its own identity with sufficient detail to allow the government to evaluate its standing and ability to bring a claim in its own right. LuBian claims to be an "unincorporated collective of software engineers," but its interrogatory responses provide no detail about what that means, who really exercises control over LuBian's affairs, or how LuBian is related to other claimants in this action.

First, LuBian provides insufficient information about its organizational identity. LuBian states that, as an unincorporated collective, it "does not have a separate legal personality" and "does not have an ownership structure in the corporate sense." Obj. & Resp. at 4. But LuBian declines to provide any further detail—providing no information, for instance, about the names or identities of any of the "software engineers" who comprise the collective (other than the individual who claims to be LuBian's representative for purposes of this forfeiture litigation, referred to here

---

2 LuBian also asserts that it is the beneficiary of a "constructive trust," Obj. & Resp. at 9, but a constructive trust requires the claimant to have some preexisting right to the disputed property. *See, e.g.*, *Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d 904, 909 (9th Cir. 2010), as amended on denial of reh'g (Oct. 21, 2010) (noting that, under California law, one of the elements of a constructive trust is the claimant's "right to that *res*"). That just begs the question of what LuBian's preexisting interest in the Defendant Cryptocurrency may be.

by the initials L.S.Z.).[3] Nor does LuBian specify the *number* of software engineers—stating only that there have been "approximately 40-50 software engineers" who have been involved in LuBian "[s]ince its inception." *Id.* LuBian's inability to name any of its current or former members is significant. This is not, for example, a multinational corporation with thousands of employees, governed by an identifiable set of corporate officers and board members, but a collective of *at most* 50 persons during its organizational lifespan, all of whom might (or might not) have some degree of "collective" decisionmaking authority, and who may (or may not) be able to articulate some individualized interest in LuBian's property or operations. None of this is explained. The absence of any corporate structure does not excuse LuBian from providing information about its identity. Just the opposite, it magnifies the importance of understanding who stands behind LuBian, directs its affairs, or is poised to benefit from any recovery in this forfeiture proceeding.

Indeed, LuBian appears to be, at best, a dormant entity that has not engaged in any operations since December 2020. LuBian states that it "commenced its business in 2018" but its "cryptocurrency operations ceased in December 2020." Obj. & Resp. at 4. Of course, that answer seems to leave open the possibility that LuBian continued another line of "business" distinct from "cryptocurrency operations" past December 2020. If so, LuBian must supplement its response. But if it is true that LuBian, an "unincorporated collective," ceased all operations in December 2020, what accounts for its continuing existence and capacity to assert a claim in this proceeding?

LuBian's answers are so elastic that they could conceivably encompass a scenario in which LuBian has just *one* self-styled member (L.S.Z.) whose personal connection to the Defendant Cryptocurrency remains unexplained. The only tidbit of information LuBian offers as to L.S.Z.'s role is that he has been a "member" of LuBian's "collective of software engineers since 2018." Missing from this answer is any detail regarding the nature of L.S.Z.'s work for LuBian and his relationship to the other members of the "collective"—despite the government's specific requests for answers regarding, for example, L.S.Z.'s "role with respect to LuBian" and his "employment history and history of association with LuBian." Special Interrogatories, at 6. Also missing is any explanation of "the source of [L.S.Z.'s] authority . . . with respect to LuBian's affairs." *Id.* at 5-6. LuBian provides a hand-waving statement that L.S.Z.'s authority "derives from his membership of the collective," but that does not explain the legal basis for his authority to act and speak on LuBian's behalf, or the manner and circumstances by which LuBian's "collective" might have conferred such authority on L.S.Z.[4]

---

[3] Prior to filing its claim, LuBian filed an *ex parte* sealing motion, which has never been shared with the government. ECF No. 78. LuBian then filed a verified claim in which the name and signature of the individual purporting to represent LuBian and to verify LuBian's claim under penalty of perjury have been redacted. *See* ECF No. 79. LuBian subsequently disclosed the identity of this individual to the government, and its Objections and Responses to the government's Special Interrogatories were verified by the same individual. The government is referring to this individual by the initials L.S.Z.

[4] It is also unclear how LuBian can reconcile its claim to be an unincorporated collective represented by one of its members, L.S.Z., with its statement elsewhere that *all* of LuBian's profits are due to be paid to a different individual, Li Thet. *See* Obj. & Resp. at 5.

C. LuBian Has Not Addressed Its Relationship to Other Claimants (Special Interrogatories 8, 9, 10, 11, 12)

Finally, LuBian fails to address or explain its relationship with other claimants in this litigation, including Chen Zhi, Prince Holding Group, Warp Data, and Jian Yang. At the heart of the standing inquiry is the determination of whether a claimant is asserting an ownership interest in its own right, or whether it is merely acting as a pass-through or straw claimant on behalf of another. As this Court has explained, straw owners "lack standing because they 'do not themselves suffer an injury when the property is taken.'" ECF No. 472, at 11 (quoting *United States v. Khudainatov*, 177 F.4th 224, 229 (2d Cir. 2026)). Special interrogatories are necessary to "'test the Claimant's assertion that she is the true owner of the defendant property and not merely a courier for a third party.'" *Id.* (quoting *United States v. $104,250.00 in U.S. Currency*, 947 F. Supp. 2d 560, 565 (D. Md. 2013)).

Some of the government's interrogatories about LuBian's relationship with other claimants are met with outright refusal. *E.g.*, Obj. & Resp. at 15-16 (declining to respond to Special Interrogatory No. 12, regarding the distinction between LuBian's claim and those filed by other claimants including Chen Zhi, Prince Holding Group, Warp Data, and Jian Yang). Others are strategically vague. *E.g.*, Obj. & Resp. at 12-13 (declining to explain relationship between LuBian and Prince Group other than to state that Prince Holding Group does not own LuBian); *id.* at 13-14 (declining to explain relationship between LuBian and Warp Data other than to state that Warp Data generated an unspecified amount of cryptocurrency that "would be held in [LuBian's] digital wallets"). LuBian's answers with respect to Chen Zhi are particularly evasive. LuBian elsewhere acknowledges what appears to be an extensively intertwined relationship between itself and Chen Zhi—stating that Chen Zhi (alone) shared access to the private keys for LuBian's digital wallets; that LuBian acted as a bailee for Chen Zhi; and that one of Chen Zhi's close associates, an individual named Li Thet, is "entitled to any profits derived from [LuBian's] business operations." Obj. & Resp. at 5, 9, 14. Yet when asked in Special Interrogatory 10 to explain the relationship between LuBian and Chen Zhi, LuBian declines to provide anything close to a complete answer. Rather than affirmatively stating what the relationship between LuBian and Chen Zhi *is*, LuBian attempts to get away with stating what the relationship *is not*, offering only that "Chen Zhi had no formal membership, employment, advisory or consulting relationship with Claimant." *Id.* at 14. Such narrowly-crafted denials are transparently designed to avoid answering the question, as there are numerous other ways Chen Zhi might have exerted influence and control over LuBian's affairs or assets. And LuBian's response, framed as it is in terms of "formal" roles, is next to worthless when it comes to an "unincorporated collective" that appears to observe no corporate formalities. LuBian must supplement its responses to provide a clear and comprehensive explanation of its relationship to Chen Zhi, Warp Data, and each of the other named entities.

IV. Conclusion

For these reasons, the government respectfully requests that the Court compel LuBian to properly respond to the government's special interrogatories pursuant to Rule G(6). If LuBian fails to comply, the government intends to move to strike its claim on this basis in addition to those already contemplated in the government's forthcoming motions to strike for failure to establish statutory and constitutional standing. *See Vazquez-Alvarez,* 760 F.3d at 196; *United States v. $19,764.00 in U.S. Currency*, No. 10-CV-573A, 2011 WL 4899958, at *2-3 (W.D.N.Y.

Aug. 12, 2011), *report and recommendation adopted*, No. 10-CV-573, 2011 WL 4896507 (W.D.N.Y. Oct. 14, 2011) (citing cases granting motions to strike for failure to respond to interrogatories).

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Alexander F. Mindlin
Tanisha R. Payne
Benjamin Weintraub
Andrew D. Reich
Alessandra V. Rafalson
Assistant U.S. Attorneys
(718) 254-7000

Christopher B. Brown
Supervisory Trial Attorney
Noah Simmons
Trial Attorney
National Security Cyber Section
National Security Division
U.S. Department of Justice

cc: Clerk of Court (CHK)
Counsel of Record