**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AFM:BW
F. #2024R00105

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 2, 2026

By ECF

The Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: United States v. Approximately 127,271 Bitcoin
Civil Docket No. 25-5745 (RPK)

Dear Judge Kovner:

The government respectfully submits this letter in response to the Court's September 25, 2026 Order directing the government to respond to Hassan Miah ("Miah") and Tiger Mines New York Inc.'s ("Tiger Mines") letter requesting a pre-motion conference. In their letter, Miah and Tiger Mines (collectively, "Claimants") request that the Court accept Miah's original untimely claim (ECF No. 84) *nunc pro tunc* and grant Miah leave to amend his claim and add Tiger Mines as a claimant. Five days after the Court directed the government to respond, it granted Miah's earlier, preexisting motion for leave to file an untimely claim, *see* September 30, 2026 Order. The government respectfully moves for reconsideration of that ruling and submits that the Court should deny Claimants' motion for leave to file an untimely claim and to amend the claim. As their recent filing (ECF No. 499) makes clear, Claimants have not demonstrated excusable neglect or good cause for their untimely filings. Further, Claimants are, at best, unsecured creditors of Chen Zhi ("Chen") with a contingent interest in the forfeited property, and thus lack standing to pursue a claim in the instant forfeiture action.

I. Relevant Procedural & Factual Background

On October 8, 2025, Chen was indicted by a grand jury sitting in the Eastern District of New York. *See United States v. Chen Zhi*, No. 25-cr-321 (RPK), ECF No. 1 (the "Indictment"). The Indictment charges that Chen operated and profited from forced-labor scam compounds across Cambodia that engaged in cryptocurrency investment fraud schemes. On October 14, 2025, the Indictment was unsealed. On that same day, the government filed a civil complaint in the above-captioned case (the "Complaint"), seeking to forfeit, as proceeds of fraud and property involved in money laundering, 127,271 Bitcoin (the "Defendant Cryptocurrency"). Compl. ¶ 44 n.6; *see also* Indictment ¶ 53.

Pursuant to Rule G(4)(a)(iv)(C), the government published notice of this action on its official forfeiture website, advising that the deadline to file claims for potential claimants who did *not* receive direct notice is 60 days from the first day of publication (October 16, 2025), *i.e.* December 15, 2025. On December 11, 2025, the Court extended until December 29, 2025 the filing deadline for "third parties hop[ing] to file claims opposing forfeiture in this action. On January 19, 2026—35 days after the statutorily imposed filing deadline and 21 days after the extended filing deadline—Miah filed a *pro se* motion for an extension of time, which incorporated his putative claim. *See* ECF No. 84. In his motion for an extension of time, Miah stated that his "delay in filing was inadvertent" and attributed the delay to the fact that "determining [his] interest required time and effort," further asserting that he "did not receive direct notice and was uncertain about the applicable deadline." *Id.* at 2. Miah's submission articulated a barebones claim to the Defendant Cryptocurrency, stating merely: "I assert a direct, personal, and legally cognizable interest in the Defendant Assets, including but not limited to the Bitcoin associated with the wallet addresses identified in the Verified Complaint and any traceable proceeds." *Id.* at 4. Miah's putative claim contained no mention of Tiger Mines.

On August 10, 2026—242 days after the statutory filing deadline and 224 days after the extended deadline—Claimants filed the instant letter requesting a pre-motion conference, which incorporated a proposed amended claim, now made on behalf of both Claimants. ECF Nos. 499, 499-2. The letter motion also incorporated a sworn declaration by Miah. ECF No. 499-1.

Miah asserts that he is the sole owner and operator of Tiger Mines. *See* ECF No. 499-1 at ¶ 1. Miah claims that beginning in approximately 2023, he assisted Chen in getting Tether Holdings Limited ("Tether Holdings") to unfreeze two wallets owned by Chen (separate from and unrelated to the wallets at issue in this forfeiture action), which together held approximately $160 million USDT. *See id.* at ¶¶ 8-10. In connection with those efforts, Chen "executed an April 2024 assignment agreement with Tiger Mines, in which Chen Zhi assigned full rights in the [frozen Tether Holdings] wallets to Tiger Mines for $500,000." *Id.* at ¶ 17. As part of that written assignment agreement, Miah asserts, Chen "provided [Miah] with certain private keys to the wallets." *Id.* at ¶ 37.

In August 2024, Tiger Mines sued Tether Holdings, seeking to unfreeze the wallets and recover damages. *Id.* at ¶ 22. In early September 2024, Tether Holdings sent Tiger Mines a proposed settlement agreement, which, as relevant here, required Miah to personally indemnify Tether Holdings in the event of future claims involving the frozen wallets. *Id.* at ¶ 23. Tiger Mines responded by seeking to remove the personal indemnification requirement and adding compensatory damages. *Id.* According to Miah, on September 18, 2024, Miah met with Chen in London and Chen urged Miah to settle Tiger Mines's suit against Tether Holdings and forego the opportunity to recover compensatory damages. *Id.* at ¶ 29. Miah claims that Chen

> stated that if [Miah] agreed to sign the Tether Holdings settlement on terms acceptable to Tether Holdings—forgoing the damages claim and accepting the personal indemnity provision—he would, in exchange, pay the agreed-upon success fee, indemnify [Miah] against [Miah's] personal exposure

> under the settlement, and assign to Tiger Mines the assets [Chen] previously held in a separate set of cryptocurrency wallets that [Chen] described, collectively as his "Lubian wallets."

*Id.* Chen also acknowledged that the wallets "had been hacked and were for the time being inaccessible to him." *Id.* at ¶¶ 29-30. Chen never memorialized this supposed agreement with Miah in writing, never identified the specific wallet addresses associated with the "Lubian wallets" and never provided Miah with the private keys necessary to access the wallets. *Id.* at ¶¶ 32, 38. Miah asserts that these "Lubian wallets" are the wallets at issue in this action; *i.e.*, the wallets that previously held the Defendant Cryptocurrency.

On November 6, 2024, Tiger Mines and Tether Holdings settled their lawsuit and Tether Holdings agreed to unfreeze the wallets. *Id.* at ¶ 36. On November 20, 2024, Tether Holdings unfroze the wallets. *Id.* at ¶ 37. However, even though Chen had given Miah the private keys to the Tether Holdings wallets, Chen apparently also retained the private keys and transferred all the USDT that was in the previously frozen wallets out of the wallets before Miah could access the funds. *Id.* Thereafter, Chen never gave Miah the keys to the "Lubian wallets" and there is no indication in Miah's declaration that Chen ever paid Miah his success fee or indemnified Miah against the exposure Miah had assumed as part of the settlement.

After January 2025, Miah had no further communications with Chen regarding the "Lubian wallets." *Id.* at ¶ 41. However, from January 2025 until the filing of the Indictment in October 2025, Miah, operating through a consulting company he co-owned, was working on Chen's behalf to convince the media outlet Radio Free Asia to retract negative articles about Chen. *Id.* at ¶ 39. In early November 2025, Miah's wife traveled to Cambodia and, according to Miah, was asked by one of Chen's associates whether Miah intended to file a claim in the instant forfeiture action. *Id.* at ¶ 44. Miah claims that he had a "subsequent conversation" with his wife in which he first learned of the instant forfeiture action. *Id.* at ¶ 45. Though Miah does not state the precise date of that conversation, he claims to have "first learned of this action in late fall of 2025." ECF No. 499 at 1. "Around the same time," Miah consulted various attorneys regarding potentially filing a claim. ECF No. 499-1 at ¶ 46. Miah claims that he received advice that was "inconsistent, confusing, and, in at least one instance, came from attorneys who had a pre-existing relationship with other individuals claiming ownership" of the Defendant Cryptocurrency. *Id.* Following receipt of this legal advice, Miah opted not to file a claim by the December 29, 2025 deadline. *Id.*

On September 30, 2026, the Court granted Miah's motion for extension of time in an Order that also granted motions for extension of time filed on behalf of various putative claimants who are victims of Iranian terror attacks and hold default judgments against the State of Iran. The Court's Order stated that the claimants whose motions the Court was granting had "reasonably explained that they filed their claims as soon as they became aware of their potential interests in this action." September 30, 2026 Order.

II. <u>The Court Should Reconsider Its Prior Ruling and Find that Claimants Have Not Established Excusable Neglect</u>

The additional detail contained in Miah's declaration regarding the circumstances surrounding Claimants' putative claim makes clear that Claimants' untimeliness was not the result of excusable neglect. The government respectfully submits that, as a result, the Court should reconsider its Court's order permitting untimely filing.

A. <u>Applicable Law</u>

The standard for granting a motion to reconsider "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir. 1995) (citations omitted). "The purpose of a motion for reconsideration, therefore, is to bring to the Court's attention facts or controlling law that the moving party believes the Court has overlooked." *United States v. Spataro*, No. 04-CR-911 (SJ), 2009 WL 10718509, at *1 (E.D.N.Y. Oct. 15, 2009).

Rule G(5)(a)(ii)(B) requires claimants who did not receive direct notice to file their claims within 60 days of publication on the government's forfeiture website, "[u]nless the court for good cause sets a different time." Rule G(5)(a)(ii)(B). Although a court may alter the deadlines set forth in Rule G "for good cause," once a deadline is set "courts generally permit a party to file a belated claim [only] if the party demonstrates excusable neglect for failure to timely file." *United States v. $417,143.48*, No. 13-CV-5567 (MKB), 2015 WL 5178121, at *9 (E.D.N.Y. Sept. 2, 2015) (aff'd *United States v. $417,143.48*, 682 F. App'x 17 (2d Cir. 2017)); *see also United States v. All Assets of Blue Chip Coffee, Inc.*, 836 F. Supp. 104, 108 (E.D.N.Y. 1993) ("A claimant in a civil forfeiture action may file a late claim only upon a showing of excusable neglect." (internal quotation marks omitted)). "The late claimant has the burden of proving excusable neglect." *United States v. $96,000 in United States Currency*, No. 18-CV-5993 (ALC), 2019 WL 3334493, at *3 (S.D.N.Y. July 25, 2019) (citing *In re Enron Corp.*, 419 F.3d 115, 121 (2d Cir. 2005)).

In evaluating whether a party has demonstrated excusable neglect, the Supreme Court has directed courts to consider: (i) the danger of prejudice to the non-movant, (ii) the length of the delay and its potential impact on judicial proceedings, (iii) the reason for the delay, including whether it was within the reasonable control of the movant, and (iv) whether the movant acted in good faith. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)l;. In addition, courts in this district consider (i) "when the claimant became aware of the seizure" and (ii) "whether the government was aware of the claimant's interest." *$417,143.48*, 2015 WL 5178121, at *9; *see also* Report and Recommendation at *2, *United States v. Approximately $168,052.25*, No. 14-CV-4219 (NGG) (RER) (E.D.N.Y. Mar. 16, 2016). "When balancing these factors, the 'reason for delay' factor 'predominates, and the other three [factors set forth in *Pioneer*] are significant only in close cases.'" *$96,000*, 2019 WL 3334493, at *3 (quoting *Williams v. KFC Nat'l Mgmt. Co.*, 391 F.3d 411, 415-16 (2d Cir. 2004)).

B. Argument

The government respectfully submits that the Court, in granting Miah's earlier motion for extension of time, overlooked facts included in Miah's declaration and his proposed amended claim that are inconsistent with the justifications offered in Miah's earlier motion for an extension of time, and are in any event insufficient to warrant an extension. Accordingly, Miah cannot establish excusable neglect for his untimely filing.

*First*, Miah claims that he "first learned of this action in late fall of 2025." ECF No. 499 at 2. This assertion is dubious but, if true, would epitomize inexcusable neglect. In the first instance, both the Indictment and Complaint were highly publicized and Miah had at that point been in regular, direct communication with Chen and other members of his inner circle for three years—since November 2022. At the time when the Indictment and Complaint were filed, Miah was actively working on Chen's behalf to persuade media outlets to retract negative articles about him. It strains credulity that Miah, who was working to rehabilitate Chen's image in the press, would not have immediately learned that Chen had been charged with serious crimes and that billions of dollars' worth of Bitcoin had been seized in connection with those crimes. Beyond asserting that he did not receive "direct notice" of the forfeiture action, Miah offers no plausible explanation for how he remained unaware of the forfeiture action until "late fall." Miah does not cite any case in which a court has found neglect to be excusable on the mere basis that a putative claimant was unaware of the forfeiture action or failed to realize that it had a basis to file a claim.

Even crediting Miah's timeline of events, Miah concedes that he became aware of the forfeiture action no later than approximately November 2025, *see* ECF No. 499-1 at ¶¶ 44-45, which gave him ample time to file a timely claim by either December 11, 2025 or December 29, 2025. Once he learned of the forfeiture action and well before the filing deadline, Miah consulted multiple attorneys to discuss his potential claim. He asserts that he "did not immediately file a claim" because the legal advice he received was "inconsistent, confusing, and, in at least one instance, came from attorneys who had a pre-existing relationship with other individuals claiming ownership." *Id.* ¶ 46. Not only was this supposed justification absent from Miah's original motion for an extension of time, it is inconsistent with the excuses provided in that motion. In the original motion, Miah claimed that his "delay in filing was *inadvertent*." ECF No. 84 at 2 (emphasis added). Now, Miah admits that it was an intentional decision, albeit one supposedly reflecting conflicting legal advice. Even putting aside Miah's contradictory filings, what Miah is really saying is that he, a highly sophisticated and successful financial technology executive: (i) received legal advice before it was too late to file a claim, (ii) decided not to file a claim by the deadline, and (iii) later changed his mind and filed a claim. That conduct does not constitute excusable neglect; rather, it reflects Miah's initial, intentional decision not to file a claim and then his indecision and regret over that course of action.

*Second*, Miah claims that "[h]e also faced difficulties identifying his specific interest among the Defendants In Rem—the same difficulty the Court credited for other claimants—because Chen Zhi never provided the wallet-identifying information." ECF 499 at 2. But Miah's proposed amended claim undermines that excuse. Whereas other putative claimants claimed that they had difficulty conducting the complex cryptocurrency tracing necessary to

locate the precise relevant assets among the many virtual currency addresses through which the Defendant Cryptocurrency passed, that excuse cannot possibly apply to Miah. Claimants' proposed amended claim states that Tiger Mines is the owner of *all* of the Defendant Cryptocurrency. Under that theory, Miah did not need to conduct complicated cryptocurrency tracing to locate Tiger Mines's supposed property. Indeed, his alleged interest is not traceable to him via the blockchain or any series of historical transactions, but arises from Chen's purported general promise to give Miah the funds in the future. Accordingly, to the extent Miah claims that his untimeliness was justified by difficulty identifying Tiger Mines's specific interest in the Defendant Cryptocurrency, that justification is inconsistent with his proposed amended claim and cannot constitute excusable neglect.

In contrast to the offered by Claimants, courts have tended to find neglect excusable only where concrete, real-world obstacles intervened to prevent timely filing. *Compare United States v. $153,115.00 United States Currency*, No. 21-CV-380 (WMS), 2021 WL 3507894, at *3 (W.D.N.Y. Aug. 10, 2021) (finding excusable neglect where six-day delay was result of claimant's attorney being "adversely impacted due to COVID-19 and other health related reasons"); *United States v. $10,990.00 in United States Currency*, No. 18-CV-15 (JCH), 2019 WL 1332585, at *3 (D.N.M. Mar. 25, 2019) (finding excusable neglect where claimant asserted that his "incarceration has made it difficult to file pleadings on time because he does not have access to electronic filing"); *and $96,000*, 2019 WL 3334493, at *4 (finding excusable neglect where missed deadline caused by counsel's "administrative office failure" to record filing deadline) *with Blue Chip Coffee*, 836 F. Supp. at 108 (claimant who "believed in her husband's innocence and therefore did not make a claim to the property prior to his conviction" did not demonstrate excusable neglect for late filing) *and United States v. Funds in the Amount of $130,000 United States Currency*, No. 19-CV-3440 (EEB), 2021 WL 2433733, at *3 (N.D. Ill. June 15, 2021) (counsel's failure to realize he needed to file a claim despite being so advised by the government did not constitute excusable neglect).

## III. Claimants Do Not Have Standing

The new facts alleged in Miah's proposed amended declaration make clear that neither Miah nor Tiger Mines has standing to pursue a claim in this action. Independent of Claimants' inability to demonstrate excusable neglect for their untimely filings, the Court should deny their motion for leave to file an untimely claim because neither party has standing.

### A. Applicable Law

Courts "may deny a motion to file out of time if a putative claimant lacks standing." Memorandum & Order at 6, ECF No. 506 (citing *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 529 (2d Cir. 1999)).

To have standing to contest a civil forfeiture action, the claimant must have a present interest in the defendant property. An inchoate, contingent or future interest is insufficient because the loss of such an interest would not cause the claimant to suffer "an injury that is actual and concrete, rather than conjectural or hypothetical." *United States v. All Assets Held in Account Number XXXXXXXX, In Name of Doraville Properties Corp.,* 299 F. Supp. 3d

121, 135 (D.D.C. 2018) (beneficiary of a discretionary trust lacks a present interest in the defendant property and thus lacks standing); *see also United States v. Church & Dwight Co., Inc.*, 510 F. App'x 55, 58 (2d Cir. 2013) (claimant with a contingent interest based on the settlement of a private lawsuit lacked standing because the contingency – the Government's acquiescence – was not satisfied); *United States v. Funds Seized From Fidelity Investments*, No. 16-CV-20 (DHB), 2021 WL 2815840, at *2 (S.D. Ga. July 6, 2021) (claimant whose divorce decree provided claimant with interest in defendant property only if the United States released the seized property had only a "contingent interest" and was thus not an "innocent owner"); *United States v. All Assets Listed in Attachment A*, No. 14-CV-969 (LO), 2015 WL 1221392, at *5 (E.D. Va. Mar. 13, 2015), *aff'd sub nom. United States v. Batato*, 833 F.3d 413 (4th Cir. 2016) ("marital interest that has not yet ripened" insufficient to create "legal or equitable interest in the property" conferring putative claimant standing).

In addition, though "[a] claimant in a civil forfeiture action 'need show only a facially colorable interest in the property at issue' and 'need not prove the full merits of their underlying claim' to have Article III standing . . . a general, unsecured interest in the seized property does not suffice." *Id.* at 7 (quoting *United States v. Khudainatov*, 177 F.4th 224, 228–29 (2d Cir. 2026) (alterations omitted)). "District courts also routinely reject claims to forfeited property by general, unsecured creditors for lack of standing." *Id.* (collecting cases). A putative claimant whose supposed ownership interest in the forfeited asset is premised on a breach of contract claim against another claimant is nothing more than an unsecured creditor with a contingent or potential future interest in the forfeited asset, and thus without standing in the forfeiture action. *See United States v. White,* 675 F.3d 1073 (8th Cir. 2012) ("even assuming the existence of an enforceable oral contract, White's petition fails to demonstrate that she has standing to contest the forfeiture of the property based on a contractual interest in the stock proceeds"); *United States v. BCCI Holdings (Luxembourg) S.A.*, 841 F. Supp. 1, 5 (D.D.C. 1993) (putative claimants whose "legal interests arose from BCCI's breaches of contractual duties" were unsecured creditors who "would not be entitled to recover under" criminal forfeiture statute).

B. Argument

In asserting that Chen orally assigned him the rights to the "Lubian wallets," Miah mischaracterizes the legal effect of their September 18, 2024 meeting. At most, Chen and Miah entered into an oral contract whereby Chen agreed—at some later date—to assign Miah the "Lubian wallets" if Miah held up his end of the bargain by accepting Tether Holdings' settlement offer. *See* ECF No. 499-1 at ¶ 29. Of course, if Chen had actually wished to convey ownership of the "Lubian wallets" to Miah at the September 18, 2025 meeting, it would have been easy for Chen to give Miah the private keys to those wallets, so that Miah would have control of the contents (if recovered). Claimants' proposed amended claim makes clear that Miah and Chen viewed transfer of the private keys to Chen's wallets as a key element of transferring ownership of the assets. *See* ECF No. 499-1 at 10 (asserting Miah's belief that "the precise addresses, as well as access and control information, would be provided" by Chen Zhi; *id.* at 11 (asserting Miah's belief that "the private keys or seed phrases would be transferred to permit operational control").

But Chen did not turn over the keys. Rather, taking Miah's story as true, Miah held up his end of the bargain and settled with Tether months later, in November 2024; but Chen never held up his. He never gave Miah the private keys to the "Lubian wallets" and thus never transferred control of the "Lubian wallets" to Miah, within the terms of the bargain that the parties had struck. Miah thus has, at best, a breach of contract claim against Chen.

A third party with a cause of action in contract against the owner of the defendant property stands in the same relative position as a party with a cause of action in tort, such as a fraud victim. Just as putative fraud victims are unsecured claimants without standing, *see* ECF No. 506, a putative claimant whose claim is premised on first successfully pursuing a breach of contract claim against the owner of the defendant property is also an unsecured claimant without standing. Thus, in *BCCI Holdings*, the government moved to strike a claim for lack of standing because the claimants had nothing more than a cause of action in tort against the property owner. The claimants responded that their cause of action was based on breach of contract, not tort. Nevertheless, the court held that although the putative claimants' "characterization of the nature of their interests appears to be more accurate than the government's," it made no difference because either way the claimants were unsecured creditors with no interest in the property subject to forfeiture. *BCCI Holdings*, 844 F. Supp at 4. Similarly, in *White*, the claimant based her objection to the forfeiture of shares of stock on an oral contract that purported to give her an interest in those shares. The Eighth Circuit held that "the terms of the purported contract are too vague and indefinite" to be enforceable, but even if that were not so, a breach of the oral contract did not give the claimant a legal interest in the stock subject to forfeiture. *White*, 675 F.3d at 1080. Just as the claimants in *BCCI Holdings* and *White* lacked a basis to contest forfeiture based on a breach of contract claim, so do Miah and Tiger Mines, and the Court should deny their motions on the basis that they lack standing. Claimants' claimed ownership interest in the Defendant Cryptocurrency is an inchoate, contingent, future interest insufficient to confer standing. It is simply "too hypothetical to create an actual case or controversy." *Doraville Property*, 299 F. Supp. at 137.

IV. Conclusion

For all of the reasons discussed above, the government respectfully submits that the Court should reconsider its prior ruling, deny Hassan Miah's motion for extension of time to file a claim, and deny the pending motion to amend the pleading.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Alexander Mindlin
Tanisha R. Payne
Benjamin Weintraub
Andrew Reich
Alessandra Raffalson
Assistant U.S. Attorneys
(718) 254-7000

Christopher B. Brown
Noah Simmons
Trial Attorneys
National Security Cyber Section
National Security Division
U.S. Department of Justice