# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

| | |
|---|---|
| FRITZ, et al., | : 25-CV-07093 (RPK) |
| Plaintiffs, | : |
| -against- | : United States Courthouse<br>: Brooklyn, New York |
| IRAN AND CHINA INVESTMENT DEVELOPMENT GROUP, | : Tuesday, October 13, 2026<br>: 3:00 p.m. |
| Defendant. | : |

- - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR PRE-MOTION CONFERENCE
BEFORE THE HONORABLE RACHEL P. KOVNER
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For Fritz Plaintiffs: GIBSON DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166-0193
BY: ROBERT L. WEIGEL, ESQ.
JESSICA L. WAGNER, ESQ.
JASON MYATT, ESQ.
FREDERICK FREEMAN, ESQ.

For the Plaintiffs' Companion Case: WIGGINS CHILDS PANTAZIS FISHER GOLDFARB
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
BY: DENNIS G. PANTAZIS, ESQ.
DOUGLAS MITCHELL, ESQ.

A P P E A R A N C E S: (Continued)

For the USA: U.S ATTORNEY'S OFFICE
EASTERN DISTRICT OF NEW YORK
271 Cadman Plaza East
Brooklyn, New York 11201
BY: ALEXANDER MINDLIN, ESQ.
BENJAMIN WEINTRAUB, ESQ.
ANDREW REICH, ESQ.

and

U.S. DEPARTMENT OF JUSTICE
National Security Division
950 Pennsylvania Ave, N.W.
Suite 6744A
Washington, DC 20530
BY: CHRISTOPHER B. BROWN, ESQ.

For the 9/11 and O'Neill Intervenors: ANDERSON KILL
7 Times Square
15th Floor
New York, New York 10036
BY: JERRY S. GOLDMAN, ESQ.
BRUCE STRONG, ESQ.

MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
BY: JOHN M. EUBANKS, ESQ.

For the Breitweiser Intervenors: McANDREW VUOTTO, LLC
13 Mt. Kemble Avenue
Morristown, New Jersey 07960
BY: THOMAS P. SHERIDAN, ESQ.

Court Reporter: Stacy A. Mace, RMR, CRR, RPR
Official Court Reporter
E-mail: SMaceRPR@gmail.com

Proceedings recorded by computerized stenography. Transcript produced by Computer-aided Transcription.

(In open court.)

THE COURTROOM DEPUTY: All rise.

(Judge RACHEL P. KOVNER entered the courtroom.)

THE COURT: Good afternoon, everybody can be seated. Please be seated.

THE COURTROOM DEPUTY: Fritz, et al versus Iran and China Investment Development Group.

Counsel, please state your name for the record.

MR. WEIGEL: Robert Weigel from Gibson, Dunn & Crutcher for the Fritz plaintiffs.

With me is my partner Jessica Wagner and my partner Jason Myatt, and Frederick Freeman from our office.

With the Court's permission, I'm going to address our affirmative case under what the Second Circuit has said we need to do in these circumstances.

Ms. Wagner, who argued the D.C. Circuit case Levin is going to handle the Government's motion to dismiss in the event Your Honor wants to hear anything about it.

THE COURT: Okay.

MR. MINDLIN: Good afternoon.

For the Government, AUSA Alexander Mindlin.

Beside me is my colleague Christopher Brown of the Department of Justice's National Security and Cyber Section.

Beside him is my colleague AUSA Benjamin Weintraub, and my colleague AUSA Andrew Reich.

THE COURT: Great.

Anybody else who is appearing today?

MR. MITCHELL: My name is Doug Mitchell, and I'm here with Dennis Pantazis on behalf the Havlish plaintiffs who are in that companion case.

THE COURT: Yes.

MR. GOLDMAN: Good afternoon, Your Honor.

My name is Jerry Goldman from Anderson Kill. I'm here with Bruce Strong from my firm.

I'm also here with Andrew Maloney, and John Eubanks. Andrew Maloney is from Kreindler. John Eubanks is from Motley.

We are here on behalf of the 9/11 plaintiffs, which is captioned in this case the O'Neill plaintiffs.

Thank you, Your Honor.

THE COURT: Thanks.

MR. SHERIDAN: Good afternoon Your Honor.

Tom Sheridan of McAndrew Vuotto, and I'm here on my own from representing the Breitweiser intervenors.

THE COURT: Okay.

MR. SHERIDAN: Thank you.

THE COURT: Great. Thank you all for coming in today.

I wanted to talk with you all because we've got a couple proceedings, a couple cases that are filed that present

overlapping issues. And then we have different motions that are filed that are contemplated here that also present overlapping issues.

And what I wanted to talk with you all about is how we can set up an order of operations that handles these issues in an efficient way to save you all time and energy and to save me time and energy too.

So, I guess I'd like to hear from you all about what you think that would be.

It seems like one set of issues we have are the issues that the challenges that the Government is raising to the Fritz plaintiffs' claims, and I think the same for the other claimants with similar arguments, for attaching these assets. So those, I think, are presented in opposition to the Fritz claimants motion for an order of attachment. And maybe that's kind of how you want -- maybe that's what you all have decided on as the vehicle for briefing that issue.

There's also been a discussion of a motion to dismiss, so one, that's one set of filings.

There is a potential default judgment motion, and then there are these other motions seeking to attach or establish priority in the world of attachment.

So, I guess do you all think that's the universe of filings that are in the world or about to be in the world?

And if so, do you have thoughts on the order in

which these things should be briefed and decided?

I guess I have some reactions, but maybe I'll ask you all first.

MR. WEIGEL: Yes, Your Honor.

We think that the pending motion for an attachment should be decided first. The Second Circuit in virtually the same circumstance where the Government had moved first for an attachment in the 650 cases, which is the Kirschenbaum case.

And then the second time up the appeal was Havlish.

The Second Circuit plainly said to attach defendants' properties under TRIA, the plaintiff must show that the defendants are a terrorist party or an agency or instrumentality of the terrorist party; and two, that defendants' properties are blocked assets. And then they go and define what it means to be an agency or instrumentality under TRIA, and what it means to be a blocked asset.

We believe we've met that test and, therefore, we think you should decide it first, particularly given the primacy of TRIA. TRIA says expressly that notwithstanding any other provision of law, in every case the blocked assets of a terrorist party are available and an agency or instrumentality are available for attachment or execution.

So, we would -- in another Havlish case from 2025 on the Taliban, the Second Circuit said the first clause of the statute, which provides that TRIA applies notwithstanding any

other provision of law, carries great weight in our analysis of how TRIA interacts with the FSIA. The Supreme Court has observed that notwithstanding clauses like this one contained in TRIA have generally — and this is a quote — been interpreted to supersede all other laws and that to provide a clearer statement of a drafter's intent that they so supersede is difficult to imagine.

So, Congress when it enacted TRIA said -- it was in response to the Executive Branch really not cooperating in terms of collecting these judgments. It said these judgments should be collected against blocked assets.

And we think the right way to do this is to decide the attachment motion first, and then move, allow us to move — as would be our right — to -- for default judgment against LuBian.

LuBian has defaulted, which means that at least as to LuBian under Rule 8(b)(6) I think, anything they didn't respond to, which is the entire complaint except damages, is deemed to be admitted.

As to the first prong of this, whether LuBian is an agency or instrumentality, the Government takes no position on that — which given how vigorously they've opposed everything else we've come up with, suggests to me that they believe we're right. And certainly, we have introduced a lot of evidence to show that LuBian meets the definition of an agency

or instrumentality under TRIA, which is a different definition than the definition under the FSIA.

THE COURT: So, your motion would present the questions of, first, are these assets assets that are subject to seizure under TRIA?

And as part of that, are these assets assets of an instrumentality of Iran or not?

And then all of the Government's legal arguments about whether they are subject to attachment.

Is that the kind of the universe of things?

MR. WEIGEL: Yes.

I think Second Circuit phrased it the other way.

First, are they an agency or instrumentality of a terrorist party?

And second, are they blocked assets, which means essentially are they owned by the terrorist party?

THE COURT: Yes.

And then probably some other universe of arguments about is there some other legal obstacle to your collecting under TRIA; a criminal forfeiture, any other arguments, sovereign immunity?

MR. WEIGEL: I think the way it would work, Your Honor, is that I think we're entitled to our attachment, which is a preliminary remedy still. I mean it requires a likelihood of success on the merits, not a, not al final

determination. It's been pending and it's been fully briefed for quite a while. We think we're entitled to that.

Then I think we should set a briefing schedule for the motion for a default judgment.

We, of course, incorporate the CPLR under Rule 69. The CPLR provides that 5240 -- it says that anyone with an interest can come in and ask the Court for relief and the Court really has broad discretion as to what it would apply, you know, what kind of relief it would apply.

So, I would suggest that the cleanest way to do this is to let us have our attachment, and then we can argue about the default judgment, everybody who wants to come in can come in. LuBian has defaulted, and so that has certain impacts on their ability to come in, but anybody else, Chen or any of those other people in the forfeiture action can come in and be heard.

And if we're right, we're going to short circuit an awful lot of process to save fuel, as Your Honor was saying, because we're really plowing the field for everybody else behind us. Okay. We are the ones who came up with this. Not casting aspersions to my fellow plaintiffs, but they just copied what we did. And so, we have the experts. We have two very strong experts who -- one analyzed the block chain and showed why it is that LuBian is an instrumentality of Iran. And although LuBian has admitted, and the Government doesn't

contest it, the Levinson case would suggest that you should still make findings about that.

And then as to whether it's a blocked asset, the Government concedes that LuBian mined in Iran. That's in their forfeiture complaint. And they concede that LuBian mined 11,000 of this Bitcoin and that went to some wallets.

We can show that that was Iranian. We've got -- our experts have everything from the electrical bill showing how much power they were drawing, LuBian's own statements that they run the largest compliant Bitcoin mine. We have pictures of Iranian officials at the opening of the mine. We have the Iranian officials talking about, you know, why mining Bitcoin is important to Iran because it allows them to take their energy resources, convert it to electricity, and then the electricity gets converted into Bitcoin and they can use that Bitcoin to avoid U.S. sanctions.

So --

THE COURT: So, the Government has various arguments that it is trying to make in this case about why you can't attach these assets that are separate from arguments about whether, you know, is this -- whose Bitcoin is it and is the Bitcoin an Iranian asset in some way or an asset of an instrumentality of Iran.

Is it your view that those arguments are arguments I would consider in deciding your attachment motion or that they

are arguments that I would consider in deciding some other motion, or you just think they're not arguments I should consider?

How are you thinking those are fitting in?

MR. WEIGEL: I don't think, I don't think that the Government is in a position to move to dismiss our claim against LuBian because Rule 12 says it has to be a party that can make a motion.

The Government is not a party in this case yet, although I suppose they could come in if they wanted to. But on the attachment motion where we're moving for a turnover, the CPLR says — and as you'd imagine, in an ordinary circumstance if we go for a car or we were to go for a building or something, everybody with a claim can come in and get it resolved in one place.

I don't think the Government's arguments about immunity make a lot of sense. If you look at the Kirschenbaum case, the Government says this is -- it's the issue of sovereign immunity and the Government has sovereign immunity because they have attached it just flies in the face the statute.

THE COURT: So, all these arguments are so complicated and you know a lot more about them than I do, and this is -- your conversation now is going to the merits of whether that's a good argument or not, and I'm really focused

on the issue of how can I structure the briefing in this case to address all these arguments in an efficient way.

And so, I'm trying to figure out, these are arguments that the Government is making, your pitch is let's go forward on our attachment motion, and I'm trying to figure out are you thinking all of those arguments that the Government is making are going to be motions they can make in opposition to your attachment motion or arguments I would consider when I was deciding your attachment motion; or your pitch is we should be able to attach these assets and you shouldn't even consider those arguments, and you're going to tell me maybe you would consider them at the default judgment stage or some other later time?

How are you thinking that's going to work?

MR. WEIGEL: I think that because of the lesser standard for an attachment and the preliminary -- you know, it's -- it's a likelihood of success standard, that you should allow the attachment right now.

THE COURT: Without considering the Government's -- so, you were telling me the Government's arguments are bad and silly, but let's just assume the Government's arguments are great, because I'm not assessing them.

MR. WEIGEL: Right.

THE COURT: So maybe they're good, maybe they're bad.

And your view is even if the Government has really strong arguments that sovereign immunity applies or the various other barriers they're asserting, even if those arguments are really colorable, great, strong, I should say grant the attachment motion without considering them?

MR. WEIGEL: I think the answer to that is yes. Although, obviously, Your Honor can consider them at either stage.

I think they fit better in opposition to the turnover motion, that the Government can come in at that point in time under 5240, which gives an express statutory provision for the Government to come in and be heard, as well as everybody else, including the people in the back who probably didn't enter appearances. And everybody can be heard. And in that one proceeding, if you grant our motion, if you find that we're right, that these are blocked assets, then you will have resolved most of the case and maybe all of the forfeiture case.

It's going to depend on what the Bitcoin is worth and everything else, but there's a hundred billion dollars of plaintiffs standing behind us, more than that. And so, if you rule that these are blocked assets and that the terror victims under TRIA are entitled to them, then -- then that's it. If Chen wants to come in and say: Well, you know, I invested in this or the mine or something -- I don't know how he does

that, but you can resolve everybody's claim to these assets in connection with our turnover motion. There's express authority for that.

And if we're right, we've resolved everybody's claim. They all just fall in line behind us. If we're wrong — and I don't think we are, but if we are — then all of us drop out essentially.

THE COURT: So, and you think in granting an attachment motion the questions would be, effectively, whose assets are these?

Are these LuBian's assets?

And then is LuBian an instrumentality of Iran?

And you would be presenting evidence about, you know, power bills and statements and things like that to show that it's an instrumentality of Iran.

MR. WEIGEL: Yes.

THE COURT: And you think those are the things that would be shown. And if those are shown, the attachment should be granted without consideration of things like, whether or not the assets are held by the Government, and there's a certain sovereign immunity or something like that, just don't consider those, just grant based on those facts, is that right?

MR. WEIGEL: Yes, Your Honor.

THE COURT: Okay.

And then who is it that you think would be heard on that, like on this issue?

You're coming in and you're saying: Hey, these are assets that belong to Iran or these are assets of LuBian or connect -- I'm saying belong to Iran, and I know that's not the term of art, they are sufficiently connected to Iran to trigger TRIA. You would be briefing one side of it.

Is anybody going to be briefing the other side of it?

Do you think anybody gets to be heard on the other side of it?

MR. WEIGEL: Well, the briefing -- this came in as a, you know, an ex parte motion.

THE COURT: Yes.

MR. WEIGEL: Which is one of the ways you can do it under New York law, you can move ex parte.

You can certainly grant it ex parte and let everybody come in if you want to do that.

I think that all those issues are going to get resolved, and I think they get resolved easier in the -- in the motion for a default judgment. Because they were clearly entitled to a default judgment against LuBian because LuBian was served. They had notice. They didn't do it.

If there's some reason that that isn't enough to give us a turnover motion, we're going to have a lot of people

come in and say that.

But -- and this is, this is very important to us, is that the law favors the diligent creditor, and we are the one who spent hundreds of thousands of dollars on experts. We've been working on this thing for months before the Government ever filed their thing. We never heard of Chen before the Government filed it.

We came in with the evidence and we had a ton of people come in and copy us. But if we have an attachment, then that gives us priority in the event that we're right. If we're wrong, it disappears.

So, I think that it would be fair and just to give us our attachment first. Let us preserve our priority to go argue whether or not we're entitled to a default judgment against LuBian that would grant us a turnover of these assets. And the Government can make its immunity arguments in that -- in that motion. Anybody else who wants to be heard — Chen, Warp Data, I think there's a couple of other people who are claiming — can come in and make their assertion if they want. And we can certainly serve everybody. And in one proceeding you might short circuit this whole thing.

You'd make it -- it's a bench trial. The Second Circuit made that clear in the Havlish case in the 650 case. So Your Honor can resolve it all and --

THE COURT: You mean by saying it's not a LuBian

asset and it's not a blocked asset, is that what you mean it would resolve it all?

MS. WAGNER: Yes.

MR. WEIGEL: In other words, not only can you resolve the legal issues, but if someone wants to come in and say, for example, it's my asset, it's not LuBian's --

THE COURT: Right.

MR. WEIGEL: -- we can get that resolved here.

THE COURT: At a later stage, not at the attachment stage at later stage?

MR. WEIGEL: I think that the way to do it is to do it at the default judgment stage because we can set a briefing schedule out. We can give everybody notice. No one can claim that they didn't know what's going on.

I mean I think everybody knows what's going on now. I mean this is quite public, but we can make sure that everybody who could possibly have a claim who has raised their head in a forfeiture action, whatever, that they can come in and be heard.

THE COURT: Okay.

MR. WEIGEL: And then Your Honor can resolve it all.

THE COURT: Okay. Got it.

MR. MINDLIN: Your Honor, there is actually a type of case designed for figuring out to whom an asset belongs and determining the correct owner. There is one of those with

respect to these asset. It was filed before Mr. Weigel made his ex parte motion to the magistrate, and that is the proper vehicle for determining to whom this race belongs.

The plaintiffs in this case deserve sympathy. They deserve some kind of redress. But front-loading this motion and trying to do it now puts the cart before the horse. The notion that the Court will determine in a -- in a bench trial, presided over by whoever Mr. Weigel invites to attend, that a court will determine the ownership of this race simply makes no sense.

This litigation should wait. It should be dismissed. We are happy to move affirmatively to dismiss it or rely on our papers, as Your Honor directs, or it should be held via a stay. Again, we're happy to move for a stay if Your Honor so directs. But it should wait until there's been a determination as to whom this asset belongs.

Because if you outcome in a forfeiture case that this asset does not belong to LuBian — the asset over which these many parties are fighting — and make no mistake, what you're witnessing here is a fight among priority -- for priority among these parties dressed up as a certain amount of high-mindedness, but really what they're saying is I got here first.

The Government actually brought their forfeiture case here first, and we are proceeding in a disinterested good

faith way to try and determine who is the owner of that race.

If the outcome of the forfeiture case is that LuBian is the owner, then these people are welcomed to have their litigation as to whether, in fact, they should be entitled to the asset. But doing that now adjudicates, at most, the assignment of an asset should LuBian prevail in the forfeiture case. There's not even an asset at this point owned by the party that they claim owns it.

There is presently litigation, and the Government strenuously is going to claim that LuBian doesn't own that asset.

It's unclear, in fact, what these people would win if they prevailed in this litigation.

Would they step into LuBian's shoes in the forfeiture case?

How would they participate in fact development in a forfeiture case as to the claim that they had won from LuBian? They don't have access to the underlying facts.

So --

THE COURT: What do you think the next steps are in the forfeiture action that you filed?

MR. MINDLIN: The Government is in the middle of Interrogatories, as Your Honor knows. Some of the parties have responded adequately, some of them have responded inadequately, and the Court has ruled that we are -- that they

are required to provide us better information.

The Government anticipates with respect to many of the claimants, ultimately, moving to strike. And some of them may survive a motion to strike, some of them may not. And ultimately at that -- should there -- should there be claimants that survive a motion to strike, then there would be litigation, sort of there would be discovery.

THE COURT: And you all have filed in the underlying forfeiture action?

MR. WEIGEL: We have, Your Honor.

We are concerned, however, that without attachment the Government is going to say that we are just an undifferentiated creditor and that we don't have standing.

And the Government doesn't want to get into the facts here. They're really trying to avoid having you decide whether these are LuBian's assets or not.

The Government acknowledges that LuBian mined 11,000 of this Bitcoin, which is worth, give or take, a billion dollars.

We are not bound under -- TRIA says notwithstanding any provision of law, which I would submit — and which the Second Circuit in Havlish says — trumps everything. So, it should get resolved first.

And if Your Honor rules that this is LuBian's, you don't have to deal with the Government's money laundering

claims.

THE COURT: So, do you think the Government's underlying case, do you think that tees up the question of is this LuBian's?

Is that presented in both actions or do you think it's not presented in the Government's action?

MR. WEIGEL: I believe that what the Government is going to try to do is dismiss LuBian's claim on the ground that LuBian is not an innocent owner. And that's not a defense to our claim. It's not likely that agencies or instrumentalities of terrorist parties are innocent owners of the asset.

THE COURT: Okay. Can I ask?

So, I guess I was trying --

MR. MINDLIN: I can answer that question as well, Your Honor, which is that -- the question whether it's LuBian's -- forgive me, Your Honor.

Do you want an answer from the Government?

THE COURT: Okay. Go ahead.

MR. MINDLIN: The question of whether the asset is LuBian's is central to the forfeiture case. It is absolutely at issue, and it is being vigorously litigated by parties with strong incentives to litigate it.

THE COURT: So, I asked your friend on the other side kind of to help me run through the sequence of issues if

the case proceeded in the way he was proposing, and maybe I'll ask you to do the same.

So, your view of it is stay this action or grant your motion to dismiss.

They seem like those are quite different things, right?

Like one would be resolve on the merits our arguments that these are not subject to TRIA, right?

And the other one would be just say that it's more efficient for this other case — I don't know what your arguments, per se, would be — it's better case management, is that it effectively, for the Government's action to proceed first, right?

So, I guess running through that possibility, just help me see how things would unfold. And I guess I want to know how your friends on the other side are going to get the chance to present their arguments when that, when that's going to happen?

MR. MINDLIN: Certainly.

So, we have no objection, as you can tell from our brief, to -- to debating the legal issues that are at stake here on the papers in the context of a motion to dismiss. But I don't think this case should go further at this stage.

So, Your Honor, as you pointed out has two possible paths.

You can hear the motion to dismiss and decide it. Certainly, if Your Honor -- and to the extent Your Honor grants the motion to dismiss on the legal basis that there is no case to be had here, I think you've dealt with that issue sort of conclusively.

But we don't think that -- we don't object to these folks having their day in court. And, you know, we don't also -- we don't object to the determination of legal issues being effectively deferred until later.

You could dismiss it without prejudice without deciding the legal issues at hand. You could -- you could stay it. I agree those are different courses, but they are serving what we see as the main sort of practical necessity.

THE COURT: Yes. And tell me what happens.

MR. MINDLIN: Yes.

THE COURT: So, let's say that this action were stayed. What happens next?

MR. MINDLIN: What happens next is that the parties keep litigating 127,721 Bitcoin, the forfeiture case, that's also before Your Honor. Ultimately, someone prevails in that forfeiture case.

If LuBian wins --

THE COURT: And the kind of universe of people there are you, LuBian --

MR. MINDLIN: Right. Chen Zhi.

THE COURT: -- Chen Zhi. So, all the various folks who have a theory this is absolutely my Bitcoin.

MR. MINDLIN: Absolutely.

THE COURT: How about the litigants like those who appear here, are they a part of that bucket of people who can say under TRIA, we are actually litigants with an interest in it?

MR. MINDLIN: So, they're also clearly in the case, right?

THE COURT: Yes.

MR. MINDLIN: Yes, these folks are claimants and now there are the other Iran victim cases that have become claimants.

Without hiding the ball, Your Honor, I don't think that they're proper claimants in the forfeiture case. It seems just they can't participate in a meaningful way in fact development. They don't have facts to offer that would help determine ownership. They have, in a sense, legal arguments, interesting complicated ones, but essentially legal arguments. So, actually I don't think they belong in the forfeiture case.

So, playing it out, as Your Honor asked us to do, we anticipate moving to strike them from the forfeiture case.

THE COURT: And I think your friend on the other side anticipated that.

MR. MINDLIN: Yes.

THE COURT: And says: Look, one reason we need to pursue our writ of attachment is that changes our status, I guess, right?

And you alluded to that too. Maybe then they step into the shoes of LuBian, I don't know. If they had an attachment it would be different.

MR. MINDLIN: Ultimately, there's no discovery that we could seek from them that affects the outcome of the forfeiture case. They -- the losses that their clients have suffered, which are tragic, are not ultimately germane to the issues in the forfeiture case.

The question whether, the question whether this Bitcoin was involved with the crimes of Chen Zhi is unconnected to these, to these plaintiffs who have, essentially, a legal argument to make about it.

THE COURT: Okay.

So, your view is in the forfeiture case there would be a determination based on facts that you would present, that other people -- and I guess some legal arguments that this is subject to forfeiture?

MR. MINDLIN: Yes. And in the course of that litigation, LuBian will argue: No, these are our assets. Chen Zhi will argue: No, these are my assets. The Prince Group will make its own arguments. Warp Data will make its own arguments. And at the end of that litigation we'll

understand more about how those assets were mined, who had them and, inevitably, they will inform Your Honor's view of this litigation, which should come afterwards.

Now, it may be that someone else prevails in litigation than the Government or LuBian. Perhaps Chen Zhi wins the forfeiture case. And nonetheless, these folks say that didn't actually settle the matter as to our entitlement because the way the Chen Zhi got them triggered involvement of the Iranian government, and so we're still entitled to them. They'll be able to make those arguments to you, and they should, but you will know a lot more then than we know now.

THE COURT: Okay. So, just still playing it out.

So, there is a determination of whose Bitcoin this is in some sense.

MR. MINDLIN: Yes.

THE COURT: What happens next?

MR. MINDLIN: So at that stage, Your Honor, let's say that the Government prevails in the forfeiture action. The forfeiture action effectively will convey title of the asset into the United States, which already has possession. At that stage, if this action is stayed, let's say, it will come back to life and these folks or their successors will say: These are our assets. They were mined, you know, they were mined in Iran and they were sanctions of Asian tool, instrumentality for the Iran government. And they will make

the arguments that they are making now, but they'll be informed by fact development in that case.

The only reason that they want to do this now is that they have an internecine fight among them about who gets to come first in expending the assets because New York's Civil Procedure prescribes a race to the courthouse.

We don't have a view as to who should come first. We don't have a view as to whether Your Honor wants to somehow encode the priority among them, but we do think that this should be done in a way that is going to lead to a correct outcome.

THE COURT: Okay.

The one thing I am still trying to wrap my head around, and I think you all understand better than me, is it feels like what you're trying to show to seize the assets and what you're trying to show to attach the assets are actually kind of different things. Right?

So, like resolving the facts that you want resolved in order to claim the assets and the facts that you want resolved in order to claim the assets is not resolving the same set of facts, right?

Like you want to show it's involved in this money laundering forced labor scam, basically, and you want to show it went through Iran.

MR. MINDLIN: Right. They're connected, but there's

a version of things --

THE COURT: Yes.

MR. MINDLIN: -- where the Government wins the forfeiture case. And yet in winning, it demonstrates that all 15 billion Bitcoin were, in fact, mined through Iran.

THE COURT: Right.

MR. MINDLIN: And these people are then very energized and come in and say: Well, you know, what you've done is to, you know, obtain title to the asset, but in turn triggered our own entitlement to the asset.

And, you know, as a first thing let me say that in some ways that would be, from the point of view of justice, it would be a good situation. People winning would either be the victims of fraud or victims of Iranian terrorism, but Your Honor would be in no worse position to hear their arguments -- or would be in a far better position, I should say, to hear their arguments than now.

THE COURT: I mean it feels like in some ways, though, you are both hoping to present evidence, but in separate proceedings, of what at a thousand feet is the same question, which is like whose money is this? And how did the money come to be here? Right?

MR. MINDLIN: Yes. Although, as you identified the question of whose it is is different from how it came to be here and whose it is isn't precisely at stake in their case.

THE COURT: Yes.

MR. MINDLIN: But the procedural vehicle for determining whose it is is one that is in existence and that came first, which is the forfeiture case we filed. You know, not to repeat myself.

THE COURT: Yes.

MR. MINDLIN: And I don't actually see any reason to think that lots of nonparties are going to flood into a default judgment action to sort of -- to hash this out. And it would also require discovery in contravention of fairly elaborate specific discovery protocols that are in the civil forfeiture rules.

THE COURT: Okay.

MR. WEIGEL: Your Honor, in the 650 case, by the way, the two cases, the Government's forfeiture action and the plaintiffs' TRIA action, move simultaneously. In fact, they were tried together.

But my colleague is, I fear, leading you astray because his strategy is quite simple. He's going to move to strike our claim and then there will be nobody in that action, not Chen, not LuBian, not any of the other plaintiffs, who are going to say: Oh, by the way, we are an agency or instrumentality of Iran.

And the Government's view --

THE COURT: But he's not disputing that you could

present those arguments, he's just saying you would present them after -- you would go second effectively, right?

MR. WEIGEL: Well, no, because what he's saying is first he's going to move to dismiss us because he says we're not a valid party in there.

THE COURT: Yes.

MR. WEIGEL: And then second — I don't know if this is intentional or not and I assume it was thought out — if the Government wins and the Government gets actually -- confiscates the Bitcoin, then they're not blocked assets anymore and he's managed to defeat the TRIA claim without actually having it be litigated. And that is what they want.

Because if you look at their forfeiture complaint, the only thing they have to tie their wire fraud allegations to the United States are $22 million on Bitcoin worth 4 billion, I think, when it was stolen of people who were defrauded in Brooklyn in 2022.

This Bitcoin was hacked in 2020 and we believe has been in the United States since. We believe that the person who hacked it was in contract with the government. We believe that -- in any event, it's been -- in other words, it's been out of LuBian's possession and control since -- since 2020.

Whatever was done in 2022 in Brooklyn has nothing to do with this $4 billion Bitcoin. It might have something to do with some other Bitcoin.

The Government doesn't want to have this litigated. He says we don't have any proof, but we have produced two expert -- the thing about -- the thing about Bitcoin, which I've learned and I'll say some words that I'm speaking like a parrot, but it is -- it's all on a block chain. And if you know what you're doing, you can analyze where it went and who it went to and so forth. And our experts have shown that LuBian mined this in Iran. They said they were mining in Iran. We can show the fact that on the block chain there came a time in 2020 when all of a sudden there was this massive hit of Bitcoin that started to come in. This LuBian mine mines 6 percent of the world's Bitcoin, which is more than the entire United States.

THE COURT: Okay. But it seems like now we're talking about the facts of --

MR. WEIGEL: Yes, Your Honor.

THE COURT: So let me ask you, the motion to strike, what will the basis for the motion to strike be with respect to these claimants?

MR. BROWN: Your Honor, in the civil forfeiture case, the Government anticipates moving to strike the TRIA plaintiffs for lack of standing and --

THE COURT: Is that going to tee up their arguments, the arguments that you all are in conflict about, about whether TRIA applies to these assets or not?

MR. BROWN: Yes.

THE COURT: Okay.

MR. BROWN: They would be free to argue TRIA nullifies the requirement that claimants in the civil forfeiture case have a claim in specific property. They would be free to argue that TRIA overcomes other parts of the civil forfeiture statute that -- that a -- sort of a later-in-time judgment creditor like them ordinarily wouldn't be able to satisfy the statutory criteria for a successful claim in the civil forfeiture.

THE COURT: If they attached, let's say I granted their attachment motion tomorrow, are you still moving to strike?

MR. BROWN: Yes, Your Honor.

THE COURT: All the same, you think it doesn't change things?

Because then they have --

MR. BROWN: Your Honor, it would change things.

THE COURT: Yes.

MR. BROWN: It would change things because then they would have a -- some sort of secured interest in the specific property.

Our position in this proceeding is that for the Court to grant that remedy, grant that relief, is awarding them the judgment -- some sort of merits of judgment, which

is -- which is premature where the Government has raised dispositive and jurisdictional questions about their ability to even put forward an attachment motion against the Government under these circumstances.

THE COURT: I mean one option would be to decide first those legal questions about TRIA, the arguments that the Government is presenting in its motion to dismiss that it's contemplating in opposing the attachment motion, one idea would be to decide those legal questions first.

Thoughts about that?

MR. BROWN: Your Honor, I think that the Government would be, as we've maintained, we would be happy to have the Court adjudicate the motion to dismiss in this proceeding, the Fritz proceeding.

Separate from that, we believe the civil forfeiture proceeding is the best most efficient and fairest way to adjudicate claims of all claimants to the property, not just those in this case.

THE COURT: Is my only way to address those issues through the motion to dismiss because I haven't dug into the question of can you file a motion to dismiss?

You haven't intervened. I haven't thought about that.

So, is that like the first step, I'd have to decide if you can do that, or there's an existing alternative vehicle

to decide those questions?

MR. BROWN: Your Honor, we would be happy to. If the question is has the Government formally intervened, we would be happy to make a formal motion to intervene if that would take that issue away.

THE COURT: It may be a good idea. I don't know, it might be.

MR. BROWN: Yes, Your Honor.

MR. WEIGEL: Your Honor, I think that's a fine idea.

We're prepared to address the legal issues. We think they should be heard and we think that if Your Honor rules in our favor, as we think you will, then we will have cleared out this underbrush and we can go forth.

I mean just listening to my colleague, I mean you're looking at, I don't know, years of litigation with the forfeiture action and all sorts of issues that really we contend have nothing to do with it. We don't care if it's Chen's or Chen is LuBian or Warp Data is LuBian. If it's Iran's and we can prove that whoever owned the stuff it was in Iran, that resolves the issue.

So, as I said before, I thought that the Government's papers go better to the issue of whether or not we're entitled to a default judgment, but I think — particularly if they intervene — we can address those issues up front. And I think that will definitely inform how to go

forward.

THE COURT: Can I ask you one more thing?

You all know more about attachment law than I do, but I've certainly learned from all of your filings that there is this race to the courthouse aspect of it.

MR. WEIGEL: Yes.

THE COURT: And that's part of the law, but it feels like I don't want us to all be doing crazy things driven by that, particularly if there is something that I can do to prevent that.

And it seems that the state of world is that you, among the various, you know, Iran-related claimants filed first is true. And if a lot of what's going on is that you need some kind of preliminary determination to enable you to preserve that status as first filer, or that you're worried that I'm going to just like go on ECF grant somebody else's first, like, and then you will have like lost your place in the queue.

I guess I wonder if there's something that we should be doing about that, if you have ideas about that?

And everybody would have the opportunity to be heard about that idea, but it seems like we know who filed first and second and third, and to the extent that that's relevant under New York law, that's the order and I don't want to be structuring things just in order -- you get what I'm saying.

Thoughts?

MR. WEIGEL: Well, the way that the CPLR is set up to do this is to let us have the ex parte attachment, which then gives us priority. And then we'd have to move to confirm it.

THE COURT: Yes.

MR. WEIGEL: And then everybody that wants to can be heard in that -- at that juncture, which has to be done quickly. I think, I don't have it memorized, maybe ten days or 20 or 14 days, something like that, you have to move to confirm the ex parte attachment. So, that would be one way to do it.

We also had a case recently in front of Judge Stark where you had 22 other judgments relating to the sale of CITGO. And Judge Stark did The Fish Counter at Zabars approach. He had everybody line up and do it.

THE COURT: Yes.

MR. WEIGEL: The only concern I have about that approach, Your Honor, is that to the extent that you have the cases and you have the race, I think we're good. But people, you know, get clever and they can file elsewhere and somebody else might not be aware of everything and might grant an attachment, and then we're fighting that fight.

THE COURT: I get that risk. I think it's a remote risk.

I mean this I guess was the issue we were all thinking about when you first came into the case.

MR. WEIGEL: Yes.

THE COURT: So, I get that that's a risk you would be worried about.

I guess my conclusion, when I looked at it at first, was I get why you would be worried about it, but it seems unlikely to happen, it seems unlikely that one of my colleagues would unknowingly step in and grant somebody else attachment of this asset --

MR. WEIGEL: Right.

THE COURT: -- in a case before me.

MR. WEIGEL: And in theory, these ex parte attachments are something to be done quickly. And, you know, somebody could, you know, without thinking, just sign it and they could jump ahead of us after we did all the work.

THE COURT: All right.

So, I guess what I'm hearing -- I'd like to go back and think about it a little more. This is all complicated and this has all been helpful information, but I'm hearing from you all a consensus that it might be appropriate for the Government to intervene.

And then I don't know if you want to brief a motion to dismiss or you want to deem the existing papers to be the briefing on the motion to dismiss.

But then that would be the first set of issues that I would address.

MR. BROWN: Yes, Your Honor.

The Government would be amenable to intervening, moving to dismiss. I think we would, we would like to sort of, if we are briefing this, I mean we would like to have a fresh briefing schedule.

And I would just mention on the order of priority on the attachment motions, which seems to be driving a lot of these collateral actions --

THE COURT: Yes.

MR. BROWN: -- you know, the Court in its February 2nd, 2026 minute order talked about the Court has inherent authority over its own docket, including the authority to equitably consolidate requests for attachment.

And so, you know, as we've been saying, all of the attachment motions and actions can be stayed or held in abeyance. And the Court, through its equitable authority and its docket management authority, can deem the Fritz claim as first in line --

THE COURT: Yes.

MR. BROWN: -- and another set of claims second.

THE COURT: And I'll look at Judge Stark's order. It might be a helpful template for that. And if you have anything else that you want to draw my attention to, I'd be

happy to look at that because I do think to the extent that I can give parties comfort that they are in the order that they are in, and that might be clarifying for other folks too, and prevent everybody from expending a lot of resources that are just designed to preserve their place in the queue. That would be probably good for everybody.

Okay. So, you all want to brief that separately. So, we can set a schedule about that. I am going to go back and make sure there's not anything I'm missing when I look at this all again, but that could be a way forward.

Do you all other folks want to chime in?

MR. SHERIDAN: Yes. Good afternoon, Your Honor.

Tom Sheridan from McAndrew Vuotto. We represent the Breitweiser intervenors.

And I'm just going to touch first on the issue that's being discussed in terms of memorializing attachment and priority through -- through the attachment process.

But also, we're trying -- we, the Breitweiser intervenors, have proposed kind of a middle ground that allows us to effectuate the priority process under the CPLR, while also avoiding having to brief the sovereign immunity issues that we know that are extremely relevant as also as indicated by the Greenbaum case out of the D.C. Circuit.

And what we have proposed is allowing the Breitweiser or in all the parties maintaining order — we're

not trying like gamesmanship among the parties that have intervened and commenced the action — but allow us to deliver the orders of attachment to the Marshal, but then it be stayed at that point. And the reason that that is important, and we think is significant, is because under the CPLR Section 6203, delivery to the sheriff, but in this case would be the Marshal, provides the creditor with obtaining certain rights.

THE COURT: Can I ask just before you complete the proposal?

Is the idea that I would grant the orders of attachment and then have them delivered to the Marshal or it's a separate thing you're proposing?

MR. SHERIDAN: That's correct, Your Honor.

You would grant the orders of attachment. You would maintain the priority of the parties in the order filing in this case, but you prevent the Marshal from actually levying against the U.S. government.

So, the delivery occurs, and that's significant because also under CPLR Section 6226 priority is determined by the order in which the orders were delivered to the officer who ultimately levied upon the property.

So, the levy doesn't have to happen, in our opinion, to effectuate the priority being codified under the CPLR. It is the delivery to the officer in which order they are delivered.

And so if you allowed us, if you were to grant the orders of attachment, and we would be delivering them to the Marshals service in the order that they've been filed here, then it would codify or memorialize the priority that has been established and we think effectuated under the CPLR. And then also allow the Court to get to the bigger more substantive issues.

THE COURT: Yes.

Do you have any thoughts on this question of if I am not inclined to make my first order of business granting orders of attachment, but rather to brief these issues that the Government is teeing up in a motion to dismiss, is there something that you all want to do?

I guess I've been asking everybody about this, the preserving people's place in the queue so that you are not worried about that or, you know, so that that is something that's been accomplished without my granting the orders of attachment?

Is there anything you want me to do about that?

I know you're telling me to grant the orders of attachment, but I'm asking about your second choice.

MR. SHERIDAN: Well, the way that we have tried to see through it is through the granting of the order.

THE COURT: Okay.

MR. SHERIDAN: But staying it, it would be stayed

immediately upon, you know, delivery to the marshals.

THE COURT: Okay.

MR. SHERIDAN: So that the levying process would not occur. The, you know, establishing the security, you know, the secured interest that was also raised by the Government also is avoided, but by delivery the priority would be, you know, memorialized in effectuating the CPLR's purpose.

THE COURT: Got it.

MR. WEIGEL: Your Honor, may I be heard on that?

THE COURT: Yes.

MR. WEIGEL: I would like to check this, but one intermediate step may be for you to issue an order directing that anybody with claims to this particular asset be directed to your court, in which case -- I mean I have no -- I don't doubt that Your Honor is not going to mistakenly hit a key and grant somebody else's attachment.

And I don't know if that -- I want to check, but I think that you have possession of the race at this point in time and that you could issue an order directing that if anybody has it they'd have to come to your court, which would then solve the problem.

THE COURT: Is that kind of automatically happening in the forfeiture action, like you're supposed to come in within a certain period of time if you have a claim on the race?

MR. WEIGEL: You would think so, Your Honor, but --

THE COURT: Okay.

MR. WEIGEL: -- people can react. And there is a slight flaw with what my colleague said, which is it is true that you can grant an order of attachment without specifying which particular asset it applies to.

As Seigel says, it just gives you a hunting licensee essentially, and if you can't find anything then you just have an expensive souvenir.

But the problem is that if you don't actually have the Marshals serve it on the them, then you don't have priority. The order that the Marshal gets it determines where the money, if the Marshal gets money, where it goes, but vis-a-vis the world you need the marshals to serve it.

THE COURT: Okay.

MR. BROWN: Your Honor --

THE COURT: Just, sorry. Well, go ahead. You all figure out how you want to, whoever wants to --

MR. GOLDMAN: Let the Government speak first.

MR. BROWN: A very small point.

Your Honor, I think if a party attempted to file an attachment motion in another court or another jurisdiction, what would happen is under prior exclusive jurisdiction this Court has in rem jurisdiction over the res, another court cannot assert jurisdiction over it. And so, when that

attachment order, you know, if none of us get wind of it beforehand, if it shows up on the Government's doorstep, we would just say that's void.

And what I've seen in practice in other districts is the sort of -- the less senior court issuing that attachment order would simply vacate it.

THE COURT: Yes.

MR. GOLDMAN: Thank you, Your Honor.

I'm Jerry Goldman. I represent the O'Neill plaintiffs directly in the 9/11 litigation. I represent and I'm speaking on behalf of now over 95 percent of the 9/11 victims with over $95 billion of judgments excluding interest, excluding any sort of punitive or treble damages.

We are strongly opposed to any sort of gamesmanship to move up positions, particularly on account of three or four families, when we have 28 or 2900 with judgments.

We think, and we agree, and we appreciate the Court's actions in the past almost year, in not allowing someone to grab the assets — be it the U.S. government, be it my friends in front of me on the Fritz, or any of the other groups.

We believe that this Court has the authority under both New York and federal law to equitably make certain determinations as to the distribution of the assets, recognizing those who may have come first in the litigation

and recognizing as well, the scope and the degree of the damages that my clients have suffered and have judgments for.

We also acknowledge that there's been extensive litigation in the Southern District by certain parties trying to slow down the issuance of judgments. We think we've gotten past most of them. We believe we'll get past all of them. But we do not want gamesmanship to hurt any of our clients.

We agree with the proposals that certain common facts should be determined first. And we further agree that certain common legal issues that would affect everything should be determined first.

We think any attempt to attach assets, which appear to be secured right now, in order to gain priority would be both premature and inappropriate.

Thank you, Your Honor.

THE COURT: Okay. Thank you.

MR. MINDLIN: Your Honor, I just -- I wanted to note something, which is that there's a certain momentum because of the fact that we're all in this room, behind the idea that these assets are in some way connected to Iran or to the Iranian government. And we're all kind of taking that in some ways as given because we're interested in the legal arguments and the housekeeping about how this case worked.

But I wanted to put a marker down for Your Honor that that is in no way something the Government is conceding.

And, indeed, seems -- there seems little reason to think that's the case, either that any substantial portion of these assets were mined in Iran, much less that they were an instrumentality of the Iranian government. And the language in the complaint so asserting is notably kind of elliptical.

And I don't want to say more about that right now. I don't think that's what we're arguing about, but I want to make clear we're not saying, oh it's....

THE COURT: Okay.

My takeaway is --

MR. WEIGEL: May I have just one last thing?

THE COURT: Okay.

MR. MINDLIN: Sorry, Judge.

THE COURT: Okay.

MR. WEIGEL: Just really quickly. We think the proposal makes good sense.

I don't think that the Government can actually move to dismiss the claims against LuBian, which has defaulted, even if they intervene.

I do think the Government under 5240 has a right to oppose any sort of motion for an attachment we make, and they can make the same exact arguments in support of their or in support of their opposition to our motion for attachment.

THE COURT: So you think even if they intervene, they can't move to dismiss?

MR. WEIGEL: I'm sorry. What?

THE COURT: You think even if they intervene, they cannot move to dismiss?

Is that what you're saying?

MR. WEIGEL: They can't move to dismiss our claims against another party, correct. But the can --

THE COURT: But if they intervene, they're saying effectively: We have an interest in this asset.

MR. WEIGEL: Yes. And 5240 says that they can -- the Court can issue any order it deems fit, essentially, to protect the interests of somebody who claims an interest in the asset.

THE COURT: So, if you think it's not a motion to dismiss that they would be appropriately briefing to present to deal with these issues, what is the motion you think they should be briefing?

MR. WEIGEL: I think the motion they should be bringing is an opposition to our motion for an attachment.

And in reality, Your Honor, when they filed their letter opposition to our attachment they asked that that same letter be treated as their motion to dismiss. So, it's the same arguments.

THE COURT: Okay.

I feel like we're moving away from what I thought was a consensus, but to play it out, so the proposal would be

you present your arguments, as you have, in the form of opposing their attachment motion?

MR. BROWN: Your Honor, we think that -- for example, for reasons of sovereign immunity, this action -- that the Court lacks subjects jurisdiction.

THE COURT: That's probably true, they could move to dismiss on subject matter jurisdiction.

I don't know. I guess I could lack subject matter jurisdiction. I'm not sure you would be able to move to --

MR. BROWN: Well, we could make a limited appearance for purposes of disputing the Court's subject matter jurisdiction over the case.

THE COURT: Okay.

What do you think about their idea that it's -- you would approach this issue through the lens of, okay, they filed a motion for attachment; now their view is you actually can make your legal arguments if you intervene in opposition to their motion for attachment?

MR. BROWN: Your Honor, we have already opposed their motion for attachment.

THE COURT: Yes.

MR. BROWN: If they -- if these are arguments about why the Government lacks the power to move to dismiss under Rule 12, they can raise those arguments in opposition to our motion, the Court will adjudicate it.

THE COURT: Okay.

Well, that I guess kicks the issue down the road. You have raised them already in opposition to their motion for attachment. You can file a motion to dismiss, and you can argue this was not the right vehicle for you to make those arguments.

MR. WEIGEL: I think that we would like to get to the merits of it quickly, Your Honor, and I think that we'll get to the merits either way.

THE COURT: Yes.

MR. WEIGEL: I think I heard the Government suggest that they would like to have some additional briefing, and then we would too. Although, it's been briefed.

THE COURT: Sure.

MR. WEIGEL: I think both parties would benefit, it's been a while since we briefed.

THE COURT: Sure. Okay.

So, that's fine with me. So what I may do is deny without prejudice the existing motions and let you all refile them.

MR. BROWN: Yes, Your Honor.

MR. WEIGEL: Your Honor, we would ask that you not do that because of when we filed and the timing of things, that it might impact the ability of somebody else to come in and say we're behind them. So --

THE COURT: Is it really? Would it?

MR. WEIGEL: Honestly, I don't want to get into the law school example of whether it would or wouldn't.

THE COURT: Yes.

MR. WEIGEL: We filed first. It's filed.

THE COURT: Okay.

MR. WEIGEL: If it's denied, somebody else could come in --

THE COURT: I'm going to think a little bit.

Go ahead.

MR. BROWN: Your Honor, if it would make things more efficient, we would be happy to have our already-filed papers deemed as our -- our briefing on the motion to dismiss.

If the Court would like supplemental briefing, for instance, on the Government's ability to bring forward a motion to dismiss, we'd be happy to provide supplemental briefing.

We're flexible about the procedure.

THE COURT: Okay.

So, I think we have consensus on a thousand-foot issue, which is let's resolve the Government's sort of threshold legal arguments at the outset. A little less consensus on exactly what the vehicle is to do it.

So, I'm going to give a little thought to that. We could just deem it briefed or we could give an opportunity for

more briefing. And it seems that there's the motion to dismiss and there's the attachment motion, are both possible vehicles for this issue. So, I'll go back to chambers and think about that a little bit. But it seems like that's just implementing something that we have some consensus about.

And the other things that folks are contemplating in this action are things that would follow on, like a default judgment motion, other attachment motions, all seem like they're downstream of resolving these legal issues at the outset. That's where I am.

Anyone have anything else they -- last words?

Okay.

All right. This is very helpful.

MR. WEIGEL: We're content, Your Honor, either to file additional briefing if the Government files additional briefing or to stand on the papers.

THE COURT: Okay.

All right. Well, this has been helpful for me. It's a complicated interesting case. Thank you all for coming in.

MR. WEIGEL: Thank you, Your Honor.

MR. BROWN: Thank you, Your Honor.

THE COURTROOM DEPUTY: All rise.

(Judge RACHEL P. KOVNER exited the courtroom.)

(Proceedings adjourned.)

## $

**$22** [1] - 30:15
**$95** [1] - 44:12

## 0

**07960** [1] - 2:20

## 1

**10036** [1] - 2:13
**10166-0193** [1] - 1:17
**11,000** [2] - 10:6, 20:17
**11201** [1] - 2:4
**12** [2] - 11:7, 48:24
**127,721** [1] - 23:19
**13** [2] - 1:8, 2:19
**14** [1] - 36:10
**15** [1] - 28:5
**15th** [1] - 2:12
**19th** [1] - 1:22

## 2

**20** [1] - 36:10
**200** [1] - 1:17
**2020** [3] - 30:18, 30:22, 31:10
**2022** [2] - 30:17, 30:23
**2025** [1] - 6:23
**2026** [2] - 1:8, 38:13
**20530** [1] - 2:9
**22** [1] - 36:14
**25-CV-07093** [1] - 1:4
**271** [1] - 2:3
**28** [2] - 2:16, 44:16
**2900** [1] - 44:16
**29464** [1] - 2:17
**2nd** [1] - 38:13

## 3

**301** [1] - 1:22
**35203** [1] - 1:22
**3:00** [1] - 1:8

## 4

**4** [2] - 30:16, 30:24

## 5

**5240** [4] - 9:6, 13:11, 46:20, 47:9

## 6

**6** [1] - 31:12
**6203** [1] - 40:5
**6226** [1] - 40:19
**650** [3] - 6:8, 16:23, 29:14
**6744A** [1] - 2:9
**69** [1] - 9:5

## 7

**7** [1] - 2:12

## 8

**8(b)(6** [1] - 7:17

## 9

**9/11** [4] - 2:11, 4:13, 44:10, 44:11
**95** [1] - 44:11
**950** [1] - 2:8

## A

**abeyance** [1] - 38:18
**ability** [4] - 9:14, 33:2, 49:24, 50:15
**able** [4] - 12:10, 26:10, 32:8, 48:9
**absolutely** [3] - 21:21, 24:2, 24:3
**access** [1] - 19:18
**accomplished** [1] - 41:17
**account** [1] - 44:15
**acknowledge** [1] - 45:3
**acknowledges** [1] - 20:17
**action** [20] - 9:15, 17:18, 19:21, 20:9, 21:6, 22:3, 22:12, 23:16, 26:18, 26:19, 26:21, 29:9, 29:15, 29:16, 29:20, 34:16, 40:2, 42:23, 48:4, 51:7
**actions** [4] - 21:5, 38:10, 38:17, 44:18
**additional** [3] - 49:12, 51:15
**address** [6] - 3:13, 12:2, 33:19, 34:10, 34:24, 38:2
**adequately** [1] - 19:24
**adjourned** [1] - 51:25
**adjudicate** [3] - 33:13, 33:17, 48:25
**adjudicates** [1] - 19:5
**admitted** [2] - 7:19, 9:25
**affect** [1] - 45:10
**affects** [1] - 25:8
**affirmatively** [1] - 18:12
**afternoon** [5] - 3:4, 3:20, 4:7, 4:17, 39:12
**afterwards** [1] - 26:3
**agencies** [1] - 21:10
**agency** [7] - 6:12, 6:15, 6:21, 7:21, 7:25, 8:13, 29:22
**agree** [4] - 23:12, 44:17, 45:8, 45:9
**ahead** [4] - 21:19, 37:16, 43:17, 50:10
**aided** [1] - 2:25
**al** [3] - 1:4, 3:6, 8:25
**Alabama** [1] - 1:22
**Alexander** [1] - 3:21
**ALEXANDER** [1] - 2:4
**allegations** [1] - 30:14
**allow** [4] - 7:13, 12:18, 40:2, 41:6
**allowed** [1] - 41:1
**allowing** [2] - 39:24, 44:18
**allows** [2] - 10:13, 39:19
**alluded** [1] - 25:4
**almost** [1] - 44:18
**already-filed** [1] - 50:12
**alternative** [1] - 33:25
**amenable** [1] - 38:4
**amount** [1] - 18:21
**analysis** [1] - 7:1
**analyze** [1] - 31:6
**analyzed** [1] - 9:23
**AND** [1] - 1:8
**Anderson** [1] - 4:8
**ANDERSON** [1] - 2:11
**Andrew** [3] - 3:25, 4:10, 4:11
**ANDREW** [1] - 2:5
**answer** [3] - 13:6, 21:15, 21:18
**anticipate** [1] - 24:22
**anticipated** [1] - 24:24
**anticipates** [2] - 20:2, 31:21
**appeal** [1] - 6:9
**appear** [2] - 24:5, 45:12
**appearance** [1] - 48:10
**appearances** [1] - 13:14
**appearing** [1] - 4:2
**applies** [4] - 6:25, 13:2, 31:25, 43:6
**apply** [2] - 9:8, 9:9
**appreciate** [1] - 44:17
**approach** [3] - 36:16, 36:19, 48:15
**appropriate** [1] - 37:21
**appropriately** [1] - 47:14
**argue** [7] - 9:11, 16:14, 25:22, 25:23, 32:3, 32:6, 49:5
**argued** [1] - 3:16
**arguing** [1] - 46:7
**argument** [2] - 11:25, 25:15
**arguments** [47] - 5:13, 8:8, 8:18, 8:20, 10:18, 10:20, 10:24, 11:1, 11:2, 11:16, 11:22, 12:2, 12:4, 12:6, 12:8, 12:11, 12:20, 12:21, 13:2, 13:4, 16:16, 22:8, 22:11, 22:17, 24:18, 24:19, 25:19, 25:24, 25:25, 26:10, 27:1, 28:15, 28:17, 30:1, 31:23, 31:24, 33:6, 45:22, 46:22, 47:22, 48:1, 48:17, 48:22, 48:24, 49:6, 50:22
**art** [1] - 15:6
**Asian** [1] - 26:24
**aspect** [1] - 35:5
**aspersions** [1] - 9:21
**assert** [1] - 43:25
**asserting** [2] - 13:3, 46:5
**assertion** [1] - 16:19
**assessing** [1] - 12:22
**asset** [26] - 6:16, 10:3, 10:22, 17:1, 17:6, 17:24, 18:1, 18:16, 18:18, 19:5, 19:6, 19:7, 19:11, 21:12, 21:20, 26:20, 28:9, 28:10, 37:10, 42:13, 43:6, 47:8, 47:12
**assets** [37] - 5:14, 6:14, 6:20, 7:11, 8:4, 8:6, 8:15, 10:20, 12:10, 13:16, 13:22,

14:1, 14:10, 14:11, 14:20, 15:4, 16:15, 20:16, 25:22, 25:23, 26:1, 26:23, 27:5, 27:15, 27:16, 27:19, 27:20, 30:10, 31:25, 44:19, 44:24, 45:12, 45:20, 46:3
**assignment** [1] - 19:6
**assume** [2] - 12:21, 30:8
**astray** [1] - 29:18
**attach** [6] - 5:21, 6:10, 10:20, 12:10, 27:16, 45:12
**attached** [2] - 11:20, 32:11
**attaching** [1] - 5:13
**attachment** [61] - 5:15, 5:22, 6:5, 6:8, 6:22, 7:13, 8:9, 8:23, 9:11, 10:25, 11:11, 12:5, 12:8, 12:9, 12:16, 12:18, 13:5, 14:9, 14:18, 16:9, 16:13, 17:9, 20:11, 25:2, 25:6, 32:12, 33:3, 33:8, 35:3, 36:3, 36:11, 36:23, 37:10, 38:9, 38:15, 38:17, 39:16, 39:17, 40:3, 40:11, 40:14, 41:2, 41:11, 41:18, 41:21, 42:16, 43:5, 43:22, 44:1, 44:5, 46:21, 46:23, 47:18, 47:20, 48:2, 48:16, 48:18, 48:20, 49:4, 51:2, 51:8
**attachments** [1] - 37:14
**attempt** [1] - 45:12
**attempted** [1] - 43:21
**attend** [1] - 18:8
**attention** [1] - 38:25
**ATTORNEY'S** [1] - 2:2
**AUSA** [3] - 3:21, 3:24, 3:25
**authority** [6] - 14:3, 38:14, 38:15, 38:18, 38:19, 44:22
**automatically** [1] - 42:22
**available** [2] - 6:21, 6:22
**Ave** [1] - 2:8
**Avenue** [2] - 1:17, 2:19
**avoid** [2] - 10:16, 20:15
**avoided** [1] - 42:6
**avoiding** [1] - 39:21
**awarding** [1] - 32:24
**aware** [1] - 36:22
**awful** [1] - 9:18

**B**

**bad** [2] - 12:20, 12:25
**ball** [1] - 24:14
**barriers** [1] - 13:3
**based** [2] - 14:22, 25:18
**basis** [2] - 23:3, 31:18
**become** [1] - 24:12
**BEFORE** [1] - 1:13
**beforehand** [1] - 44:2
**behalf** [3] - 4:4, 4:13, 44:11
**behind** [5] - 9:20, 13:21, 14:5, 45:19, 49:25
**belong** [4] - 15:4, 15:5, 18:18, 24:20
**belongs** [3] - 17:24, 18:3, 18:16
**bench** [2] - 16:22, 18:7
**benefit** [1] - 49:15
**BENJAMIN** [1] - 2:5
**Benjamin** [1] - 3:24
**beside** [2] - 3:22, 3:24
**best** [1] - 33:16
**better** [6] - 13:9, 20:1, 22:11, 27:14, 28:16, 34:22
**bigger** [1] - 41:6
**bill** [1] - 10:8
**billion** [6] - 13:20, 20:18, 28:5, 30:16, 30:24, 44:12
**bills** [1] - 14:14
**Birmingham** [1] - 1:22
**bit** [2] - 50:9, 51:4
**Bitcoin** [22] - 10:6, 10:10, 10:12, 10:15, 10:16, 10:21, 10:22, 13:19, 20:18, 23:19, 24:2, 25:13, 26:13, 28:5, 30:10, 30:15, 30:18, 30:24, 30:25, 31:3, 31:11, 31:12
**block** [3] - 9:23, 31:5, 31:9
**blocked** [10] - 6:14, 6:16, 6:20, 7:11, 8:15, 10:3, 13:16, 13:22, 17:1, 30:10
**Boulevard** [1] - 2:16
**bound** [1] - 20:20
**Branch** [1] - 7:9
**Breitweiser** [5] - 2:19, 4:19, 39:14, 39:18, 39:25
**Bridgeside** [1] - 2:16
**brief** [5] - 22:21, 37:23, 39:7, 39:21, 41:11
**briefed** [5] - 6:1, 9:1, 49:13, 49:16, 50:25
**briefing** [19] - 5:17, 9:3, 12:1, 15:7, 15:8, 15:12, 17:12, 37:25, 38:6, 38:7, 47:14, 47:16, 49:12, 50:13, 50:14, 50:17, 51:1, 51:15, 51:16
**bring** [1] - 50:15
**bringing** [1] - 47:18
**broad** [1] - 9:8
**Brooklyn** [4] - 1:6, 2:4, 30:17, 30:23
**brought** [1] - 18:24
**BROWN** [22] - 2:10, 31:20, 32:1, 32:3, 32:14, 32:18, 32:20, 33:11, 34:2, 34:8, 38:3, 38:12, 38:22, 43:16, 43:20, 48:3, 48:10, 48:19, 48:22, 49:21, 50:11, 51:22
**Brown** [1] - 3:22
**Bruce** [1] - 4:9
**BRUCE** [1] - 2:14
**bucket** [1] - 24:5
**building** [1] - 11:14
**Building** [1] - 1:21
**business** [1] - 41:10
**BY** [7] - 1:18, 1:23, 2:4, 2:10, 2:13, 2:17, 2:20

**C**

**Cadman** [1] - 2:3
**cannot** [2] - 43:25, 47:3
**captioned** [1] - 4:14
**car** [1] - 11:13
**care** [1] - 34:17
**Carolina** [1] - 2:17
**carries** [1] - 7:1
**cart** [1] - 18:6
**case** [60] - 3:14, 3:16, 4:5, 4:14, 6:8, 6:20, 6:23, 10:1, 10:19, 11:9, 11:18, 12:1, 13:17, 13:18, 16:23, 17:24, 18:4, 18:17, 18:25, 19:2, 19:7, 19:15, 19:17, 21:3, 21:21, 22:1, 22:10, 22:11, 22:23, 23:4, 23:19, 23:21, 24:8, 24:15, 24:20, 24:22, 25:9, 25:11, 25:17, 26:6, 27:2, 28:4, 28:25, 29:4, 29:14, 31:21, 32:5, 33:18, 36:13, 37:2, 37:12, 39:23, 40:6, 40:16, 42:14, 45:23, 46:2, 48:12, 51:19
**Case** [1] - 1:21
**cases** [5] - 4:25, 6:8, 24:12, 29:15, 36:20
**casting** [1] - 9:21
**CAUSE** [1] - 1:13
**central** [1] - 21:21
**certain** [10] - 9:13, 14:21, 18:21, 40:7, 42:24, 44:23, 45:4, 45:8, 45:10, 45:18
**certainly** [6] - 7:24, 15:17, 16:20, 22:19, 23:2, 35:4
**chain** [3] - 9:23, 31:5, 31:9
**challenges** [1] - 5:11
**chambers** [1] - 51:3
**chance** [1] - 22:17
**change** [3] - 32:16, 32:18, 32:20
**changes** [1] - 25:2
**check** [2] - 42:11, 42:17
**Chen** [12] - 9:14, 13:24, 16:6, 16:17, 23:25, 24:1, 25:13, 25:23, 26:5, 26:8, 29:21, 34:18
**Chen's** [1] - 34:18
**CHILDS** [1] - 1:21
**chime** [1] - 39:11
**China** [1] - 3:7
**CHINA** [1] - 1:8
**choice** [1] - 41:21
**CHRISTOPHER** [1] - 2:10
**Christopher** [1] - 3:22
**circuit** [2] - 9:17, 16:21
**Circuit** [9] - 3:14, 3:16, 6:6, 6:10, 6:24, 8:12, 16:23, 20:22, 39:23
**circumstance** [2] - 6:7, 11:13
**circumstances** [2] - 3:15, 33:4
**CITGO** [1] - 36:15
**CIVIL** [1] - 1:13
**civil** [6] - 29:11, 31:20, 32:4, 32:6, 32:10, 33:15
**Civil** [1] - 27:5
**claim** [19] - 11:6, 11:14, 14:1, 14:5, 17:13, 17:17, 19:8, 19:10, 19:17, 21:8, 21:10, 27:19, 27:20, 29:20, 30:11, 32:5, 32:9, 38:19, 42:24
**claimants** [11] - 5:13, 5:15, 20:3, 20:6, 24:11, 24:13, 24:15, 31:19, 32:4,

33:17, 35:12
**claiming** [1] - 16:19
**claims** [8] - 5:12, 21:1, 33:17, 38:22, 42:13, 46:18, 47:5, 47:11
**clarifying** [1] - 39:3
**clause** [1] - 6:24
**clauses** [1] - 7:3
**cleanest** [1] - 9:10
**clear** [2] - 16:23, 46:8
**cleared** [1] - 34:13
**clearer** [1] - 7:6
**clearly** [2] - 15:21, 24:8
**clever** [1] - 36:21
**clients** [3] - 25:9, 45:2, 45:7
**codified** [1] - 40:23
**codify** [1] - 41:4
**collateral** [1] - 38:10
**colleague** [6] - 3:22, 3:24, 3:25, 29:18, 34:14, 43:4
**colleagues** [1] - 37:9
**collected** [1] - 7:11
**collecting** [2] - 7:10, 8:19
**colorable** [1] - 13:4
**comfort** [1] - 39:2
**coming** [3] - 4:22, 15:3, 51:19
**commenced** [1] - 40:2
**common** [2] - 45:8, 45:10
**companion** [1] - 4:5
**Companion** [1] - 1:21
**complaint** [4] - 7:18, 10:5, 30:13, 46:5
**complete** [1] - 40:8
**compliant** [1] - 10:10
**complicated** [4] - 11:23, 24:19, 37:19, 51:19
**Computer** [1] - 2:25
**Computer-aided** [1] - 2:25
**computerized** [1] - 2:25
**concede** [1] - 10:5
**concedes** [1] - 10:4
**conceding** [1] - 45:25
**concern** [1] - 36:18
**concerned** [1] - 20:11
**conclusion** [1] - 37:6
**conclusively** [1] - 23:5
**CONFERENCE** [1] - 1:13
**confirm** [2] - 36:4, 36:11
**confiscates** [1] - 30:10
**conflict** [1] - 31:24
**Congress** [1] - 7:8
**connect** [1] - 15:5
**connected** [3] - 15:6, 27:25, 45:20
**connection** [1] - 14:2
**consensus** [5] - 37:21, 47:25, 50:20, 50:23, 51:5
**consider** [8] - 10:25, 11:1, 11:3, 12:9, 12:11, 12:12, 13:7, 14:22
**consideration** [1] - 14:19
**considering** [2] - 12:19, 13:5
**consolidate** [1] - 38:15
**contained** [1] - 7:3
**contemplated** [1] - 5:2
**contemplating** [2] - 33:8, 51:6
**contend** [1] - 34:17
**content** [1] - 51:14
**contest** [1] - 10:1
**context** [1] - 22:22
**Continued** [1] - 2:1
**contract** [1] - 30:20
**contravention** [1] - 29:10
**control** [1] - 30:22
**conversation** [1] - 11:24
**convert** [1] - 10:14
**converted** [1] - 10:15
**convey** [1] - 26:19
**cooperating** [1] - 7:9
**copied** [1] - 9:22
**copy** [1] - 16:9
**correct** [4] - 17:25, 27:10, 40:13, 47:6
**counsel** [1] - 3:8
**Counter** [1] - 36:15
**couple** [3] - 4:25, 16:18
**course** [2] - 9:5, 25:21
**courses** [1] - 23:12
**Court** [19] - 2:23, 2:23, 7:2, 9:7, 9:8, 18:7, 19:25, 32:24, 33:13, 38:12, 38:13, 38:18, 41:6, 43:24, 44:22, 47:10, 48:5, 48:25, 50:14
**COURT** [103] - 1:1, 3:4, 3:19, 4:1, 4:6, 4:16, 4:20, 4:22, 8:3, 8:17, 10:18, 11:22, 12:19, 12:24, 14:8, 14:17, 14:25, 15:14, 16:25, 17:7, 17:9, 17:20, 17:22, 19:20, 20:8, 21:2, 21:13, 21:19, 21:24, 23:14, 23:16, 23:23, 24:1, 24:4, 24:10, 24:23, 25:1, 25:16, 26:12, 26:16, 27:12, 28:2, 28:6, 28:18, 29:1, 29:6, 29:13, 29:25, 30:6, 31:14, 31:17, 31:23, 32:2, 32:11, 32:15, 32:19, 33:5, 33:19, 34:6, 35:2, 35:7, 36:6, 36:17, 36:24, 37:4, 37:12, 37:17, 38:11, 38:21, 38:23, 40:8, 41:8, 41:24, 42:2, 42:8, 42:10, 42:22, 43:2, 43:15, 43:17, 44:7, 45:16, 46:9, 46:12, 46:14, 46:24, 47:2, 47:7, 47:13, 47:23, 48:6, 48:13, 48:21, 49:1, 49:10, 49:14, 49:17, 50:1, 50:4, 50:6, 50:9, 50:19, 51:17
**court** [8] - 3:1, 18:9, 23:7, 42:14, 42:20, 43:22, 43:24, 44:5
**Court's** [3] - 3:13, 44:18, 48:11
**courthouse** [2] - 27:6, 35:5
**Courthouse** [1] - 1:6
**COURTROOM** [3] - 3:2, 3:6, 51:23
**courtroom** [2] - 3:3, 51:24
**CPLR** [9] - 9:5, 9:6, 11:12, 36:2, 39:20, 40:5, 40:19, 40:23, 41:5
**CPLR's** [1] - 42:7
**crazy** [1] - 35:8
**creditor** [4] - 16:3, 20:13, 32:8, 40:7
**crimes** [1] - 25:13
**criminal** [1] - 8:20
**criteria** [1] - 32:9
**CRR** [1] - 2:23
**Crutcher** [1] - 3:10
**CRUTCHER** [1] - 1:16
**Cyber** [1] - 3:23

## D

**D.C** [2] - 3:16, 39:23
**damages** [3] - 7:18, 44:13, 45:2
**Data** [3] - 16:18, 25:24, 34:18
**days** [2] - 36:9, 36:10
**DC** [1] - 2:9
**deal** [2] - 20:25, 47:15
**dealt** [1] - 23:4
**debating** [1] - 22:21
**decide** [8] - 6:18, 7:12, 20:15, 23:1, 33:5, 33:9, 33:24, 34:1
**decided** [3] - 5:17, 6:1, 6:6
**deciding** [4] - 10:25, 11:1, 12:9, 23:11
**deem** [3] - 37:24, 38:19, 50:25
**deemed** [2] - 7:19, 50:13
**deems** [1] - 47:10
**default** [12] - 5:20, 7:14, 9:4, 9:12, 12:12, 15:21, 15:22, 16:14, 17:12, 29:9, 34:23, 51:7
**defaulted** [3] - 7:16, 9:13, 46:18
**defeat** [1] - 30:11
**Defendant** [1] - 1:10
**defendants** [1] - 6:12
**defendants'** [2] - 6:11, 6:14
**defense** [1] - 21:10
**deferred** [1] - 23:9
**define** [1] - 6:15
**definitely** [1] - 34:25
**definition** [3] - 7:25, 8:1, 8:2
**defrauded** [1] - 30:17
**degree** [1] - 45:1
**deliver** [1] - 40:2
**delivered** [3] - 40:11, 40:20, 40:25
**delivering** [1] - 41:2
**delivery** [5] - 40:6, 40:18, 40:24, 42:1, 42:6
**demonstrates** [1] - 28:4
**denied** [1] - 50:7
**DENNIS** [1] - 1:23
**Dennis** [1] - 4:4
**deny** [1] - 49:18
**Department** [1] - 3:23
**DEPARTMENT** [1] - 2:7
**DEPUTY** [3] - 3:2, 3:6, 51:23
**deserve** [2] - 18:4, 18:5
**designed** [2] - 17:24, 39:5
**determination** [6] - 9:1, 18:16, 23:8, 25:18, 26:13, 35:14
**determinations** [1] - 44:24
**determine** [4] - 18:7, 18:9, 19:1, 24:18
**determined** [3] - 40:19, 45:9, 45:11
**determines** [1] - 43:12

**determining** [3] - 17:25, 18:3, 29:3
**Development** [1] - 3:7
**development** [3] - 19:16, 24:17, 27:2
**DEVELOPMENT** [1] - 1:9
**different** [7] - 5:1, 8:1, 22:5, 23:12, 25:6, 27:17, 28:24
**difficult** [1] - 7:7
**diligent** [1] - 16:3
**directed** [1] - 42:13
**directing** [2] - 42:12, 42:19
**directly** [1] - 44:10
**directs** [2] - 18:13, 18:15
**disappears** [1] - 16:11
**discovery** [4] - 20:7, 25:7, 29:10, 29:11
**discretion** [1] - 9:8
**discussed** [1] - 39:16
**discussion** [1] - 5:18
**disinterested** [1] - 18:25
**dismiss** [31] - 3:17, 5:19, 11:6, 18:12, 21:8, 22:4, 22:22, 23:1, 23:3, 23:10, 30:4, 33:7, 33:13, 33:20, 33:21, 37:24, 37:25, 38:5, 41:12, 46:18, 46:25, 47:3, 47:5, 47:14, 47:21, 48:7, 48:23, 49:4, 50:13, 50:16, 51:2
**dismissed** [1] - 18:12
**dispositive** [1] - 33:2
**disputing** [2] - 29:25, 48:11
**distribution** [1] - 44:24
**DISTRICT** [4] - 1:1, 1:1, 1:14, 2:3
**District** [1] - 45:4
**districts** [1] - 44:4
**Division** [1] - 2:8
**docket** [2] - 38:14, 38:19
**dollars** [3] - 13:20, 16:4, 20:19
**done** [5] - 27:10, 28:9, 30:23, 36:8, 37:14
**doorstep** [1] - 44:2
**doubt** [1] - 42:15
**Doug** [1] - 4:3
**DOUGLAS** [1] - 1:23
**down** [3] - 45:5, 45:24, 49:2
**downstream** [1] - 51:9
**drafter's** [1] - 7:6
**draw** [1] - 38:25
**drawing** [1] - 10:9
**dressed** [1] - 18:21
**driven** [1] - 35:8
**driving** [1] - 38:9
**drop** [1] - 14:7
**dug** [1] - 33:20
**Dunn** [1] - 3:9
**DUNN** [1] - 1:16

**E**

**E-mail** [1] - 2:24
**easier** [1] - 15:20
**East** [1] - 2:3
**EASTERN** [2] - 1:1, 2:3
**ECF** [1] - 35:16
**effectively** [6] - 14:9, 22:12, 23:9, 26:19, 30:2, 47:8
**effectuate** [2] - 39:20, 40:23
**effectuated** [1] - 41:5
**effectuating** [1] - 42:7
**efficient** [5] - 5:6, 12:2, 22:10, 33:16, 50:12
**either** [5] - 13:7, 28:13, 46:2, 49:9, 51:14
**elaborate** [1] - 29:11
**electrical** [1] - 10:8
**electricity** [2] - 10:14, 10:15
**elliptical** [1] - 46:5
**elsewhere** [1] - 36:21
**enable** [1] - 35:14
**enacted** [1] - 7:8
**encode** [1] - 27:9
**end** [1] - 25:25
**energized** [1] - 28:8
**energy** [3] - 5:6, 5:7, 10:14
**enter** [1] - 13:14
**entered** [1] - 3:3
**entire** [2] - 7:18, 31:13
**entitled** [8] - 8:23, 9:2, 13:23, 15:22, 16:14, 19:4, 26:9, 34:23
**entitlement** [2] - 26:7, 28:10
**equitable** [1] - 38:18
**equitably** [2] - 38:15, 44:23
**ESQ** [14] - 1:18, 1:18, 1:19, 1:19, 1:23, 1:23, 2:4, 2:5, 2:5, 2:10, 2:13, 2:14, 2:17, 2:20
**essentially** [6] - 8:16, 14:7, 24:19, 25:15, 43:8, 47:10
**establish** [1] - 5:22
**established** [1] - 41:5
**establishing** [1] - 42:4
**et** [2] - 1:4, 3:6
**EUBANKS** [1] - 2:17
**Eubanks** [2] - 4:10, 4:11
**event** [3] - 3:18, 16:10, 30:21
**evidence** [4] - 7:25, 14:13, 16:8, 28:19
**ex** [7] - 15:13, 15:16, 15:17, 18:2, 36:3, 36:11, 37:13
**exact** [1] - 46:22
**exactly** [1] - 50:23
**example** [3] - 17:6, 48:4, 50:3
**except** [1] - 7:18
**excluding** [2] - 44:12, 44:13
**exclusive** [1] - 43:23
**execution** [1] - 6:22
**Executive** [1] - 7:9
**existence** [1] - 29:3
**existing** [3] - 33:25, 37:24, 49:19
**exited** [1] - 51:24
**expending** [2] - 27:5, 39:4
**expensive** [1] - 43:9
**expert** [1] - 31:3
**experts** [5] - 9:22, 9:23, 10:8, 16:4, 31:7
**express** [2] - 13:11, 14:2
**expressly** [1] - 6:19
**extensive** [1] - 45:3
**extent** [4] - 23:2, 35:23, 36:19, 39:1
**extremely** [1] - 39:22

**F**

**face** [1] - 11:20
**fact** [9] - 19:4, 19:12, 19:16, 24:16, 27:2, 28:5, 29:16, 31:9, 45:19
**facts** [10] - 14:22, 19:18, 20:15, 24:17, 25:18, 27:18, 27:19, 27:21, 31:15, 45:9
**fair** [1] - 16:12
**fairest** [1] - 33:16
**fairly** [1] - 29:10
**faith** [1] - 19:1
**fall** [1] - 14:5
**families** [1] - 44:16
**far** [1] - 28:16
**favor** [1] - 34:12
**favors** [1] - 16:3
**fear** [1] - 29:18
**February** [1] - 38:13
**federal** [1] - 44:23
**feet** [1] - 28:20
**fellow** [1] - 9:21
**field** [1] - 9:19
**fight** [3] - 18:20, 27:4, 36:23
**fighting** [2] - 18:19, 36:23
**figure** [3] - 12:3, 12:5, 43:18
**figuring** [1] - 17:24
**file** [5] - 33:21, 36:21, 43:21, 49:4, 51:15
**filed** [17] - 4:25, 5:2, 16:6, 16:7, 18:1, 19:21, 20:8, 29:4, 35:12, 35:22, 41:3, 47:19, 48:16, 49:23, 50:5, 50:12
**filer** [1] - 35:15
**files** [1] - 51:15
**filing** [1] - 40:15
**filings** [3] - 5:19, 5:24, 35:4
**final** [1] - 8:25
**findings** [1] - 10:2
**fine** [2] - 34:9, 49:18
**firm** [1] - 4:9
**First** [1] - 8:13
**first** [36] - 6:3, 6:6, 6:7, 6:18, 6:24, 7:13, 7:20, 8:4, 16:13, 18:23, 18:25, 20:23, 22:13, 27:5, 27:7, 28:11, 29:4, 30:4, 33:6, 33:9, 33:24, 35:13, 35:15, 35:17, 35:22, 37:2, 37:6, 38:1, 38:20, 39:15, 41:10, 43:19, 44:25, 45:9, 45:11, 50:5
**Fish** [1] - 36:15
**FISHER** [1] - 1:21
**fit** [2] - 13:9, 47:10
**fitting** [1] - 11:4
**flaw** [1] - 43:4
**flexible** [1] - 50:18
**flies** [1] - 11:20

**flood** [1] - 29:8
**Floor** [1] - 2:12
**focused** [1] - 11:25
**folks** [8] - 23:7, 24:1, 24:11, 26:6, 26:22, 39:3, 39:11, 51:6
**follow** [1] - 51:7
**foot** [1] - 50:20
**FOR** [1] - 1:13
**forced** [1] - 27:23
**forfeiture** [38] - 8:20, 9:15, 10:5, 13:17, 17:18, 18:17, 18:24, 19:2, 19:6, 19:15, 19:17, 19:21, 20:9, 21:21, 23:19, 23:21, 24:15, 24:20, 24:22, 25:9, 25:11, 25:17, 25:20, 26:6, 26:18, 26:19, 28:4, 29:4, 29:12, 29:15, 30:13, 31:20, 32:5, 32:7, 32:10, 33:15, 34:16, 42:23
**forgive** [1] - 21:17
**form** [1] - 48:1
**formal** [1] - 34:4
**formally** [1] - 34:3
**forth** [2] - 31:7, 34:13
**forward** [5] - 12:5, 33:3, 35:1, 39:10, 50:15
**four** [1] - 44:15
**fraud** [2] - 28:14, 30:14
**FREDERICK** [1] - 1:19
**Frederick** [1] - 3:12
**free** [2] - 32:3, 32:6
**FREEMAN** [1] - 1:19
**Freeman** [1] - 3:12
**fresh** [1] - 38:7
**friend** [2] - 21:24, 24:23
**friends** [2] - 22:16, 44:20
**fritz** [1] - 3:6
**FRITZ** [1] - 1:4
**Fritz** [7] - 1:16, 3:10, 5:12, 5:15, 33:14, 38:19, 44:20
**front** [4] - 18:5, 34:25, 36:13, 44:20
**front-loading** [1] - 18:5
**FSIA** [2] - 7:2, 8:2
**fuel** [1] - 9:18
**fully** [1] - 9:1

## G

**gain** [1] - 45:13
**gamesmanship** [3] - 40:1, 44:14, 45:7
**generally** [1] - 7:4
**germane** [1] - 25:10
**GIBSON** [1] - 1:16
**Gibson** [1] - 3:9
**given** [3] - 6:18, 7:22, 45:22
**GOLDFARB** [1] - 1:21
**Goldman** [2] - 4:8, 44:9
**GOLDMAN** [4] - 2:13, 4:7, 43:19, 44:8
**government** [7] - 26:9, 26:25, 30:20, 40:17, 44:19, 45:21, 46:4
**Government** [52] - 3:21, 5:11, 6:7, 7:21, 9:25, 10:4, 10:18, 11:6, 11:9, 11:18, 11:19, 12:4, 12:7, 13:1, 13:10, 13:12, 14:20, 16:5, 16:7, 16:16, 18:24, 19:9, 19:22, 20:2, 20:12, 20:14, 20:17, 21:7, 21:18, 26:5, 26:18, 28:3, 30:9, 31:1, 31:21, 33:1, 33:4, 33:7, 33:11, 34:3, 37:22, 38:4, 41:12, 42:5, 43:19, 45:25, 46:17, 46:20, 48:23, 49:11, 51:15
**Government's** [16] - 3:17, 8:8, 11:16, 12:19, 12:20, 12:21, 20:25, 21:2, 21:6, 22:12, 29:15, 29:24, 34:22, 44:2, 50:15, 50:21
**grab** [1] - 44:19
**grant** [17] - 13:5, 13:15, 14:22, 15:17, 16:15, 22:3, 32:24, 35:16, 36:22, 37:9, 40:10, 40:14, 41:1, 41:20, 42:16, 43:5
**granted** [2] - 14:19, 32:11
**granting** [4] - 14:8, 41:10, 41:17, 41:23
**grants** [1] - 23:3
**great** [5] - 4:1, 4:22, 7:1, 12:22, 13:4
**Greenbaum** [1] - 39:23
**ground** [2] - 21:8, 39:19
**GROUP** [1] - 1:9
**Group** [2] - 3:7, 25:24
**groups** [1] - 44:21
**guess** [15] - 5:8, 5:23, 6:2, 21:14, 22:14, 22:15, 25:3, 25:19, 35:19, 37:1, 37:6, 37:18, 41:14, 48:8, 49:2

## H

**hacked** [2] - 30:18, 30:20
**hand** [1] - 23:11
**handle** [1] - 3:17
**handles** [1] - 5:5
**happy** [8] - 18:12, 18:14, 33:12, 34:2, 34:4, 39:1, 50:12, 50:16
**hash** [1] - 29:9
**Havlish** [5] - 4:4, 6:9, 6:23, 16:23, 20:22
**head** [2] - 17:18, 27:13
**hear** [5] - 3:18, 5:8, 23:1, 28:15, 28:16
**heard** [13] - 9:16, 13:12, 13:14, 15:1, 15:10, 16:6, 16:17, 17:19, 34:11, 35:21, 36:8, 42:9, 49:11
**hearing** [2] - 37:18, 37:20
**held** [3] - 14:20, 18:14, 38:17
**help** [3] - 21:25, 22:15, 24:17
**helpful** [4] - 37:20, 38:24, 51:13, 51:18
**hiding** [1] - 24:14
**high** [1] - 18:22
**high-mindedness** [1] - 18:22
**hit** [2] - 31:10, 42:15
**honestly** [1] - 50:2
**Honor** [61] - 3:18, 4:7, 4:15, 4:17, 6:4, 8:23, 9:18, 13:7, 14:24, 16:24, 17:21, 17:23, 18:13, 18:15, 19:23, 20:10, 20:24, 21:16, 21:17, 22:24, 23:2, 23:20, 24:14, 24:21, 26:17, 27:8, 28:15, 29:14, 31:16, 31:20, 32:14, 32:18, 33:11, 34:2, 34:8, 34:9, 34:11, 36:19, 38:3, 39:12, 40:13, 42:9, 42:15, 43:1, 43:16, 43:21, 44:8, 45:15, 45:17, 45:24, 47:19, 48:3, 48:19, 49:8, 49:21, 49:22, 50:11, 51:14, 51:21, 51:22
**Honor's** [1] - 26:2
**HONORABLE** [1] - 1:13
**hoping** [1] - 28:19
**horse** [1] - 18:6
**housekeeping** [1] - 45:23
**hundred** [1] - 13:20
**hundreds** [1] - 16:4
**hunting** [1] - 43:7
**hurt** [1] - 45:7

## I

**idea** [7] - 33:8, 34:6, 34:9, 35:22, 40:10, 45:19, 48:14
**ideas** [1] - 35:20
**identified** [1] - 28:23
**imagine** [2] - 7:7, 11:12
**immediately** [1] - 42:1
**immunity** [9] - 8:21, 11:17, 11:19, 13:2, 14:21, 16:16, 39:21, 48:4
**impact** [1] - 49:24
**impacts** [1] - 9:13
**implementing** [1] - 51:5
**important** [3] - 10:13, 16:2, 40:4
**inadequately** [1] - 19:25
**inappropriate** [1] - 45:14
**incentives** [1] - 21:23
**inclined** [1] - 41:10
**including** [2] - 13:13, 38:14
**incorporate** [1] - 9:5
**indeed** [1] - 46:1
**indicated** [1] - 39:22
**inevitably** [1] - 26:2
**inform** [2] - 26:2, 34:25
**information** [2] - 20:1, 37:20
**informed** [1] - 27:2
**inherent** [1] - 38:14
**innocent** [2] - 21:9, 21:11
**instance** [1] - 50:15
**instrumentalities** [1] - 21:11
**instrumentality** [14] - 6:13, 6:15, 6:21, 7:21, 8:1, 8:7, 8:13, 9:24, 10:23, 14:12, 14:15, 26:25, 29:23, 46:4
**intent** [1] - 7:6
**intentional** [1] - 30:8
**interacts** [1] - 7:2
**interest** [7] - 9:7, 24:6, 32:21, 42:5, 44:12, 47:8, 47:11
**interested** [1] - 45:22
**interesting** [2] - 24:19, 51:19
**interests** [1] - 47:11
**intermediate** [1] - 42:12
**internecine** [1] - 27:4
**interpreted** [1] - 7:5
**Interrogatories** [1] - 19:23

**intervene** [8] - 34:4, 34:24, 37:22, 46:19, 46:24, 47:2, 47:7, 48:17
**intervened** [3] - 33:22, 34:3, 40:2
**intervening** [1] - 38:4
**Intervenors** [2] - 2:12, 2:20
**intervenors** [3] - 4:19, 39:14, 39:19
**introduced** [1] - 7:24
**invested** [1] - 13:24
**INVESTMENT** [1] - 1:8
**Investment** [1] - 3:7
**invites** [1] - 18:8
**involved** [2] - 25:13, 27:22
**involvement** [1] - 26:8
**IRAN** [1] - 1:8
**Iran** [23] - 3:6, 8:7, 9:24, 10:4, 10:13, 10:23, 14:12, 14:15, 15:4, 15:5, 15:6, 24:12, 26:24, 26:25, 27:24, 28:5, 29:23, 31:8, 31:9, 34:20, 35:12, 45:20, 46:3
**Iran's** [1] - 34:19
**Iran-related** [1] - 35:12
**Iranian** [8] - 10:7, 10:11, 10:12, 10:22, 26:9, 28:14, 45:21, 46:4
**issuance** [1] - 45:5
**issue** [18] - 5:17, 11:18, 12:1, 15:2, 21:22, 23:4, 34:5, 34:20, 34:22, 37:1, 39:15, 42:12, 42:19, 47:10, 48:15, 49:2, 50:21, 51:3
**issues** [23] - 5:1, 5:3, 5:5, 5:10, 5:11, 15:19, 17:5, 21:25, 22:21, 23:8, 23:11, 25:11, 33:19, 34:10, 34:16, 34:24, 38:1, 39:21, 41:7, 41:11, 45:10, 47:15, 51:9
**issuing** [1] - 44:5
**it's...** [1] - 46:8

## J

**Jason** [1] - 3:12
**JASON** [1] - 1:19
**Jerry** [2] - 4:8, 44:9
**JERRY** [1] - 2:13
**Jersey** [1] - 2:20
**Jessica** [1] - 3:11
**JESSICA** [1] - 1:18
**JOHN** [1] - 2:17
**John** [2] - 4:10, 4:11
**JUDGE** [1] - 1:14
**Judge** [6] - 3:3, 36:13, 36:15, 38:23, 46:13, 51:24
**judgment** [15] - 5:20, 7:14, 9:4, 9:12, 12:12, 15:21, 15:22, 16:14, 17:12, 29:9, 32:8, 32:25, 34:23, 51:8
**judgments** [7] - 7:10, 36:14, 44:12, 44:16, 45:2, 45:5
**jump** [1] - 37:16
**juncture** [1] - 36:8
**jurisdiction** [8] - 43:22, 43:23, 43:24, 43:25, 48:5, 48:7, 48:9, 48:12
**jurisdictional** [1] - 33:2
**justice** [1] - 28:12
**JUSTICE** [1] - 2:7
**Justice's** [1] - 3:23

## K

**keep** [1] - 23:19
**Kemble** [1] - 2:19
**key** [1] - 42:15
**kicks** [1] - 49:2
**KILL** [1] - 2:11
**Kill** [1] - 4:8
**kind** [12] - 5:16, 8:10, 9:9, 18:5, 21:25, 23:23, 27:17, 35:14, 39:19, 42:22, 45:21, 46:5
**Kirschenbaum** [2] - 6:8, 11:17
**knows** [2] - 17:15, 19:23
**KOVNER** [3] - 1:13, 3:3, 51:24
**Kreindler** [1] - 4:11
**Kress** [1] - 1:21

## L

**labor** [1] - 27:23
**lack** [2] - 31:22, 48:8
**lacks** [2] - 48:5, 48:23
**language** [1] - 46:4
**largest** [1] - 10:10
**last** [2] - 46:11, 51:11
**later-in-time** [1] - 32:7
**laundering** [2] - 20:25, 27:23
**law** [10] - 6:20, 7:1, 15:16, 16:3, 20:21, 35:3, 35:7, 35:24, 44:23, 50:3
**laws** [1] - 7:5
**lead** [1] - 27:10
**leading** [1] - 29:18
**learned** [2] - 31:4, 35:4
**least** [1] - 7:16
**legal** [19] - 8:8, 8:19, 17:5, 22:21, 23:3, 23:8, 23:11, 24:18, 24:19, 25:15, 25:19, 33:6, 33:9, 34:10, 45:10, 45:22, 48:17, 50:22, 51:9
**lens** [1] - 48:15
**less** [3] - 44:5, 46:3, 50:22
**lesser** [1] - 12:15
**letter** [2] - 47:20, 47:21
**levied** [1] - 40:21
**Levin** [1] - 3:16
**Levinson** [1] - 10:1
**levy** [1] - 40:22
**levying** [2] - 40:16, 42:3
**licensee** [1] - 43:7
**life** [1] - 26:22
**likelihood** [2] - 8:25, 12:17
**likely** [1] - 21:10
**limited** [1] - 48:10
**line** [3] - 14:5, 36:16, 38:20
**listening** [1] - 34:14
**litigants** [2] - 24:4, 24:6
**litigate** [1] - 21:23
**litigated** [3] - 21:22, 30:12, 31:1
**litigating** [1] - 23:19
**litigation** [13] - 18:11, 19:4, 19:9, 19:13, 20:7, 25:22, 25:25, 26:3, 26:5, 34:15, 44:10, 44:25, 45:4
**LLC** [2] - 2:16, 2:19
**LLP** [1] - 1:16
**loading** [1] - 18:5
**look** [6] - 11:17, 25:1, 30:13, 38:23, 39:1, 39:9
**looked** [1] - 37:6
**looking** [1] - 34:15
**losses** [1] - 25:9
**lost** [1] - 35:17
**LuBian** [35] - 7:15, 7:16, 7:17, 7:20, 7:25, 9:13, 9:24, 9:25, 10:4, 10:5, 11:7, 14:12, 15:4, 15:22, 16:15, 16:25, 18:18, 19:2, 19:6, 19:10, 19:17, 20:17, 21:9, 23:22, 23:24, 25:5, 25:22, 26:5, 29:21, 31:8, 31:11, 34:18, 46:18
**LuBian's** [11] - 10:9, 14:11, 17:6, 19:14, 20:16, 20:24, 21:4, 21:8, 21:17, 21:21, 30:22

## M

**Mace** [1] - 2:23
**magistrate** [1] - 18:2
**mail** [1] - 2:24
**main** [1] - 23:13
**maintain** [1] - 40:15
**maintained** [1] - 33:12
**maintaining** [1] - 39:25
**Maloney** [2] - 4:10, 4:11
**managed** [1] - 30:11
**management** [2] - 22:11, 38:19
**marker** [1] - 45:24
**Marshal** [6] - 40:3, 40:7, 40:11, 40:16, 43:12, 43:13
**marshals** [2] - 42:1, 43:14
**Marshals** [2] - 41:3, 43:11
**massive** [1] - 31:10
**matter** [4] - 26:7, 48:7, 48:8, 48:11
**McAndrew** [3] - 2:19, 4:18, 39:13
**mean** [12] - 8:24, 16:25, 17:1, 17:15, 17:16, 28:18, 33:5, 34:14, 37:1, 38:6, 42:14
**meaningful** [1] - 24:16
**means** [4] - 6:15, 6:16, 7:16, 8:15
**meets** [1] - 7:25
**memorialize** [1] - 41:4
**memorialized** [1] - 42:7
**memorializing** [1] - 39:16
**memorized** [1] - 36:9
**mention** [1] - 38:8
**merits** [6] - 8:25, 11:24, 22:7, 32:25, 49:8, 49:9
**met** [1] - 6:17
**middle** [2] - 19:22, 39:19

**might** [9] - 16:21, 30:24, 34:7, 36:22, 37:21, 38:24, 39:3, 49:24
**million** [1] - 30:15
**mindedness** [1] - 18:22
**Mindlin** [1] - 3:21
**MINDLIN** [26] - 2:4, 3:20, 17:23, 19:22, 21:15, 21:20, 22:19, 23:15, 23:18, 23:25, 24:3, 24:8, 24:11, 24:25, 25:7, 25:21, 26:15, 26:17, 27:25, 28:3, 28:7, 28:23, 29:2, 29:7, 45:17, 46:13
**mine** [4] - 10:10, 10:11, 13:25, 31:11
**mined** [9] - 10:4, 10:6, 20:17, 26:1, 26:23, 26:24, 28:5, 31:8, 46:3
**mines** [1] - 31:11
**mining** [2] - 10:12, 31:8
**minute** [1] - 38:13
**missing** [1] - 39:9
**mistake** [1] - 18:19
**mistakenly** [1] - 42:15
**Mitchell** [1] - 4:3
**MITCHELL** [2] - 1:23, 4:3
**momentum** [1] - 45:18
**money** [6] - 20:25, 27:22, 28:21, 28:22, 43:13
**months** [1] - 16:5
**Morristown** [1] - 2:20
**most** [4] - 13:17, 19:5, 33:16, 45:6
**MOTION** [1] - 1:13
**motion** [65] - 3:17, 5:15, 5:18, 5:20, 6:5, 7:13, 8:3, 9:4, 10:25, 11:2, 11:8, 11:11, 12:5, 12:8, 12:9, 13:5, 13:10, 13:15, 14:2, 14:9, 15:13, 15:21, 15:25, 16:17, 18:2, 18:5, 20:4, 20:6, 22:4, 22:22, 23:1, 23:3, 31:17, 31:18, 32:12, 33:3, 33:7, 33:8, 33:13, 33:20, 33:21, 34:4, 37:23, 37:25, 41:12, 43:22, 46:21, 46:23, 47:13, 47:15, 47:17, 47:18, 47:21, 48:2, 48:16, 48:18, 48:20, 48:25, 49:3, 49:4, 50:13, 50:16, 51:1, 51:2, 51:8
**motions** [7] - 5:1, 5:21, 12:7, 38:9, 38:17, 49:19, 51:8
**MOTLEY** [1] - 2:16
**Motley** [1] - 4:12
**Mount** [1] - 2:17
**move** [19] - 7:13, 11:6, 15:16, 18:12, 18:14, 29:16, 29:19, 30:4, 36:4, 36:10, 44:15, 46:17, 46:25, 47:3, 47:5, 48:6, 48:9, 48:23
**moved** [1] - 6:7
**moving** [7] - 11:11, 20:3, 24:22, 31:21, 32:12, 38:5, 47:24
**MR** [106] - 3:9, 3:20, 4:3, 4:7, 4:17, 4:21, 6:4, 8:11, 8:22, 11:5, 12:15, 12:23, 13:6, 14:16, 14:24, 15:12, 15:15, 17:4, 17:8, 17:11, 17:21, 17:23, 19:22, 20:10, 21:7, 21:15, 21:20, 22:19, 23:15, 23:18, 23:25, 24:3, 24:8, 24:11, 24:25, 25:7, 25:21, 26:15, 26:17, 27:25, 28:3, 28:7, 28:23, 29:2, 29:7, 29:14, 30:3, 30:7, 31:16, 31:20, 32:1, 32:3, 32:14, 32:18, 32:20, 33:11, 34:2, 34:8, 34:9, 35:6, 36:2, 36:7, 36:18, 37:3, 37:11, 37:13, 38:3, 38:12, 38:22, 39:12, 40:13, 41:22, 41:25, 42:3, 42:9, 42:11, 43:1, 43:3, 43:16, 43:19, 43:20, 44:8, 45:17, 46:11, 46:13, 46:15, 47:1, 47:5, 47:9, 47:17, 48:3, 48:10, 48:19, 48:22, 49:7, 49:11, 49:15, 49:21, 49:22, 50:2, 50:5, 50:7, 50:11, 51:14, 51:21, 51:22
**MS** [1] - 17:3
**Mt** [1] - 2:19
**must** [1] - 6:11
**Myatt** [1] - 3:12
**MYATT** [1] - 1:19

## N

**N.W** [1] - 2:8
**name** [3] - 3:8, 4:3, 4:8
**National** [2] - 2:8, 3:23
**necessity** [1] - 23:13
**need** [4] - 3:15, 25:1, 35:14, 43:14
**never** [1] - 16:6
**NEW** [2] - 1:1, 2:3
**New** [11] - 1:6, 1:17, 2:4, 2:13, 2:20, 15:16, 27:5, 35:24, 44:23
**next** [4] - 19:20, 23:17, 23:18, 26:16
**nobody** [1] - 29:20
**none** [1] - 44:1
**nonetheless** [1] - 26:6
**nonparties** [1] - 29:8
**North** [1] - 1:22
**notably** [1] - 46:5
**note** [1] - 45:17
**nothing** [2] - 30:23, 34:17
**notice** [2] - 15:23, 17:13
**notion** [1] - 18:7
**notwithstanding** [4] - 6:19, 6:25, 7:3, 20:20
**nullifies** [1] - 32:4

## O

**O'Neill** [3] - 2:12, 4:14, 44:9
**object** [2] - 23:6, 23:8
**objection** [1] - 22:20
**observed** [1] - 7:3
**obstacle** [1] - 8:19
**obtain** [1] - 28:9
**obtaining** [1] - 40:7
**obviously** [1] - 13:7
**occur** [1] - 42:4
**occurs** [1] - 40:18
**October** [1] - 1:8
**OF** [4] - 1:1, 1:13, 2:3, 2:7
**offer** [1] - 24:17
**office** [1] - 3:12
**OFFICE** [1] - 2:2
**officer** [2] - 40:20, 40:24
**official** [1] - 2:23
**officials** [2] - 10:11, 10:12
**one** [25] - 5:10, 5:19, 7:3, 9:23, 11:15, 13:15, 15:7, 15:15, 16:3, 16:20, 17:13, 17:25, 22:7, 22:9, 25:1, 27:13, 29:3, 33:5, 33:8, 35:2, 36:11, 37:8, 42:11, 46:11
**ones** [2] - 9:20, 24:19
**open** [1] - 3:1
**opening** [1] - 10:11
**operations** [1] - 5:5
**opinion** [1] - 40:22
**opportunity** [2] - 35:21, 50:25
**oppose** [1] - 46:21
**opposed** [3] - 7:22, 44:14, 48:19
**opposing** [2] - 33:8, 48:2
**opposition** [9] - 5:14, 12:8, 13:9, 46:23, 47:18, 47:20, 48:17, 48:24, 49:3
**option** [1] - 33:5
**order** [26] - 5:5, 5:15, 5:25, 27:19, 27:20, 35:24, 35:25, 38:8, 38:13, 38:23, 39:2, 39:25, 40:15, 40:20, 40:24, 41:3, 41:10, 41:23, 42:12, 42:19, 43:5, 43:12, 44:1, 44:6, 45:13, 47:10
**orders** [8] - 40:3, 40:10, 40:14, 40:20, 41:2, 41:11, 41:17, 41:20
**ordinarily** [1] - 32:8
**ordinary** [1] - 11:12
**outcome** [4] - 18:17, 19:2, 25:8, 27:11
**outset** [2] - 50:22, 51:10
**overcomes** [1] - 32:6
**overlapping** [2] - 5:1, 5:3
**own** [7] - 4:19, 10:9, 19:10, 25:24, 25:25, 28:10, 38:14
**owned** [3] - 8:16, 19:7, 34:19
**owner** [4] - 17:25, 19:1, 19:3, 21:9
**owners** [1] - 21:11
**ownership** [2] - 18:9, 24:18
**owns** [1] - 19:8

## P

**p.m** [1] - 1:8
**PANTAZIS** [2] - 1:21, 1:23
**Pantazis** [1] - 4:4
**papers** [6] - 18:13, 22:22, 34:22, 37:24, 50:12, 51:16
**Park** [1] - 1:17
**parrot** [1] - 31:5
**part** [3] - 8:6, 24:5, 35:7
**parte** [7] - 15:13, 15:16, 15:17, 18:2, 36:3, 36:11, 37:13
**participate** [2] - 19:16, 24:16
**particular** [2] - 42:13, 43:6
**particularly** [4] - 6:18, 34:24, 35:9, 44:15
**parties** [12] - 18:19, 18:21, 19:23, 21:11, 21:22, 23:18, 39:2, 39:25, 40:1, 40:15, 45:4, 49:15

**partner** [2] - 3:11
**parts** [1] - 32:6
**party** [11] - 6:12, 6:13, 6:21, 8:14, 8:16, 11:7, 11:9, 19:8, 30:5, 43:21, 47:6
**past** [3] - 44:18, 45:6
**paths** [1] - 22:25
**pending** [2] - 6:5, 9:1
**Pennsylvania** [1] - 2:8
**people** [15] - 9:15, 13:13, 15:25, 16:9, 16:18, 19:3, 19:12, 23:23, 24:5, 25:19, 28:7, 28:13, 30:16, 36:20, 43:3
**people's** [1] - 41:15
**per** [1] - 22:11
**percent** [2] - 31:12, 44:11
**perhaps** [1] - 26:5
**period** [1] - 42:24
**permission** [1] - 3:13
**person** [1] - 30:19
**phrased** [1] - 8:12
**pictures** [1] - 10:10
**pitch** [2] - 12:4, 12:10
**place** [4] - 11:15, 35:17, 39:5, 41:15
**plainly** [1] - 6:10
**plaintiff** [1] - 6:11
**Plaintiffs** [2] - 1:5, 1:16
**plaintiffs** [11] - 3:10, 4:4, 4:13, 4:14, 9:21, 13:21, 18:4, 25:14, 29:21, 31:22, 44:10
**plaintiffs'** [2] - 5:12, 29:16
**Plaintiffs'** [1] - 1:21
**play** [1] - 47:25
**playing** [2] - 24:21, 26:12
**Plaza** [1] - 2:3
**Pleasant** [1] - 2:17
**plowing** [1] - 9:19
**point** [6] - 13:10, 19:7, 28:12, 40:4, 42:18, 43:20
**pointed** [1] - 22:24
**portion** [1] - 46:2
**position** [5] - 7:21, 11:6, 28:15, 28:16, 32:23
**positions** [1] - 44:15
**possession** [3] - 26:20, 30:22, 42:18
**possibility** [1] - 22:14
**possible** [2] - 22:24, 51:2
**possibly** [1] - 17:17
**potential** [1] - 5:20
**power** [3] - 10:9, 14:14, 48:23
**practical** [1] - 23:13
**practice** [1] - 44:4
**PRE** [1] - 1:13
**PRE-MOTION** [1] - 1:13
**precisely** [1] - 28:25
**prejudice** [2] - 23:10, 49:19
**preliminary** [3] - 8:24, 12:16, 35:14
**premature** [2] - 33:1, 45:14
**prepared** [1] - 34:10
**prescribes** [1] - 27:6
**present** [10] - 4:25, 5:2, 8:3, 22:17, 25:18, 28:19, 30:1, 47:14, 48:1
**presented** [3] - 5:14, 21:5, 21:6
**presenting** [2] - 14:13, 33:7
**presently** [1] - 19:9
**preserve** [3] - 16:13, 35:15, 39:5
**preserving** [1] - 41:15
**presided** [1] - 18:8
**prevail** [1] - 19:6
**prevailed** [1] - 19:13
**prevails** [3] - 23:20, 26:4, 26:18
**prevent** [3] - 35:10, 39:4, 40:16
**primacy** [1] - 6:19
**Prince** [1] - 25:23
**priority** [17] - 5:22, 16:10, 16:13, 18:20, 18:21, 27:9, 36:4, 38:8, 39:17, 39:20, 40:15, 40:19, 40:23, 41:4, 42:6, 43:12, 45:13
**problem** [2] - 42:21, 43:10
**procedural** [1] - 29:2
**procedure** [1] - 50:18
**Procedure** [1] - 27:6
**proceed** [1] - 22:12
**proceeded** [1] - 22:1
**proceeding** [7] - 13:15, 16:20, 18:25, 32:23, 33:13, 33:14, 33:16
**proceedings** [2] - 4:25, 28:20
**Proceedings** [2] - 2:25, 51:25
**process** [4] - 9:18, 39:17, 39:20, 42:3
**produced** [2] - 2:25, 31:2
**prong** [1] - 7:20
**proof** [1] - 31:2
**proper** [2] - 18:2, 24:15
**properties** [2] - 6:11, 6:14
**property** [4] - 32:5, 32:22, 33:17, 40:21
**proposal** [3] - 40:9, 46:16, 47:25
**proposals** [1] - 45:8
**proposed** [2] - 39:19, 39:24
**proposing** [2] - 22:1, 40:12
**protect** [1] - 47:11
**protocols** [1] - 29:11
**prove** [1] - 34:19
**provide** [3] - 7:5, 20:1, 50:16
**provides** [3] - 6:25, 9:6, 40:7
**provision** [4] - 6:20, 7:1, 13:11, 20:21
**public** [1] - 17:16
**punitive** [1] - 44:13
**purpose** [1] - 42:7
**purposes** [1] - 48:11
**pursue** [1] - 25:2
**put** [2] - 33:3, 45:24
**puts** [1] - 18:6

## Q

**questions** [6] - 8:4, 14:9, 33:2, 33:6, 33:9, 34:1
**queue** [3] - 35:18, 39:5, 41:15
**quickly** [4] - 36:9, 37:14, 46:15, 49:8
**quite** [4] - 9:2, 17:16, 22:5, 29:19
**quote** [1] - 7:4

## R

**race** [8] - 18:3, 18:9, 19:1, 27:6, 35:5, 36:20, 42:18, 42:25
**RACHEL** [3] - 1:13, 3:3, 51:24
**raise** [1] - 48:24
**raised** [4] - 17:17, 33:1, 42:5, 49:3
**raising** [1] - 5:11
**rather** [1] - 41:11
**react** [1] - 43:3
**reactions** [1] - 6:2
**reality** [1] - 47:19
**really** [11] - 7:9, 9:8, 9:19, 11:25, 13:1, 13:4, 18:22, 20:15, 34:16, 46:15, 50:1
**reason** [6] - 15:24, 25:1, 27:3, 29:7, 40:4, 46:1
**reasons** [1] - 48:4
**recently** [1] - 36:13
**recognizing** [2] - 44:25, 45:1
**record** [1] - 3:8
**recorded** [1] - 2:25
**redress** [1] - 18:5
**refile** [1] - 49:19
**Reich** [1] - 3:25
**REICH** [1] - 2:5
**related** [1] - 35:12
**relating** [1] - 36:14
**relevant** [2] - 35:23, 39:22
**relief** [3] - 9:7, 9:9, 32:24
**rely** [1] - 18:13
**rem** [1] - 43:24
**remedy** [2] - 8:24, 32:24
**remote** [1] - 36:24
**repeat** [1] - 29:5
**Reporter** [2] - 2:23, 2:23
**represent** [3] - 39:13, 44:9, 44:10
**representing** [1] - 4:19
**requests** [1] - 38:15
**require** [1] - 29:10
**required** [1] - 20:1
**requirement** [1] - 32:4
**requires** [1] - 8:24
**res** [1] - 43:24
**resolve** [7] - 14:1, 16:24, 17:2, 17:5, 17:21, 22:7, 50:21
**resolved** [9] - 11:15, 13:17, 14:4, 15:20, 17:8, 20:23, 27:18, 27:20
**resolves** [1] - 34:20
**resolving** [3] - 27:18, 27:20, 51:9
**resources** [2] - 10:14, 39:4
**respect** [3] - 18:1, 20:2, 31:18
**respond** [1] - 7:18
**responded** [2] - 19:24
**response** [1] - 7:9
**RICE** [1] - 2:16
**rights** [1] - 40:7
**rise** [2] - 3:2, 51:23

**risk** [3] - 36:24, 36:25, 37:4
**RMR** [1] - 2:23
**road** [1] - 49:2
**ROBERT** [1] - 1:18
**Robert** [1] - 3:9
**room** [1] - 45:19
**RPK** [1] - 1:4
**RPR** [1] - 2:23
**rule** [1] - 13:22
**Rule** [4] - 7:17, 9:5, 11:7, 48:24
**ruled** [1] - 19:25
**rules** [3] - 20:24, 29:12, 34:12
**run** [2] - 10:10, 21:25
**running** [1] - 22:14

## S

**sale** [1] - 36:14
**sanctions** [2] - 10:16, 26:24
**satisfy** [1] - 32:9
**save** [3] - 5:6, 5:7, 9:18
**scam** [1] - 27:23
**schedule** [4] - 9:3, 17:13, 38:7, 39:8
**school** [1] - 50:3
**scope** [1] - 45:1
**se** [1] - 22:11
**seated** [2] - 3:4, 3:5
**Second** [7] - 3:14, 6:6, 6:10, 6:24, 8:12, 16:22, 20:22
**second** [7] - 6:9, 8:15, 30:2, 30:7, 35:23, 38:22, 41:21
**Section** [3] - 3:23, 40:5, 40:19
**secured** [3] - 32:21, 42:5, 45:13
**Security** [2] - 2:8, 3:23
**security** [1] - 42:4
**see** [4] - 22:15, 23:13, 29:7, 41:23
**seek** [1] - 25:8
**seeking** [1] - 5:21
**seem** [2] - 22:5, 51:8
**Seigel** [1] - 43:7
**seize** [1] - 27:15
**seizure** [1] - 8:5
**senior** [1] - 44:5
**sense** [5] - 11:17, 18:10, 24:18, 26:14, 46:16
**separate** [4] - 10:20, 28:20, 33:15, 40:12
**separately** [1] - 39:7
**sequence** [1] - 21:25
**serve** [3] - 16:20, 43:11, 43:14
**served** [1] - 15:23
**service** [1] - 41:3
**serving** [1] - 23:13
**set** [10] - 5:5, 5:10, 5:19, 9:3, 17:12, 27:21, 36:2, 38:1, 38:22, 39:8
**settle** [1] - 26:7
**SHERIDAN** [8] - 2:20, 4:17, 4:21, 39:12, 40:13, 41:22, 41:25, 42:3
**Sheridan** [2] - 4:18, 39:13
**sheriff** [1] - 40:6
**shoes** [2] - 19:14, 25:5
**short** [2] - 9:17, 16:21
**show** [9] - 6:11, 7:25, 10:7, 14:14, 27:15, 27:16, 27:22, 27:23, 31:9
**showed** [1] - 9:24
**showing** [1] - 10:8
**shown** [3] - 14:18, 31:7
**shows** [1] - 44:2
**side** [6] - 15:7, 15:8, 15:11, 21:25, 22:16, 24:24
**sign** [1] - 37:15
**significant** [2] - 40:5, 40:18
**silly** [1] - 12:21
**similar** [1] - 5:13
**simple** [1] - 29:19
**simply** [2] - 18:9, 44:6
**simultaneously** [1] - 29:16
**situation** [1] - 28:13
**slight** [1] - 43:4
**slow** [1] - 45:5
**SMaceRPR@gmail.com** [1] - 2:24
**small** [1] - 43:20
**solve** [1] - 42:21
**someone** [4] - 17:5, 23:20, 26:4, 44:19
**sorry** [3] - 43:17, 46:13, 47:1
**sort** [13] - 20:7, 23:5, 23:13, 29:9, 32:7, 32:21, 32:25, 38:5, 44:5, 44:13, 44:14, 46:21, 50:21
**sorts** [1] - 34:16
**South** [1] - 2:17
**Southern** [1] - 45:4
**souvenir** [1] - 43:9
**sovereign** [7] - 8:21, 11:19, 13:2, 14:21, 39:21, 48:4
**speaking** [2] - 31:4, 44:11
**specific** [3] - 29:11, 32:5, 32:21
**specifying** [1] - 43:5
**spent** [1] - 16:4
**Square** [1] - 2:12
**Stacy** [1] - 2:23
**stage** [9] - 12:13, 13:8, 17:9, 17:10, 17:12, 22:23, 26:17, 26:21
**stake** [2] - 22:21, 28:25
**stand** [1] - 51:16
**standard** [2] - 12:16, 12:17
**standing** [3] - 13:21, 20:13, 31:22
**Stark** [2] - 36:13, 36:15
**Stark's** [1] - 38:23
**started** [1] - 31:11
**state** [2] - 3:8, 35:11
**statement** [1] - 7:6
**statements** [2] - 10:9, 14:14
**STATES** [2] - 1:1, 1:14
**States** [5] - 1:6, 26:20, 30:15, 30:19, 31:13
**status** [2] - 25:2, 35:15
**statute** [3] - 6:25, 11:21, 32:7
**statutory** [2] - 13:11, 32:9
**stay** [4] - 18:14, 22:3, 23:12
**stayed** [5] - 23:17, 26:21, 38:17, 40:3, 41:25
**staying** [1] - 41:25
**stenography** [1] - 2:25
**step** [5] - 19:14, 25:4, 33:24, 37:9, 42:12
**steps** [1] - 19:20
**still** [6] - 8:24, 10:2, 26:9, 26:12, 27:13, 32:12
**stolen** [1] - 30:16
**strategy** [1] - 29:19
**Street** [1] - 1:22
**strenuously** [1] - 19:10
**strike** [9] - 20:3, 20:4, 20:6, 24:22, 29:20, 31:17, 31:18, 31:21, 32:13
**Strong** [1] - 4:9
**STRONG** [1] - 2:14
**strong** [4] - 9:23, 13:2, 13:4, 21:23
**strongly** [1] - 44:14
**structure** [1] - 12:1
**structuring** [1] - 35:25
**stuff** [1] - 34:19
**subject** [7] - 8:4, 8:9, 22:8, 25:20, 48:7, 48:8, 48:11
**subjects** [1] - 48:5
**submit** [1] - 20:21
**substantial** [1] - 46:2
**substantive** [1] - 41:6
**success** [2] - 8:25, 12:17
**successful** [1] - 32:9
**successors** [1] - 26:22
**sudden** [1] - 31:10
**suffered** [2] - 25:10, 45:2
**sufficiently** [1] - 15:6
**suggest** [3] - 9:10, 10:1, 49:11
**suggests** [1] - 7:23
**Suite** [1] - 2:9
**supersede** [2] - 7:5, 7:6
**supplemental** [2] - 50:14, 50:16
**support** [2] - 46:22, 46:23
**suppose** [1] - 11:10
**supposed** [1] - 42:23
**Supreme** [1] - 7:2
**survive** [2] - 20:4, 20:6
**sympathy** [1] - 18:4

## T

**takeaway** [1] - 46:10
**Taliban** [1] - 6:24
**tee** [1] - 31:23
**teeing** [1] - 41:12
**tees** [1] - 21:3
**template** [1] - 38:24
**ten** [1] - 36:9
**term** [1] - 15:6
**terms** [2] - 7:10, 39:16
**terror** [1] - 13:22
**terrorism** [1] - 28:14
**terrorist** [6] - 6:12, 6:13, 6:21, 8:14,

8:16, 21:11
**test** [1] - 6:17
**THE** [106] - 1:13, 3:2, 3:4, 3:6, 3:19, 4:1, 4:6, 4:16, 4:20, 4:22, 8:3, 8:17, 10:18, 11:22, 12:19, 12:24, 14:8, 14:17, 14:25, 15:14, 16:25, 17:7, 17:9, 17:20, 17:22, 19:20, 20:8, 21:2, 21:13, 21:19, 21:24, 23:14, 23:16, 23:23, 24:1, 24:4, 24:10, 24:23, 25:1, 25:16, 26:12, 26:16, 27:12, 28:2, 28:6, 28:18, 29:1, 29:6, 29:13, 29:25, 30:6, 31:14, 31:17, 31:23, 32:2, 32:11, 32:15, 32:19, 33:5, 33:19, 34:6, 35:2, 35:7, 36:6, 36:17, 36:24, 37:4, 37:12, 37:17, 38:11, 38:21, 38:23, 40:8, 41:8, 41:24, 42:2, 42:8, 42:10, 42:22, 43:2, 43:15, 43:17, 44:7, 45:16, 46:9, 46:12, 46:14, 46:24, 47:2, 47:7, 47:13, 47:23, 48:6, 48:13, 48:21, 49:1, 49:10, 49:14, 49:17, 50:1, 50:4, 50:6, 50:9, 50:19, 51:17, 51:23
**theory** [2] - 24:2, 37:13
**therefore** [1] - 6:17
**they've** [2] - 7:22, 41:3
**thinking** [5] - 11:4, 12:6, 12:14, 37:2, 37:15
**third** [1] - 35:23
**THOMAS** [1] - 2:20
**thoughts** [4] - 5:25, 33:10, 36:1, 41:9
**thousand** [2] - 28:20, 50:20
**thousand-foot** [1] - 50:20
**thousands** [1] - 16:4
**three** [1] - 44:15
**threshold** [1] - 50:22
**tie** [1] - 30:14
**timing** [1] - 49:23
**title** [2] - 26:19, 28:9
**today** [2] - 4:2, 4:23
**together** [1] - 29:17
**Tom** [1] - 4:18
**tom** [1] - 39:13
**tomorrow** [1] - 32:12
**ton** [1] - 16:8
**tool** [1] - 26:24
**touch** [1] - 39:15
**tragic** [1] - 25:10
**TRANSCRIPT** [1] - 1:13
**Transcript** [1] - 2:25
**Transcription** [1] - 2:25
**treated** [1] - 47:21
**treble** [1] - 44:13
**TRIA** [23] - 6:11, 6:16, 6:19, 6:25, 7:2, 7:4, 7:8, 8:1, 8:5, 8:20, 13:23, 15:7, 20:20, 22:8, 24:6, 29:16, 30:11, 31:21, 31:25, 32:3, 32:6, 33:6
**trial** [2] - 16:22, 18:7
**tried** [2] - 29:17, 41:22
**trigger** [1] - 15:7
**triggered** [2] - 26:8, 28:10
**true** [3] - 35:13, 43:4, 48:6
**trumps** [1] - 20:22
**try** [2] - 19:1, 21:8
**trying** [12] - 10:19, 12:3, 12:5, 18:6, 20:15, 21:14, 27:13, 27:15, 27:16, 39:18, 40:1, 45:4
**Tuesday** [1] - 1:8
**turn** [1] - 28:9
**turnover** [5] - 11:11, 13:10, 14:2, 15:25, 16:15
**two** [5] - 6:13, 9:22, 22:24, 29:15, 31:2
**type** [1] - 17:23

## U

**U.S** [5] - 2:2, 2:7, 10:16, 40:17, 44:19
**ultimately** [6] - 20:3, 20:5, 23:20, 25:7, 25:10, 40:21
**unclear** [1] - 19:12
**unconnected** [1] - 25:14
**under** [25] - 3:14, 6:11, 6:16, 7:17, 8:1, 8:2, 8:5, 8:20, 9:5, 13:11, 13:23, 15:16, 20:20, 24:6, 33:4, 35:23, 39:20, 40:5, 40:19, 40:23, 41:5, 43:23, 44:22, 46:20, 48:23
**underbrush** [1] - 34:13
**underlying** [3] - 19:18, 20:8, 21:3
**undifferentiated** [1] - 20:13
**unfold** [1] - 22:15
**UNITED** [2] - 1:1, 1:14
**United** [5] - 1:6, 26:20, 30:15, 30:19, 31:13
**universe** [4] - 5:23, 8:10, 8:18, 23:23
**unknowingly** [1] - 37:9
**unlikely** [2] - 37:8
**up** [13] - 5:5, 6:9, 7:23, 9:20, 18:21, 21:3, 31:23, 34:25, 36:2, 36:16, 41:12, 44:2, 44:15
**USA** [1] - 2:2

## V

**vacate** [1] - 44:6
**valid** [1] - 30:5
**various** [4] - 10:18, 13:3, 24:1, 35:12
**vehicle** [6] - 5:17, 18:3, 29:2, 33:25, 49:5, 50:23
**vehicles** [1] - 51:3
**version** [1] - 28:1
**versus** [1] - 3:6
**via** [1] - 18:14
**victim** [1] - 24:12
**victims** [4] - 13:22, 28:14, 44:12
**view** [10] - 10:24, 13:1, 22:3, 25:17, 26:2, 27:7, 27:8, 28:12, 29:24, 48:16
**vigorously** [2] - 7:22, 21:22
**virtually** [1] - 6:6
**vis** [2] - 43:14
**vis-a-vis** [1] - 43:14
**void** [1] - 44:3
**VUOTTO** [1] - 2:19
**Vuotto** [2] - 4:18, 39:13

## W

**Wagner** [2] - 3:11, 3:16
**WAGNER** [2] - 1:18, 17:3
**wait** [2] - 18:11, 18:15
**wallets** [1] - 10:6
**wants** [8] - 3:18, 9:12, 13:24, 16:17, 17:5, 27:8, 36:7, 43:18
**Warp** [3] - 16:18, 25:24, 34:18
**Washington** [1] - 2:9
**ways** [4] - 15:15, 28:12, 28:18, 45:22
**Weigel** [3] - 3:9, 18:1, 18:8
**WEIGEL** [50] - 1:18, 3:9, 6:4, 8:11, 8:22, 11:5, 12:15, 12:23, 13:6, 14:16, 14:24, 15:12, 15:15, 17:4, 17:8, 17:11, 17:21, 20:10, 21:7, 29:14, 30:3, 30:7, 31:16, 34:9, 35:6, 36:2, 36:7, 36:18, 37:3, 37:11, 37:13, 42:9, 42:11, 43:1, 43:3, 46:11, 46:15, 47:1, 47:5, 47:9, 47:17, 49:7, 49:11, 49:15, 49:22, 50:2, 50:5, 50:7, 51:14, 51:21
**weight** [1] - 7:1
**Weintraub** [1] - 3:24
**WEINTRAUB** [1] - 2:5
**welcomed** [1] - 19:3
**whole** [1] - 16:21
**WIGGINS** [1] - 1:21
**win** [1] - 19:12
**wind** [1] - 44:1
**winning** [2] - 28:4, 28:13
**wins** [4] - 23:22, 26:6, 28:3, 30:9
**wire** [1] - 30:14
**witnessing** [1] - 18:20
**won** [1] - 19:17
**wonder** [1] - 35:19
**words** [4] - 17:4, 30:21, 31:4, 51:11
**world** [5] - 5:22, 5:24, 35:11, 43:14
**world's** [1] - 31:12
**worried** [4] - 35:15, 37:5, 37:7, 41:16
**worse** [1] - 28:15
**worth** [3] - 13:19, 20:18, 30:15
**wrap** [1] - 27:13
**writ** [1] - 25:2

## Y

**year** [1] - 44:18
**years** [1] - 34:15
**YORK** [2] - 1:1, 2:3
**York** [9] - 1:6, 1:17, 2:4, 2:13, 15:16, 35:24, 44:23
**York's** [1] - 27:5

## Z

**Zabars** [1] - 36:15
**Zhi** [6] - 23:25, 24:1, 25:13, 25:23, 26:5, 26:8

—

— [23] - 7:4, 7:13, 7:14, 7:22, 11:12, 14:6, 16:17, 16:19, 18:18, 18:19, 20:21, 20:22, 22:10, 22:11, 30:7, 30:8, 34:23, 34:24, 39:25, 40:2, 44:19