**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AFM:BW/JB
F. #2024R00105

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 4, 2026

By ECF

The Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: United States v. Approximately 127,271 Bitcoin
Civil Docket No. 25-5745 (RPK)

Dear Judge Kovner:

The government respectfully submits this reply in further support of its October 2, 2026 motion to strike the Amended Claim and Amended Answer, ECF No. 499, filed by Hassan Miah and Tiger Mines New York Inc. ("Miah" or "Claimant"), and in response to Claimant's opposition, ECF No. 663 (the "Opposition").

## I. Introduction

Assuming for the sake of this motion the broad outlines of Miah's story as articulated in his Amended Claim and declarations,[1] a contract was formed during the September 2024 meeting between Miah and Chen Zhi. As part of that contract, both sides exchanged promises. Miah

[1] In order to prevail on the merits, Miah must establish that he is an "innocent owner" within the statutory definition of 18 U.S.C. § 983(d). For an after-acquired interest in the defendant *res*, he must show that he was "a bona fide purchaser or seller for value" who "did not know and was reasonably without cause to believe that the property was subject to forfeiture." 18 U.S.C. § 983(d)(3)(A)(i)-(ii). Should this claim survive a motion to strike, the government anticipates far more extensive factual inquiry into Miah's claim to be a bona fide purchaser for value, such as whether he was a mere nominee who obtained his alleged ownership interest through "de minimis consideration" and failed to "exercise[] sufficient dominion and control over the subject asset to establish a vested legal interest in the property," *United States v. Bangiyeva*, 75 F.4th 445, 454 (4th Cir. 2023); and whether the alleged assignment was part of a potentially illegal scheme to defeat Tether's anti-money laundering compliance efforts by obscuring Chen Zhi's present and future interests in the USDT cryptocurrency that Tether had frozen at the request of foreign law enforcement.

promised to enter into a settlement agreement with Tether on terms dictated by Chen—agreeing to relinquish his claim to compensatory damages, and to give Tether the indemnity it sought. In exchange, Chen promised to provide Miah with various inducements: Chen would pay a "success fee" to Miah, Chen would indemnify Miah against his personal exposure in the settlement, and Chen would assign to Miah certain missing cryptocurrency wallets that he referred to as his "Lubian wallets" (which, Miah claims, he subsequently learned correspond to the Defendant Cryptocurrency).

The question before the Court is what Chen actually delivered to Miah during the September 2024 meeting. If Chen merely gave a *promise* of future action—if he promised to assign the Defendant Cryptocurrency at some future date, just as he promised to provide a "success fee" and to indemnify Miah at a future date—then no assignment was completed during the September 2024 meeting, and Miah is nothing more than an unsecured creditor in this proceeding who has a contract claim against Chen. Miah, however, now argues that Chen orally effected the assignment of the Defendant Cryptocurrency during the September 2024 meeting—transferring title over billions of dollars in distressed assets to Miah then and there, before either side had performed any other part of their contract. This scenario is not just wildly implausible, but is contradicted by Miah's own words. Even at this preliminary stage, the Court is not required to accept such internally contradictory allegations as true.

## II. The Amended Claim Does Not Plausibly Assert that Chen Gave Miah the "Lubian Wallets" in September 2024

At the core of Miah's claim is his assertion that Chen assigned him the "Lubian wallets" instantaneously in the course of a September 18, 2024 meeting at Chen's London townhouse (the "September 2024 Meeting"). Opp. 4.[2] But Miah's own submissions directly contradict this assertion, making plain that the Lubian wallets were no more than a future prospect during the September 2024 meeting, and so remained through the two parties' dealings.

Miah's core concession is in his August 10, 2026 declaration, ECF No. 499-1 (the "First Declaration"). Miah outlines a contract wherein Chen made him an "offer" that Miah "accepted". First Decl. ¶ 30. Tiger Mines would "relinquish[] its damages claim against Tether" and Hassan would personally indemnify Tether; in return, Miah would receive a success fee, "the assets held in the Lubian wallets" and an indemnity from Chen covering Miah's exposure to Tether. *Id.* ¶ 31. As Miah tells it, Miah performed on his obligations nearly two months later, on November 6, 2024, when he executed a settlement agreement with Tether, forgoing his compensatory damages claim and agreeing to personally indemnify Tether. First Decl. ¶ 36. But even at that point, two months after the September meeting, Miah explains that he still viewed Chen's side of the bargain as a deliverable *yet to come*:

> I was under no obligation to sign the Tether Holdings settlement, and I did so only because I understood that, in exchange, I *would receive* the full consideration I

---

[2] References herein to the Opposition brief use the page numbers printed in the footer of the brief, rather than those in the ECF header.

> had agreed to with Chen Zhi, *which included the assets previously held in the Lubian wallets.*"

First Decl. ¶ 31 (emphasis added). Simply put, Miah recites that in November 2024, the "Lubian wallets" were an asset that he "would receive" in the future.

Chen paid Miah a success fee soon thereafter, on November 21, 2024, as recounted in Miah's second declaration (ECF No. 663-1, the "Second Declaration"), at ¶ 4. But Chen never did anything to make good on his promise to indemnify Miah or to convey the "Lubian wallets." The most Miah can offer, by way of any assertion from Chen regarding the supposed conveyance, is that Chen "never disclaimed or retracted his assignment of the assets previously held in the Lubian wallets." *Id.* ¶ 40. But Miah offers no detail to corroborate that the assignment happened in the first place.

Indeed, the lack of *any* evidence of a transfer is strikingly at odds with the rest of the parties' dealings. Miah portrays himself and Chen as sophisticated parties accustomed to transferring large sums of cryptocurrency. First Decl. at ¶¶ 4, 10-11, 17. He alleges that in their prior business dealings, Chen and Miah met several times and Miah conducted due diligence, including blockchain tracing, with respect to cryptocurrency at issue. *Id.* ¶¶ 12-14. The parties had even undertaken a previous assignment of cryptocurrency, which they executed through a formal, written assignment agreement. *Id.* ¶ 17. Miah also had reason to doubt Chen's trustworthiness; Chen had previously pulled the rug out from under Miah by draining wallets to which the two men had joint access. *See* First Decl. ¶¶ 37, 40 (describing Chen "drain[ing] Tether wallets" that Miah recovered for Chen, without warning).

Chen and Miah thus had a background of extensive prior dealings, including (1) a transfer of crypto assets effected through (2) a formal written assignment, that was (3) undermined by Miah's failure to obtain cryptographic control. Against this background, Miah nonetheless asks the Court to accept, in the face of his explicit contrary assertions, that in September 2024 Chen instantaneously assigned him over $15 billion dollars' worth of crypto assets (nearly one hundred times the value of their previous transaction) without any writing, without any specification of the assets' location, without any way for Miah to access the assets, without exclusive or even joint cryptographic control over the assets' last known location, and without Chen receiving anything of value on the spot in return. The assertion is not plausible, nor is it consistent with the facts recited.[3] *See DPWN Holdings v. United Air Lines*, 747 F.3d 145, 151-52 (2d Cir. 2014) ("Although factual allegations of a complaint are normally accepted as true on a motion to dismiss, that

---

[3] Given the richness of detail in the First Declaration about the two parties' prior dealings, the sparseness with which Miah recounts the supposed assignment is telling. *Compare* First Decl. ¶¶ 16-19 (describing extensive dealings around Tether assignment) *with id.* ¶ 29 (asserting that Chen "stated . . . he would . . . assign" the contents of the "Lubian wallets") *and* ¶ 33 ("I understood it to be a binding conveyance, and Chen never disclaimed the assignment thereafter"). *Cf. Yout v. Recording Indus. Ass'n of Am.,* 633 F. Supp. 3d 650, 667 (D. Conn. 2022) (dismissing complaint, and noting "stark contrast" between "anemic allegations" on key matters, "in contrast to its precise statements . . . and its meticulous instructions" on other topics).

principle does not apply to general allegations that are contradicted by more specific allegations in the complaint.") (cleaned up); *id.* at 152 (affirming dismissal of plaintiff's claims that were "contradicted by several allegations in its complaint"); *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013) ("easily conclud[ing] that Plaintiffs' claims lack the facial plausibility necessary to survive a motion to dismiss" where "the allegations of the Complaint are materially inconsistent with" other allegations); *Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir. 1993) (affirming the dismissal of a claim based on "wholly conclusory and inconsistent allegations"); *Samanich v. Facebook*, No. 20-cv-4058, 2021 WL 2856634, at *22 (E.D.N.Y. July 8, 2021) (dismissing allegations that are "fantastical and conclusory"). *See also Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (affirming summary judgment for defendant where plaintiff's testimony was "unsubstantiated" and "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint") (cleaned up).

Elsewhere in the First Declaration, Miah takes pains to recite that "[a]lthough Chen Zhi's assignment of the assets held in the Lubian wallets to Tiger Mines was oral, I understood it to be a binding conveyance of his full ownership interest, and Chen Zhi never disclaimed the assignment thereafter." First Decl. ¶ 33. But the facts in Miah's declaration strain against these incantations, and his recitation of a legal conclusion has no independent weight. *See Buon v. Spindler*, 65 F.4th 64, 76 (2d Cir. 2023) ("We are not bound to accept as true a legal conclusion couched as a factual allegation." (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted); *Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008) ("[W]hether a binding agreement exists is a legal issue, not a factual one.").

## III. <u>The Amended Claim Does Not Plausibly Assert that Chen Gave Miah the "Lubian Wallets" in November 2024</u>

As a fallback position, Miah asserts that Chen gave him the "Lubian wallets" in November 2024. *See* Opp. 9 ("Even if the Government were correct, and the assignment awaited Mr. Miah's performance, Claimants still prevail: Mr. Miah fully performed by November 6, 2024, when Tiger Mines settled the Tether Litigation.").

That assertion is subject to the central fallacy of Miah's claim: it confuses what Chen was *supposed* to do (turn over the "Lubian wallets" upon Miah's settlement with Tether) with what Chen *did* do (nothing). The First Declaration makes clear that, following September 2024, Chen did literally nothing to help Miah get access to the "Lubian wallets." In January 2025 when Miah asked Chen for the information necessary to pursue the wallets ("for example, the wallet addresses, any private keys or seed phrases in his custody, and any related custodial information") Chen put him off. First Decl. ¶ 38. And after January 2025, Miah *simply dropped* the subject of the uncollected $15 billion asset he supposedly owned:

> After the January 2025 Meeting, I had no further substantive communications with Chen Zhi about the Lubian wallets, the assets previously held therein, or their assignment to Tiger Mines. . . . My professional engagements with Chen Zhi and his associates during the spring and summer of 2025 . . . were unrelated to the Lubian wallets."

First Decl. ¶ 41. This assertion is noteworthy. Miah claims, without elaboration, that Chen had *given him title* to a $15 billion crypto asset. But far from pursuing Chen, Miah simply went dark on the subject. The two had "no further substantive communications" about Chen's supposed conveyance. Simply put, nothing about this course of dealings bespeaks a conveyance by Chen of the "Lubian wallets." At *most*, Miah's claim could be read to suggest that Chen *owed* Miah the "Lubian wallets," after "Mr. Miah fully performed," Opp. 9. And even that assertion is hard to square with Miah's oddly negligent pursuit of this gigantic asset.[4] But read at its strongest, Miah's assertion sketches out no more than a contract claim. And a disappointed contracting party is an unsecured creditor who cannot bring a claim in forfeiture.

## IV. Contract Claimants Lack Standing

Miah devotes much ink to establishing that the parties had a contract. *See, e.g.*, Opp. 5 (declaring that "The September 2024 Agreement Is Valid and Enforceable"); Opp. 6 (declaring that the parties' contract "does not run afoul of the statute of frauds." But this highlights, again, the central flaw in Miah's claim. The role of a court sitting in forfeiture is emphatically not to determine and enforce contract entitlements. Miah's claim fails precisely because he is asking this court to find and enforce what is at best, concededly, an oral contract.

As this Court has pointed out, contesting a civil forfeiture action requires Article III standing, and "a general, unsecured interest in the seized property does not suffice." Memorandum & Order at 7, ECF No. 506 (citing *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 529 (2d Cir. 1999)). As addressed in the government's opening submission, *see* ECF No. 512, a putative claimant whose supposed ownership interest in the forfeited asset is premised on a breach of contract claim against another claimant is nothing more than an unsecured creditor with a contingent or potential future interest in the forfeited asset, and thus lacks standing in the forfeiture action. *See* ECF No. 512 at 7 (citing *United States v. White*, 675 F.3d 1073 (8th Cir. 2012), and *United States v. BCCI Holdings (Luxembourg) S.A.*, 841 F. Supp. 1, 5 (D.D.C. 1993)). *See also United States v. Morani*, No. 24-cr-20132, 2026 WL 2516400, at *4 (S.D. Fla. Aug. 26, 2026) (same).

Miah concedes this point of law, Opp. 10, but contends again that he was given the asset in September 2024—an assertion that his own declaration contradicts, as discussed above. To the extent Miah insists that he was party to an "enforceable oral agreement." Opp. 5, that "manifested an intent to be bound," Opp. 8, these are excellent arguments for a contract claim that can and

[4] The likely true catalyst for Miah's claim is disclosed in Paragraph 44 of the First Declaration, where Miah recounts that Chen's coterie urged him to file a claim in this action after the government unsealed its indictment and forfeiture complaint. That is consistent with a pattern where Chen and Prince Group have advanced claims in this case through straw men, such as Warp Data, which Miah notably recounts is beneficially owned by Chen, contrary to Warp's own strenuous assertions. *Compare* First Decl. ¶ 9 ("During this trip, William Wei informed me for the first time that Chen Zhi was the ultimate beneficial owner of Warp Data, Prince Group, and the frozen Tether wallets.") *with* ECF No. 439 at 8 (government filing revealing that in response to special interrogatories, Warp Data disclaimed ownership by Prince Group or Chen Zhi).

should be brought—but not in this case, because they do not amount to an assertion of title. Allowing Miah into this action based on Chen's alleged nonperformance on a contract would open the door to Chen's many unsecured creditors, including the many victims of his fraud empire. And this Court has already ruled that such parties lack standing. *See* Memorandum & Order at 64, ECF No. 506 (holding parties who voluntarily gave Chen money and never received a promised return lack standing in this proceeding).

V. <u>The Court Can Strike Claimant's Self-Contradictory Pleading Without Further Discovery</u>

Almost as an afterthought, Miah cites *Elkowitz v. UnitedHealthcare* for the premise that challenges regarding the existence or scope of an assignment cannot be resolved on the pleadings. Opp. at 10 (citing No. 17-CV-4663, 2021 WL 9594380 (E.D.N.Y. Mar. 31, 2021)). The point of law is flatly mistaken. Rule G(5)'s pleading standard contains no cutout for assertions regarding assignments, and courts routinely evaluate the plausibility of plaintiffs' claims regarding assignments. *See*, *e.g.*, *Atlanticare v. Scottsdale Ins*, No. 24-CV-3956 (NSR), 2026 WL 1662146, at *4 n.2 (S.D.N.Y. June 9, 2026) (dismissing complaint and noting that plaintiff "argues that the scope of the Assignment is a fact question reserved for trial. Not so. The Assignment is incorporated into the FAC by reference and is the instrument on which [plaintiff's] claim depends . . . and courts routinely construe the scope and validity of assignments at the pleading stage") (cleaned up); *Murphy Med. Assocs., LLC v. Yale Univ.*, 120 F.4th 1107, 1113–14 (2d Cir. 2024) (affirming Rule 12(b)(6) dismissal and construing patient-assignment scope from the plan documents and assignment forms); *Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 418 (2d Cir. 2015) (assessing on the pleadings whether an assignment conveyed the right to sue).

*Elkowitz* is distinguishable and, if anything, underscores the strength of the government's argument here. The defendant in *Elkowitz* filed "more than 10,000 pages of documents with its motion to dismiss" 2021 WL 9594380, at *2. The court properly found that "these documents are not attached to the complaint, integral to the complaint, or incorporated into it by reference" and therefore could not be considered, and that conflicting documentation "regarding the existence, substance, and validity of any assignments" should be resolved in discovery. *Id.* at *1-3. But this case is not *Elkowitz*. The government is not relying on documents outside the pleadings. And unlike the plaintiffs in *Elkowitz*, Miah cannot plausibly claim that discovery will bolster his purported title; rather, he concedes that no documentation of the supposed agreement or transfer of title exists. Nor can Miah even point to affirmative statements by Chen that witness testimony could corroborate—the most he offers in his declaration is that Chen "never disclaimed" the assignment, an assertion that is equally consistent with no assignment having taken place at all.

In short, Miah's insufficiently pleaded allegations cannot survive on the promise of discovery. *See Pampillonia v. RJR Nabisco. Inc.*, 138 F.3d 459, 462 (1998) (affirming grant of defendant's motion to dismiss and rejecting plaintiff's claims that it was "entitled to discovery" because the allegations as pled were "vague and conclusory allegations which do not provide any possibility of success under state law"). In any event, Miah's claim fails not merely for lack of factual corroboration, but on the law that necessarily applies to the facts as he has pled them. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (dismissing complaint consisting of insufficient facts and unsupported legal conclusions).

## VI. Conclusion

For the reasons set forth above and in the government's October 2, 2026, letter in support of its motion to strike, Claimant has failed to establish constitutional standing. Accordingly, his Amended Claim and Answer should be struck on the pleadings pursuant to Rule G(8)(c)(ii)(B).

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Alexander F. Mindlin
Tanisha R. Payne
Benjamin Weintraub
Andrew D. Reich
Alessandra V. Rafalson
Jane Black
Assistant U.S. Attorneys
(718) 254-7000

Christopher B. Brown
Supervisory Trial Attorney
National Security Cyber Section
National Security Division
U.S. Department of Justice

cc: Clerk of Court (RPK) (via ECF)